**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

MILWAUKEE DIVISION

---------------------------------------------------

JOSE ACEVEDO, individually,
and as a Special Administrator
of the ESTATE OF JOEL ACEVEDO,

        Plaintiff,

   -vs-          Case No. 23-cv-00489

MICHAEL MATTIOLI, et al.,

        Defendants.

---------------------------------------------------

      Examination of MICHAEL MATTIOLI,

taken at the instance of the Plaintiff, under and

pursuant to the Federal Rules of Civil Procedure,

before ALICIA PABICH, a Certified Shorthand Reporter

and Notary Public in and for the State of Wisconsin,

at Wirth + Baynard, 9898 W. Bluemound Road, Suite 2,

Wauwatosa, Wisconsin, on April 25, 2025, commencing

at 9:36 a.m. and concluding at 1:33 p.m.

**2**

1        A P P E A R A N C E S
2 JACOB LITIGATION, INC., by
  MR. DEVON M. JACOB,
3 P.O. Box 837,
  Mechanicsburg, Pennsylvania 17055-0837,
4 appeared on behalf of the Plaintiff.
5 THE LAMARR FIRM, by
  MR. B'IVORY LAMARR,
6 5718 Westheimer Road, Suite 1000,
  Houston, Texas 77057,
7 appeared on behalf of the Plaintiff.
8 WIRTH + BAYNARD, by
  MS. JASMYNE M. BAYNARD,
9 9898 West Bluemound Road, Suite 2,
  Wauwatosa, Wisconsin 53226,
10 appeared on behalf of the Defendant, Michael
  Mattioli.
11
  CITY OF MILWAUKEE,
12 OFFICE OF THE CITY ATTORNEY, by
  MR. CLINT B. MUCHE,
13 841 North Broadway, Room 716,
  Milwaukee, Wisconsin 53202,
14 appeared on behalf of the Defendants, Robert Roach,
  Alfonso Morales, and City of Milwaukee.
15
16           * * * * *
17
18
19
20
21
22
23
24
25

**3**

1           I N D E X
2 Examination:                     Page
3 By Mr. Jacob.....................................  4
  By Mr. Muche................................... 140
4 By Ms. Baynard................................. 156
  By Mr. Jacob.................................. 167
5
6 Exhibits Identified:               Page
7 Exhibit 16 -Criminal Complaint................. 113
  Exhibit 17 -Jury Trial Day Four Transcript..... 144
8
9 Disposition Of Original Exhibit/s:
10 Attached To Original Transcript
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1      TRANSCRIPT OF PROCEEDINGS
2      MICHAEL MATTIOLI, called as a witness
3 herein, having been first duly sworn on oath,
4 was examined and testified as follows:
5         EXAMINATION
6 BY MR. JACOB:
7 **Q. It's Michael Mattioli; correct?**
8 A. Correct.
9 **Q. Do you have a middle name?**
10 A. Anthony.
11 **Q. And are you a junior, a senior, the third?**
12 A. No.
13 **Q. Just one of you?**
14 A. Just me.
15 **Q. Got it. Have you ever given a deposition**
16   before?
17 A. No.
18 **Q. I mean, I know you went to a trial so you are**
19   familiar with testifying in questions and
20   answers, but just to make sure we are on the
21   same page, I'm just going to go through a few
22   things. First of all, the court reporter has
23   two hands, but it's not one for you, one for
24   me. So to the extent that you can let me
25   finish my questions, even if you can tell where

                             1 (Pages 1 to 4)

**Page 5**

1  I'm going, please let me do so so that way we
2  can get it down on the record.  Of course I
3  will do the same for you, I will wait to start
4  a question until you're finished with your
5  answer.  Okay?
6  A.  Okay.
7  Q.  You are also -- you know, you are verbalizing.
8  You know how to do that.  And so I just ask you
9  to continue to do that because shakes of the
10  head, nods, gestures, it's impossible later to
11  figure out what anyone was trying to say on a
12  written record.  Okay?
13  A.  Right.
14  Q.  If at any point in time you need a break, just
15  let me know.  I don't need to know why, just if
16  you need a break, we will take one.  I just ask
17  if there's a question pending that you answer
18  that question before we take the break.  Okay?
19  A.  Okay.
20  Q.  If at any point in time you don't understand a
21  question that I ask, I'm sure it's my fault,
22  not yours, so just let me know.  I will be
23  happy to rephrase, restate, whatever you need
24  to understand what I'm trying to say because I
25  only want you to answer a question if you

**Page 6**

1  understand it.  Okay?
2  A.  Okay.
3  Q.  I'm not here to play games.  I'm pretty
4  straightforward.  Counsel, you know, has pretty
5  much figured that out by now, too.  So, again,
6  I'm not here to trick you or to force you to
7  guess on anything.  In fact, I don't want that.
8  I am just here to get factual information from
9  you because you were involved in an incident
10  that I wasn't, and so you're one of the best
11  sources for that information.  Okay?
12  A.  Okay.
13  Q.  There's been a significant passage of time, so
14  if you don't remember something or don't
15  recall, that's fine, that's your answer, I
16  don't remember, I don't recall.  I just ask
17  that if later in the deposition if something
18  has refreshed your memory or something has come
19  back to you, just let me know, we can amend the
20  answer.  I won't think that you are playing
21  games with me either.  I just realize there's,
22  you know, a passage of time and this is not
23  your focus every single day.  Okay?
24  A.  Okay.
25  Q.  Is there any reason you wouldn't be able to

**Page 7**

1  answer truthfully questions here today?
2  A.  No.
3  Q.  Meaning, there's no medication or medical
4  condition that would prevent you from doing so?
5  A.  No.
6  Q.  I'm assuming you are prepared to proceed then?
7  A.  Yes.
8  Q.  All right.  I just want to do a little bit of
9  background just because I don't know you,
10  obviously.  You graduated high school; correct?
11  A.  I did.
12  Q.  And then went on -- did you go to college?
13  A.  I got an associate's degree in -- from a
14  technical college for police science.
15  Q.  Okay.  And then naturally went into policing?
16  A.  Correct.
17  Q.  I know some departments -- and I don't think
18  that is the case for the city, but I know some
19  places you can put yourself through the
20  academy, other ones the department you are
21  going to work for puts you through?
22  A.  That's right.
23  Q.  So in this situation, the department that you
24  went to work for put you through the academy?
25  A.  Correct.

**Page 8**

1  Q.  And that department was?
2  A.  Milwaukee.
3  Q.  And was that the only police department that
4  you worked for?
5  A.  Yes, the only one.
6  Q.  And other than policing, have you had any
7  similar-type experience, meaning like private
8  security?
9  A.  No.
10  Q.  Were you in the military?
11  A.  I was.
12  Q.  And what -- what was generally your job in the
13  military?
14  A.  I was military and police in the Army National
15  Guard.
16  Q.  And was that -- that was all before policing or
17  did it continue into policing?
18  A.  It was -- well, right after I went into the
19  police academy first.  And I think it was
20  within a month of graduating the police academy
21  I went to basic training.  Excuse me.
22  Q.  Are you okay?
23  A.  So it was during --
24      MS. BAYNARD:  Do you need a drink of
25  water?

Page 9

```
1          THE WITNESS:  Yeah.  I don't know if
2     my throat is all --
3  BY MR. JACOB:
4  Q.  Go ahead.  A lot of people are allergic to me.
5  A.  I don't know why --
6  Q.  Could be the extreme heat in here.  No, I'm
7     just kidding.  Sorry.
8          Military policing, excuse me, was
9     there a separate police training for that job?
10 A.  There was, yes.
11 Q.  And that wasn't very clear to me.  But, I mean,
12    you went to basic training.  And then is there
13    a specialized training for military police?
14 A.  There is.
15 Q.  And how long is the military policing part?
16 A.  I don't remember exactly.  Maybe about two
17    months possibly.
18 Q.  Okay.
19 A.  Two or three months.  Not sure.
20 Q.  And -- I'm sorry, I cut you off.
21 A.  I don't know the exact.  Maybe two to
22    three months.  Something like that.
23 Q.  And what types of things do they teach you with
24    respect to military police training?
25 A.  Oh, jeez.  This was back in 2009, I think it
```

Page 10

```
1     was.  I don't remember a lot and it was very
2     minimal.  It was very -- is basic training and
3     the military police, it's very much hurry up,
4     let's go, hurry up.  That's how military is.
5     So it wasn't -- like we would do some training
6     very quickly and then never again.  So I -- you
7     lose all of that.  And I never got a chance to
8     practice any of that training that I got in the
9     military, so it kind of just is gone.
10 Q.  So you got trained for the job that you were
11    assigned, military policing, and you continued
12    to train on your required duty weekends for the
13    National Guard; is that correct?
14 A.  Correct.
15 Q.  Were you ever activated?
16 A.  I was not, no.
17 Q.  Okay.  And, also, then all your time was here
18    stateside?
19 A.  Correct.
20 Q.  With respect to the military policing, I think
21    you said that you didn't get to use it, but did
22    you ever get to arrest somebody as a military
23    police officer?
24 A.  No.  I never actually worked in that capacity
25    as -- when I was in the Army.  We just would do
```

Page 11

```
1     training.  I was never actually activated in
2     any capacity.
3  Q.  So they had you fully trained, ready to go if
4     they needed, but they never called you up to
5     actually do the job?
6  A.  Right.
7  Q.  Fair enough.  Are you still in the National
8     Guard?
9  A.  No.
10 Q.  And how often did you have to retrain with the
11    National Guard?  Is it a yearly thing, a
12    monthly thing?
13 A.  We would do about once a month and on a weekend
14    for drill they call it, and then about two
15    weeks in the summertime we would do some sort
16    of training.
17 Q.  Okay.  So you went through a police academy for
18    civilian policing and you went through a
19    military police academy.  Would you agree with
20    me that there are different rules of engagement
21    that would apply in each context?
22 A.  Yes.
23 Q.  And can you -- I will leave it at that then.
24    With respect to that, though, were you trained
25    regarding the various laws that would apply in
```

Page 12

```
1     each venue?
2  A.  Not in military, no.
3  Q.  So in the military -- I guess, how do you know
4     what you are allowed or not allowed to do as a
5     military police officer in the military if they
6     are not teaching you the laws, or how does it
7     work?
8  A.  If you are ever activated, deployed somewhere,
9     they would give you briefings on that.  They'd
10    give you the rules of engagement and whatever
11    laws apply to whatever country you are in, then
12    you would get that training.  But I never did.
13 Q.  And am I correct, civilian policing is a
14    paramilitary-type structure, whereas the
15    military is a military structure?
16 A.  That's right.
17 Q.  So much less discretion in the military;
18    correct?
19 A.  Well, I was never in that situation, so I can't
20    really say.
21 Q.  Well, when you were taught, did they tell you
22    that pretty much you are going to get orders
23    and you are going to follow them?  Is that
24    pretty much how the military works?
25 A.  Pretty much, yes.
```

3 (Pages 9 to 12)

---

13

1  Q. Okay. Separate and apart from the laws that
2     apply to each venue, were you taught
3     hand-to-hand combat and tactics for, you know,
4     taking people into custody?
5  A. In the military?
6  Q. Yes.
7  A. We were. Yes, we did.
8  Q. And at any point in time, did you become a
9     certified trainer or a trainer?
10 A. No.
11 Q. I saw something in records about combatives
12    training. Does that mean anything to you?
13 A. Yes. That's -- yes. That's training that some
14    people go through.
15 Q. And is that military?
16 A. Yes.
17 Q. And is that something where you were providing
18    the information to others?
19 A. Me, no.
20 Q. There was -- again, I'm not saying that the
21    records are correct, but there's some
22    indication that because you had been a trained
23    law enforcement officer, that you were also
24    helping to provide the training to certain
25    persons taking that class?

---

14

1  A. No, not a combatives class. No.
2  Q. Okay. Is there another situation where you
3     were functioning, for lack of a better term, as
4     a use of force trainer?
5  A. No.
6  Q. Are you certified to -- or were you ever
7     certified to provide training to others?
8  A. I don't think so, no.
9  Q. Even if you weren't certified or trained or
10    officially assigned that task, were you ever
11    asked or did you ever provide training to
12    others?
13 A. I did some training, some very small-level
14    training, but it wasn't in combatives. It was
15    other -- I can't remember. It was so long ago.
16    I know, like, weapons training, training people
17    how to fire a handgun or a rifle in the
18    military, but it was very low-level thing,
19    small group kind of thing. Nothing big.
20 Q. So was it more of an informal-type situation?
21 A. Correct, yes.
22 Q. And other than weapons, was there some of that
23    type of training with respect to hand-to-hand
24    combat or grappling techniques?
25 A. No, not with -- not that included weapons, no.

---

15

1  Q. I'm sorry?
2  A. Nothing -- no, not that -- nothing that I
3     taught, no.
4  Q. Okay. In the military, were you trained with
5     respect to how to physically take somebody into
6     custody without weapons? So, meaning, it can
7     be joint manipulation, it can be takedowns.
8     Things of that nature.
9  A. I believe in 2009 when I was going through
10    basic training, we went through some sort of
11    training of that nature, learning how to
12    handcuff people and things like that. That's
13    all I can remember.
14 Q. Did they -- in the military, did they ever
15    provide you with training on how to take people
16    from a standing position to the ground?
17 A. I believe they did. I think so, yes.
18 Q. Did they ever train you with respect to joint
19    manipulation?
20 A. That I don't think so.
21 Q. Did they train you with respect to various
22    restraint holds?
23 A. No.
24 Q. Did they train you with respect to any type of
25    strikes, like hand or foot strikes or knee

---

16

1     strikes?
2  A. Yes.
3  Q. Did they train you with respect to any type of
4     restraints around the neck area?
5  A. No.
6  Q. I saw another note, and I don't know if it was
7     you, frankly, or another witness, but were you
8     involved in MMA-type fighting and training?
9  A. No.
10 Q. You've never taken an MMA class?
11 A. Never.
12 Q. Never participated in an MMA fight or -- I
13    don't know what you would call it. We would
14    call it a fight?
15 A. Never.
16 Q. Were you ever trained by somebody who was
17    involved with MMA?
18 A. Not that I know of.
19 Q. How about in high school, did you wrestle?
20 A. No.
21 Q. Football? Any sports?
22 A. Played a little bit of basketball. That was
23    it.
24 Q. Okay. Didn't turn that into a career path?
25 A. I did not.

---

17

1　Q.　All right.　Fair enough.　Did you have any
2　　sport-type activities outside of school?
3　A.　I don't think so.
4　Q.　Like clubs or, you know, informal groups that
5　　would meet every week to, you know, play this,
6　　that or the other thing?　Anything like that?
7　A.　I don't think so.
8　Q.　Did you have any friends whom you would wrestle
9　　with just for fun?
10　A.　No.　No.
11　Q.　Anybody -- any of your friends wrestlers?
12　A.　I don't think so.　Not that I know of.
13　Q.　In the police academy, tell me a little bit
14　　about the use-of-force-type training.　Not from
15　　the legal side, but the tactic side.　What
16　　types of things were you taught?
17　A.　Okay.　I remember being taught strikes, like,
18　　punches, kicks.　Things of that nature.
19　　Batons, the use of batons, handcuffing people,
20　　some decentralizations a couple different ways,
21　　pepper spray, firearms.　That's it.　I think
22　　that's about it.
23　Q.　And back when you were going through the
24　　academy, didn't they also teach neck
25　　restraints?

18

1　A.　I don't think so.
2　Q.　Okay.　What is -- just because it was kicked
3　　around yesterday just so it's clear on the
4　　record, what is DAAT training, I guess they
5　　refer to it as?
6　A.　I think it stands for defense and arrest
7　　techniques.
8　Q.　And is that something that was included in the
9　　academy -- the police academy or separate from
10　　the police academy?
11　A.　The training was in the police academy.
12　Q.　And what did that training consist of?
13　A.　All of the things I just told you, like the
14　　striking, handcuffing, batons, that was all
15　　considered DAAT.
16　Q.　Okay.　And were you ever provided with any
17　　information with respect to force around the
18　　neck region?
19　　　　　　MS. BAYNARD:　Object to the form of
20　　the question.
21　　　　　　Go ahead.
22　　　　　　THE WITNESS:　So I can answer the
23　　question?
24　　　　　　MS. BAYNARD:　Yeah, you can answer
25　　all of them.

19

1　　　　　　THE WITNESS:　Sorry, it was
2　　confusing.
3　　　　　　MS. BAYNARD:　It's okay.
4　　　　　　THE WITNESS:　Can you ask me the
5　　question again, please?
6　BY MR. JACOB:
7　Q.　Sure.　I will clean it up a little bit.　But
8　　with respect to use of force in the academy,
9　　were you provided with any training that
10　　discussed any type of force around the neck
11　　region?
12　A.　Not that I can remember.
13　Q.　Do you know what a rear naked chokehold is?　I
14　　think that's how it's pronounced.
15　A.　I think I do.
16　Q.　Okay.　Tell me what you know about it.
17　A.　Well, after this all happened, I had to do some
18　　research about it, and I guess it's a chokehold
19　　of some sort.
20　Q.　Okay.　Were you ever trained to apply or how to
21　　perform any type of neck restraint, neck hold?
22　A.　I don't think so, no.
23　Q.　And so is it your testimony then before this
24　　incident and going into this incident, you had
25　　never had any training, any experience in

20

1　　applying neck holds to anybody?
2　A.　That's right.
3　Q.　And that you knew nothing about what a rear
4　　naked chokehold was going into this incident?
5　A.　I probably heard the term before this happened,
6　　but I wasn't familiar with it.
7　Q.　And in what context do you think you may have
8　　heard the term before the incident?
9　A.　I mean, it's just -- I don't know.　Something
10　　-- just a term that you may have heard in
11　　conversation or on the TV or something like
12　　that.　I think I've heard that term before.
13　Q.　Am I correct, though, there were officers in
14　　the department during that time who were using
15　　neck restraints?
16　A.　Not that I know of.
17　Q.　You never saw that?
18　A.　No.
19　Q.　You never heard about that?
20　A.　No.
21　Q.　You never saw anybody or heard that anyone was
22　　trained to do that?
23　A.　No.
24　Q.　Okay.　Other than this police department, the
25　　Milwaukee Police Department, had you applied at

5　(Pages 17 to 20)

## Page 21

1     any other police department?
2  A.  No, never.
3  **Q.  So one department you apply to and you get**
4     **hired?**
5  A.  Right.
6  **Q.  And roughly, when did you start on the street?**
7  A.  Sometime in 2009. I don't remember the exact
8     month.
9  **Q.  And it's a rigorous application process, isn't**
10     **it? Hiring process, isn't it?**
11  A.  I would say so, yes.
12  **Q.  Can you just tell me the various steps without**
13     **-- you don't have to -- you know, the flyover**
14     **version.**
15  A.  I don't remember every step, but I know it
16     involved things like a drug test, a physical
17     test, a background investigation, interviews.
18     Things of that nature. I don't remember what
19     else.
20  **Q.  I think you said psychological testing? I**
21     **think you said that.**
22  A.  That -- that was part of it, yes.
23  **Q.  I'm assuming there's a written application?**
24  A.  There must have been.
25  **Q.  A written test?**

## Page 22

1  A.  Yes. There is a written test, too, yeah.
2  **Q.  Physical agility-type test?**
3  A.  Right.
4  **Q.  And then once you are hired, is there a**
5     **probationary period?**
6  A.  There is.
7  **Q.  And then eventually you join a union; correct?**
8  A.  Correct.
9  **Q.  And then you have the collective bargaining**
10     **protection; correct?**
11  A.  I suppose, yes.
12  **Q.  Well, yeah. I guess we will remove the**
13     **"Protection" word and just say you're apart of**
14     **a collective bargaining unit at that point;**
15     **correct?**
16        MS. BAYNARD: Objection, sorry, form
17     of the question, calls for speculation.
18        To the extent you know, go ahead.
19        THE WITNESS: I was --
20  BY MR. JACOB:
21  **Q.  Let's pause there for a minute. So I'm not**
22     speculating, I'm literally asking you were you
23     apart of the bargaining unit. Number two, I
24     only want you to answer what you know because
25     obviously you can only answer what you know.

## Page 23

1     So go ahead.
2  A.  I was a member of the police union. That's
3     what I know.
4  **Q.  Have you ever been to an incident either in the**
5     military or policing where a person has died as
6     a result of something a police officer has done
7     at that scene?
8  A.  Yes.
9  **Q.  And did that happen before this incident?**
10  A.  Yes.
11  **Q.  And how many times do you think that has**
12     **happened?**
13  A.  One time is all I can remember right now.
14  **Q.  And without getting into the extreme details,**
15     but what type of force was involved in that
16     incident?
17  A.  It was a shooting.
18  **Q.  And were you involved in the shooting?**
19  A.  No.
20  **Q.  Have you ever -- other than this incident, have**
21     you been involved in a use of force incident
22     where somebody has suffered a serious injury?
23  A.  No.
24  **Q.  And after this incident, am I correct you were**
25     on leave?

## Page 24

1  A.  After?
2  **Q.  Yeah.**
3  A.  After my incident?
4  **Q.  Right.**
5  A.  Yes.
6  **Q.  And so you never went back to the street after**
7     **your incident?**
8  A.  No.
9  **Q.  With respect to the hiring process and while**
10     **you were employed, is there any screening that**
11     **is conducted for alcohol use?**
12  A.  I don't think so.
13  **Q.  How about drug use?**
14  A.  There's a drug test before you can get hired,
15     and then there was a random drug test in the
16     academy. I remember that. And that's all I
17     can remember.
18  **Q.  During the time of this incident -- when I say**
19     **"This incident," I mean, the one with Joel**
20     **Acevedo -- had anyone, friends, family,**
21     **whatever ever come to you and said, hey, you**
22     **might have an issue with alcohol?**
23  A.  No.
24  **Q.  Had you yourself recognized that you had an**
25     **issue and sought treatment?**

Case 2:23-cv-00489-BHL   Filed 08/01/25   Page 6 of 66   Document 56-1

25

1  A.  No.
2  Q.  Do you think that during that period of time
3     you had an issue with alcohol?
4  A.  I don't think so.
5  Q.  Even if people did not tell you that, do you
6     think that others perceived you as potentially
7     having an issue with alcohol?
8  A.  No.
9         MS. BAYNARD:  Objection, calls for
10    speculation.
11        Go ahead.
12        THE WITNESS:  Not that I know of.
13 BY MR. JACOB:
14 Q.  Before this incident, had you been involved in
15    investigations related to your conduct where
16    your judgment was questioned?
17 A.  Can I ask you what do you mean?  I don't
18    understand.
19 Q.  Well, like, for instance, Internal Affairs when
20    they said, you know, listen, we are wondering
21    why you decided to do X, Y and Z, we think that
22    that was just very poor judgment on your part.
23    Any type of investigation like that?
24 A.  I've never had anybody tell me that that was
25    poor judgment or anything like that.

26

1  Q.  Before this incident, I realize it's kind of a
2     hazard of the job, I'm assuming there had been
3     at least some complaints with respect to
4     policing, valid or otherwise, but I'm just
5     saying related to your conduct as a police
6     officer?
7  A.  I remember I had one complaint from a citizen.
8  Q.  Just generally, what was the complaint?
9  A.  That I handcuffed him and he didn't like that.
10 Q.  I'm sure he didn't.  Okay.  And I'm assuming
11    nothing came of that?
12 A.  No.
13 Q.  During the time of this incident, did you have
14    any mental health issues?
15 A.  No.
16 Q.  Meaning, you weren't being treated for
17    depression or anxiety?
18 A.  No.
19 Q.  Had anyone ever told you you had an anger
20    issue?
21 A.  No.
22 Q.  And you never received treatment, went to anger
23    management or anything like that?
24 A.  No.
25 Q.  Before this incident, had you ever been

27

1     arrested for anything?
2  A.  No.
3  Q.  Are you originally from Wisconsin?
4  A.  Yes.
5  Q.  And from the Milwaukee area or a different
6     area?
7  A.  From Milwaukee.
8  Q.  And how old are you right now?
9  A.  37.
10 Q.  And how tall are you?
11 A.  6'3".
12 Q.  And I'm assuming you were 6'3" on the day of
13    the incident?
14 A.  I believe so, yes.
15 Q.  And roughly, how much do you think you weighed
16    on the day of the incident?
17 A.  Around 230.
18 Q.  Did you at that time have any physical or
19    mental disabilities?
20 A.  No.
21 Q.  And you had been on the job on the day of this
22    incident roughly how long?
23 A.  13 or 14 years, I think.  I can't remember.
24 Q.  And in what capacity did you function?
25    Meaning, were you always a patrol officer or

28

1     did you have other assignments?
2  A.  I was always a police officer.
3  Q.  And were you ever assigned specialized teams?
4  A.  I was.
5  Q.  And what types of teams were you assigned to?
6  A.  Well, I was at District 7 at the beginning of
7     my career.  I was assigned to a anti-burglary
8     team, I guess you could say, and then I moved
9     to anti-gang unit at District 7.  I later moved
10    to the Robbery Task Force, and that eventually
11    molded into the Special Investigation Division,
12    and that's where I remained until the end.
13 Q.  Did any of these assignments come with
14    specialized use of force training?
15 A.  I suppose, yes.  Well, I will say this.  When I
16    was on the Robbery Task Force in the Special
17    Investigation Division, we had training on how
18    to stop cars that nobody else could really do.
19    What did they call it?  A positive vehicle
20    containment, I think, which is considered a use
21    of force, but it was basically blocking in a
22    car so they can't flee because so many cars
23    would flee.  So I guess that's considered a use
24    of force.  That's about it.
25 Q.  Okay.  While you were a police officer after,

1    you know, being trained in the academy, did you
2    continue to actually practice use of force
3    techniques in the training or was it just book
4    stuff is what I'm asking?
5  A.  We did do some practices.  It was very little,
6    very minimal, I would say, at, like, in-service
7    training.  Or maybe once a year or less, I
8    can't remember exactly, we would do some sort
9    of physical training in the gym at the police
10   academy, which would consist of us, like, using
11   a baton to strike a bag or things like that.
12 Q.  Just to make sure you could still literally
13   function?
14 A.  Pretty much, yes.
15 Q.  Are you or were you ever the member of
16   any professional organizations?
17 A.  Like what?  I don't understand.
18 Q.  I don't know.  You tell me.  Are you a member
19   of any associations or, you know, groups for
20   policing or things of that nature?
21 A.  No.
22 Q.  With respect to social media just because it's
23   a huge thing today, around the time of the
24   incident or now, do you have any social
25   media-type accounts?

1  A.  I had a Facebook account during this incident.
2    I had to delete it afterwards because people
3    were sending me threatening messages.  So I had
4    one, yes, but not anymore.
5  Q.  And I know you said deleted, but I also know
6    some of these places maintain -- you can still
7    get access to even if it's not public.  Do you
8    still have access to your social media,
9    Facebook?
10 A.  I -- not my old one.
11 Q.  Okay.  The old one with the messages that were
12   on there that you indicated were threatening,
13   were those messages saved somewhere or reported
14   somewhere?
15 A.  I don't think so.
16 Q.  So if I were to ask you, for instance, hey, can
17   you give us those messages, would you be able
18   to?
19 A.  I don't think so.
20 Q.  The Facebook, the old one, what was it titled
21   or what was the username?  What do you call it?
22   A profile name?
23 A.  I think it was just my name.
24 Q.  And your current one, same?
25 A.  No.

1  Q.  Okay.  And does the current one have anything
2    related to policing, this incident or the
3    litigation?
4  A.  Not at all.
5  Q.  Even if you are not posting it, has anybody
6    else posted anything to the new one?
7  A.  No.
8  Q.  We had a deposition or took a deposition of a
9    representative of the city just to basically
10   kind of get the lay of the land, and I want to
11   show you a few things just to see if you are in
12   agreement.  We went in on that deposition in a
13   different order than I'm going to use with you,
14   so just bear with me a second if you would.
15       First of all, I'm going to show a
16   document that was marked Exhibit 8.  Is that a
17   document that you've seen before?
18 A.  I believe so.
19 Q.  And what do you believe that to be?
20 A.  Well, it says right on there, "Milwaukee Police
21   Department Oath of Office."
22 Q.  And is that something that was explained to
23   you?
24 A.  I would think.  It had to have been.  I don't
25   remember, but, I mean, I would believe so, yes.

1  Q.  But you agree, you did take an oath when you
2    took the office or were given the office of a
3    police officer?
4  A.  Yes.
5  Q.  And what did you understand the oath to require
6    of you?
7  A.  I don't remember.  I haven't seen this in many
8    years.
9  Q.  Okay.  Showing you a document marked Exhibit
10   Number 9.  Have you seen this before?
11 A.  I -- yes, I have.
12 Q.  And what is that?
13 A.  The Milwaukee Police Department Code of Conduct
14   booklet.
15 Q.  And what does that document mean to you?
16 A.  It's the -- it says right here, the core values
17   and guiding principles of the Milwaukee Police
18   Department.
19 Q.  And were you ever told what that means to you
20   as a police officer?
21 A.  I don't.
22 Q.  Meaning, were you required to conduct yourself
23   in accordance with the code of conduct?
24 A.  I believe we were, yes.
25 Q.  Was it ever explained to you?

33

1  A. I don't think so, no.
2  Q. Was there ever any training with respect to
3  what that code meant you were required to do?
4  A. Not that I remember.
5  Q. Were you ever trained with respect to what that
6  code limited you from doing?
7  A. I'm not sure. I don't -- I don't --
8  Q. Showing you a document marked Exhibit Number 5.
9  If you take a moment to look through it, do you
10  know what that is?
11  A. I don't think I've ever seen this.
12  "Preparatory Law Enforcement Officer Training
13  Transcript" is what it says, but I've never --
14  I don't think I've ever seen this. Is this a
15  list of -- it looks like it's a list of all the
16  in-service training that I had throughout the
17  years.
18  Q. Okay. But as you look at it, you can't tell me
19  with certainty what this document represents?
20  A. Well, it looks to represent the -- like I said,
21  it says on the top, "Preparatory Law
22  Enforcement Officer Training Transcript" with
23  my name on it. So it's a training transcript.
24  Q. All right. Do you have any reason to believe
25  that that is not a training transcript for you

34

1  when you went through the academy? At least
2  the first part, I'm sorry, because it -- you
3  had flipped to other pages.
4  A. Yeah. It does have years of 2017, 2018 I'm
5  looking at, and I was in the academy in 2009,
6  so I don't know. It looks like it's in-service
7  transcript.
8  Q. Okay. You're just not sure, though, as you
9  look at it?
10  A. Like I said, I've never seen this before.
11  Q. I'm showing you -- actually, let's do this one
12  first. I'm showing you a document marked
13  Exhibit Number 7. Do you know what that is?
14  A. It looks like a piece of paper with my
15  signature on it acknowledging that I received
16  the police department's rules and procedures
17  manual.
18  Q. And am I correct when you first started it was
19  paper form?
20  A. It was, yes.
21  Q. Eventually switched over to an electronic
22  format?
23  A. Correct.
24  Q. So initially you signed for it in paper form,
25  and then eventually electronically. Is that

35

1  fair?
2  A. Yes.
3  Q. I'm going to show you a document marked Exhibit
4  Number 6. Have you ever seen this document or
5  something similar where it acknowledges that
6  you received certain policies and procedures?
7  A. I've never seen this document before, no.
8  Q. Do you at least agree, though, that at various
9  times during your employment as a police
10  officer, you were provided with policies from
11  the department that you are required to sign
12  for?
13  A. Yes.
14  Q. And it wasn't just day one and then never
15  again. As policies changed or were revised,
16  they were provided to you?
17  A. Can you say that again?
18  Q. As policies were changed or revised throughout
19  your career, they were provided to you?
20  A. Yes.
21  Q. And you were expected to sign for those?
22  A. Yes, we were.
23  Q. And were you ever told once you received it --
24  let's ask it that way. Once you received it,
25  did they ever give you instructions other than

36

1  just sign for receipt?
2  A. No.
3  Q. I mean, were you ever told you need to read
4  this?
5  A. I don't think so, no. They just said we need
6  to acknowledge it or sign it like I said.
7  Q. Did anyone sit down with you when you would
8  receive these policies and explain them to you?
9  A. No.
10  Q. Did anyone come to you when you received these
11  policies and ask if you had any questions about
12  them?
13  A. No.
14  Q. Other than simply signing receipt for policies,
15  do you recall the policies being discussed any
16  further with you?
17  A. Only certain ones like at an in-service
18  training. And it was normally in reaction to
19  some incident that happened so they would give
20  us better clarification on the SOP and they
21  finally changed the SOP because of the
22  incident. That's usually how it goes.
23  Q. So am I correct -- and I don't want to put
24  words in your mouth -- you would receive a
25  policy, there would be no discussion, no

9 (Pages 33 to 36)

---

**37**

1  training, no reading, no asking if there's
2  questions, an incident would happen, and then
3  you would be told, hey, this is what should
4  have happened?
5  A.  Yes, that would happen a lot.
6  **Q.  Hey, because this happened, we are going to**
7  **change X, Y and Z?**
8  A.  Correct.
9  **Q.  I'm going to show you a document marked Exhibit**
10  **Number 4.  Have you ever seen this before?**
11  A.  It's a -- one of the SOPs, but I don't know
12  what this one is.
13  **Q.  Okay.**
14  A.  Early intervention.
15  **Q.  As you sit here today, you don't recall that**
16  **policy.  All you can say is that it's written**
17  **on it that it's a policy.  Is that fair?**
18  A.  Right.
19  **Q.  Do you remember, though, being subjected to a**
20  **policy that basically said they are going to be**
21  **monitoring your conduct as a police officer?**
22  A.  I don't remember that.  I don't remember all of
23  the policies.
24  **Q.  I understand.**
25  A.  There were so many, so I don't remember that

---

**38**

1  specific one.
2  **Q.  Okay.  I'm going to show you a document marked**
3  **Exhibit Number 2.  Is this a document that you**
4  **can identify?**
5  A.  This one says standard operating procedure for
6  arrest authority from Milwaukee Police
7  Department.
8  **Q.  Okay.  During the time of this incident that we**
9  **are here to discuss today, am I correct that**
10  **was a policy that you were required to follow?**
11  A.  I believe so.
12  **Q.  And despite being required to follow, had**
13  **anybody trained you with respect to what that**
14  **policy meant?**
15  A.  Well, I mean, there's a lot in this policy.
16  **Q.  I don't want you guessing.  Only if you**
17  **remember.**
18  A.  I don't remember any specific training for this
19  specific policy, so no.
20  **Q.  Okay.  I'm going to show you a document marked**
21  **Exhibit Number 3.  Do you know what that is?**
22  A.  This is another standard operating procedure on
23  use of force.
24  **Q.  And would you agree with me that during the**
25  **time of this incident that was a policy that**

---

**39**

1  you were required to comply with?
2  A.  Yes.
3  **Q.  And same question as the other one, do you**
4  **recall when you received that policy anyone**
5  **sitting down and going through it with you**
6  **making sure you understood what it meant?**
7  A.  I don't think anybody has ever sat down with me
8  and -- with the policy and said this is what
9  this means, this is what this means.  It's
10  never happened.
11  **Q.  So after the academy, did you have a field**
12  **training program?**
13  A.  I did.
14  **Q.  And during the field training program, were --**
15  **was one section related to policies?**
16  A.  Not that I remember.  Not in field training.
17  **Q.  At any point in time either in the academy,**
18  **field training or roll call training, did**
19  **anyone say, okay, today we are going to review**
20  **the use of force policy and we are just going**
21  **to, you know, go through the highlights of it?**
22  **Any type of training like that even?**
23  A.  Possibly.  I can't remember.  I mean, I sat
24  through probably over a thousand roll calls,
25  and it's whatever pertinent information

---

**40**

1  happened from the shift before and things like
2  that.  And it's possible we could have gone
3  over things like this, but I don't remember.
4  **Q.  You just have no independent recollection now?**
5  A.  Right.
6  **Q.  But you are not saying it didn't happen?**
7  A.  It could have happened, but I don't remember.
8  **Q.  Okay.  We talked about the police academy, we**
9  **talked about in-service.  I guess it was**
10  **yearly, correct, the re-trainings?**
11  A.  Once -- once or twice a year.  I can't
12  remember.
13  **Q.  Okay.  And we talked about roll call.  Now, I**
14  **just assumed, and I shouldn't have, that**
15  **there's roll call training as opposed to just a**
16  **briefing.  What do you recall as far as --**
17  A.  Roll call is more of just, like, a briefing.
18  Kind of like a before your shift briefing,
19  basically.  There's no actual training, it's
20  quick.  It's usually five to ten minutes and
21  just discuss -- usually the supervisor will
22  discuss -- they will give you your assignment
23  for the day and they'll discuss if something
24  major happened the shift before or night before
25  or something like that, and that's about it.

41

1  Q.  Okay.  Other than the, you know, in-service and
2      the academy, do you recall any other type of
3      training maybe specific to your shift?  I've
4      heard of some departments when I was associated
5      with where if it got slow, we would all collect
6      somewhere and we would do an informal training.
7      Anything like that?
8  A.  No.
9  Q.  Hang on one second.  With respect to your
10      training, I think we discussed it, there were
11      hand-to-hand tactics that you were trained in
12      the academy; correct?
13  A.  Yes.
14  Q.  Were you provided with any medical training?
15  A.  I'm sure I was, but I don't remember what the
16      extent of it was.
17  Q.  Okay.  With respect to the hand-to-hand combat,
18      for lack of a better term, type training, was
19      it ever discussed the medical issues that could
20      arise with certain types of uses of force?
21  A.  I really don't remember.
22  Q.  Meaning, for instance, pepper spray.  Did you
23      guys carry pepper spray?
24  A.  We did.
25  Q.  And were you trained that, hey, once you pepper

42

1      spray somebody, they are going to have a
2      medical reaction, you need to decontaminate
3      them?
4  A.  Well, yeah.  Yes.  After you get pepper
5      sprayed, you have to flush your eyes out for
6      quite a while before it can -- before it goes
7      away.
8  Q.  With respect to Tasers, did you guys have
9      Tasers?
10  A.  I personally never had a Taser.
11  Q.  Did you go through any Taser training?
12  A.  In the Army I did, but not in the police -- I
13      never had one as a police officer.
14  Q.  Okay.  We can utilize that for purposes of what
15      I'm trying to ask, though.  When you went
16      through your Taser training in the military,
17      did they explain, hey, medically this could
18      happen to an individual so you need to be aware
19      of this?
20  A.  I think so.
21  Q.  With respect to the hand-to-hand techniques in
22      the police academy or during in-service or any
23      other time, were you ever trained, hey, listen
24      if you're -- you know, if you operate around
25      the head or the neck, these are things that

43

1      medically you need to watch for?
2  A.  I -- I don't really remember a whole lot about
3      the academy because it was so long ago.  And I
4      don't know.  It was a fast-moving time, and I
5      just -- I can't remember specifics anymore.
6  Q.  Even if you don't remember specifics, let's
7      just say, for instance, on the date of this
8      incident, do you recall, even if you don't
9      remember exactly what it was, that, yeah, I had
10      been trained to look for certain things
11      medically with respect to certain types of
12      force that I may use?
13  A.  Nothing -- I can't remember anything specific
14      right now.
15  Q.  Okay.  Do you recall ever being trained with
16      respect to a deescalation policy?
17  A.  I remember -- I remember the word
18      "Deescalation," and I remember them having a
19      chart of different steps they want you to take
20      in a situation.  Yes.
21  Q.  Okay.  So it was your understanding that even
22      if you don't remember the specifics right now,
23      you were expected to engage in deescalation if
24      and when possible?
25  A.  Correct.

44

1  Q.  And with respect to use of force -- I think you
2      already identified a policy -- do you recall
3      any other use of force-type policies?  Meaning,
4      separate from it, like a neck restraint policy,
5      or a Taser policy, or a pepper spray policy?
6  A.  I thought all of that is -- would be covered
7      under the use of force.  Except for the neck
8      restraint thing, I don't think that was in any
9      policies.  But I think everything was covered
10      under use of force policy, I believe.
11  Q.  Okay.  Do you recall whether you were ever
12      trained about the positioning of an individual
13      who is taken into custody?
14  A.  Yes.
15  Q.  And what do you recall about that?
16  A.  Well, it depends on what -- what position a
17      person is in when they are taken into custody.
18  Q.  Okay.  Can you explain a little bit more?
19  A.  Like, for instance, handcuffing, I remember
20      training on how to handcuff a person while they
21      are standing and when they are on the ground.
22      Yeah, that's about it.
23  Q.  Do you recall any training with respect to
24      medical complications that can result based on
25      the position that a person is in when they are

11  (Pages 41 to 44)

---

**45**

1  in custody?
2      MS. BAYNARD:  I'm just -- when you
3  say "custody," what do you mean?
4  BY MR. JACOB:
5  Q.  That's fair.
6      When you have somebody whose movement
7  is restrained in any capacity, do you recall
8  any training with respect to medical
9  complications that can result based on
10  positioning of the person?
11  A.  I really don't remember specifics in that area,
12  no.
13  Q.  Without necessarily remembering the specifics,
14  do you recall, though, that, yes, I was
15  trained, I just can't as I sit here today tell
16  you what it is, or no, I don't think we were
17  ever trained on that?
18  A.  It's possible we were trained on that and I
19  just don't remember the specifics of it.
20  Q.  Okay. How about same question with respect to
21  putting pressure on somebody's back when they
22  are on their stomach, do you recall any
23  training with respect to the dangers that may
24  be associated with that?
25  A.  Not that I remember, no.

---

**46**

1  Q.  Do you recall any training with respect to when
2  you have somebody whose movement you've
3  restricted in any way that you need to monitor
4  them medically?
5  A.  I mean, yes, that's always something that you
6  could do.
7  Q.  I'm not asking could do. I'm asking were you
8  trained that, yes, that's something we were
9  required to do?
10  A.  I'm sure we were. I just -- like I said, I
11  can't remember the specifics of it.
12  Q.  Okay. So you are sure you received it, you
13  just don't remember the details. Is that fair?
14  A.  I would say so, yes.
15  Q.  Do you recall any training or rules that said,
16  hey, you are only permitted to use certain
17  tactics, hand-to-hand tactics that were trained
18  to you in the academy?
19  A.  No.
20  Q.  Meaning, you were taught in the academy, I
21  guess, what we would call best practices;
22  correct?
23  A.  Correct.
24  Q.  But you were never told these are the only
25  types of restraints, for instance, that you are

---

**47**

1  permitted to use?
2  A.  Right.
3  Q.  Let's back up a little bit. What is your
4  understanding of the reason for a policy? Just
5  generally, what does policy do? What's the
6  purpose of policy?
7      MS. BAYNARD:  Object on the basis of
8  foundation.
9      Go ahead.
10      THE WITNESS:  Policy is a rule that
11  whatever the department wants you to follow.
12  BY MR. JACOB:
13  Q.  Okay. So I think you said "rule." Would you
14  agree with me that the one purpose of policy is
15  to protect police officers?
16  A.  No.
17  Q.  No. Would you agree with me, though, that when
18  you have a policy that explains to the officer
19  how they are supposed to perform something,
20  that that helps the officer to remain safe
21  around the job?
22  A.  I don't think so, no.
23  Q.  Would you agree with me that a policy can help
24  to protect individuals with whom a police
25  officer comes into contact?

---

**48**

1  A.  Say that again.
2  Q.  Would you agree with me that policy can help to
3  protect persons with whom a police officer
4  comes into contact?
5  A.  Possibly. Depends on the policy, depends on
6  the situation, you know. It could be -- could
7  be yes, could be no.
8  Q.  It's your understanding, though, I think you
9  said, though, that policy is the employer
10  telling the employee their expectations on how
11  something is supposed to be done; correct?
12  A.  That's fair.
13  Q.  And then training, am I correct that training
14  explains how to implement the policy?
15  A.  That's fair.
16  Q.  And would you agree with me that training --
17  the purpose of training is also to protect the
18  police officer and the individual with whom
19  they come into contact?
20  A.  Not necessarily.
21  Q.  Okay. In what scenarios would training make it
22  more dangerous for a police officer or with a
23  person with whom they come into contact?
24  A.  Well, I will say this. In the police academy,
25  they would -- I remember them teaching us

---

12  (Pages 45 to 48)

Page 49

```
 1    certain things of like how to strike, how to
 2    kick, and things like that, and they are what I
 3    thought to be completely unrealistic for a real
 4    life situation.  And if you were to do that in
 5    the street in a real life situation, you can
 6    get yourself hurt and not be an effective
 7    police officer.
 8  Q.  Okay.  Do you remember either in the academy or
 9    just generally it being said that better to be
10    judged by twelve than be carried by six?
11  A.  I've heard that, but I don't know if I heard
12    that in the academy.
13  Q.  And in what context did you hear that?
14  A.  I've just heard the saying before.  I don't
15    remember the context of it.
16  Q.  Do you recall -- well, what years did you go
17    through the academy?
18  A.  It was in 2009.
19  Q.  Okay.  So I will ask it this way.  Do you
20    recall being told, hey, you need to come home
21    at the end of your shift?
22        MS. BAYNARD:  Objection to the form
23    of the question.
24        Go ahead.
25        THE WITNESS:  I remember things being
```

Page 50

```
 1    said like that, yes.
 2  BY MR. JACOB:
 3  Q.  Did you recall being told every incident can
 4    turn into a deadly incident?
 5  A.  Yes.
 6  Q.  And do you recall being told that you should
 7    approach every incident as if it's a threat to
 8    your life or someone else's?
 9  A.  I don't know about that.
10  Q.  Actually, not a fair question.  Were you
11    being -- were you told that you should approach
12    every incident as it could develop into a
13    threat to yourself or somebody else?
14  A.  Yes, that's fair.
15  Q.  So even a parking ticket, for instance, you
16    should be prepared for that to deescalate into
17    something that could become life threatening?
18  A.  It's possible, yes.
19  Q.  But, I mean, you were always told be on guard,
20    be ready for that; correct?
21  A.  That's correct.
22        MS. BAYNARD:  Sorry.  Object to the
23    form of the question.
24        Go ahead.
25  BY MR. JACOB:
```

Page 51

```
 1  Q.  Is that correct?
 2  A.  That's fair.
 3  Q.  During the deposition yesterday, there was some
 4    discussion about former Chief Morales, his
 5    employment situation that eventually happened
 6    with the city and the FPC.  Were you -- you
 7    worked under Chief Morales for a period of
 8    time; correct?
 9  A.  I did.
10  Q.  What we learned yesterday during the deposition
11    is there may have been some suspicions on the
12    part of the FPC with respect to a culture that
13    was not necessarily the best over at the police
14    department under his supervision.  Do you know
15    anything about that?
16  A.  No.
17  Q.  Meaning, where -- for instance, maybe that
18    certain types of force were permitted that
19    shouldn't have been?
20        MR. MUCHE:  I am just going to object
21    that may mischaracterize the testimony.
22  BY MR. JACOB:
23  Q.  And, actually, fair.  My question was poor.
24        I'm asking, do you recall one of the
25    complaints being that, you know, force was
```

Page 52

```
 1    permitted that maybe shouldn't have been?
 2  A.  No.
 3  Q.  Do you remember like an "us vs. Them" mentality
 4    between police and citizens?
 5  A.  No.  No.
 6  Q.  When you were out on the street, you had a lot
 7    of interaction with the general population;
 8    correct?
 9  A.  I did.
10  Q.  And what was the feel out there?  Did you feel
11    that the population trusted the police or were
12    suspicious of the police?
13        MS. BAYNARD:  Objection to the form
14    of the question, calls for speculation.
15        Go ahead.
16  BY MR. JACOB:
17  Q.  No, I'm not asking you to speculate.  I'm
18    asking what did you determine from your
19    interactions whether there was any indication
20    that they were trusted, not trusted?
21  A.  Well, that changed over time.  When I first
22    started, it was different.  People respected
23    the police and criminals feared the police, and
24    the victims of crimes and the innocent people
25    that lived in these bad neighborhoods were --
```

13  (Pages 49 to 52)

Case 2:23-cv-00489-BHL    Filed 08/01/25    Page 13 of 66    Document 56-1

53

1    wanted us there.  They were glad when we could
2    help them because people who lived in the bad
3    neighborhood in Milwaukee were scared.
4          As time went on, like to 2020 when
5    this incident happened, the attitude towards
6    police deteriorated very badly, and it was
7    every day people would walk down the street and
8    yell eff you, eff you.  The things -- the
9    disrespect ramped up.  And the amount of people
10   that were bold enough to resist the police and
11   shoot at the police and fight the police ramped
12   up noticeably in the year 2020.
13  **Q.  And you were talking about before this incident**
14      with Joel?
15  A.  Correct.
16  **Q.  Did you perceive it to become more dangerous**
17      for police officers in the community in which
18      you were serving?
19  A.  Absolutely.  And that's because before when I
20      started, there was not a police officer killed
21      on duty for many years.  I think it was over
22      ten years or more than that.  And then all the
23      sudden there was three killed within one year.
24      So, yes, extremely.
25  **Q.  And did the culture in the police department**

54

1    change from a, hey, we are kind of one with the
2    community to this community is kind of after us
3    a little bit?
4    A.  It did seem like the community was after us.
5        Some parts of the community, not all of the
6        parts of the community.  It was -- "the
7        community" is a broad statement.  Some people
8        were against us for sure, some people were not.
9    **Q.  Going back to policies and training.  If the**
10       department gave you a policy, did you always
11       try to comply with policy when it was safe to
12       do so?
13   A.  I would always try to do the right thing.  I
14       was not always 100 percent aware of what all
15       the policies were.  Although because there's
16       thousands of pages of reading to do and it's
17       not realistic when you are working in a busy
18       city, it's almost impossible to read thousands
19       of pages of policies.  So I personally would
20       try to do the right thing in every situation I
21       was in.
22   **Q.  Were you ever provided with time during your**
23       employment to actually have an opportunity to
24       review these policies?
25   A.  No.  I remember trying to read some of them in

55

1    the beginning of my shift, but then you get
2    called immediately.  As soon as -- as soon as
3    you get to work, you get called on the street
4    to go take a call immediately, so there's no
5    time to read.
6   **Q.  So I'm hearing you say the city provides me**
7       with a policy, I'm required to sign for it or I
8       can get disciplined; correct?
9    A.  Correct.
10  **Q.  But at the same time, I'm required to comply**
11      with the policy, but I haven't been provided
12      with time to review it.  Is that fair?
13   A.  That's fair.
14  **Q.  And I'm required to comply with the policy, but**
15      nobody sat me down and discussed it with me to
16      ask me if I had any questions or explained this
17      policy to me; is that correct?
18   A.  That's right.
19  **Q.  Around the time of this incident, was there any**
20      discussion before the Joel incident about
21      whether any type of neck restraint, chokehold,
22      any of that, whether that was even permitted to
23      be used in the police department?
24   A.  I don't think there was any -- any neck
25      restraints or anything like that ever.  In the

56

1    police department, I don't think there was any.
2   **Q.  So not taught to police officers; correct?**
3    A.  Right.
4   **Q.  But, also, police officers never were told that**
5       you are not permitted to do neck restraints or
6       chokeholds; correct?
7    A.  Well, I mean, there was no policy about it.
8        There's just no talk about it ever.  I guess
9        I've never --
10  **Q.  Just wasn't an issue?**
11   A.  Right.
12  **Q.  One way or the another?**
13   A.  Right.
14  **Q.  Never cautioned during training, hey, listen,**
15      you know, you are going to be taking people to
16      the ground, going to be wrestling around, but
17      never go around their neck unless it's a deadly
18      force incident.  Nobody ever told you that;
19      correct?
20   A.  Not that I remember.
21          MR. JACOB:  Okay.  This would be a
22      good time to break for five minutes before I go
23      to the next section.  Does that sound good?
24          MS. BAYNARD:  Yeah.
25          (Recess.)

14  (Pages 53 to 56)

57

1  BY MR. JACOB:
2  **Q.  We just had an opportunity to take a break.**
3  Are you prepared to proceed?
4  A.  Yes.
5  **Q.  When you become a police officer, you are**
6  issued a badge; is that correct?
7  A.  Yes.
8  **Q.  And you're issued ID?**
9  A.  Yes.
10  **Q.  And where would you -- generally when you were**
11  off duty, where did you keep your ID?
12  A.  Well, that changed throughout the years.  I did
13  things differently.  My ID, I think I used to
14  keep it in my wallet or I had a little lanyard
15  that I would wear.  And, yeah, that was it.
16  **Q.  Okay.  So it was always with you somewhere.  Is**
17  that fair to say?
18  A.  I think I would -- I think so.  When I would
19  carry it, it was in my wallet and my wallet was
20  with me.  And my lanyard, I would bring that
21  home with me to and from work because it also
22  worked as an ID or like a --
23  **Q.  Badge holder?**
24  A.  To scan into the buildings.  So you needed it
25  to get into work, so yes, I would take it with

58

1  me.
2  **Q.  And when you got home, where would you**
3  generally keep it?  Let's just narrow it down
4  to the year of this incident.  What was your
5  general practice?
6  A.  I had an office and I would usually put it on
7  my desk.
8  **Q.  In your -- in your house?**
9  A.  Right.
10  **Q.  When you say on your desk, was it in a wallet**
11  on your desk or was it just actually on your
12  desk?  Like, you know, taken out of the wallet?
13  A.  I think around the time of this incident in
14  2020, I believe I was wearing -- I had a
15  lanyard and I would just put the whole thing on
16  my desk.
17  **Q.  So if you're home, your ID is home with you**
18  somewhere in that house?
19  A.  Yes.
20  **Q.  And readily accessible to you?**
21  A.  Well, it's in the house.
22  **Q.  Meaning, if somebody came to the front door and**
23  said I need to see your ID, you could go get it
24  and bring it to them; correct?
25  A.  Right.

59

1  **Q.  It wasn't lost or misplaced?**
2  A.  No.
3  **Q.  And on the date of this incident, you had it.**
4  It hadn't been lost or misplaced; correct?
5  A.  I don't remember exactly on the day where my ID
6  was.  I'm assuming it was on the desk, but I
7  don't -- I can't tell you for sure.
8  **Q.  But there was no reason for you to believe that**
9  it wasn't on your desk where you would normally
10  put it; correct?
11  A.  That's -- that sounds about right.
12  **Q.  Meaning, it wasn't like on the date of this**
13  incident was the first date you decided to
14  leave it at work; correct?
15  A.  I mean, that's possible.  I just don't
16  remember.
17  **Q.  All right.  But as you sit here, you have no**
18  reason to believe that it wasn't on your desk?
19  A.  That's where I would think it was.
20  **Q.  Okay.  I saw that the department does not or**
21  did not during that period of time say you
22  absolutely could not perform the job of a
23  police officer while off duty.  Was that your
24  understanding that you could perform the job of
25  a police officer while off duty?

60

1  A.  Yes, that's my understanding.
2  **Q.  I also saw in the policy with respect to being**
3  off duty that the policy did not say you
4  absolutely cannot perform the job of a police
5  officer while you've consumed alcohol.  Is that
6  your understanding?
7  A.  Yes.
8  **Q.  And that simply the policy discouraged**
9  performing off duty while consuming alcohol.
10  Is that your understanding?
11  A.  Yes.
12  **Q.  If the policy had said you are precluded, you**
13  absolutely may not take any action as a police
14  officer while consuming alcohol, would you have
15  done your best to comply with that policy?  And
16  I'm not saying with respect to this incident.
17  I'm sorry, let me rephrase it.
18  I'm just saying generally, as long as
19  it was not safe to comply, meaning, to -- or
20  shouldn't be to comply, meaning, not to get
21  involved.  Would you agree with me if the
22  policy said you may not get involved while
23  drank any alcohol, would you have done your
24  best not to get involved?
25  A.  I mean, that depends on what -- you know,

15  (Pages 57 to 60)

61

1  depends on the circumstances. I can't really
2  answer that.
3  Q. Okay. And that's because there are situations
4  that just arise that cannot be prevented; is
5  that correct?
6  A. That's fair, I suppose.
7  Q. Now, it's no secret, you admitted it that you
8  had at least consumed alcohol on the night in
9  question; correct?
10 A. I did, yes.
11 Q. But there's a question about this issue of
12 impairment and judgment. Did you believe that
13 you had consumed alcohol to a point where you
14 were impaired that your judgment was just
15 clouded?
16 A. I don't think so.
17 Q. So while you may -- for instance, if you
18 slurred your words, you could still think
19 clearly. Is that fair?
20 A. That's fair.
21 Q. That nothing led you to believe that your
22 judgment was way off on that night; correct?
23 A. No, I don't think so.
24 Q. And that was not the first night that you had
25 ever consumed alcohol in your life; correct?

62

1  A. No.
2  Q. So presumably, you knew personally how your
3  body reacts to the consumption of alcohol;
4  correct?
5  A. Right.
6  Q. And did you know or had you ever -- not that
7  night, but had you ever in your life consumed
8  alcohol to a point where you knew, yeah, my
9  judgment is a little off now?
10 A. Ever? I'm sure I have in the past.
11 Q. Okay. And that was not this night, though;
12 correct?
13 A. No.
14 Q. I'm sorry, yes, it's correct that that was not
15 this night that you were to a point where,
16 yeah, my judgment is way off here?
17 A. I didn't feel that way that night, no.
18 Q. And having had that happen at some point in
19 your life, you would have recognized it if it
20 was going on that night; correct?
21 A. I would think so.
22         MS. BAYNARD: I just want to clarify.
23 When you are saying "night," you mean, the
24 night --
25         MR. JACOB: I'm sorry. The day --

63

1         MS. BAYNARD: Yeah. The next morning
2  at 7:30. At any point --
3         MR. JACOB: Next morning, day.
4         MS. BAYNARD: Right.
5  BY MR. JACOB:
6  Q. Sorry. Fair. Yes, fair.
7         Now, on the date in question -- and
8  let's just put that on the record -- it was
9  Sunday, April 19th, 2020; correct?
10 A. Correct. That was the morning.
11 Q. Okay.
12 A. Sunday morning.
13 Q. So that's the morning when Joel Acevedo and
14 yourself and others had this incident that
15 results in police coming to your residence;
16 correct?
17 A. Right.
18 Q. And on that date, you were employed by the City
19 of Milwaukee Police Department as a police
20 officer; correct?
21 A. I was.
22 Q. And you were still in good standing as a police
23 officer; correct?
24 A. I was.
25 Q. Your certification wasn't suspended or anything

64

1  like that; correct?
2  A. No, it was not.
3  Q. Now, the night before, so now we are on the,
4  what, Saturday, the 19th, I guess. Let me see.
5  Oh, Saturday the 18th; is that correct? You
6  have a social gathering at your house. Is that
7  fair to say?
8  A. Yes.
9  Q. And tell me a little bit about that. What was
10 it supposed to be or what was it intended to
11 be?
12 A. Just -- it was just the four of us sitting
13 around a fire, having a couple drinks. It was
14 a very uneventful kind of boring night, to be
15 honest.
16 Q. And the four of you, that would be who?
17 A. Me, Joel, Christopher Peters and Andrew
18 Janowski.
19 Q. Now, how did you meet or come to know these
20 three individuals?
21 A. Christopher, I grew up -- when I grew up as a
22 child, he was my next door neighbor and a
23 friend of mine, so I've known him ever since he
24 was born. Andrew, I met him -- actually, I met
25 him through Christopher, but he was also a

16 (Pages 61 to 64)

65

1    probation agent and I would see him at work
2    every once in a while. And then Joel, I met
3    him the Northwestern Mutual building in
4    downtown Milwaukee. He was a security guard
5    there, and I would work there off duty as a
6    police officer but on my day off, and that's
7    how I met him.
8  Q. Now, you said as a police officer, but on your
9    day off. So was that approved off-duty private
10   security work?
11 A. I guess you could call it private security.
12   I'm not -- I don't know. But I was in full
13   Milwaukee police uniform in the building.
14 Q. I see. So it was a situation where this
15   business pays the city to use a police officer
16   for a particular function?
17 A. Yes.
18 Q. So you're off duty in the sense that it's not
19   your normal schedule; correct?
20 A. Right.
21 Q. But you're on duty in a sense that you are in
22   uniform, you are there to function as a police
23   officer; correct?
24 A. Right.
25 Q. And, again, you said you met Joel at that time

66

1    because he was private security in the same
2    location?
3  A. Right.
4  Q. Roughly, how long do you think you knew Joel as
5    of -- I keep forgetting our date there -- as of
6    the date of this incident? Let's just go with
7    that.
8  A. I don't remember exactly, but I want to say I
9    met him about a year before, but I would only
10   see him every once in a while. I would only
11   see him a couple times a year because I
12   wouldn't work there that regularly, and
13   sometimes he wasn't at work while I was there.
14   So I met him about a -- I think about a year
15   before the incident happened, but I -- yeah,
16   that's about it.
17 Q. So to the extent that there's any question
18   about whether Joel knew that you were a police
19   officer, do you believe there was any question
20   that Joel somehow didn't know that you were a
21   police officer?
22 A. No. He knew because I -- like I met him while
23   I was in uniform, full uniform.
24 Q. Okay. He never looked at you in that uniform
25   and said, come on, are you really a police

67

1    officer?
2  A. No, he didn't.
3  Q. All right. So when he was sitting in your
4    house, did he ever say, were you really a
5    police officer while you were working downtown?
6  A. No.
7  Q. So there was literally no doubt that Joel knew
8    that you were a full-fledged police officer on
9    the night in question?
10 A. Right.
11 Q. Or the day in question. Okay. Now, had Joel
12   said I want to see your ID because I don't
13   believe you that you are a police officer now
14   that you've arrested me, assuming that you
15   arrested him, would you have shown him?
16 A. I don't know. I mean, that's kind of a --
17   that's an odd question, but --
18 Q. I know, but if he said I'm not cooperating
19   unless you show me your actual ID, would you
20   have shown it to him?
21 A. I don't see why not.
22 Q. Okay. And you could have because it was in
23   your house in the next room on your desk in
24   your office; correct?
25 A. Well, if you are talking about the situation

68

1    while we are all here.
2  Q. No, I'm saying in general.
3  A. In general?
4  Q. If he had asked, you could have?
5  A. In general?
6  Q. Yes.
7  A. Not in -- not in this situation?
8  Q. Correct.
9  A. So in general, yes, I could, but --
10 Q. Okay. Now, when this incident occurred when
11   there's this struggle between Joel and
12   yourself, what were you wearing?
13 A. Just jeans and a T-shirt, no shoes, socks.
14 Q. And what was that T-shirt?
15 A. I remember it was a memorial T-shirt for one of
16   the officers that was killed, an officer that I
17   knew, and that was the T-shirt.
18 Q. And it also had an MPD badge insignia over your
19   left chest?
20 A. Yes.
21 Q. And a tactical enforcement design on the back?
22 A. Yes.
23 Q. And it was the Officer Matthew Rittner memorial
24   shirt?
25 A. Right.

17 (Pages 65 to 68)

69

1 **Q. So to the extent that Joel suddenly forgot that**
2 you were a police officer, looking at you he
3 would have seen you wearing something that
4 indicates you are a police officer, too;
5 correct?
6 A. That's possible, yes.
7 **Q. Now, did -- the other people there with you, do**
8 you know if they knew you were a police
9 officer?
10 A. Yes. Yes, everybody knew.
11 **Q. And how do you know that they knew?**
12 A. Well, Andy, I've seen him while I was at work
13 before, so he's seen me in uniform -- or I saw
14 -- I've seen him in the jail before, so he
15 knows that way. Christopher, he just -- he
16 knew because I told him and it's just kind of
17 common knowledge.
18 **Q. Okay. So the four of you in a room, there is**
19 absolutely no question that everybody in that
20 room knew that Mr. Mattioli is a police
21 officer?
22 A. That's right.
23 **Q. At this gathering, there are persons who are**
24 consuming alcohol. I think you said you were
25 one of them; correct?

70

1 A. Yes, all of us were.
2 **Q. And how about illegal drugs? Do you know if --**
3 at the time, did you know whether there were
4 persons taking drugs that were not lawful?
5 A. No.
6 **Q. Now, something happens; am I correct? You go**
7 to sleep at some point in the night; correct?
8 A. Yes.
9 **Q. And before you went to sleep, though, was**
10 everyone getting along?
11 A. Yes. It was a normal -- normal night. Like I
12 said, it was kind of a boring night. We didn't
13 -- there was no conflicts of any sort
14 whatsoever. It was a friendly, boring night,
15 really.
16 **Q. What were you guys doing? Just sitting around**
17 and talking, watching TV, playing games? What
18 were you doing?
19 A. We were outside by the fire for the beginning
20 of the night. Eventually, we came inside and
21 sat around my kitchen table and just talked. I
22 don't know. I think maybe the guys were
23 playing cards. I wasn't playing cards myself,
24 just talking.
25 **Q. Okay. You guys eating food?**

71

1 A. I don't think we ate anything.
2 **Q. Okay. Anybody come and go to visit, or just**
3 was it always just the four of you?
4 A. No. It was just the four of us.
5 **Q. At some point I think it's my understanding**
6 everybody goes to sleep, but in different
7 places within the home?
8 A. Right. Well, I don't know for a fact that
9 everybody slept. I know I went up to my
10 bedroom and I went to sleep, and I know Andy
11 went to sleep on the couch in the first floor
12 living room. But as far as Christopher and
13 Joel actually sleeping, I don't know if they
14 did.
15 **Q. Was it the intent that everybody would sleep**
16 there, or was it just, ah, we've had stuff to
17 drink, let's just crash for the night kind of
18 thing?
19 A. For -- it was kind of implied that everybody
20 would sleep over, yeah. That was my
21 understanding that people would sleep over. I
22 know Christopher and Andy had slept over in the
23 past, so it was implied for them. Joel had
24 never been in my house before, this was the
25 first time he had ever been in my house, so at

72

1 some point during the night he asked me if it
2 was okay if he slept over, and I said
3 absolutely because we've all been drinking,
4 stay here, no problem.
5 **Q. And do you know where he went in the home --**
6 when you went upstairs, do you know where he
7 was?
8 A. No.
9 **Q. Okay. So you go to sleep, everything is calm**
10 when you go to sleep, what happens next?
11 A. The next thing after I went to sleep is I woke
12 up because I felt Joel going through my pockets
13 in my pants when I was sleeping.
14 **Q. And so what happens?**
15 A. I woke up because I felt somebody touching me.
16 So I woke up and I was laying on my back, I sat
17 up, and I was startled because it was somebody
18 just touching me in my sleep, it was strange,
19 and somebody was in my pocket. So I sat up and
20 I looked and I saw that it was Joel. He
21 quickly took his hand out of my pocket and took
22 a step back. The bedroom was dark, the lights
23 were off, it was still early in the morning,
24 the sun was just coming up, I think.
25 And I asked him, I said, "What are

18 (Pages 69 to 72)

---

**73**

1  you doing?"  Just like that, I said, "What are
2  you doing?"  And he didn't say anything to me,
3  he was just silent and just stood there over
4  me.  So the next thing I said to him, I said,
5  "Really, you are just going to steal from me
6  like that?"  And when I said that, he got
7  angry, really angry and irate and started
8  yelling at me.  While I'm still laying in bed
9  and he's still standing over me, he was yelling
10  and moving fast.
11       And I could tell by his energy level
12  and his movement that he hadn't slept.  And
13  that worried me because I thought he was
14  sleeping, I thought everybody was sleeping.  So
15  he said -- when I asked him, "You are going to
16  steal from me like that?"  He started yelling
17  at me and saying things like, "No, I didn't.  I
18  wasn't stealing from you.  I wasn't stealing
19  from you," but yelling it.
20       And while he was doing that, he was
21  taking everything out of his pockets and, like,
22  throwing it at me, saying, "Look, I didn't
23  steal anything from you."  Whatever he had in
24  his pockets he was throwing at me on top of me
25  on my bed.  Yeah, that's what happened.

---

**74**

1  Q.  And what did you have in your pockets at the
2      time, if anything?
3  A.  I don't remember.
4  Q.  Did you have your wallet in your pocket, do you
5      think?
6  A.  I think I had my wallet in my back pocket, yes.
7  Q.  If you had your wallet, do you know if you had
8      any identification in there that would identify
9      you as a police officer?
10  A.  I don't remember.  I don't remember what was in
11      my wallet that day.
12  Q.  Did you -- did you ever come to learn what Joel
13      was looking for?
14  A.  No, I -- I don't know.  I assume that he was
15      looking for money, but I don't know if anything
16      was stolen because I never got a chance.  I was
17      arrested immediately, taken out of my house,
18      and then when I came back home, got out of
19      jail, there was tons of things missing from my
20      house, and I didn't know if it was from the
21      police or just from Joel.  I still don't know
22      to this day.
23  Q.  Okay.  All right.  So he -- Joel has now thrown
24      stuff at you, you've asked him, you know, are
25      you going to steal from me, what happens next?

---

**75**

1  A.  That's when he's yelling at me and throwing all
2      of the stuff from his pockets onto my bed.  And
3      I'm sitting there looking at him trying to
4      figure out what's going on because it was
5      really strange, really confusing to me because
6      only a couple hours ago we were all friends
7      having a good time, a normal time, and now he's
8      super hostile and irate, and I'm trying to
9      figure out why.  And I couldn't figure it out,
10      but all I knew is you need to get out of my
11      house.  And that's what I said to him, I said,
12      "You need to leave right now."
13  Q.  So he's a completely different person than
14      before you --
15  A.  100 percent different person.
16  Q.  And that's unnerving to you?
17  A.  It was strange.
18  Q.  And in that moment, you realized maybe I don't
19      know this guy as well as I thought?
20  A.  That's fair, yes.
21  Q.  And you decide you are going to have him leave
22      your house?
23  A.  Right.
24  Q.  So what did you do to try to get him out of
25      your house?

---

**76**

1  A.  Well, first I told him while I was in bed, I
2      said, "You need to leave my house right now."
3      And I stood up and I got out of bed, and we
4      both walked down the stairs together.  I think
5      he walked down first, I walked down behind him,
6      and we got downstairs to my living room, and he
7      was walking towards the kitchen, which is the
8      door that we use to leave the house.  I thought
9      he was going to leave and everything was going
10      to be okay, but he stopped and turned me around
11      and, like, faced me in an aggressive manner,
12      like squared up on me.
13  Q.  Now, at that point in time, did you tell him
14      you really don't want to do this, you know I'm
15      a police officer, or, like, what are you doing?
16      Anything like that?
17  A.  I didn't say that.  I just kept telling him to
18      get out, just leave, get out of my house.  And
19      I was pointing towards the door, "Get out of my
20      house."  That's probably all I really said to
21      him was, "Get out of my house."
22  Q.  Okay.  And then at some point, others join you?
23  A.  So when we're downstairs, we walked down to the
24      living room, that's when he turned around and,
25      like, squared up -- kind of squared up on me.

---

1    Andy was sleeping on the couch right there.
2    And Joel was, like, yelling and pacing back and
3    forth, like fast pacing, and he was pacing,
4    like, past Andy, who was sleeping on the couch.
5    And Joel shook Andy to wake him up, and Andy
6    stood up as confused as I was to what's going
7    on.
8         Andy just -- he got up, and he just
9    sat -- like stood there with a confused look on
10   his face, and I just kept telling Joel, "Get
11   out."
12   **Q.  And Joel is not a small person either; correct?**
13   A.  No, he's bigger than me.
14   **Q.  All right.  If you had to guess height-wise, do**
15   you recall?
16   A.  I said he -- he was about my height.  I'm 6'3",
17   so he was around my height.
18   **Q.  And weight-wise, do you recall?**
19   A.  I saw on the autopsy he was 270 pounds.
20   **Q.  And was he muscular or more fat and obese?**
21   A.  Well, they called him obese in the autopsy.  I
22   didn't really see him that way.  I know he was
23   a big guy.  I didn't really look at him that
24   closely to call him obese, but I knew he was a
25   big guy.

1    **Q.  And you also knew then that he had worked in**
2    private security, so presumably had at least
3    some training; correct?
4    A.  Possibly.
5    **Q.  All right.  Did you perceive him to be a**
6    physical threat?
7    A.  Of course, yes.
8    **Q.  Okay.  And he's now squared off with you, he's**
9    now woken up your friend, what happens next?
10   A.  He woke up Andy off the couch.  Andy was
11   standing there.  At some point Christopher
12   comes upstairs.  I believe he was downstairs in
13   the basement, and he -- he came up.  I think he
14   probably heard us yelling because I was yelling
15   at Joel to get out.  Joel was yelling back at
16   me that he didn't do anything, and he was just
17   saying eff you and I'm not leaving.  Things
18   like that.
19        So Christopher comes up.  And at some
20   point I told Christopher -- because Christopher
21   came upstairs with a confused look on his face,
22   and I went like this towards Joel, and I said
23   to Christopher that he was stealing from me.
24   Yeah.
25   **Q.  Then what happens?**

1    A.  That's when Joel began to get physical.  He
2    lunged at me and struck me in my chest, neck
3    area.  It was either a punch or a push.  I
4    don't know.  A little bit of both.  I don't
5    know.  But he lunged at me like that and hit me
6    here, and I took a step back.  I didn't fight
7    him back, I didn't throw a punch -- or a punch
8    back.  I was kind of in shock as to is this
9    actually happening right now, I can't believe
10   somebody would do this.
11   **Q.  Were you injured?**
12   A.  I don't think so, no.
13   **Q.  All right.  But when you said you took a step**
14   back, was it because of the force that he
15   pushed you back or that you just took back to
16   create some distance?
17   A.  Because he pushed me back.
18   **Q.  Okay.  And then what happens?**
19   A.  Shortly after that, he, Joel, punched
20   Christopher in the face.
21   **Q.  What prompted that?  Do you know?**
22   A.  Nothing.  As far as I could tell, it was
23   absolutely nothing.  It was totally unprovoked.
24   **Q.  Had something been said maybe or --**
25   A.  Not that I know of, no.  It was -- I -- the way

1    I remember it, Christopher didn't say a word.
2    It was 100 percent unprovoked.  Joel just
3    swung, punched him right in the face.  And it
4    was a bad -- it was a good -- I don't know how
5    you want to say it.  It was a bad punch.
6    **Q.  So you knew it connected?**
7    A.  Oh, yeah.  I felt -- or I heard it crack and I
8    saw Christopher go back.  And Joel threw the
9    punch so hard that he knocked himself off his
10   own feet when he threw the punch and he fell
11   over.  And I had a tall lamp that was right
12   next to Joel, when he threw the punch, he
13   knocked the lamp over and the glass shattered.
14   It was ridiculous.  It was all in a tight
15   little spot in my small house, too.
16   **Q.  So this has now gone from somebody you want to**
17   leave your house to now you witnessing, what, a
18   misdemeanor assault in your presence.  Is that
19   fair?
20   A.  He assaulted me and Christopher, yes.
21   **Q.  Okay.  What happens next?**
22   A.  After Joel fell onto the ground, I got on top
23   of him and I used my bodyweight to keep him on
24   the ground because I knew that as soon as he
25   got back up, he was going to continue throwing

81

1    punches.  It was my goal to not let that
2    happen.
3  **Q.  Now, at this point you've seen this assault,**
4    it's not -- would you agree with me you didn't
5    witness something that you would consider to be
6    a felony level assault at this point?
7  A.  I would say so, yes.
8  **Q.  You would say so what?**
9  A.  If you want to talk about crimes, what was
10   going through my head at the time was that Joel
11   had just tried to steal from me.  I don't know
12   if he did try to -- I don't know if he did
13   steal anything or if he just attempted to steal
14   anything.  But he did that, and then he refused
15   to leave my house, and then he started
16   physically assaulting people.  So in my head, I
17   was thinking of the crime of robbery with use
18   of force, which is a felony.  Also, could be
19   interpreted of theft from person, which is a
20   felony, upstairs in my room.
21       He damaged property in my -- in my
22   house.  There's different crimes that you could
23   say he committed and I think he committed.
24 **Q.  Okay.  So potential felonies that you've now**
25   witnessed.  With respect to the physical

82

1    threat, though, he had not presented as a
2    deadly threat to anyone yet; correct?
3       MS. BAYNARD:  Objection to the form
4    of the question.
5       Go ahead.
6  BY MR. JACOB:
7  **Q.  Or at any time; correct?**
8       MS. BAYNARD:  Same objection.
9       THE WITNESS:  I don't know about
10   that, but he -- I don't know how to answer that
11   question.  He was -- he was a threat.  He was a
12   big guy and he was throwing punches in a tight
13   little spot in my dark house.  It was a threat.
14 BY MR. JACOB:
15 **Q.  Oh, I'm not disputing whether it was a threat**
16   or not.  I'm asking, did this threat rise to
17   the he's trying to kill somebody?
18       MS. BAYNARD:  I'm sorry, calls for
19   speculation.
20       Your perception.
21 BY MR. JACOB:
22 **Q.  Correct.  I don't want to you speculate.  I'm**
23   asking for your perception.  Did this threat
24   rise to the level where you concluded Joel is
25   trying to commit an unlawful homicide in this

83

1    moment?
2  A.  Well, like I said before, he was a big guy
3    throwing punches in a small tight spot in my
4    house.  I know from experience that punching
5    somebody in the face can be deadly.  That's
6    possible.
7  **Q.  So if you had your gun with you, would it have**
8    been lawful for you to use deadly force as a
9    police officer if you were performing as a
10   police officer in full uniform at that moment?
11 A.  That would be -- I don't know how to answer
12   that.  I -- that's not what happened.  I did
13   have my gun in the house, it was in another
14   room, and never during this incident did I even
15   think about going to get it.  Didn't cross my
16   mind.
17 **Q.  If it was on you, did you feel threatened to**
18   the point you would have shot him that moment?
19 A.  If I had my gun on me, it would be a different
20   story, it would have been different
21   circumstances.  I -- you know, different things
22   could have happened.  I could have pointed it
23   at him and told him to get out of my house.
24 **Q.  Not my question.**
25 A.  Lots of things could happen.

84

1  **Q.  I appreciate that.  My question, though, is**
2    he's now gone to the ground after throwing a
3    punch after pushing you.  If you had your gun
4    on him, would you have shot him?
5  A.  At that point while he was on the ground, no.
6  **Q.  Okay.  And that's because you didn't perceive**
7    this as an immediate deadly threat to you;
8    correct?
9  A.  Immediately deadly threat?  I don't know what
10   his exact intentions were.
11 **Q.  I didn't ask that.  I'm asking your perception.**
12 A.  I really don't know how to answer your
13   question.
14 **Q.  Well, you know, down the road we are going to**
15   be in front of a jury and I'm going to ask you
16   the same thing, so I am trying to find out now
17   what your answer is going to be.  When I say
18   would you have shot him, you told me no.  I'm
19   just asking, well, why wouldn't you have shot
20   him?
21 A.  In that very second while he was on the ground
22   when he knocked himself over, that's what we
23   were speaking about, and no, I wouldn't have
24   shot him when he was down.  I wouldn't have --
25 **Q.  And that's because?**

21  (Pages 81 to 84)

85

1  A.  I would have done what I did.  I would have
2     used my bodyweight to just hold him down until
3     the police could get there.  And that's what I
4     probably would have tried to do.
5  Q.  Would you have tried to take his life in that
6     moment?  Was it that type of danger you felt
7     you were facing?
8  A.  I -- well, I never tried to take his life and
9     I -- I didn't feel -- no.  I didn't feel in
10    that type of danger that I would need to take
11    his life, no.
12 Q.  As then being a police officer, I'm allowed to
13    ask a little bit of legal as far as how it
14    pertains to your job and how you've been
15    trained.  So my question to you then is as a
16    police officer in that moment if you were on
17    duty, would you have been allowed lawfully to
18    shoot him when he was on the ground in that
19    moment?
20        MS. BAYNARD:  I'm going to object to
21    the form of the question.
22        Go ahead.
23        THE WITNESS:  Would I -- I mean,
24    using deadly force is a very fluid situation.
25    One person might say you are allowed, another

86

1     person would say you are not allowed.
2  BY MR. JACOB:
3  Q.  I'm not asking that.  I'm asking you would it
4     have been your belief that using deadly force
5     would have been lawful in that moment when he
6     was on the ground?
7  A.  No.
8  Q.  Now, you, though, go to him; correct?
9  A.  I -- when he fell over, I got on top of him,
10    because like I said, I didn't want him to get
11    up and keep punching people.
12 Q.  Okay.  And then what happens?
13 A.  We wrestled around a little bit on the ground.
14    He was trying to stand up and I was trying to
15    keep him down on the ground.  And he stopped
16    struggling with me for a second, so I stood up
17    over him and I got my phone out and I called
18    911.
19 Q.  All right.  And what happens then?
20 A.  I told the dispatcher I need help at my house.
21    And shortly after that, Joel started to -- he
22    tried to get back up again, and I tried to keep
23    him back down on the ground.
24 Q.  Am I correct, though, during the 911 call, you
25    said I am a police officer and I need help?

87

1  A.  I think -- yes.  My words I think I said, "I'm
2     an off-duty police officer and I need help at
3     my house."  That is what I said.
4  Q.  And you admitted during cross-examination at
5     your criminal trial you were attempting an
6     arrest.  You don't -- you didn't testify
7     falsely at your criminal trial; correct?
8  A.  No.  I believe I said that to the police
9     officers afterwards.
10 Q.  Okay.  So you're attempting at this point to
11    arrest him because now he has done the various
12    crimes that you had observed; correct?
13 A.  Well, I mean, that's kind of a gray area.  It
14    -- I wanted him -- I wanted him arrested for
15    sure --
16 Q.  No, I understand.
17 A.  -- because of the crimes that he did commit.  I
18    was off duty in my house.  I didn't have --
19    like I'm not the police officer who can
20    handcuff him and book him into the -- you know,
21    because I was off.
22 Q.  I understand that.  But my question is when you
23    testified at your criminal trial under oath and
24    you are cross-examined by the prosecutor and
25    asked if you were performing an arrest and you

88

1     said you were, were you telling them the truth
2     when you testified?
3  A.  Is that the words that I said?  I'm not sure --
4  Q.  You were asked --
5  A.  -- that's correct.
6  Q.  -- were you making an arrest and you said well,
7     yeah.
8  A.  I think I said, "In a way I was."
9  Q.  Yeah.
10 A.  I think those were my --
11 Q.  Right.
12 A.  -- exact words at the trial.
13 Q.  Yeah.  So you admitted it; correct?
14 A.  I said -- I said "in a way" because I wanted --
15    I detained him until the police got there.
16 Q.  Right.  So you had gotten up, everything was
17    calm, and when he said and can be heard saying,
18    "Let me go.  I want to go home," you don't let
19    him go home, though, at that point; correct?
20        MS. BAYNARD:  Objection to the form
21    of the question, and assumes facts not in
22    evidence, so --
23 BY MR. JACOB:
24 Q.  Is that correct?
25 A.  Say it again.

22  (Pages 85 to 88)

89

1 **Q. Yeah. What --**
2 　　MS. BAYNARD: And -- sorry. And
3 compound. That was my form.
4 BY MR. JACOB:
5 **Q. Sorry. Yes. Then when he is saying "I want to**
6 go home" and you can hear him in the call say
7 "I want to go home," you don't let him?
8 A. Well, I heard him say that on the tape. I
9 didn't hear that in person in the heat of the
10 moment. I didn't hear that.
11 **Q. But you weren't letting him go. He was trying**
12 to get -- squirm away at some point. You don't
13 let him go; correct?
14 A. No, I did not.
15 **Q. All right. Whereas earlier when you were**
16 saying, "Get out of my house," you would have
17 let him go?
18 A. Right. I would have, but that was before he
19 became physical with us.
20 **Q. All right. And before it had turned from I'm**
21 defending myself and others to I'm also
22 arresting him now; correct?
23 A. I mean, I detained him until the police got
24 there. That's what I did.
25 **Q. Right. And you told the prosecutor you agreed**

90

1 that it was in the performance of an arrest;
2 correct?
3 A. I said, "In a way." Yes, that's what I said.
4 **Q. Well, you didn't say no; correct?**
5 A. Right, I did not say no.
6 **Q. And after the incident when you were asked, you**
7 explained you were arresting him for his
8 conduct; correct?
9 A. I did say that, yes.
10 **Q. And you weren't obstructing justice and lying**
11 to law enforcement when you were saying those
12 things after the incident; correct?
13 A. No.
14 　　MS. BAYNARD: Objection to form.
15 　　THE WITNESS: Sorry.
16 　　MS. BAYNARD: Go ahead. He already
17 answered.
18 BY MR. JACOB:
19 **Q. You weren't obstructing justice, you were being**
20 truthful at that time; correct?
21 A. I was truthful through this entire process.
22 **Q. Okay. Now, as a police officer, am I correct**
23 you are allowed to -- you have a privilege
24 under the law to use force that is objectively
25 reasonable to affect arrest; correct?

91

1 A. That sounds right.
2 **Q. And you did use some level of force with Joel**
3 in affecting this arrest; correct?
4 A. Yes.
5 **Q. The end result was Joel suffers**
6 life-threatening injuries and eventually dies;
7 correct?
8 A. You are asking me if the end result -- his
9 death was the end result of my force?
10 **Q. Yes.**
11 A. I don't know that.
12 **Q. Would you at least agree your force is part of**
13 the events that resulted in a life-threatening
14 injury to him?
15 　　MS. BAYNARD: Objection to the form
16 of the question.
17 　　You can answer.
18 　　THE WITNESS: I don't see it that
19 way, no.
20 BY MR. JACOB:
21 **Q. All right. Let me ask it this way. When he's**
22 standing punching somebody, you don't see him
23 as -- as a medical emergency where he's dying
24 in that moment; correct?
25 A. Correct.

92

1 **Q. But when he's on the floor after you get off**
2 and they are doing CPR, would you agree with me
3 that it appears that he's suffering from some
4 sort of medical emergency, which could be
5 deadly?
6 A. I would agree with you when I saw it on the
7 body camera.
8 **Q. Okay. So in between those two events, him**
9 punching and CPR performing, is anyone else
10 using any force on him other than, I think it
11 was, the friend who was holding his legs?
12 A. No.
13 **Q. So the only force that's being used at that**
14 time other than the legs is by you; correct?
15 A. Correct.
16 **Q. Hang on one second here. Bear with me here.**
17 I've got to navigate to something on here. The
18 force that you were using on Joel, the
19 technique for restraining him, where did you
20 learn that?
21 A. I -- all I basically did was use my bodyweight
22 to keep him on the ground.
23 **Q. Okay. Where did you learn that?**
24 A. Basically from experience on the police force.
25 A lot of people try to run away from me and I

23 (Pages 89 to 92)

93

1    was always able to just use my bodyweight to
2    keep the person on the ground until I could get
3    him in handcuffs.
4  **Q.  It's not the first time that you used your**
5    **bodyweight on somebody who is on their stomach**
6    **to restrain them; correct?**
7  A.  No.
8  **Q.  No, it's not correct or no, it's not the first**
9    **time?**
10  A.  No, it's not the first time.
11  **Q.  All right.  This was something that you have**
12    **done on duty in front of other police officers;**
13    **correct?**
14  A.  Yes.
15  **Q.  Nobody has told you during any of those scenes,**
16    **hey, don't do that, that's dangerous; correct?**
17  A.  Correct.
18  **Q.  Nobody has said, hey, that's excessive force,**
19    **you need to not do that; correct?**
20  A.  Correct, nobody has said anything like that.
21  **Q.  And at times, has this occurred even in front**
22    **of supervisors of the police department?**
23  A.  Yes.
24  **Q.  And those supervises never said, hey, don't do**
25    **that; correct?**

94

1  A.  Correct.
2  **Q.  And had you been told by a supervisor, hey,**
3    **don't do that, that can hurt somebody, that's**
4    **excessive, would you have tried to conform your**
5    **future conduct to the instruction?**
6  A.  Yes.
7  **Q.  And in this situation, you are merely doing**
8    **what you had been doing when you are on duty as**
9    **far as restraining somebody; correct?**
10  A.  To an extent, yes.
11  **Q.  During the investigation, you had commented**
12    **that you had him under control, he was on his**
13    **stomach, but you couldn't see his face.  Would**
14    **you agree with that?**
15  A.  That sounds fair, yes.
16  **Q.  And, also, when you were asked if you heard any**
17    **noises, you had said that you heard wheezing**
18    **noises coming from him toward the end.  Do you**
19    **recall that?**
20  A.  I don't recall that.
21  **Q.  Hang on one second here.  I got to find where I**
22    **put this.  I apologize.  Nothing is ever where**
23    **you think it's going to be.**
24        MS. BAYNARD:  Do you want to take a
25    break?

95

1        MR. JACOB:  Yeah, let's take a
2  minute.
3        (Recess.)
4  BY MR. JACOB:
5  **Q.  You recall speaking with David Dalland?**
6  A.  I do.
7  **Q.  Do you recall saying, "I didn't suffocate the**
8    **guy.  I had my arms around his neck, yes, and I**
9    **held him there, but I didn't suffocate the guy.**
10    **I didn't press hard enough"?  Do you recall**
11    **saying that?**
12  A.  I do.
13  **Q.  All right.  And you weren't lying to him at**
14    **that time; correct?**
15  A.  No.
16  **Q.  You had no reason to lie; correct?**
17  A.  Right.
18  **Q.  You knew that this was an investigation and**
19    **that you are required to tell the truth; right?**
20  A.  Right.
21  **Q.  And so when your arms are around his neck, can**
22    **you tell us how they were around his neck?**
23  A.  I was -- well, he was laying on his stomach and
24    I was on top of him with my knees on the
25    ground.  And just like I said before, my arm

96

1    was -- now, this was after a tussle, after
2    wrestling him for several minutes or however
3    long, I don't know, we were wrestling for.  And
4    we ended in this position where I was on top of
5    his upper back and my right arm was on the
6    ground like across his neck and chin area, and
7    my other hand, my elbow was on the ground next
8    to his head on the left side.
9  **Q.  In fact, when I saw on the video when the**
10    **officer comes in first, you are actually laying**
11    **down, though, on top of his back and upper head**
12    **area; correct?**
13  A.  I -- I was kind of like straddling him, I guess
14    you could say.
15  **Q.  I'm sorry.  Yes, you are straddling, but your**
16    **upper body is laying down on his back, neck and**
17    **head area; is that correct?**
18  A.  That's where I was positioned, yes.
19  **Q.  Okay.  And so you had the one arm under his**
20    **chin, neck area; correct?  That was your right**
21    **arm, did you say?**
22  A.  Yes.
23  **Q.  And then your left -- am I correct at some**
24    **point, though, you are sort of holding his**
25    **head?**

24  (Pages 93 to 96)

97

1 A.  I don't think I ever held his head.  I don't
2 think so.
3 Q.  Okay.  Well, even -- I mean, you are trying to
4 prevent him from rising up; right?
5 A.  Right.  Which he did several times during the
6 struggle.
7 Q.  So he's pushing up, you are pushing down with
8 your upper body against his back, head and neck
9 area; correct?
10 A.  Correct.
11 Q.  And with the arm underneath his neck, that
12 presumably -- was that what caused the
13 wheezing, do you think?
14 A.  I don't think so, no.
15 Q.  What do you think was causing the wheezing?
16 A.  Well, I just want to say during the incident, I
17 don't really -- well, I don't recall any
18 wheezing.  I know I might have said that, but I
19 don't recall it now.
20 Q.  Okay.
21 A.  And I didn't know at the time about all of his
22 health history with his lungs and asthma, and
23 things like that.  So that could have caused
24 the wheezing, but I don't know.  I didn't know
25 that was a thing at the time.  I didn't know

98

1 that was an issue.
2 Q.  All right.  But when you heard this respiratory
3 distress, did you do anything to adjust?
4 MS. BAYNARD:  Sorry.  Objection to
5 the form to the question with the phrase
6 "Respiratory distress," misstates --
7 mischaracterizes his testimony.
8 Go ahead.
9 THE WITNESS:  Well, yeah, I didn't
10 notice any respiratory distress at any time.
11 If I did, that would have changed the
12 situation.
13 BY MR. JACOB:
14 Q.  But we know you did because you told the
15 investigator that you heard him wheezing;
16 right?
17 A.  I don't -- well, I don't agree with that.
18 Q.  You don't agree that you told the investigator
19 that you heard wheezing?
20 A.  I don't remember saying that, but if you tell
21 me I did, it is possible.  But --
22 Q.  Okay.  Now, in fairness, you said, "I wasn't
23 squeezing tight enough where he couldn't
24 breathe."  Explain "squeezing" if you only have
25 an arm under his neck.

99

1 A.  Well, I didn't squeeze his neck at all ever.
2 Q.  Well, it says, though, that "I wasn't squeezing
3 tight enough where he couldn't breathe."  So
4 were you -- did you mean, like, the pressure
5 with the arm underneath, the pressure of your
6 upper body underneath?  Is that what you are
7 referring to?
8 A.  No.  Like I said, I never did squeeze his neck,
9 so if I said that, that was poor choice of
10 words.
11 Q.  Okay.
12 A.  But no, I never did squeeze his neck.
13 Q.  But you at least knew, though, that the arm was
14 under the chin and the neck area and your body
15 is on top of him, and at some point the
16 struggle stops; correct?
17 A.  Yes.
18 Q.  And at that point, what did you do to
19 deescalate to back off the level of force that
20 you were using?
21 A.  Well, I tried to deescalate before this even
22 happened.  I tried.
23 Q.  I understand.
24 A.  I tried to deescalate by telling him to leave
25 my house, but he didn't.  He escalated the

100

1 force.
2 Q.  I appreciate that.  Can we stay on the question
3 now, which was, at that point when he stops
4 moving -- let me ask it differently.  Am I
5 correct when he stops moving, you still hold
6 him in that position until the officer gets
7 there?
8 A.  I stayed on top of him until the police got
9 there, yes.
10 Q.  What, if anything, did you change, or did you
11 maintain that same restraint-type technique
12 until the officer got there?
13 A.  I just stayed on top of him with my knees and
14 elbows on the ground so he couldn't get back
15 up.
16 Q.  Okay.  And arm still under his chin and the
17 neck area?
18 A.  That's the position we ended up in, yes.
19 Q.  So he stops moving.  The arm doesn't get
20 withdrawn; correct?  Because it was still there
21 when the officer got there; correct?
22 A.  Well --
23 Q.  Right?
24 A.  That happened, yes.
25 Q.  So the officer gets there, and the arm is still

25 (Pages 97 to 100)

101

1 under his chin and the neck area, and he's not
2 moving anymore; correct?
3 A. Correct.
4 **Q. And, again, as we saw in the video, your upper**
5 body is still laying on his upper back, neck
6 and head area; correct?
7 A. I was on top of him, yes.
8 **Q. Okay. Is there anything that's not factually**
9 correct about what I just said?
10 A. I don't think so.
11 **Q. All right. And when asked by the officer,**
12 though, who arrives, "Is he breathing," you
13 said you didn't know?
14 A. Right. Because when that officer first walked
15 in, I said, "Handcuff this guy." That was my
16 main concern because I figured he was still a
17 threat.
18 **Q. I see. So --**
19 A. And --
20 **Q. So breathing was not your main concern?**
21 A. I didn't know there was anything wrong with his
22 breathing at all, so my main concern was
23 handcuff him. And then the officer asked me --
24 he kind of ignored me, my request to handcuff
25 him, and he asked me again -- or he asked me,

102

1 "Is he breathing?" And I said, "I don't know.
2 Handcuff him." I was blowing off his question
3 saying "handcuff this guy" for a second time
4 because I was concerned that he's still a
5 threat.
6 **Q. And yet he's essentially lifeless, he's not**
7 moving at that point; right?
8 MS. BAYNARD: Objection to the form
9 of the question, calls for --
10 If you know.
11 BY MR. JACOB:
12 **Q. Of course if you know.**
13 MS. BAYNARD: Yeah.
14 BY MR. JACOB:
15 **Q. If you don't know, don't tell me something you**
16 don't know. And of course if he's laying there
17 lifeless, tell me that, yes, that's what I
18 observed, he was laying there lifeless.
19 A. I did not know he was lifeless or not breathing
20 or anything like that. I didn't -- I thought
21 he was fine.
22 **Q. He was not moving at all at that point;**
23 correct?
24 A. I guess not.
25 **Q. And you still -- when the officer tells you to**

103

1 get up a couple times, you take his arms, you
2 put them behind his back and want him
3 handcuffed; correct?
4 A. Yes.
5 **Q. And, again, though, when asked, "Is he**
6 breathing," before you get up, you don't know;
7 correct?
8 A. I said, "I don't know. Handcuff him," because
9 I didn't think he wasn't breathing, I thought
10 he was fine.
11 **Q. Well, then why did you say, "He's fine.**
12 Handcuff him"?
13 A. Those just weren't the words that came out of
14 my mouth. I don't know.
15 **Q. Why didn't you say "handcuff him," and not even**
16 -- you said you were trying to blow off the
17 question or blowing off the question. Why
18 didn't you just say "handcuff him"?
19 A. Because I already did say that and he didn't
20 listen to me, and I had to -- I had -- I don't
21 know, say it in a way that would convey the
22 correct message to him, I guess.
23 **Q. So as you're there in that position when the**
24 officer walks in and he asks you if he's
25 breathing and you say you don't know, you did

104

1 know?
2 A. No, I did not know. I didn't know that he was
3 hurt in any way, shape or form.
4 **Q. Okay. So you didn't know if he was breathing,**
5 that's why you told the officer you didn't know
6 if he was breathing; correct?
7 A. No. I --
8 MS. BAYNARD: Objection --
9 Oh, sorry.
10 Objection to the form of the
11 question --
12 BY MR. JACOB:
13 **Q. Is that correct?**
14 MS. BAYNARD: -- asked and answered.
15 Go ahead.
16 THE WITNESS: I thought he was okay,
17 so "okay" would be him breathing. I thought he
18 was breathing.
19 BY MR. JACOB:
20 **Q. Okay. So you thought he was breathing and you**
21 told the officer you didn't know if he was
22 breathing. That's what you are saying?
23 A. That's right.
24 **Q. Okay. What were you doing while you were**
25 holding him once he started to calm down, slow

26 (Pages 101 to 104)

**Page 105**

```
 1      down and eventually stop moving?  Were you
 2      talking to him at all?
 3   A.  After he calmed down?
 4   Q.  Yes.
 5   A.  I don't think -- I don't remember talking to
 6      him after that.  I was exhausted from
 7      struggling so much and I figured he was, too,
 8      and I knew the police were going to be there
 9      any minute, so I thought everything was okay.
10   Q.  Did you say anything while you were doing it,
11      look, just relax, calm down, the police are
12      coming?  Anything that you recall?
13   A.  Before when we were struggling with each other,
14      I know I was -- we were talking to each other
15      then.
16   Q.  Do you remember what -- I know we could hear
17      him saying, "Let me go.  I will go home."  What
18      was your response to that?
19   A.  I said a bunch of words.  I don't remember the
20      exact things that I said, but I know I was
21      cursing and I was angry, you know.  But I don't
22      remember the exact words I said to him at that
23      point.
24   Q.  Okay.  So he does calm, he does stop moving.
25      How long before the officer gets there does
```

**Page 106**

```
 1      that happen?
 2   A.  I don't know exactly.  I really couldn't tell
 3      you.  It's been a long time.
 4   Q.  It wasn't at the same moment, though; correct?
 5      I mean, it wasn't that the officer walked in
 6      and then he stopped moving?
 7   A.  It wasn't instant.
 8   Q.  So he had stopped moving, and then some time,
 9      however much it is, passes, and then the
10      officer comes in; is that correct?  That's the
11      order of things?
12   A.  Yes.
13   Q.  And so between the time he stops moving and the
14      officer comes in, what are you doing to assess
15      him medically to see is he breathing, is he
16      okay?
17   A.  Well, one time when he originally stops
18      struggling with me, I did look down and I saw
19      that he was breathing.  I saw, like, the rise
20      and fall of his chest, and I thought to myself
21      it was a relief.  I was okay, thank God he's
22      done fighting me.  Everything is okay.  The
23      police will be here every minute, because I
24      called them, I gave them my address, so
25      everything is okay.  I thought everything was
```

**Page 107**

```
 1      okay.
 2   Q.  And yet the officer comes in, your upper body
 3      is back to laying down on him after apparently
 4      getting up and seeing him breathing, and your
 5      arm is still under his neck; is that correct?
 6   A.  I never got up.
 7   Q.  Okay.  How did you see him breathing unless you
 8      leaned up?
 9   A.  I just looked down.
10   Q.  But you're laying -- your body was laying on
11      him by the time the officer got there.  What
12      made you lay back down on him?
13   A.  I was on top of him, but I wasn't laying
14      100 percent of my bodyweight on him because my
15      arms -- or, I'm sorry, my elbows and my arms
16      and my knees were on the ground, so I was able
17      to just look down and see and feel that he was
18      breathing, and I didn't think it was a concern.
19   Q.  And you said, you know, thank God -- I think
20      you said you were telling yourself thank God
21      he's done fighting, the police are going to be
22      there.  So why did you leave your arm under his
23      neck?
24   A.  I didn't think it was a problem because I
25      wasn't -- I was not choking him, I wasn't
```

**Page 108**

```
 1      applying pressure to his neck, so I didn't
 2      think it was a problem.
 3   Q.  Okay.  Am I correct, though, all you can say is
 4      your arm was under his neck.  You can't say
 5      whether that was cutting off his airway or
 6      cutting off his blood flow.  Is that fair?
 7   A.  I don't think it was.  I don't believe it was.
 8   Q.  No, I understand.  But as you sit here, can you
 9      say with certainty, no, I wasn't cutting off
10      his airway at any point when my arm was under
11      his chin?
12   A.  I think I can say that, yes.
13   Q.  Can you say with certainty I did not cut off
14      his blood flow at all or restrict his blood
15      flow at all while my arm was where it was
16      placed at any time?
17   A.  With my arm?  Is that what your question was?
18   Q.  Based on how you are holding him, arm under the
19      chin, body laying down on him, can you say that
20      that technique did not restrict or stop his air
21      at any point in time?
22   A.  I can say that, yes.
23   Q.  You can say with certainty?
24   A.  Yes.
25   Q.  And same question with respect to blood flow.
```

109

1    Can you say that with certainty that it didn't
2    restrict the blood flow, cut off the blood flow
3    at any point in time?
4  A.  I mean, that's -- that's -- I can't really
5    answer that question. That's more for a
6    doctor, not me.
7  Q.  Well, I'm asking you can you sit here and say
8    yes or no?
9  A.  I guess not.
10 Q.  Okay. But if you were standing across the
11   room, you would be able to say I didn't slow
12   his blood down because I'm standing across the
13   room; correct?
14 A.  That's fair.
15 Q.  All right. So there are scenarios where you
16   would be able to tell us with certainty that
17   you didn't. For instance, standing across the
18   room; right?
19 A.  Right. If I was standing across the room, yes.
20 Q.  But with this technique that you are using on
21   Joel, you can't say with certainty that you
22   didn't restrict his blood flow. Fair?
23 A.  I can't say that.
24 Q.  Okay. Do you know now, because you said you
25   Googled it, the rear naked chokehold? Do you

110

1    know how that's performed?
2  A.  I think so. I've seen it on TV.
3  Q.  Am I correct, it's an arm underneath the chin,
4    neck area and the other arm putting pressure on
5    the head region?
6  A.  I don't know about that.
7  Q.  Okay. What's your understanding of how it's
8    performed?
9  A.  I don't -- well, I don't think it has any -- I
10   don't know. I didn't think it would have
11   anything to do with putting pressure on my
12   head. It's more of just the choke around the
13   neck.
14 Q.  Okay. That was your understanding?
15 A.  Yes.
16 Q.  Now, you said something to the effect you
17   weren't squeezing enough to choke. So you were
18   applying some pressure at some point; correct?
19 A.  No, I never did.
20 Q.  Never?
21 A.  No.
22 Q.  No pressure, your arm is just there?
23 A.  Right.
24 Q.  And you were not pushing down from above?
25 A.  I didn't have all my weight on him, no.

111

1  Q.  So you had some weight, but you were or were
2    not applying pressure to his neck area?
3  A.  I had some weight on top of him, but I was not
4    applying pressure to his neck.
5  Q.  Do you know if because you had weight on top of
6    him based on positioning and with your arm
7    under his neck necessarily there would have
8    been some pressure to his neck?
9        MS. BAYNARD: Objection, asked and
10   answered, and form of the question.
11       Go ahead.
12       THE WITNESS: I don't know that.
13 BY MR. JACOB:
14 Q.  Why did you say wasn't squeezing tight enough
15   where he couldn't breathe if you are saying now
16   that you didn't put any pressure at all?
17   That's a strange thing to say, isn't it?
18 A.  It was poor choice of words for me to say
19   anything at that point. I was very worked up
20   and I was mad and I was yelling at the
21   officers.
22 Q.  Okay. Why would you also say "I didn't press
23   hard enough" as opposed to I didn't put any
24   pressure on his neck?
25       MS. BAYNARD: Objection to the form

112

1    of the question.
2        Go ahead.
3        THE WITNESS: In hindsight, that's
4    what I should have said, but at that time, I
5    didn't -- like I said, I was worked up and I
6    was yelling, and it was just poor choice of
7    words on my part.
8  BY MR. JACOB:
9  Q.  So in hindsight, meaning, before you knew that
10   he had suffered a lethal injury, before you
11   knew that you were being criminally charged and
12   before you were being sued civilly, your
13   position was immediately after the incident
14   that I did not press hard enough; is that
15   correct?
16       MS. BAYNARD: Objection to the form
17   of the question, argumentative, misstates his
18   prior testimony.
19       Go ahead.
20 BY MR. JACOB:
21 Q.  Correct?
22 A.  No, that's not what I'm saying.
23 Q.  Okay. I noticed in your criminal trial your
24   attorney asked you about whether you had locked
25   your hand with your arm. Do you recall that?

28 (Pages 109 to 112)

---

113

1  A.  Yes.
2  Q.  And your answer was no; correct?
3  A.  Correct.
4  Q.  But I notice he didn't ask you if you had any
5     arms around or on his neck.  Do you know why?
6  A.  I don't.  I don't know why.
7           (Exhibit No. 16 was marked.)
8  BY MR. JACOB:
9  Q.  Showing you a document marked Exhibit Number
10    14.
11          MR. MUCHE:  Oh, that's 16.
12  BY MR. JACOB:
13  Q.  Oh, 16.  Gosh.
14          MS. BAYNARD:  Did you mark that
15    yesterday?
16  BY MR. JACOB:
17  Q.  No.
18          Do you know what that is?
19  A.  It looks like the criminal complaint against
20    me.
21  Q.  Now, having been a police officer, you are
22    familiar with what a criminal complaint looks
23    like; correct?
24  A.  Yes.
25  Q.  And you are aware that there's an affidavit of

---

114

1     probable cause attached to that?
2  A.  Is there?
3  Q.  I think it's -- well, we may call it something
4     different.  You guys -- sorry, different state.
5     You guys included just this part of the body of
6     it.  You would agree that it's sworn out by the
7     affiant; correct?
8  A.  That sounds right.
9  Q.  And that within the body of the complaint is
10    the -- what's supposed to be within the four
11    corners the facts that support probable cause
12    for the charge; correct?
13  A.  Right.
14  Q.  Presumably you've reviewed that document then.
15    Is that fair to say?
16  A.  I believe I read through when it first came out
17    in 2020.
18  Q.  All right.  Let's take five minutes, and I'm
19    going to ask you to review it just because I
20    have some questions about it.  And basically
21    the question is going to be is there anything
22    that's in there that is factually not correct?
23    Okay?
24  A.  Okay.
25          (Recess.)

---

115

1  BY MR. JACOB:
2  Q.  You've had an opportunity to review Exhibit
3     Number 16, which you identified as the criminal
4     complaint that was filed against you; correct?
5  A.  Right.  I just looked it over.
6  Q.  Now having read through it, can you -- is there
7     anything that is not factually correct stated
8     in that document?
9          MS. BAYNARD:  Hold on.  I'm going --
10    I'm going to object to the form of the question
11    and foundation.  This -- well, without making
12    speaking objections, the information that you
13    can confirm or -- trying not to make a speaking
14    objection.  That my objection on foundation be
15    the information that he knows.
16  BY MR. JACOB:
17  Q.  Obviously you are only being asked about what
18    you know.  So, again, is there anything in
19    there that you know to be not factually
20    correct?
21  A.  There's a lot of things in here.  One thing
22    that stuck out to me was the fact that it says
23    I had him in a rear naked chokehold, which that
24    is not correct.
25  Q.  Okay.

---

116

1  A.  There is a lot of things on here, I don't know,
2     but that was the one that stuck out to me.
3  Q.  Well, if there's other things, this is your
4     time.
5  A.  This is a long complaint.
6  Q.  Yeah.  We might be doing this in front of the
7     jury, though.  So, I mean, I want to know now
8     what you are going to identify.
9  A.  Well, after -- like I said, that was the one
10    thing that stuck out to me.  I'd have to
11    probably have more time to look at it.
12  Q.  We can take a longer break if you'd like.
13          MS. BAYNARD:  Can he mark on it?
14          MR. JACOB:  Huh?
15          MS. BAYNARD:  Can he mark on it?
16          MR. JACOB:  That's fine if you want
17    to use a highlighter.
18          MS. BAYNARD:  Just to keep track of
19    stuff.
20          THE WITNESS:  I suppose.
21          MS. BAYNARD:  Or he can underline.
22          MR. JACOB:  He can highlight it if
23    everyone is okay with that.  That's fine with
24    me.  Whatever.
25          MS. BAYNARD:  Do you want to call it

---

29 (Pages 113 to 116)

117

```
1    like 16 and 16A?
2         MR. JACOB:  That's fine.  He can use
3    a highlighter.
4         MS. BAYNARD:  It's totally up to you
5    however you want to best go through it.
6         THE WITNESS:  I don't know.  What
7    should be done here?  What's the right way to
8    do this?
9  BY MR. JACOB:
10 Q.  Just go take it paragraph by paragraph and look
11    it over, and if something jumps out as that's
12    not factually correct, tell us that's not
13    factually correct.
14 A.  All right.  The line that I said before on page
15    number 2, number 6 -- not the first number 6,
16    the second number 6, that's something I don't
17    agree with.
18 Q.  Can you read what part you don't agree with?
19 A.  Number 6, "It appeared that Mattioli had the
20    victim in a rear naked choke hold."  That I
21    don't agree with.  And, also -- let's see here.
22    Holding -- holding the victim's head, I wasn't
23    holding his head.  Yeah.
24 Q.  Okay.  Where is that in there?
25 A.  That's also in line number 6, same line.  Also,
```

118

```
1    number 6 at the end, it said, "Mattioli had his
2    body weight on the victim's upper body and it
3    appeared Mattioli may have been compressing the
4    victim's neck."  I was not compressing his
5    neck.  And that statement is kind of -- it
6    appeared that may have been, it's kind of a -- I
7    don't like that statement.
8  Q.  Okay.
9  A.  Line number 8, "He asked Mattioli if the victim
10    was breathing and Mattioli responded 'I don't
11    know.'"  Well, they cut off the second part of
12    the sentence that I said, which was "handcuff
13    him."  I think they do that another time in
14    this complaint somewhere, but I'm not sure.
15    But I don't agree with that because they take
16    half my words, not all my words.  Sorry, I'm a
17    slow reader.
18 Q.  That's fine.  Take all the time you need.
19 A.  There's some things about the writing out of
20    the 911 tape that I kind of don't agree with,
21    because I'm sure you guys have listened to it
22    and it's really garbled and it's not as clear
23    as they say it is on here.  And then -- I don't
24    know.  This is weird.  But that line 6, and
25    excuse my profanity, but it says I am stating,
```

119

```
1    "Oh yeah.  Oh yeah, fuck me fucking so bad."
2    Like I -- why would I ever say anything like
3    that?  That's strange.  So I don't really agree
4    with that.
5  Q.  With respect to the 911 tape that you just
6    said, are you saying it's factually incorrect
7    or just saying that you couldn't hear that when
8    you were listening to it?
9         MS. BAYNARD:  Sorry, hold on.  When
10    you say -- are you talking about the recreation
11    of it or playing it right now?
12 BY MR. JACOB:
13 Q.  He just said that he doesn't like the way it's
14    written out because he thought it was garbled.
15         So I'm asking if you're saying that
16    it's written out incorrectly or not?
17 A.  Well, I would have to listen to the tape and go
18    line for line, but I -- I will tell you this.
19    When I first saw this complaint and I read this
20    complaint, I thought, wow, that was clear as
21    day.  And then I listened to the tape, and I
22    said there's no way that this is the same tape
23    that they listened to because the tape was so
24    bad.  That's my opinion of it.
25 Q.  Okay.  So what you are saying is you're not
```

120

```
1    sure if it's factually correct, we need to
2    compare the two.  Is that fair?
3  A.  Fair.
4  Q.  But if the tape does say what it says it says,
5    then you don't dispute that the -- you are not
6    saying that the tape or the 911 call is not
7    authentic; correct?
8  A.  I believe it's authentic, it's just hard to
9    hear.
10 Q.  Okay.
11 A.  Yeah.
12 Q.  So it will speak for itself; correct?
13 A.  I suppose we can say that.
14 Q.  All right.  But you just want to make sure that
15    that is factually correct as stated in there.
16    Is that fair?
17 A.  Say that again.
18 Q.  Yeah.  You just -- as you sit here since we are
19    not comparing it right now, you are not
20    comfortable saying yes, it's factually correct.
21    You are saying that if, in fact, it matches,
22    then you don't dispute, but as you sit here you
23    can't say because you are not reviewing it?
24 A.  That's right.
25 Q.  That works.
```

30 (Pages 117 to 120)

121

1   A.  For example, the eff me so effing -- or so bad,
2       that can't be correct because I would never say
3       anything like that. That's a strange thing to
4       say, so I think that's wrong.
5   Q.  Okay.
6   A.  This line number 20 of the 911 tape where it
7       says, "Gasping and a sound similar to loud
8       snorting can be heard." I don't really agree
9       with that because I never heard a snorting
10      noise the night -- or the day of or on that
11      tape of all the times I listened to it. I
12      don't really -- I didn't really hear that.
13  Q.  Okay.
14  A.  All right. I think I'm done.
15  Q.  **Okay. Now, you've admitted that you are**
16      **attempting an arrest. On whose behalf would**
17      you be attempting that arrest?
18  A.  I was -- I held Joel down until the police
19      could come and get him on behalf of everybody,
20      on behalf of me, on behalf of Christopher who
21      got punched in it the face.
22  Q.  **My question is more on are you arresting on**
23      behalf of the state, are you arresting on
24      behalf of a local county, are you arresting on
25      behalf of another entity? That's my question.

122

1   A.  Well, I mean, it really wasn't like that, but
2       it happened in the city of Milwaukee, my house
3       was in the city and county of Milwaukee. I was
4       just -- like I said before, I just detained him
5       until the police could get there.
6   Q.  **I understand that, but we're past that where we**
7       already talked about the criminal trial where
8       you admitted where you were making an arrest as
9       well, where you told the investigators you were
10      making that arrest. We are past that. My
11      question is when you are making that arrest,
12      you are doing that on behalf of someone, the
13      king, the state, the federal government. I'm
14      just asking you on behalf of whom?
15          MS. BAYNARD: Objection to the form
16      of the question.
17          Go ahead.
18          THE WITNESS: I mean, I didn't see it
19      that way. In the heat of that moment, which
20      was chaotic, I didn't --- I wasn't thinking,
21      okay, I am arresting this man on behalf of the
22      county of Milwaukee.
23  BY MR. JACOB:
24  Q.  **I didn't ask that question. Can you just -- I**
25      appreciate that, but can you answer my

123

1       question? I have a reason for it. So when you
2       admitted that you are making an arrest, I'm
3       just asking you on whose behalf that arrest is?
4           MS. BAYNARD: Just object to asked
5       and answered. I do think he explained to
6       you -- I do think he answered the question.
7           But I think you can answer it again.
8           MR. MUCHE: I agree wholeheartedly.
9   BY MR. JACOB:
10  Q.  **Great.**
11          I don't get it, so help me
12      understand. I'm glad that they heard it and
13      understood it. Maybe you can explain your
14      answer to me. Was it on behalf of the federal
15      government, on behalf of the state government,
16      on behalf of some other government?
17          MS. BAYNARD: Same objection.
18          Go ahead.
19          THE WITNESS: I mean, I don't see it
20      that way. Even when I was an on-duty police
21      officer arresting somebody, I never -- that's
22      not something you think about.
23  BY MR. JACOB:
24  Q.  **So you don't know as a police officer on behalf**
25      of whom your authority comes from when you are

124

1       making an arrest?
2   A.  No, I didn't say that.
3   Q.  **Well, I'm asking you, when you are making an**
4       arrest, are you making it on behalf of the
5       federal government, the state government, your
6       counsel?
7   A.  Well, I suppose it would depend on the
8       circumstances of the arrest. That's -- I don't
9       know.
10  Q.  **So you were making an arrest. Would it have**
11      been for a federal crime?
12  A.  I don't think so, but --
13  Q.  **Would it have been for a state crime?**
14  A.  Possibly, yes.
15  Q.  **Would it have been for a local ordinance?**
16  A.  Possibly, yes.
17  Q.  **Okay. And when you are functioning as a police**
18      officer, performing your law enforcement duties
19      as a police officer, are you doing it on behalf
20      of, let's say, your neighbor said, hey, you are
21      going to be a police officer today, or are you
22      doing it on behalf of a police department that
23      says, hey, we are going to swear you in as a
24      police officer, we are going to ask you to
25      perform as a police officer on our behalf?

31  (Pages 121 to 124)

---

125

1  A.  The second part, on behalf of the police
2      department whatever.
3  Q.  And which police department was that?
4  A.  Well, the only police department I've ever
5      worked for was Milwaukee.
6  Q.  Okay.  And were you acting pursuant to -- or
7      when you are a police officer, are you acting
8      pursuant to your neighbor's book of rules, or
9      does your police department give you a set of
10     policies that you are acting pursuant to?
11 A.  The police department.
12 Q.  Or I should say attempting to act pursuant to
13     because I understand there was some question as
14     to whether you knew what was in certain
15     policies.  Is that fair?
16 A.  That's fair.
17 Q.  All right.  And with respect to training, you
18     went to the police academy, but that police
19     academy was put on the by the city; correct?
20 A.  Right.
21 Q.  So is it fair to say -- you also said that that
22     was the only law enforcement training you had.
23     When you were acting as a police officer, were
24     you attempting to apply the training that you
25     received from the city then?

---

126

1  A.  Can you say that again, please?
2  Q.  When you were acting in the capacity as a
3      police officer, were you attempting to conduct
4      yourself in accordance with the training
5      provided by the city?
6  A.  When I was a police officer?
7  Q.  Yeah.
8  A.  Like in general?
9  Q.  Is there another time?  I'm not trying to be
10     smart, but --
11 A.  Well, it kind of seems like you are talking
12     about the night of this incident.
13 Q.  Well, was there a different -- on the night of
14     the incident, was there some other training
15     that you were trying to adhere to, or were you
16     trying to always perform when you performed as
17     a police officer in accordance with the
18     training provided by the city?
19 A.  You are getting me tricked up with all of these
20     questions here.  I don't know how to correctly
21     respond.
22 Q.  All right.  Well, let's ask it this way.  When
23     you perform an arrest as a police officer,
24     okay --
25 A.  Okay.

---

127

1  Q.  -- are you always trying to conform your
2      conduct in accordance with your training?
3  A.  I suppose that's fair.
4  Q.  You were eventually internally investigated
5      related to this incident through IAD.  Is that
6      fair?
7  A.  I was.
8  Q.  And if I recall, the violations that were
9      alleged was integrity.  And basically a core
10     value of integrity and, again, a -- basically
11     saying you violated the law.  Is that fair?
12 A.  I think so.  I don't remember exactly what they
13     alleged me to have done.  I don't know.
14 Q.  Were you ever investigated specifically for
15     using a neck restraint?
16 A.  By MPD?
17 Q.  Yes.
18 A.  I don't know exactly what they did investigate
19     me for.
20 Q.  Okay.
21 A.  They investigated me for this incident, but I
22     don't know, like, what specifically what, you
23     know --
24 Q.  Did you ever receive -- or do you recall
25     receiving a document saying IAD is

---

128

1      investigating you because you were intoxicated
2      when you performed an arrest?
3  A.  I don't remember that, no.
4  Q.  Did IAD ever provide you or did MPD ever
5      provide you with a document that said you are
6      being investigated by IAD because you used
7      non-sanctioned techniques during an arrest?
8  A.  Not that I remember.
9  Q.  At some point, are you aware that a Dr. Brian
10     Peterson, a chief medical examiner, had
11     performed an autopsy on Joel?
12 A.  Yes.
13 Q.  And are you aware that the cause of death was
14     determined to be "anoxic encephalopathy" --
15     I will give you the spelling later.
16     -- "due to traumatic asphyxia"?
17 A.  That sounds right.  I believe that's what it
18     said in the complaint here.
19 Q.  And do you agree that the manner of death was
20     determined to be homicide?
21 A.  That's what it says in the complaint, yes.
22 Q.  And is it your contention that the medical
23     examiner's cause of death is not correct?
24     MS. BAYNARD:  Hold on a second.
25     Objection, calls for a medical -- medical

---

32 (Pages 125 to 128)

129

1    opinion far beyond what Mr. Mattioli can
2    render.
3         Go ahead.
4         MR. JACOB:  No, I'm not --
5         MS. BAYNARD:  That --
6         MR. JACOB:  Okay.  That's your
7    objection.  Fine.
8         MS. BAYNARD:  Go ahead.  Yeah.
9  BY MR. JACOB:
10  Q.  Yeah.  Are you saying that that is not correct
11    because of whatever reason, some information
12    you have or something else?
13  A.  From what I remember, I would have to sit down
14    and look at all of the medical reports, but I
15    don't know.  That was -- plus the standards for
16    them to call -- a medical examiner to call a
17    death a homicide are pretty low, from my
18    understanding.  But I would need to sit down --
19  Q.  And as you sit here at your deposition having
20    gone through the criminal trial, everything
21    else, as you sit here are you saying or are you
22    saying you can't answer -- are you saying that
23    this cause of death stated by this medical
24    examiner is not correct?
25  A.  This medical examiner, Dr. Peterson, he called

130

1    it a homicide.  That was -- that's what he
2    called it.
3  Q.  Okay.  Again, please listen to the question
4    because I'm not even talking about manner of
5    death right now, I'm talking about cause of
6    death when he said the anoxic asphyxia injury.
7    What I'm asking is as you sit here today, are
8    you saying or can you say that that cause of
9    death is not correct?  Either can say it or you
10    can't say it?
11         MS. BAYNARD:  Same objection.
12         Go ahead.
13         THE WITNESS:  I can't say that.
14  BY MR. JACOB:
15  Q.  And same question with respect to manner of
16    death being a homicide.  As you sit here today,
17    can you say that is absolutely not correct, or
18    I can't answer, or that is correct?
19  A.  I'd have to say the same.  I can't really
20    answer that.
21  Q.  In the event that the manner of death is
22    correct, it being a homicide, is there anyone
23    other than you whom you believe could have
24    caused that homicide?
25  A.  That's another strange question.  I don't know

131

1    how to answer that.  I mean --
2  Q.  Well, let's look at it this way.  Did anyone
3    come running in and commit a homicide in front
4    of you?
5  A.  No.
6  Q.  Okay.  So there's two of you who are hands on
7    with Joel; correct?
8  A.  Right.
9  Q.  Well, if the -- if it's proven that the manner
10    of death is, in fact, correct a homicide, was
11    it your friend who was holding the legs who
12    caused that, or would you have caused that, or
13    was there someone else that I'm not aware of
14    who caused that?
15         MS. BAYNARD:  Again, I think it calls
16    for an opinion outside of what he can render.
17         Go ahead.
18         THE WITNESS:  I don't know how to
19    answer your question.
20  BY MR. JACOB:
21  Q.  Truthfully would work.  I mean, seriously.
22    There's only two of you who were touching him.
23    Is there somebody else that I'm missing who
24    could have caused this homicide if it's proven
25    to be a homicide?

132

1  A.  Joel himself.  His actions had a huge part to
2    do with this, yes.
3  Q.  Okay.  That's what I'm asking.  So if it's
4    proven to be a homicide, you are saying that
5    Joel himself could have caused his own death.
6    Is that what you are saying?
7  A.  He had a large part to do with his own death,
8    yes.
9  Q.  Okay.  Anyone else -- if it's proven to be a
10    homicide, anyone else you could have --
11  A.  Not that I can think of, no.
12  Q.  How about you, do you believe that if it's
13    proven to be homicide that you caused that
14    homicide?
15         MS. BAYNARD:  Object to the form of
16    the question.
17         Go ahead.
18         THE WITNESS:  Well, I think it was
19    proven to not be homicide, wasn't it, at the
20    criminal trial?
21  BY MR. JACOB:
22  Q.  I'm asking you.  This was --
23  A.  So I don't agree with that.
24  Q.  Well, actually, it was proven not to be an
25    unlawful homicide; correct?  Meaning, nobody --

33 (Pages 129 to 132)

### 133

1 A. That was never really explained in the trial.
2 I never got any clarification to what the jury
3 decided on, if it was like a self-defense or a
4 defense of others, accident or something else.
5 There was no -- I never got any -- any
6 clarification on that.
7 Q. You would agree, though, that a person killing
8 another person is a homicide? Regardless of
9 whether it's lawful or unlawful, that is
10 homicide?
11 A. That's the definition there.
12 Q. All right.
13 A. That's the definition, I would think, yes.
14 Q. So, again, putting aside lawful or unlawful,
15 I'm just asking, if it's proven that this is,
16 in fact, a homicide -- because you said you
17 didn't agree with it. If it's proven, though,
18 that's it's a homicide, I'm asking who would be
19 involved in that? Would it have just been Joel
20 in his own body, would it have been you, would
21 it have been you and Joel?
22 A. Respectfully, it was proven not to be homicide
23 at trial.
24 Q. Okay. How about the injury, that is, again,
25 the anoxic injury, if that is proven to be the

### 134

1 cause of death, did you cause that, did Joel
2 cause that, did somebody else cause that?
3 A. I don't --
4 MS. BAYNARD: Hold on.
5 THE WITNESS: Sorry.
6 MS. BAYNARD: Calls for a medical
7 conclusion.
8 Go ahead.
9 THE WITNESS: I don't even know what
10 that all means.
11 BY MR. JACOB:
12 Q. Okay.
13 A. It's a big word.
14 Q. You were charged, you were ultimately
15 acquitted; correct?
16 A. I was.
17 Q. Did the city provide you with an attorney to
18 defend you during the criminal trial?
19 A. No.
20 Q. When it was determined that you hadn't violated
21 state law, did the city pay for your criminal
22 defense?
23 A. No.
24 Q. Do you know why?
25 A. I don't know why exactly, no.

### 135

1 Q. Were you offered your job back by the city?
2 A. No.
3 Q. When you were sued in this matter after it had
4 been determined by a jury that you had not
5 committed the crime as alleged, did the city
6 say, hey, we will defend you under a
7 reservation of rights?
8 A. No.
9 Q. Do you know why not?
10 A. I don't know exactly why, no.
11 Q. Do you -- are you aware that the city's
12 position is you were not acting as a police
13 officer that night?
14 A. I believe that's their position.
15 Q. Are you aware that the city's position is you
16 were acting in self-defense as just a citizen?
17 A. I think so.
18 Q. When you were just a citizen before you became
19 a police officer, did you believe you had a
20 lawful right to go arrest people on behalf of
21 the state?
22 A. Well, there is the statute of citizen's arrest.
23 Q. Okay.
24 A. Citizens do have the power to arrest a person
25 or defend themselves or defend others, so I

### 136

1 suppose, yes.
2 Q. Okay. And, in fact, officers can also engage
3 in self-defense while performing their duty;
4 correct?
5 A. That's correct.
6 Q. So the mere fact that you are at one point
7 believing that you were acting in self-defense,
8 that doesn't mean you weren't acting as a
9 police officer; correct?
10 A. Me acting in self-defense doesn't necessarily
11 mean I was acting as a police officer. You
12 know, it was a very fast and fluid situation.
13 Q. No. I'm saying even if you were at some point
14 during this incident -- I understand it's fluid
15 and it changes. But at some point if you were
16 trying to defend yourself, that doesn't mean
17 that you weren't a police officer; correct?
18 correct?
19 MS. BAYNARD: I'm just going to
20 object to the form of the question.
21 Go ahead.
22 THE WITNESS: I'm trying to
23 understand the question here.
24 BY MR. JACOB:
25 Q. The city is saying you are acting in

34 (Pages 133 to 136)

137

```
 1    self-defense, therefore, you are not acting as
 2    a police officer.
 3  A.  Okay.
 4  Q.  My question is aren't there times as a police
 5    officer where you may need to act in
 6    self-defense?
 7  A.  Yes.
 8  Q.  And that doesn't mean if you suddenly act in
 9    self-defense that you are not a police officer;
10    correct?
11  A.  That's right.
12  Q.  And when you are a citizen while you may have
13    been able to perform a citizen's arrest, you
14    were not actually assigned that as a job to go
15    out and arrest people on behalf of the city;
16    correct?
17  A.  Before I was a police officer?
18  Q.  Yes.
19  A.  No.
20  Q.  Okay.  Just going to take a -- oh, wait.  I'm
21    sorry, there is one.  Sorry.  I'm showing you a
22    document marked Exhibit Number 11.  What is
23    that?
24  A.  This is my letter of resignation from the
25    police department.
```

138

```
 1  Q.  Did you do anything wrong during this incident
 2    as a police officer?
 3  A.  I don't believe so, no.
 4  Q.  Why did you resign?
 5      MS. BAYNARD:  I'm just going to
 6    object to the extent that it invokes anything
 7    that would be protected by attorney-client
 8    privilege.
 9  BY MR. JACOB:
10  Q.  No offense, don't -- I'm not asking what your
11    attorney says, I'm asking you.  Why did you
12    resign?
13      MS. BAYNARD:  Yeah, you personally.
14      THE WITNESS:  Sure.  The reason I
15    resigned is -- I didn't want to resign, but the
16    Fire and Police Commission was very quickly
17    doing their investigation, and they were even
18    going to have a trial and they were doing all
19    sorts of stuff I think within a month or two of
20    this incident happening, and they were going to
21    televise everything.  So they were going to
22    televise -- because everything was televised,
23    everything was on the news.
24      So that means all the information
25    about my trial -- or about this incident would
```

139

```
 1    have been out in the news immediately.  And my
 2    two criminal attorneys advised me --
 3  BY MR. JACOB:
 4  Q.  I don't want to know that.
 5      MS. BAYNARD:  Yeah.
 6  BY MR. JACOB:
 7  Q.  Okay.  So that's why you resigned?
 8  A.  To prevent them from basically violating my
 9    constitutional rights of having a fair trial.
10  Q.  So is it fair to say you were put in a
11    Catch-22, that either you exercise your
12    constitutional rights or you protect your
13    employment, and you had to choose one or the
14    other?
15  A.  That's fair.
16      MR. JACOB:  Let's take a moment.
17      (Recess.)
18  BY MR. JACOB:
19  Q.  Just to clarify, in your discovery responses
20    and I believe that you even said, you were
21    trying to comply with the off-duty policy;
22    correct?
23      MS. BAYNARD:  Hold on one second.
24    Object to the form of the question.  Did you
25    say in his discovery responses?
```

140

```
 1  BY MR. JACOB:
 2  Q.  Yeah.  In request for admissions, there's
 3    something the policy -- I remember he was
 4    saying he was trying to comply with the policy.
 5      You knew that there was an off-duty
 6    policy with respect to police officers;
 7    correct?
 8  A.  I know that -- yeah.  I knew that there was
 9    such a policy.
10  Q.  And in your discovery responses, you indicated
11    that you had been trying to comply with that
12    policy.  You don't dispute that; right?
13  A.  I don't really remember that.
14  Q.  Okay.  You just don't remember as you sit here
15    today?
16  A.  I don't remember saying anything like that.
17  Q.  Okay.  Okay.
18  A.  I don't remember every word.
19      MR. JACOB:  Okay.  We will rest on
20    your discovery responses.  That's fine.  Fair
21    enough.  All right.  I'm finished.
22      EXAMINATION
23  BY MR. MUCHE:
24  Q.  Okay.  Good morning, Mr. Mattioli.  I'm going
25    to probably hop around a little bit.
```

35 (Pages 137 to 140)

141

1 A. Okay.
2 Q. Maybe just go in reverse order. There's just a
3 couple points I want to pick up that came over
4 the course of this morning, but I'm not going
5 to belabor this any more than necessary.
6 A. Okay.
7 Q. I think the last sort of thing that you were
8 discussing with Attorney Jacob was your letter
9 of resignation. And that obviously took place
10 chronologically before the criminal trial;
11 right?
12 A. Right.
13 Q. So at the point that you were acquitted by the
14 criminal jury, you had already resigned from
15 that?
16 A. Right.
17 Q. You didn't -- you didn't approach the police
18 department in any way seeking reinstatement at
19 that point, did you?
20 A. No.
21 Q. Okay. At the point that you invited
22 Mr. Acevedo to your house on April 18th of
23 2020, fair to say you knew his first and last
24 name?
25 A. Yes.

142

1 Q. Had you ever -- I believe we talked previously,
2 Mr. Acevedo had met you at your house before a
3 St. Patrick's Day pub crawl event at some point
4 prior to this; right?
5 A. Yes.
6 Q. Had you ever been to Mr. Acevedo's house?
7 A. No.
8 Q. Were you aware where he lived?
9 A. I just knew he lived in Milwaukee somewhere was
10 my understanding.
11 Q. Okay. Fair enough. There was some discussion
12 previously about -- about some attempts to
13 transcribe the 911 call; right?
14 A. Right.
15 Q. Do you also remember during the course of your
16 criminal trial when the district attorney
17 played the 911 recording and asked you
18 questions about it?
19 A. Yes.
20 Q. And in the course of that testimony, I think
21 there were specific questions identifying
22 certain statements that were captured in that
23 recording and you identified yourself as the
24 speaker. Do you remember that?
25 A. That sounds right.

143

1 Q. As you sit here today, is it your testimony
2 that to the extent that you identified yourself
3 as the speaker at the criminal trial that that
4 was truthful and accurate?
5 A. As -- I identified myself on that tape, yes.
6 There was other people's voices on that tape,
7 but I -- I'm sure I identified myself during
8 the trial. I know I made the call and I was
9 the first -- I believe I was the first person
10 to talk on that tape, I think, so that sounds
11 right.
12 Q. Okay. And just one more clarification to make
13 sure that we're connecting with one another,
14 right. I agree with you that there are other
15 voices on the call. To the extent that you
16 testified at your trial this particular voice,
17 that was me -- that this was me that time, you
18 would agree with all of that now?
19 A. I don't remember my exact testimony to what
20 question was asked. I don't remember exactly,
21 but I know I did testify about that tape, and
22 they did play the tape in the trial. I just
23 don't remember exactly what I said or what was
24 asked of me.
25 Q. Do you want to review the transcript of those

144

1 proceedings to refresh your recollection?
2 A. If it will help.
3 Q. Okay. Well, it's fair to say your memory is
4 exhausted at this point; right?
5 A. Well, I don't remember everything. It was five
6 years ago and I would love to put this behind
7 me.
8 Q. I can appreciate that. Okay. So why don't we
9 mark this as Exhibit 17. And then once it's
10 marked, Mr. Mattioli, I will just ask you to
11 look at pages 72 and 73.
12 (Exhibit No. 17 was marked.)
13 THE WITNESS: 72 and 73?
14 BY MR. JACOB:
15 Q. Yeah. And there's actually some highlighted
16 portions on that page. I wasn't necessarily
17 anticipating offering this as an exhibit, but
18 you can actually limit your focus to the
19 highlighted portions of 72 and 73, I think.
20 A. Okay.
21 Q. And when you've had a chance to read that, just
22 let me know.
23 A. Okay.
24 Q. Having reviewed your prior testimony, is your
25 memory as to the specific statements to the 911

36 (Pages 141 to 144)

145

1    recording refreshed?
2  A.  For this particular section of it, yes.
3  Q.  Okay.  And so now that your recollection has
4     been refreshed, I will just return to my
5     original question.  To the extent that you
6     identified particular statements as statements
7     that you made that were captured in that
8     recording, was that testimony truthful to the
9     best of your recollection now?
10 A.  Yes.  I -- it was truthful, and I identified --
11    the district attorney asked me, was this -- did
12    you say this, and I said yes, did you say this,
13    and I said yes.
14 Q.  Okay.  When Officer Roach and Officer Sheremeta
15    arrived at your home on the morning of
16    April 19th, you were wearing jeans -- a pair of
17    jeans and a T-shirt; right?
18 A.  Right.
19 Q.  And that T-shirt was a memorial T-shirt related
20    to an officer that had been killed on duty?
21 A.  Yes.
22 Q.  Okay.  Was that item of clothing issued to you
23    by the Milwaukee Police Department?
24 A.  No.
25 Q.  Was that item of clothing part of your uniform

146

1     as a Milwaukee police officer?
2  A.  No, it was -- no, it was just a shirt.
3  Q.  Fair to say that if you were scheduled to be at
4     work, you would be -- you would be wearing
5     something else, a uniform and not that T-shirt?
6  A.  Well, at the end of my career, I did work in
7     plain clothes and there were times I did wear a
8     T-shirt or T-shirt of that nature.
9  Q.  To the extent -- well, fair enough.  You had
10    testified earlier that it was somewhat implied
11    or understood that Andrew and Chris would sleep
12    over on the evening of the 18th; right?
13 A.  That was my understanding that they would most
14    likely sleep over.
15 Q.  And that's because everybody was going to be
16    consuming alcohol that night; right?
17 A.  Right.
18 Q.  And because after consuming alcohol, your
19    functions and faculties could be impaired and
20    it might not be safe to operate machinery like
21    a motor vehicle?
22 A.  Right.
23 Q.  And for the same reason, you told Mr. Acevedo
24    that he could stay over that evening; right?
25 A.  Right.

147

1  Q.  Fair to say that you were intoxicated when you
2     went to bed?
3        MR. JACOB:  Objection.
4  BY MR. MUCHE:
5  Q.  You can answer.
6        MS. BAYNARD:  You can answer.
7        THE WITNESS:  Okay.
8        MS. BAYNARD:  He's allowed to make
9     objections, too.
10       THE WITNESS:  Okay.  Yes.  I was
11    intoxicated when I went to bed.
12 BY MR. MUCHE:
13 Q.  And would you also agree that you were
14    intoxicated when you woke up in the morning?
15       MR. JACOB:  Objection.
16       MS. BAYNARD:  Go ahead.
17       THE WITNESS:  Somewhat, yes.
18 BY MR. MUCHE:
19 Q.  Okay.  Prior to your being sworn in as a
20    Milwaukee Police Department officer, you first
21    joined the police department as a police aide;
22    is that right?
23 A.  Right.
24 Q.  And when was that?
25 A.  I think it was in 2006.

148

1  Q.  Is that the same year you graduated high
2     school?
3  A.  God, 2005 I think I graduated, and '06 I
4     started at the police department.
5  Q.  Okay.  So did you have any other jobs after
6     graduation before starting with the police
7     department as a police aide?
8  A.  I did.
9  Q.  Okay.  What were those?
10 A.  I did a few -- I did a few different things.
11    What did I do?  I worked at Leon's Custard
12    Stand, I worked in American TV Distribution
13    Center, and I worked somewhere else.  I can't
14    remember.  At a car wash I worked at the time.
15    A bunch of weird jobs.
16 Q.  Would you agree that you were basically angling
17    to get onto the police force from graduation?
18       MS. BAYNARD:  Objection to the form
19    of the question.
20       Go ahead.
21       THE WITNESS:  No.  No.  Because I
22    started going to college for pre-dentistry.
23    Maybe I should have stayed in that, but for
24    some reason I chose to be a police officer
25    instead.

37 (Pages 145 to 148)

149

```
1  BY MR. MUCHE:
2  Q.  Fair enough.  In any event, when you became a
3      police aide, you signed an acknowledgement that
4      you had received all of the policies and
5      procedures of the police department; right?
6  A.  I don't really remember that as a police aide.
7      I remember as a police officer in the academy,
8      but not as a police aide.
9  Q.  Okay.  Give me just one second to find the
10     appropriate page here.  And I think maybe you
11     can help me out because maybe I'm
12     misunderstanding.  Exhibit Number 8 --
13          MR. JACOB:  I got you.
14          MR. MUCHE:  Thank you.
15          MR. JACOB:  8 is the oath, 7 is the
16     acknowledgement.
17 BY MR. MUCHE:
18 Q.  Okay.  Then I mean 7.  Thank you.  I appreciate
19     it.
20          So I think we took at look at -- or
21     you took a look at this earlier in the course
22     of Attorney Jacob's questions; right?
23 A.  Right.
24 Q.  And do you see at the bottom of the this page
25     the date that this document was signed?
```

150

```
1  A.  Yes.  I see it's in 2006, which would have been
2      when I was a police aide.  I didn't realize
3      that date before when he was asking me.  Before
4      I assumed it was from the academy, but now I
5      see it's 2006.
6  Q.  Okay.  And then you also had an opportunity
7      earlier this morning to review Exhibit
8      Number 6, which were topic acknowledgements
9      that you -- you executed during the course of
10     your service as a police officer; right?
11 A.  Can I see that again?
12          MS. BAYNARD:  Sorry, which one are
13     you saying?
14          MR. MUCHE:  6.
15          MS. BAYNARD:  6.  So it will be in
16     front of you.
17          THE WITNESS:  Okay.  This long list
18     of SOPs?
19 BY MR. MUCHE:
20 Q.  Yes.  And I think your testimony earlier might
21     have been that you hadn't seen this document
22     previously; right?
23 A.  Right.
24 Q.  If I were to represent to you that this is a
25     print-off of the records maintained by the
```

151

```
1      police department about topic acknowledgements
2      you made during your time as a police officer,
3      would you have any reason to doubt that?
4  A.  No.
5  Q.  And so can you just -- well, let me back up.
6      As policies change during the course of your
7      time as a police officer, you would receive
8      correspondence from the department asking that
9      you acknowledged those changes; is that right?
10 A.  Right.
11 Q.  How exactly did that work?  Like is it an
12     e-mail, or is it a link that takes you to a
13     portal, or something different?
14 A.  I don't really remember.  It might have been in
15     an e-mail, but I can't remember.
16 Q.  Okay.
17 A.  It's been a long time.
18 Q.  Was it your understanding at that time that the
19     expectation was that you would read the
20     changes?
21 A.  Well, that was never really explained to me.  I
22     know we were responsible for it, but nobody
23     ever -- like I said, there was no time to sit
24     down and read this.  Especially with new
25     changes coming out over and over, it was
```

152

```
1      unreasonable to -- unrealistic to read all of
2      that while you are working.
3  Q.  Appreciating all of that, would you agree or
4      disagree that your understanding was you were
5      expected to do that, whether it was feasible?
6  A.  Well, nobody ever did tell me that.
7  Q.  All right.  That's fair.  I think there was a
8      question earlier about whether you were -- you
9      were trained in the course of your time as a
10     Milwaukee police officer to only use trained
11     tactics.  And if memory serves, your answer was
12     that maybe that wasn't said to you in so many
13     words.  Does that sound right?
14          MS. BAYNARD:  Object to the form --
15          MR. JACOB:  Objection.
16          MS. BAYNARD:  -- form of the
17     question.  Can you say the question again?
18 BY MR. MUCHE:
19 Q.  I will withdraw the question and try it a
20     different way.  During the course of the time
21     that you were a police officer, were you aware
22     of any action taken by supervising officers
23     either to yourself or any of your colleagues
24     relative to the use of untrained tactics?
25 A.  Was there any training to that?  Is that
```

38  (Pages 149 to 152)

153

1    what --
2    Q.  Were there any corrective measures, any policy
3    consultations, any disciplinary actions?
4         MS. BAYNARD:  Just -- I'm going to
5    object to the form of the question.
6         You can answer.
7         MR. JACOB:  Objection.
8         THE WITNESS:  I don't know how to --
9    I don't want to speak to that.
10   BY MR. MUCHE:
11   Q.  You can answer if you can.
12   A.  I really don't remember.
13   Q.  You do recall when you were speaking with
14   Inspector Dalland making a comment in response
15   to him about how it was not a trained
16   technique; right?
17   A.  Right.
18        MR. JACOB:  Objection.
19   BY MR. MUCHE:
20   Q.  And is that because you were aware that use of
21   untrained techniques could result in a
22   supervisory response?
23        MS. BAYNARD:  Objection to the form
24   of the question.
25        Go ahead.

154

1         THE WITNESS:  I -- no.  I said that
2    to him because it was not a trained technique.
3    BY MR. MUCHE:
4    Q.  But why was that significant to you, I guess,
5    is what I'm trying to understand?
6         MS. BAYNARD:  Objection to the form
7    of the question.
8         Go ahead.
9         THE WITNESS:  Well, because they were
10   accusing me of strangling Joel, and I was
11   trying to tell him that I -- that was not what
12   happened here.
13   BY MR. MUCHE:
14   Q.  You went to bed sometime after midnight in the
15   second floor of your house; right?
16   A.  Right.
17   Q.  And then you were awoken in the morning by
18   Mr. Acevedo in your bedroom?
19   A.  Correct.
20   Q.  And you and Mr. Acevedo became involved in a
21   verbal argument at that point; is that right?
22   A.  That's fair.
23   Q.  And that argument sort of which began on the
24   second floor proceeded down to the first floor
25   of the house; right?

155

1    A.  Yes.
2    Q.  And ultimately, Mr. Acevedo struck you on the
3    first floor; right?
4    A.  Yes.
5    Q.  And then actually punched your friend, Chris,
6    on the first floor; right?
7    A.  Right.
8    Q.  At that point, he fell onto the ground and you
9    jumped onto his back?
10   A.  Joel fell, yes.
11   Q.  At any point while you were on Mr. Acevedo's
12   back, did you say the words "you are under
13   arrest" to him?
14   A.  No.
15   Q.  You and Mr. Acevedo began wrestling in, I think
16   it was, sort of the living room area, and that
17   proceeded in the kitchen area of the house on
18   the first floor; right?
19   A.  Right.  It was all kind of right in the
20   doorway.
21   Q.  Okay.  And during the time that you were
22   wrestling or struggling with him, at any point
23   did you say the words "stop resisting"?
24   A.  No.
25        MR. MUCHE:  I don't think I have

156

1    anything else.
2         EXAMINATION
3    BY MS. BAYNARD:
4    Q.  I will be quick, well, as I can.  I am going to
5    direct you to Exhibit 16.  Now, you were asked
6    to identify this document and review it for its
7    factual accuracy; true?
8    A.  True.
9    Q.  You didn't draft this document; correct?
10   A.  No, I did not.
11   Q.  And other than -- or would you agree that
12   statements you've made are quoted partially in
13   this document?
14   A.  Yes, that's fair to say.
15   Q.  Other than statements that you've made that are
16   quoted in their accuracy, can you, I guess,
17   confirm or deny the accuracy of any of the
18   information in here, factual accuracy?
19        MR. JACOB:  Objection.
20        THE WITNESS:  I suppose not.
21   BY MS. BAYNARD:
22   Q.  Now, I'm going to take you to the second page.
23   And I believe when you were asked to point out
24   things you disagreed with, you said the second
25   number 6 and the second number 8.  Would you

39 (Pages 153 to 156)

157

1    agree with that?
2           MR. JACOB:  Objection as to
3    characterization of my question.
4           MS. BAYNARD:  What was your --
5           MR. JACOB:  It was what was factually
6    correct or incorrect.
7    BY MS. BAYNARD:
8    **Q.  Oh, factually, sorry, correct or incorrect.**
9           Would you agree that the -- before we
10   get to 1 through 12 on that page -- so I'm just
11   going to point to it so we can move along
12   faster.  It indicates Investigator Sarah Blomme
13   interviewed Officer Roach.  Do you agree that
14   these bullet points come from statements
15   Mr. Roach made to an Investigator Sarah Blomme?
16   A.  That sounds right.
17   **Q.  Okay.  I'm going to take you to the second or**
18   the third page and the first set of -- the
19   first set of numbers.  If you look at number 3,
20   do you recall ever making a statement -- and I
21   can't tell if I'm looking at this as the
22   complete statement or not.  There's a quote
23   from Mattioli, "there's no funny business Joel
24   might tell you something else... I have
25   nothing to hide.  I was just going to sleep.  I

158

1    held him on the ground in my kitchen for quite
2    a while before the police showed up.  I told
3    him to get out of my house."  And there's other
4    stuff quoted from you.
5           Do you recall telling -- or making
6    the statement, "there's no funny business Joel
7    might tell you something else"?
8    A.  I do remember that.
9    **Q.  Did you make the statement because -- I guess,**
10   why did you make the statement?
11   A.  Because I thought Joel was going to tell the
12   police -- was going to lie to the police about
13   what actually happened.
14   **Q.  And this was after the police had showed up and**
15   you had been taken out of your house?
16   A.  Right.
17   **Q.  Okay.  And so you -- I guess you said this**
18   because you believed that Joel was going to be
19   able to make a statement; true?
20   A.  Right.
21   **Q.  I think there was a line of questioning about**
22   the medical examiner's report or to that
23   extent.  I'm on page 4.  Do you recall -- and
24   I'm going to direct you to bullet point --
25   there's the first bullet point 5.  During the

159

1    criminal trial or when reviewing this
2    complaint, do you recall seeing notes from the
3    fire department that says, "During the time he"
4    -- the EMT -- "was with the patient he did not
5    see any marks on the patient's neck or anything
6    out of the ordinary on the patient's body."
7           Do you recall that testimony from the
8    trial or learning that at any point after this
9    incident?
10   A.  I remember reading it on the complaint.
11   **Q.  I'm not going to belabor the 911 call on the**
12   back, but you would agree that -- the statement
13   "Let me go home... my scores not woke... I'm
14   going home."  First, did you ever hear Joel
15   Acevedo say, "let me go home... my scores not
16   woke... I'm going home" while you guys were --
17   during the interaction with him?
18   A.  No.  I don't remember him saying anything about
19   "Let me go home."  And "my scores not woke," I
20   don't remember him saying that.  And even if I
21   heard that, I wouldn't even know what that
22   would even mean --
23   **Q.  Okay.**
24   A.  -- at the time.
25   **Q.  You were asked questions about statements you**

160

1    made to investigators either directly after or
2    on body cam relating to your positioning of
3    Joel Acevedo, like around his neck, you didn't
4    squeeze that hard.  Do you remember that line
5    of questioning?  And I'm sorry, when I say "do
6    you remember," I mean, do you remember today
7    when the plaintiff attorney asked you about
8    that.
9    A.  Yes.
10   **Q.  Okay.  When you were asked those questions on**
11   the date of the incident, was that after you
12   were told by the investigator that Joel Acevedo
13   had marks on his neck?
14   A.  I believe it was.  And they told me he wasn't
15   doing well, but I didn't believe that.
16   **Q.  Okay.  And I guess who's the first person that**
17   tells you that Joel -- or does anyone ever tell
18   you during this kind of questioning session --
19   so there's several statements in here, but
20   after you are arrested until they book you,
21   that Joel Acevedo has marks on his neck?
22   A.  I thought -- if I remember right, I thought
23   Dalland told me that when we were at the police
24   station.
25   **Q.  So when you make the statement something like**

40  (Pages 157 to 160)

161

1    -- I guess it was quoted, "I didn't suffocate
2    the guy. I had my arms around his neck yes,
3    and I held him there but I didn't suffocate the
4    guy. I didn't press hard enough," were those
5    in response to being confronted -- I don't want
6    to say "confronted" -- being informed by
7    Dalland that Joel wasn't doing well and he had
8    marks on his neck?
9  A. I believe so, yes.
10 Q. Okay. Now, I believe you said that you've
11    talked about way, way, way back that there were
12    -- something about the technique you had used
13    with Mr. Acevedo to keep him on the ground, and
14    that you had used this technique to get people
15    in handcuffs before; true?
16 A. I have.
17 Q. Has anyone ever died while you placed them in
18    handcuffs?
19 A. Never.
20 Q. Did you have any idea -- well, strike that.
21       Do you know now that Mr. Acevedo had
22    some medical issues?
23 A. I do now.
24       MR. JACOB: Objection.
25 BY MS. BAYNARD:

162

1  Q. Okay. And you sat through the criminal trial,
2    you listened to the medical evidence from the
3    medical examiner and other experts presented by
4    the defense; true?
5  A. I did, yes.
6  Q. Did you have any idea that Mr. Acevedo had
7    asthma on the night of the incident?
8  A. No.
9  Q. Okay. At any point from the time that you are
10    -- during, I'm going to call it, the
11    altercation, does Mr. Acevedo appear to be in
12    medical distress?
13 A. No. Not to my knowledge, no.
14 Q. And at some point, you said he, like, gave up
15    or became calm; true?
16 A. Right.
17 Q. What did you perceive that as?
18 A. Excuse me. I perceived him as giving up the
19    fight. And I was exhausted, so I figured he
20    was, too. And basically, I thought he accepted
21    the fact that the police were on their way and
22    he wasn't going to get away, and that was it.
23 Q. And when you called -- or strike that.
24       Now, I think you said you had a duty
25    weapon at -- your duty weapon was at your house

163

1    in the office during this incident?
2  A. That's right.
3  Q. Did you ever -- and you never thought to go get
4    your duty weapon; true?
5  A. True. That never crossed my mind.
6  Q. And Mr. Acevedo punched your friend in the
7    face; true?
8  A. True.
9  Q. Did you punch Mr. Acevedo?
10 A. No, never.
11 Q. Did you ever push Mr. Acevedo?
12 A. No.
13 Q. Did you kick him?
14 A. No.
15 Q. Did you strike him?
16 A. No.
17 Q. Did you choke him?
18 A. No.
19 Q. Did you -- I guess what --
20       MR. JACOB: Sorry. Objection to that
21    last question.
22       MS. BAYNARD: My next question?
23       MR. JACOB: No, the last one. Your
24    next one I don't know what it is. Your last
25    question.

164

1  BY MS. BAYNARD:
2  Q. And what was the purpose in holding
3    Mr. Acevedo, keeping him on the ground until
4    the police showed up?
5  A. Joel was -- he was throwing punches at people,
6    and I wanted to keep him on the ground so he
7    couldn't do that anymore until the police could
8    show up to arrest him.
9  Q. And did you mean to cause any harm to
10    Mr. Acevedo?
11 A. No, not at all.
12 Q. And was Mr. Acevedo the aggressor in this
13    situation?
14       MR. JACOB: Objection.
15       THE WITNESS: He was 100 percent the
16    aggressor the entire time.
17 BY MS. BAYNARD:
18 Q. Okay. We've heard the term thrown around "rear
19    naked chokehold." Have you ever performed a
20    rear naked chokehold in your entire life?
21 A. No.
22 Q. Did you put Mr. Acevedo in a rear naked
23    chokehold?
24 A. No.
25 Q. And did you know Mr. Acevedo was using illegal

41 (Pages 161 to 164)

165

```
1   drugs on the night of or into the early morning
2   of April 19th of 2020?
3  A.  No, I didn't know it that day.
4  Q.  And you were asked whether or not you would
5   have had the ability to use deadly force.  Do
6   you -- do you recall that question?
7        MR. JACOB:  Objection.
8  BY MS. BAYNARD:
9  Q.  You can answer.
10 A.  Yes, I was asked that question.
11       MR. JACOB:  No.
12 BY MS. BAYNARD:
13 Q.  Even if --
14       You didn't ask him that?
15       MR. JACOB:  No, I --
16       MS. BAYNARD:  If he would have been
17  permitted to?
18       MR. JACOB:  If it would have been
19  lawful as a police officer in that
20  circumstance.
21 BY MS. BAYNARD:
22 Q.  Okay.  So even if you would have been permitted
23  to use deadly force against Mr. Acevedo, and by
24  "Deadly force," I mean, your firearm against
25  Mr. Acevedo, would you have?
```

166

```
1  A.  I don't think so because it was never my
2   intention to hurt him and it definitely wasn't
3   my intention to kill him.  I just wanted to
4   hold him there until the police could get
5   there.
6  Q.  You held him there because you wanted to
7   prevent him from becoming assaulted again?
8  A.  Correct.
9  Q.  And assaulting you?
10 A.  Correct.
11 Q.  And assaulting Mr. Peters?
12 A.  Yes.
13 Q.  The plaintiffs -- I'm going to represent to you
14  that the plaintiffs -- you are aware that the
15  plaintiffs filed a complaint against you, a
16  civil complaint?
17 A.  Right.
18 Q.  We are here for a civil action that's separate
19  from the criminal action?
20 A.  Correct.
21 Q.  Okay.  If I represent to you that the
22  plaintiffs allege that you applied a chokehold
23  neck restraint to Acevedo for approximately
24  11 minutes and 27 seconds, would you disagree
25  with that?
```

167

```
1  A.  Yes.
2        MS. BAYNARD:  I don't have anything
3   else.
4        EXAMINATION
5  BY MR. JACOB:
6  Q.  Just two questions.  Number one, when you are
7   on duty in full uniform and you arrest someone,
8   do you always say "you are under arrest"?
9  A.  No.
10 Q.  And can you tell us how to perform a rear naked
11  chokehold?
12 A.  Not really, no.
13       MR. JACOB:  Okay.  No further
14  questions.
15       MR. MUCHE:  I have nothing else.
16       (Proceedings concluded at 1:33 p.m.)
17
18
19
20
21
22
23
24
25
```

168

```
1   STATE OF WISCONSIN  )
                         ) SS:
2   COUNTY OF MILWAUKEE )
3
4
5        I, ALICIA PABICH, a Certified Shorthand
6   Reporter and Notary Public in and for the State of
7   Wisconsin, do hereby certify that the above
8   deposition of MICHAEL MATTIOLI was recorded by me on
9   April 25, 2025, and reduced to writing under my
10  personal direction.
11       I further certify that I am not a
12  relative or employee or attorney or counsel of any
13  of the parties, or a relative or employee of such
14  attorney or counsel, or financially interested
15  directly or indirectly in this action.
16       In witness whereof I have hereunder set
17  my hand and affixed my seal of office at Milwaukee,
18  Wisconsin, this 1st day of May, 2025.
19
20
21
22            Notary Public
             In and for the State of Wisconsin
23
24
25
```

42  (Pages 165 to 168)

169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 2:23-cv-00489-BHL    Filed 08/01/25    Page 43 of 66    Document 56-1

| **A** |
|---|
| **a.m** 1:22 |
| **ability** 165:5 |
| **able** 6:25 30:17 |
| 93:1 107:16 |
| 109:11,16 |
| 137:13 158:19 |
| **absolutely** 53:19 |
| 59:22 60:4,13 |
| 69:19 72:3 |
| 79:23 130:17 |
| **academy** 7:20,24 |
| 8:19,20 11:17 |
| 11:19 17:13,24 |
| 18:9,9,10,11 |
| 19:8 24:16 29:1 |
| 29:10 34:1,5 |
| 39:11,17 40:8 |
| 41:2,12 42:22 |
| 43:3 46:18,20 |
| 48:24 49:8,12 |
| 49:17 125:18 |
| 125:19 149:7 |
| 150:4 |
| **accepted** 162:20 |
| **access** 30:7,8 |
| **accessible** 58:20 |
| **accident** 133:4 |
| **account** 30:1 |
| **accounts** 29:25 |
| **accuracy** 156:7 |
| 156:16,17,18 |
| **accurate** 143:4 |
| **accusing** 154:10 |
| **Acevedo** 1:5,6 |
| 24:20 63:13 |
| 141:22 142:2 |
| 146:23 154:18 |
| 154:20 155:2 |
| 155:15 159:15 |
| 160:3,12,21 |
| 161:13,21 |
| 162:6,11 163:6 |
| 163:9,11 164:3 |
| 164:10,12,22 |
| 164:25 165:23 |

165:25 166:23
**Acevedo's** 142:6
155:11
**acknowledge**
36:6
**acknowledged**
151:9
**acknowledgem...**
149:3,16
**acknowledgem...**
150:8 151:1
**acknowledges**
35:5
**acknowledging**
34:15
**acquitted** 134:15
141:13
**act** 125:12 137:5
137:8
**acting** 125:6,7,10
125:23 126:2
135:12,16
136:7,8,10,11
136:25 137:1
**action** 60:13
152:22 166:18
166:19 168:15
**actions** 132:1
153:3
**activated** 10:15
11:1 12:8
**activities** 17:2
**actual** 40:19
67:19
**address** 106:24
**adhere** 126:15
**adjust** 98:3
**Administrator**
1:6
**admissions** 140:2
**admitted** 61:7
87:4 88:13
121:15 122:8
123:2
**advised** 139:2
**Affairs** 25:19

**affect** 90:25
**affiant** 114:7
**affidavit** 113:25
**affixed** 168:17
**agent** 65:1
**aggressive** 76:11
**aggressor** 164:12
164:16
**agility-type** 22:2
**ago** 14:15 43:3
75:6 144:6
**agree** 11:19 32:1
35:8 38:24
47:14,17,23
48:2,16 60:21
81:4 91:12 92:2
92:6 94:14
98:17,18 114:6
117:17,18,21
118:15,20
119:3 121:8
123:8 128:19
132:23 133:7
133:17 143:14
143:18 147:13
148:16 152:3
156:11 157:1,9
157:13 159:12
**agreed** 89:25
**agreement** 31:12
**ah** 71:16
**ahead** 9:4 18:21
22:18 23:1
25:11 47:9
49:24 50:24
52:15 82:5
85:22 90:16
98:8 104:15
111:11 112:2
112:19 122:17
123:18 129:3,8
130:12 131:17
132:17 134:8
136:21 147:16
148:20 153:25
154:8

**aide** 147:21
148:7 149:3,6,8
150:2
**air** 108:20
**airway** 108:5,10
**al** 1:11
**alcohol** 24:11,22
25:3,7 60:5,9
60:14,23 61:8
61:13,25 62:3,8
69:24 146:16
146:18
**Alfonso** 2:14
**ALICIA** 1:18
168:5
**allege** 166:22
**alleged** 127:9,13
135:5
**allergic** 9:4
**allowed** 12:4,4
85:12,17,25
86:1 90:23
147:8
**altercation**
162:11
**amend** 6:19
**American** 148:12
**amount** 53:9
**Andrew** 64:17,24
146:11
**Andy** 69:12
71:10,22 77:1,4
77:5,5,8 78:10
78:10
**anger** 26:19,22
**angling** 148:16
**angry** 73:7,7
105:21
**anoxic** 128:14
130:6 133:25
**answer** 5:5,17,25
6:15,20 7:1
18:22,24 22:24
22:25 61:2
82:10 83:11
84:12,17 91:17

109:5 113:2
122:25 123:7
123:14 129:22
130:18,20
131:1,19 147:5
147:6 152:11
153:6,11 165:9
**answered** 90:17
104:14 111:10
123:5,6
**answers** 4:20
**Anthony** 4:10
**anti-burglary**
28:7
**anti-gang** 28:9
**anticipating**
144:17
**anxiety** 26:17
**anybody** 17:11
20:1,21 25:24
31:5 38:13 39:7
71:2
**anymore** 30:4
43:5 101:2
164:7
**apart** 13:1 22:13
22:23
**apologize** 94:22
**apparently** 107:3
**appear** 162:11
**appeared** 2:4,7
2:10,14 117:19
118:3,6
**appears** 92:3
**application** 21:9
21:23
**applied** 20:25
166:22
**apply** 11:21,25
12:11 13:2
19:20 21:3
125:24
**applying** 20:1
108:1 110:18
111:2,4
**appreciate** 84:1

100:2 122:25
144:8 149:18
**Appreciating**
152:3
**approach** 50:7
50:11 141:17
**appropriate**
149:10
**approved** 65:9
**approximately**
166:23
**April** 1:21 63:9
141:22 145:16
165:2 168:9
**area** 16:4 27:5,6
45:11 79:3
87:13 96:6,12
96:17,20 97:9
99:14 100:17
101:1,6 110:4
111:2 155:16
155:17
**argument** 154:21
154:23
**argumentative**
112:17
**arm** 95:25 96:5
96:19,21 97:11
98:25 99:5,13
100:16,19,25
107:5,22 108:4
108:10,15,17
108:18 110:3,4
110:22 111:6
112:25
**arms** 95:8,21
103:1 107:15
107:15 113:5
161:2
**Army** 8:14 10:25
42:12
**arrest** 10:22 18:6
38:6 87:6,11,25
88:6 90:1,25
91:3 121:16,17
122:8,10,11

123:2,3 124:1,4
124:8,10
126:23 128:2,7
135:20,22,24
137:13,15
155:13 164:8
167:7,8
**arrested** 27:1
67:14,15 74:17
87:14 160:20
**arresting** 89:22
90:7 121:22,23
121:24 122:21
123:21
**arrived** 145:15
**arrives** 101:12
**aside** 133:14
**asked** 14:11 68:4
72:1,25 73:15
74:24 87:25
88:4 90:6 94:16
101:11,23,25
101:25 103:5
104:14 111:9
112:24 115:17
118:9 123:4
142:17 143:20
143:24 145:11
156:5,23
159:25 160:7
160:10 165:4
165:10
**asking** 22:22
29:4 37:1 46:7
46:7 51:24
52:17,18 82:16
82:23 84:11,19
86:3,3 91:8
109:7 119:15
122:14 123:3
124:3 130:7
132:3,22
133:15,18
138:10,11
150:3 151:8
**asks** 103:24

**asphyxia** 128:16
130:6
**assault** 80:18
81:3,6
**assaulted** 80:20
166:7
**assaulting** 81:16
166:9,11
**assess** 106:14
**assigned** 10:11
14:10 28:3,5,7
137:14
**assignment** 40:22
**assignments** 28:1
28:13
**associate's** 7:13
**associated** 41:4
45:24
**associations**
29:19
**assume** 74:14
**assumed** 40:14
150:4
**assumes** 88:21
**assuming** 7:6
21:23 26:2,10
27:12 59:6
67:14
**asthma** 97:22
162:7
**ate** 71:1
**attached** 3:10
114:1
**attempted** 81:13
**attempting** 87:5
87:10 121:16
121:17 125:12
125:24 126:3
**attempts** 142:12
**attitude** 53:5
**attorney** 2:12
112:24 134:17
138:11 141:8
142:16 145:11
149:22 160:7
168:12,14

**attorney-client**
138:7
**attorneys** 139:2
**authentic** 120:7,8
**authority** 38:6
123:25
**autopsy** 77:19,21
128:11
**aware** 42:18
54:14 113:25
128:9,13
131:13 135:11
135:15 142:8
152:21 153:20
166:14
**awoken** 154:17

_____
**B**
**B** 2:12
**B'IVORY** 2:5
**back** 6:19 9:25
17:23 24:6
45:21 47:3 54:9
68:21 72:16,22
74:6,18 77:2
78:15 79:6,7,8
79:14,15,15,17
80:8,25 86:22
86:23 96:5,11
96:16 97:8
99:19 100:14
101:5 103:2
107:3,12 135:1
151:5 155:9,12
159:12 161:11
**background** 7:9
21:17
**bad** 52:25 53:2
80:4,5 119:1,24
121:1
**badge** 57:6,23
68:18
**badly** 53:6
**bag** 29:11
**bargaining** 22:9
22:14,23

**based** 44:24 45:9
108:18 111:6
**basement** 78:13
**basic** 8:21 9:12
10:2 15:10
**basically** 28:21
31:9 37:20
40:19 92:21,24
114:20 127:9
127:10 139:8
148:16 162:20
**basis** 47:7
**basketball** 16:22
**baton** 29:11
**batons** 17:19,19
18:14
**Baynard** 1:20 2:8
2:8 3:4 8:24
18:19,24 19:3
22:16 25:9 45:2
47:7 49:22
50:22 52:13
56:24 62:22
63:1,4 82:3,8
82:18 85:20
88:20 89:2
90:14,16 91:15
94:24 98:4
102:8,13 104:8
104:14 111:9
111:25 112:16
113:14 115:9
116:13,15,18
116:21,25
117:4 119:9
122:15 123:4
123:17 128:24
129:5,8 130:11
131:15 132:15
134:4,6 136:19
138:5,13 139:5
139:23 147:6,8
147:16 148:18
150:12,15
152:14,16
153:4,23 154:6

156:3,21 157:4
157:7 161:25
163:22 164:1
164:17 165:8
165:12,16,21
167:2
**bear** 31:14 92:16
**becoming** 166:7
**bed** 73:8,25 75:2
76:1,3 147:2,11
154:14
**bedroom** 71:10
72:22 154:18
**began** 79:1
154:23 155:15
**beginning** 28:6
55:1 70:19
**behalf** 2:4,7,10
2:14 121:16,19
121:20,20,23
121:24,25
122:12,14,21
123:3,14,15,16
123:24 124:4
124:19,22,25
125:1 135:20
137:15
**belabor** 141:5
159:11
**belief** 86:4
**believe** 15:9,17
27:14 31:18,19
31:25 32:24
33:24 38:11
44:10 58:14
59:8,18 61:12
61:21 66:19
67:13 78:12
79:9 87:8 108:7
114:16 120:8
128:17 130:23
132:12 135:14
135:19 138:3
139:20 142:1
143:9 156:23
160:14,15

161:9,10
**believed** 158:18
**believing** 136:7
**best** 6:10 46:21
51:13 60:15,24
117:5 145:9
**better** 14:3 36:20
41:18 49:9
**beyond** 129:1
**big** 14:19 77:23
77:25 82:12
83:2 134:13
**bigger** 77:13
**bit** 7:8 16:22
17:13 19:7
44:18 47:3 54:3
64:9 79:4 85:13
86:13 140:25
**blocking** 28:21
**Blomme** 157:12
157:15
**blood** 108:6,14
108:14,25
109:2,2,12,22
**blow** 103:16
**blowing** 102:2
103:17
**Bluemound** 1:20
2:9
**body** 62:3 92:7
96:16 97:8 99:6
99:14 101:5
107:2,10
108:19 114:5,9
118:2,2 133:20
159:6 160:2
**bodyweight**
80:23 85:2
92:21 93:1,5
107:14
**bold** 53:10
**book** 29:3 87:20
125:8 160:20
**booklet** 32:14
**boring** 64:14
70:12,14

**born** 64:24
**bottom** 149:24
**Box** 2:3
**break** 5:14,16,18
56:22 57:2
94:25 116:12
**breathe** 98:24
99:3 111:15
**breathing** 101:12
101:20,22
102:1,19 103:6
103:9,25 104:4
104:6,17,18,20
104:22 106:15
106:19 107:4,7
107:18 118:10
**Brian** 128:9
**briefing** 40:16,17
40:18
**briefings** 12:9
**bring** 57:20
58:24
**broad** 54:7
**Broadway** 2:13
**building** 65:3,13
**buildings** 57:24
**bullet** 157:14
158:24,25
**bunch** 105:19
148:15
**business** 65:15
157:23 158:6
**busy** 54:17

**C**

**C** 2:1
**call** 11:14 16:13
16:14 28:19
30:21 39:18
40:13,15,17
46:21 55:4
65:11 77:24
86:24 89:6
114:3 116:25
120:6 129:16
129:16 142:13

143:8,15
159:11 162:10
**called** 4:2 11:4
55:2,3 77:21
86:17 106:24
129:25 130:2
162:23
**calls** 22:17 25:9
39:24 52:14
82:18 102:9
128:25 131:15
134:6
**calm** 72:9 88:17
104:25 105:11
105:24 162:15
**calmed** 105:3
**cam** 160:2
**camera** 92:7
**capacity** 10:24
11:2 27:24 45:7
126:2
**captured** 142:22
145:7
**car** 28:22 148:14
**cards** 70:23,23
**career** 16:24 28:7
35:19 146:6
**carried** 49:10
**carry** 41:23
57:19
**cars** 28:18,22
**case** 1:9 7:18
**Catch-22** 139:11
**cause** 114:1,11
128:13,23
129:23 130:5,8
134:1,1,2,2
164:9
**caused** 97:12,23
130:24 131:12
131:12,14,24
132:5,13
**causing** 97:15
**cautioned** 56:14
**Center** 148:13
**certain** 13:24

35:6 36:17
41:20 43:10,11
46:16 49:1
51:18 125:14
142:22
**certainty** 33:19
108:9,13,23
109:1,16,21
**certification**
63:25
**certified** 1:18
13:9 14:6,7,9
168:5
**certify** 168:7,11
**chance** 10:7
74:16 144:21
**change** 37:7 54:1
100:10 151:6
**changed** 35:15
35:18 36:21
52:21 57:12
98:11
**changes** 136:15
151:9,20,25
**chaotic** 122:20
**characterization**
157:3
**charge** 114:12
**charged** 112:11
134:14
**chart** 43:19
**chest** 68:19 79:2
106:20
**chief** 51:4,7
128:10
**child** 64:22
**chin** 96:6,20
99:14 100:16
101:1 108:11
108:19 110:3
**choice** 99:9
111:18 112:6
**choke** 110:12,17
117:20 163:17
**chokehold** 19:13
19:18 20:4

55:21 109:25 115:23 164:19 164:20,23 166:22 167:11
**chokeholds** 56:6
**choking** 107:25
**choose** 139:13
**chose** 148:24
**Chris** 146:11 155:5
**Christopher** 64:17,21,25 69:15 71:12,22 78:11,19,20,20 78:23 79:20 80:1,8,20 121:20
**chronologically** 141:10
**circumstance** 165:20
**circumstances** 61:1 83:21 124:8
**citizen** 26:7 135:16,18 137:12
**citizen's** 135:22 137:13
**citizens** 52:4 135:24
**city** 2:11,12,14 7:18 31:9 51:6 54:18 55:6 63:18 65:15 122:2,3 125:19 125:25 126:5 126:18 134:17 134:21 135:1,5 136:25 137:15
**city's** 135:11,15
**civil** 1:17 166:16 166:18
**civilian** 11:18 12:13
**civilly** 112:12

**clarification** 36:20 133:2,6 143:12
**clarify** 62:22 139:19
**class** 13:25 14:1 16:10
**clean** 19:7
**clear** 9:11 18:3 118:22 119:20
**clearly** 61:19
**CLINT** 2:12
**closely** 77:24
**clothes** 146:7
**clothing** 145:22 145:25
**clouded** 61:15
**clubs** 17:4
**code** 32:13,23 33:3,6
**colleagues** 152:23
**collect** 41:5
**collective** 22:9,14
**college** 7:12,14 148:22
**combat** 13:3 14:24 41:17
**combatives** 13:11 14:1,14
**come** 6:18 24:21 28:13 36:10 48:19,23 49:20 64:19 66:25 71:2 74:12 121:19 131:3 157:14
**comes** 47:25 48:4 78:12,19 96:10 106:10,14 107:2 123:25
**comfortable** 120:20
**coming** 63:15 72:24 94:18 105:12 151:25

**commencing** 1:21
**comment** 153:14
**commented** 94:11
**Commission** 138:16
**commit** 82:25 87:17 131:3
**committed** 81:23 81:23 135:5
**common** 69:17
**community** 53:17 54:2,2,4 54:5,6,7
**compare** 120:2
**comparing** 120:19
**complaint** 3:7 26:7,8 113:19 113:22 114:9 115:4 116:5 118:14 119:19 119:20 128:18 128:21 159:2 159:10 166:15 166:16
**complaints** 26:3 51:25
**complete** 157:22
**completely** 49:3 75:13
**complications** 44:24 45:9
**comply** 39:1 54:11 55:10,14 60:15,19,20 139:21 140:4 140:11
**compound** 89:3
**compressing** 118:3,4
**concern** 101:16 101:20,22 107:18
**concerned** 102:4

**concluded** 82:24 167:16
**concluding** 1:22
**conclusion** 134:7
**condition** 7:4
**conduct** 25:15 26:5 32:13,22 32:23 37:21 90:8 94:5 126:3 127:2
**conducted** 24:11
**confirm** 115:13 156:17
**conflicts** 70:13
**conform** 94:4 127:1
**confronted** 161:5 161:6
**confused** 77:6,9 78:21
**confusing** 19:2 75:5
**connected** 80:6
**connecting** 143:13
**consider** 81:5
**considered** 18:15 28:20,23
**consist** 18:12 29:10
**constitutional** 139:9,12
**consultations** 153:3
**consumed** 60:5 61:8,13,25 62:7
**consuming** 60:9 60:14 69:24 146:16,18
**consumption** 62:3
**contact** 47:25 48:4,19,23
**containment** 28:20
**contention**

128:22
**context** 11:21 20:7 49:13,15
**continue** 5:9 8:17 29:2 80:25
**continued** 10:11
**control** 94:12
**conversation** 20:11
**convey** 103:21
**cooperating** 67:18
**core** 32:16 127:9
**corners** 114:11
**correct** 4:7,8 7:10,16,25 10:13,14,19 12:13,18 13:21 14:21 20:13 22:7,8,10,15 23:24 34:18,23 36:23 37:8 38:9 40:10 41:12 43:25 46:22,23 48:11,13 50:20 50:21 51:1,8 52:8 53:15 55:8 55:9,17 56:2,6 56:19 57:6 58:24 59:4,10 59:14 61:5,9,22 61:25 62:4,12 62:14,20 63:9 63:10,16,20,23 64:1,5 65:19,23 67:24 68:8 69:5 69:25 70:6,7 77:12 78:3 82:2 82:7,22 84:8 86:8,24 87:7,12 88:5,13,19,24 89:13,22 90:2,4 90:8,12,20,22 90:25 91:3,7,24 91:25 92:14,15 93:6,8,13,16,17

93:19,20,25
94:1,9 95:14,16
96:12,17,20,23
97:9,10 99:16
100:5,20,21
101:2,3,6,9
102:23 103:3,7
103:22 104:6
104:13 106:4
106:10 107:5
108:3 109:13
110:3,18
112:15,21
113:2,3,23
114:7,12,22
115:4,7,20,24
117:12,13
120:1,7,12,15
120:20 121:2
125:19 128:23
129:10,24
130:9,17,18,22
131:7,10
132:25 134:15
136:4,5,9,18
137:10,16
139:22 140:7
154:19 156:9
157:6,8 166:8
166:10,20
**corrective** 153:2
**correctly** 126:20
**correspondence**
151:8
**couch** 71:11 77:1
77:4 78:10
**counsel** 6:4 124:6
168:12,14
**country** 12:11
**county** 121:24
122:3,22 168:2
**couple** 17:20
64:13 66:11
75:6 103:1
141:3
**course** 5:2 78:7

102:12,16
141:4 142:15
142:20 149:21
150:9 151:6
152:9,20
**court** 1:1 4:22
**covered** 44:6,9
**CPR** 92:2,9
**crack** 80:7
**crash** 71:17
**crawl** 142:3
**create** 79:16
**crime** 81:17
124:11,13
135:5
**crimes** 52:24
81:9,22 87:12
87:17
**criminal** 3:7 87:5
87:7,23 112:23
113:19,22
115:3 122:7
129:20 132:20
134:18,21
139:2 141:10
141:14 142:16
143:3 159:1
162:1 166:19
**criminally**
112:11
**criminals** 52:23
**cross** 83:15
**cross-examinat...**
87:4
**cross-examined**
87:24
**crossed** 163:5
**culture** 51:12
53:25
**current** 30:24
31:1
**cursing** 105:21
**Custard** 148:11
**custody** 13:4
15:6 44:13,17
45:1,3

**cut** 9:20 108:13
109:2 118:11
**cutting** 108:5,6,9

## D

**D** 3:1
**DAAT** 18:4,15
**Dalland** 95:5
153:14 160:23
161:7
**damaged** 81:21
**danger** 85:6,10
**dangerous** 48:22
53:16 93:16
**dangers** 45:23
**dark** 72:22 82:13
**date** 43:7 59:3,12
59:13 63:7,18
66:5,6 149:25
150:3 160:11
**David** 95:5
**day** 3:7 6:23
27:12,16,21
35:14 40:23
53:7 59:5 62:25
63:3 65:6,9
67:11 74:11,22
119:21 121:10
142:3 165:3
168:18
**deadly** 50:4
56:17 82:2 83:5
83:8 84:7,9
85:24 86:4 92:5
165:5,23,24
**death** 91:9
128:13,19,23
129:17,23
130:5,6,9,16,21
131:10 132:5,7
134:1
**decentralizatio...**
17:20
**decide** 75:21
**decided** 25:21
59:13 133:3

**decontaminate**
42:2
**deescalate** 50:16
99:19,21,24
**deescalation**
43:16,18,23
**defend** 134:18
135:6,25,25
136:16
**Defendant** 2:10
**Defendants** 1:12
2:14
**defending** 89:21
**defense** 18:6
133:4 134:22
162:4
**definitely** 166:2
**definition** 133:11
133:13
**degree** 7:13
**delete** 30:2
**deleted** 30:5
**deny** 156:17
**department** 7:20
7:23 8:1,3
20:14,24,25
21:1,3 31:21
32:13,18 35:11
38:7 47:11
51:14 53:25
54:10 55:23
56:1 59:20
63:19 93:22
124:22 125:2,3
125:4,9,11
137:25 141:18
145:23 147:20
147:21 148:4,7
149:5 151:1,8
159:3
**department's**
34:16
**departments**
7:17 41:4
**depend** 124:7
**depends** 44:16

48:5,5 60:25
61:1
**deployed** 12:8
**deposition** 4:15
6:17 31:8,8,12
51:3,10 129:19
168:8
**depression** 26:17
**design** 68:21
**desk** 58:7,10,11
58:12,16 59:6,9
59:18 67:23
**despite** 38:12
**details** 23:14
46:13
**detained** 88:15
89:23 122:4
**deteriorated** 53:6
**determine** 52:18
**determined**
128:14,20
134:20 135:4
**develop** 50:12
**DEVON** 2:2
**died** 23:5 161:17
**dies** 91:6
**different** 11:20
17:20 27:5
31:13 43:19
52:22 71:6
75:13,15 81:22
83:19,20,21
114:4,4 126:13
148:10 151:13
152:20
**differently** 57:13
100:4
**direct** 156:5
158:24
**direction** 168:10
**directly** 160:1
168:15
**disabilities** 27:19
**disagree** 152:4
166:24
**disagreed** 156:24

disciplinary 153:3
disciplined 55:8
discouraged 60:8
discovery 139:19
  139:25 140:10
  140:20
discretion 12:17
discuss 38:9
  40:21,22,23
discussed 19:10
  36:15 41:10,19
  55:15
discussing 141:8
discussion 36:25
  51:4 55:20
  142:11
dispatcher 86:20
Disposition 3:9
dispute 120:5,22
  140:12
disputing 82:15
disrespect 53:9
distance 79:16
distress 98:3,6,10
  162:12
Distribution
  148:12
district 1:1,2
  28:6,9 142:16
  145:11
Division 1:3
  28:11,17
doctor 109:6
document 31:16
  31:17 32:9,15
  33:8,19 34:12
  35:3,4,7 37:9
  38:2,3,20 113:9
  114:14 115:8
  127:25 128:5
  137:22 149:25
  150:21 156:6,9
  156:13
doing 7:4 33:6
  70:16,18 73:1,2

73:20 76:15
  92:2 94:7,8
  104:24 105:10
  106:14 116:6
  122:12 124:19
  124:22 138:17
  138:18 160:15
  161:7
door 58:22 64:22
  76:8,19
doorway 155:20
doubt 67:7 151:3
downstairs 76:6
  76:23 78:12
downtown 65:4
  67:5
Dr 128:9 129:25
draft 156:9
drank 60:23
drill 11:14
drink 8:24 71:17
drinking 72:3
drinks 64:13
drug 21:16 24:13
  24:14,15
drugs 70:2,4
  165:1
due 128:16
duly 4:3
duties 124:18
duty 10:12 53:21
  57:11 59:23,25
  60:3,9 65:5,18
  65:21 85:17
  87:18 93:12
  94:8 136:3
  145:20 162:24
  162:25 163:4
  167:7
dying 91:23

**E**

E 2:1,1 3:1
e-mail 151:12,15
earlier 89:15
  146:10 149:21

150:7,20 152:8
early 37:14 72:23
  165:1
EASTERN 1:2
eating 70:25
eff 53:8,8 78:17
  121:1
effect 110:16
effective 49:6
effing 121:1
either 6:21 23:4
  39:17 49:8
  77:12 79:3
  130:9 139:11
  152:23 160:1
elbow 96:7
elbows 100:14
  107:15
electronic 34:21
electronically
  34:25
else's 50:8
emergency 91:23
  92:4
employed 24:10
  63:18
employee 48:10
  168:12,13
employer 48:9
employment 35:9
  51:5 54:23
  139:13
EMT 159:4
encephalopathy
  128:14
ended 96:4
  100:18
energy 73:11
enforcement
  13:23 33:12,22
  68:21 90:11
  124:18 125:22
engage 43:23
  136:2
engagement
  11:20 12:10

entire 90:21
  164:16,20
entity 121:25
escalated 99:25
Especially
  151:24
essentially 102:6
ESTATE 1:6
et 1:11
evening 146:12
  146:24
event 130:21
  142:3 149:2
events 91:13 92:8
eventually 22:7
  28:10 34:21,25
  51:5 70:20 91:6
  105:1 127:4
everybody 69:10
  69:19 71:6,9,15
  71:19 73:14
  121:19 146:15
evidence 88:22
  162:2
exact 9:21 21:7
  84:10 88:12
  105:20,22
  143:19
exactly 9:16 29:8
  43:9 59:5 66:8
  106:2 127:12
  127:18 134:25
  135:10 143:20
  143:23 151:11
Examination
  1:15 3:2 4:5
  140:22 156:2
  167:4
examined 4:4
examiner 128:10
  129:16,24,25
  162:3
examiner's
  128:23 158:22
example 121:1
excessive 93:18

94:4
excuse 8:21 9:8
  118:25 162:18
executed 150:9
exercise 139:11
exhausted 105:6
  144:4 162:19
exhibit 3:7,7
  31:16 32:9 33:8
  34:13 35:3 37:9
  38:3,21 113:7,9
  115:2 137:22
  144:9,12,17
  149:12 150:7
  156:5
Exhibit/s 3:9
Exhibits 3:6
expectation
  151:19
expectations
  48:10
expected 35:21
  43:23 152:5
experience 8:7
  19:25 83:4
  92:24
experts 162:3
explain 36:8
  42:17 44:18
  98:24 123:13
explained 31:22
  32:25 55:16
  90:7 123:5
  133:1 151:21
explains 47:18
  48:14
extent 4:24 22:18
  41:16 66:17
  69:1 94:10
  138:6 143:2,15
  145:5 146:9
  158:23
extreme 9:6
  23:14
extremely 53:24
eyes 42:5

**F**

face 77:10 78:21
79:20 80:3 83:5
94:13 121:21
163:7
Facebook 30:1,9
30:20
faced 76:11
facing 85:7
fact 6:7 71:8 96:9
115:22 120:21
131:10 133:16
136:2,6 162:21
facts 88:21
114:11
factual 6:8 156:7
156:18
factually 101:8
114:22 115:7
115:19 117:12
117:13 119:6
120:1,15,20
157:5,8
faculties 146:19
fair 11:7 17:1
35:1 37:17 45:5
46:13 48:12,15
50:10,14 51:2
51:23 55:12,13
57:17 61:6,19
61:20 63:6,6
64:7 75:20
80:19 94:15
108:6 109:14
109:22 114:15
120:2,3,16
125:15,16,21
127:3,6,11
139:9,10,15
140:20 141:23
142:11 144:3
146:3,9 147:1
149:2 152:7
154:22 156:14
fairness 98:22
fall 106:20

falsely 87:7
familiar 4:19
20:6 113:22
family 24:20
far 40:16 71:12
79:22 85:13
94:9 129:1
fast 73:10 77:3
136:12
fast-moving 43:4
faster 157:12
fat 77:20
fault 5:21
feared 52:23
feasible 152:5
federal 1:17
122:13 123:14
124:5,11
feel 52:10,10
62:17 83:17
85:9,9 107:17
feet 80:10
fell 80:10,22 86:9
155:8,10
felonies 81:24
felony 81:6,18,20
felt 72:12,15 80:7
85:6
field 39:11,14,16
39:18
fight 16:12,14
53:11 79:6
162:19
fighting 16:8
106:22 107:21
figure 5:11 75:4
75:9,9
figured 6:5
101:16 105:7
162:19
filed 115:4
166:15
finally 36:21
financially
168:14
find 84:16 94:21

149:9
fine 6:15 102:21
103:10,11
116:16,23
117:2 118:18
129:7 140:20
finish 4:25
finished 5:4
140:21
fire 14:17 64:13
70:19 138:16
159:3
firearm 165:24
firearms 17:21
FIRM 2:5
first 4:3,22 8:19
31:15 34:2,12
34:18 52:21
59:13 61:24
71:11,25 76:1,5
93:4,8,10 96:10
101:14 114:16
117:15 119:19
141:23 143:9,9
147:20 154:24
155:3,6,18
157:18,19
158:25 159:14
160:16
five 40:20 56:22
114:18 144:5
flee 28:22,23
flipped 34:3
floor 71:11 92:1
154:15,24,24
155:3,6,18
flow 108:6,14,15
108:25 109:2,2
109:22
fluid 85:24
136:12,14
flush 42:5
flyover 21:13
focus 6:23 144:18
follow 12:23
38:10,12 47:11

follows 4:4
food 70:25
foot 15:25
Football 16:21
force 6:6 14:4
18:17 19:8,10
23:15,21 28:10
28:14,16,21,24
29:2 38:23
39:20 41:20
43:12 44:1,7,10
51:18,25 56:18
79:14 81:18
83:8 85:24 86:4
90:24 91:2,9,12
92:10,13,18,24
93:18 99:19
100:1 148:17
165:5,23,24
force-type 44:3
forgetting 66:5
forgot 69:1
form 18:19 22:16
34:19,24 49:22
50:23 52:13
82:3 85:21
88:20 89:3
90:14 91:15
98:5 102:8
104:3,10
111:10,25
112:16 115:10
122:15 132:15
136:20 139:24
148:18 152:14
152:16 153:5
153:23 154:6
format 34:22
former 51:4
forth 77:3
foundation 47:8
115:11,14
four 3:7 64:12,16
69:18 71:3,4
114:10
FPC 51:6,12

frankly 16:7
friend 64:23 78:9
92:11 131:11
155:5 163:6
friendly 70:14
friends 17:8,11
24:20 75:6
front 58:22 84:15
93:12,21 116:6
131:3 150:16
fuck 119:1
fucking 119:1
full 65:12 66:23
83:10 167:7
full-fledged 67:8
fully 11:3
fun 17:9
function 27:24
29:13 65:16,22
functioning 14:3
124:17
functions 146:19
funny 157:23
158:6
further 36:16
167:13 168:11
future 94:5

**G**

games 6:3,21
70:17
garbled 118:22
119:14
Gasping 121:7
gathering 64:6
69:23
general 52:7 58:5
68:2,3,5,9
126:8
generally 8:12
26:8 47:5 49:9
57:10 58:3
60:18
gestures 5:10
getting 23:14
70:10 107:4

126:19
**give** 12:9,10
30:17 35:25
36:19 40:22
125:9 128:15
149:9
**given** 4:15 32:2
**giving** 162:18
**glad** 53:1 123:12
**glass** 80:13
**go** 4:21 7:12 9:4
10:4 11:3 13:14
18:21 22:18
23:1 25:11
39:21 42:11
47:9 49:16,24
50:24 52:15
55:4 56:17,22
58:23 66:6 70:6
71:2 72:9,10
80:8 82:5 85:22
86:8 88:18,18
88:19 89:6,7,11
89:13,17 90:16
98:8 104:15
105:17,17
111:11 112:2
112:19 117:5
117:10 119:17
122:17 123:18
129:3,8 130:12
131:17 132:17
134:8 135:20
136:21 137:14
141:2 147:16
148:20 153:25
154:8 159:13
159:15,19
163:3
**goal** 81:1
**God** 106:21
107:19,20
148:3
**goes** 36:22 42:6
71:6
**going** 4:21 5:1

7:21 12:22,23
15:9 17:23
19:24 20:4
31:13,15 35:3
37:6,9,20 38:2
38:20 39:5,19
39:20 42:1
51:20 54:9
56:15,16 62:20
72:12 73:5,15
74:25 75:4,21
76:9,9 77:6
80:25 81:10
83:15 84:14,15
84:17 85:20
94:23 105:8
107:21 114:19
114:21 115:9
115:10 116:8
124:21,23,24
136:19 137:20
138:5,18,20,21
140:24 141:4
146:15 148:22
153:4 156:4,22
157:11,17,25
158:11,12,18
158:24 159:11
159:14,16
162:10,22
166:13
**good** 56:22,23
63:22 75:7 80:4
140:24
**Googled** 109:25
**Gosh** 113:13
**gotten** 88:16
**government**
122:13 123:15
123:15,16
124:5,5
**graduated** 7:10
148:1,3
**graduating** 8:20
**graduation** 148:6
148:17

**grappling** 14:24
**gray** 87:13
**Great** 123:10
**grew** 64:21,21
**ground** 15:16
44:21 56:16
80:22,24 84:2,5
84:21 85:18
86:6,13,15,23
92:22 93:2
95:25 96:6,7
100:14 107:16
155:8 158:1
161:13 164:3,6
**group** 14:19
**groups** 17:4
29:19
**guard** 8:15 10:13
11:8,11 50:19
65:4
**guess** 6:7 12:3
18:4 19:18
22:12 28:8,23
40:9 46:21 56:8
64:4 65:11
77:14 96:13
102:24 103:22
109:9 154:4
156:16 158:9
158:17 160:16
161:1 163:19
**guessing** 38:16
**guiding** 32:17
**gun** 83:7,13,19
84:3
**guy** 75:19 77:23
77:25 82:12
83:2 95:8,9
101:15 102:3
161:2,4
**guys** 41:23 42:8
70:16,22,25
114:4,5 118:21
159:16
**gym** 29:9

**H**

**half** 118:16
**hand** 15:25 72:21
96:7 112:25
168:17
**hand-to-hand**
13:3 14:23
41:11,17 42:21
46:17
**handcuff** 15:12
44:20 87:20
101:15,23,24
102:2,3 103:8
103:12,15,18
118:12
**handcuffed** 26:9
103:3
**handcuffing**
17:19 18:14
44:19
**handcuffs** 93:3
161:15,18
**handgun** 14:17
**hands** 4:23 131:6
**Hang** 41:9 92:16
94:21
**happen** 23:9 37:2
37:5 40:6 42:18
62:18 81:2
83:25 106:1
**happened** 19:17
20:5 23:12
36:19 37:4,6
39:10 40:1,7,24
51:5 53:5 66:15
73:25 83:12,22
99:22 100:24
122:2 154:12
158:13
**happening** 79:9
138:20
**happens** 70:6
72:10,14 74:25
78:9,25 79:18
80:21 86:12,19
**happy** 5:23

**hard** 80:9 95:10
111:23 112:14
120:8 160:4
161:4
**harm** 164:9
**hazard** 26:2
**head** 5:10 42:25
81:10,16 96:8
96:11,17,25
97:1,8 101:6
110:5,12
117:22,23
**health** 26:14
97:22
**hear** 49:13 89:6,9
89:10 105:16
119:7 120:9
121:12 159:14
**heard** 20:5,8,10
20:12,19,21
41:4 49:11,11
49:14 78:14
80:7 88:17 89:8
94:16,17 98:2
98:15,19 121:8
121:9 123:12
159:21 164:18
**hearing** 55:6
**heat** 9:6 89:9
122:19
**height** 77:16,17
**height-wise**
77:14
**held** 95:9 97:1
121:18 158:1
161:3 166:6
**help** 47:23 48:2
53:2 86:20,25
87:2 123:11
144:2 149:11
**helping** 13:24
**helps** 47:20
**hereunder**
168:16
**hey** 24:21 30:16
37:3,6 41:25

42:17,23 46:16
49:20 54:1
56:14 93:16,18
93:24 94:2
124:20,23
135:6
**hide** 157:25
**high** 7:10 16:19
148:1
**highlight** 116:22
**highlighted**
144:15,19
**highlighter**
116:17 117:3
**highlights** 39:21
**hindsight** 112:3,9
**hired** 21:4 22:4
24:14
**hiring** 21:10 24:9
**history** 97:22
**hit** 79:5
**hold** 19:21 85:2
100:5 115:9
117:20 119:9
128:24 134:4
139:23 166:4
**holder** 57:23
**holding** 92:11
96:24 104:25
108:18 117:22
117:22,23
131:11 164:2
**holds** 15:22 20:1
**home** 49:20
57:21 58:2,17
58:17 71:7 72:5
74:18 88:18,19
89:6,7 105:17
145:15 159:13
159:14,15,16
159:19
**homicide** 82:25
128:20 129:17
130:1,16,22,24
131:3,10,24,25
132:4,10,13,14

132:19,25
133:8,10,16,18
133:22
**honest** 64:15
**hop** 140:25
**hostile** 75:8
**hours** 75:6
**house** 58:8,18,21
64:6 67:4,23
71:24,25 74:17
74:20 75:11,22
75:25 76:2,8,18
76:20,21 80:15
80:17 81:15,22
82:13 83:4,13
83:23 86:20
87:3,18 89:16
99:25 122:2
141:22 142:2,6
154:15,25
155:17 158:3
158:15 162:25
**Houston** 2:6
**huge** 29:23 132:1
**Huh** 116:14
**hurry** 10:3,4
**hurt** 49:6 94:3
104:3 166:2

_____

## I

**IAD** 127:5,25
128:4,6
**ID** 57:8,11,13,22
58:17,23 59:5
67:12,19
**idea** 161:20
162:6
**identification**
74:8
**identified** 3:6
44:2 115:3
142:23 143:2,5
143:7 145:6,10
**identify** 38:4
74:8 116:8
156:6

**identifying**
142:21
**ignored** 101:24
**illegal** 70:2
164:25
**immediate** 84:7
**immediately**
55:2,4 74:17
84:9 112:13
139:1
**impaired** 61:14
146:19
**impairment**
61:12
**implement** 48:14
**implied** 71:19,23
146:10
**impossible** 5:10
54:18
**in-service** 29:6
33:16 34:6
36:17 40:9 41:1
42:22
**incident** 6:9
19:24,24 20:4,8
23:4,9,16,20,21
23:24 24:3,7,18
24:19 25:14
26:1,13,25
27:13,16,22
29:24 30:1 31:2
36:19,22 37:2
38:8,25 43:8
50:3,4,7,12
53:5,13 55:19
55:20 56:18
58:4,13 59:3,13
60:16 63:14
66:6,15 68:10
83:14 90:6,12
97:16 112:13
126:12,14
127:5,21
136:14 138:1
138:20,25
159:9 160:11

162:7 163:1
**included** 14:25
18:8 114:5
**incorrect** 119:6
157:6,8
**incorrectly**
119:16
**independent** 40:4
**indicated** 30:12
140:10
**indicates** 69:4
157:12
**indication** 13:22
52:19
**indirectly** 168:15
**individual** 42:18
44:12 48:18
**individually** 1:5
**individuals** 47:24
64:20
**informal** 17:4
41:6
**informal-type**
14:20
**information** 6:8
6:11 13:18
18:17 39:25
115:12,15
129:11 138:24
156:18
**informed** 161:6
**initially** 34:24
**injured** 79:11
**injuries** 91:6
**injury** 23:22
91:14 112:10
130:6 133:24
133:25
**innocent** 52:24
**inside** 70:20
**insignia** 68:18
**Inspector** 153:14
**instance** 1:16
25:19 30:16
41:22 43:7
44:19 46:25

50:15 51:17
61:17 109:17
**instant** 106:7
**instruction** 94:5
**instructions**
35:25
**integrity** 127:9
127:10
**intended** 64:10
**intent** 71:15
**intention** 166:2,3
**intentions** 84:10
**interaction** 52:7
159:17
**interactions**
52:19
**interested** 168:14
**Internal** 25:19
**internally** 127:4
**interpreted**
81:19
**intervention**
37:14
**interviewed**
157:13
**interviews** 21:17
**intoxicated** 128:1
147:1,11,14
**investigate**
127:18
**investigated**
127:4,14,21
128:6
**investigating**
128:1
**investigation**
21:17 25:23
28:11,17 94:11
95:18 138:17
**investigations**
25:15
**investigator**
98:15,18
157:12,15
160:12
**investigators**

122:9 160:1
**invited** 141:21
**invokes** 138:6
**involved** 6:9 16:8
16:17 21:16
23:15,18,21
25:14 60:21,22
60:24 133:19
154:20
**irate** 73:7 75:8
**issue** 24:22,25
25:3,7 26:20
56:10 61:11
98:1
**issued** 57:6,8
145:22
**issues** 26:14
41:19 161:22
**item** 145:22,25

**J**

**Jacob** 2:2,2 3:3,4
4:6 9:3 19:6
22:20 25:13
45:4 47:12 50:2
50:25 51:22
52:16 56:21
57:1 62:25 63:3
63:5 82:6,14,21
86:2 88:23 89:4
90:18 91:20
95:1,4 98:13
102:11,14
104:12,19
111:13 112:8
112:20 113:8
113:12,16
115:1,16
116:14,16,22
117:2,9 119:12
122:23 123:9
123:23 129:4,6
129:9 130:14
131:20 132:21
134:11 136:24
138:9 139:3,6

139:16,18
140:1,19 141:8
144:14 147:3
147:15 149:13
149:15 152:15
153:7,18
156:19 157:2,5
161:24 163:20
163:23 164:14
165:7,11,15,18
167:5,13
**Jacob's** 149:22
**jail** 69:14 74:19
**Janowski** 64:18
**JASMYNE** 2:8
**jeans** 68:13
145:16,17
**jeez** 9:25
**job** 8:12 9:9
10:10 11:5 26:2
27:21 47:21
59:22,24 60:4
85:14 135:1
137:14
**jobs** 148:5,15
**Joel** 1:6 24:19
53:14 55:20
63:13 64:17
65:2,25 66:4,18
66:20 67:7,11
68:11 69:1
71:13,23 72:12
72:20 74:12,21
74:23 77:2,5,10
77:12 78:15,15
78:22 79:1,19
80:2,8,12,22
81:10 82:24
86:21 91:2,5
92:18 109:21
121:18 128:11
131:7 132:1,5
133:19,21
134:1 154:10
155:10 157:23
158:6,11,18

159:14 160:3
160:12,17,21
161:7 164:5
**join** 22:7 76:22
**joined** 147:21
**joint** 15:7,18
**JOSE** 1:5
**judged** 49:10
**judgment** 25:16
25:22,25 61:12
61:14,22 62:9
62:16
**jumped** 155:9
**jumps** 117:11
**junior** 4:11
**jury** 3:7 84:15
116:7 133:2
135:4 141:14
**justice** 90:10,19

**K**

**keep** 57:11,14
58:3 66:5 80:23
86:11,15,22
92:22 93:2
116:18 161:13
164:6
**keeping** 164:3
**kept** 76:17 77:10
**kick** 49:2 163:13
**kicked** 18:2
**kicks** 17:18
**kidding** 9:7
**kill** 82:17 166:3
**killed** 53:20,23
68:16 145:20
**killing** 133:7
**kind** 10:9 14:19
26:1 31:10
40:18 54:1,2
64:14 67:16
69:16 70:12
71:17,19 76:25
79:8 87:13
96:13 101:24
118:5,6,20

126:11 155:19
160:18
**king** 122:13
**kitchen** 70:21
76:7 155:17
158:1
**knee** 15:25
**knees** 95:24
100:13 107:16
**knew** 20:3 62:2,8
66:4,18,22 67:7
68:17 69:8,10
69:11,16,20
75:10 77:24
78:1 80:6,24
95:18 99:13
105:8 112:9,11
125:14 140:5,8
141:23 142:9
**knocked** 80:9,13
84:22
**know** 4:18 5:7,8
5:15,15,22 6:4
6:19,22 7:9,17
7:18 9:1,5,21
12:3 13:3 14:16
16:6,13,18 17:4
17:5,12 19:13
19:16 20:9,16
21:13,15 22:18
22:24,25 23:3
25:12,20 29:1
29:18,19 30:5,5
33:10 34:6,13
37:11 38:21
39:21 41:1
42:24 43:4 48:6
49:11 50:9
51:14,25 56:15
58:12 60:25
62:6 64:19
65:12 66:20
67:16,18 69:8
69:11 70:2,3,22
71:8,9,10,13,22
72:5,6 74:7,14

74:15,20,21,24
75:19 76:14
77:22 79:4,5,21
79:25 80:4
81:11,12 82:9
82:10 83:4,11
83:21 84:9,12
84:14 87:20
91:11 96:3
97:18,21,24,24
97:25 98:14
101:13,21
102:1,10,12,15
102:16,19
103:6,8,14,21
103:25 104:1,2
104:2,4,5,21
105:14,16,20
105:21 106:2
107:19 109:24
110:1,6,10
111:5,12 113:5
113:6,18
115:18,19
116:1,7 117:6
118:24 123:24
124:9 126:20
127:13,18,22
127:23 129:15
130:25 131:18
134:9,24,25
135:9,10
136:12 139:4
140:8 143:8,21
144:22 151:22
153:8 159:21
161:21 163:24
164:25 165:3
**know.'** 118:11
**knowledge** 69:17
162:13
**known** 64:23
**knows** 69:15
115:15

**L**

lack 14:3 41:18
LAMARR 2:5,5
lamp 80:11,13
land 31:10
lanyard 57:14,20
58:15
large 132:7
law 13:23 33:12
33:21 90:11,24
124:18 125:22
127:11 134:21
lawful 70:4 83:8
86:5 133:9,14
135:20 165:19
lawfully 85:17
laws 11:25 12:6
12:11 13:1
lay 31:10 107:12
laying 72:16 73:8
95:23 96:10,16
101:5 102:16
102:18 107:3
107:10,10,13
108:19
leaned 107:8
learn 74:12 92:20
92:23
learned 51:10
learning 15:11
159:8
leave 11:23 23:25
59:14 75:12,21
76:2,8,9,18
80:17 81:15
99:24 107:22
leaving 78:17
led 61:21
left 68:19 96:8,23
legal 17:15 85:13
legs 92:11,14
131:11
Leon's 148:11
let's 10:4 22:21
34:11 35:24
43:6 47:3 58:3
63:8 66:6 71:17

95:1 114:18
117:21 124:20
126:22 131:2
139:16
lethal 112:10
letter 137:24
141:8
letting 89:11
level 73:11 81:6
82:24 91:2
99:19
lie 95:16 158:12
life 49:4,5 50:8
50:17 61:25
62:7,19 85:5,8
85:11 164:20
life-threatening
91:6,13
lifeless 102:6,17
102:18,19
lights 72:22
limit 144:18
limited 33:6
line 117:14,25,25
118:9,24
119:18,18
121:6 158:21
160:4
link 151:12
list 33:15,15
150:17
listen 25:20
42:23 56:14
103:20 119:17
130:3
listened 118:21
119:21,23
121:11 162:2
listening 119:8
literally 22:22
29:12 67:7
litigation 2:2
31:3
little 7:8 16:22
17:13 19:7 29:5
44:18 47:3 54:3

57:14 62:9 64:9
79:4 80:15
82:13 85:13
86:13 140:25
lived 52:25 53:2
142:8,9
living 71:12 76:6
76:24 155:16
local 121:24
124:15
location 66:2
locked 112:24
long 9:15 14:15
27:22 43:3
60:18 66:4 96:3
105:25 106:3
116:5 150:17
151:17
longer 116:12
look 33:9,18 34:9
43:10 73:22
77:9,23 78:21
105:11 106:18
107:17 116:11
117:10 129:14
131:2 144:11
149:20,21
157:19
looked 66:24
72:20 107:9
115:5
looking 34:5 69:2
74:13,15 75:3
157:21
looks 33:15,20
34:6,14 113:19
113:22
lose 10:7
lost 59:1,4
lot 9:4 10:1 37:5
38:15 43:2 52:6
92:25 115:21
116:1
Lots 83:25
loud 121:7
love 144:6

low 129:17
low-level 14:18
lunged 79:2,5
lungs 97:22
lying 90:10 95:13
_____
M
M 2:2,8
machinery
146:20
mad 111:20
main 101:16,20
101:22
maintain 30:6
100:11
maintained
150:25
major 40:24
making 39:6 88:6
115:11 122:8
122:10,11
123:2 124:1,3,4
124:10 153:14
157:20 158:5
man 122:21
management
26:23
manipulation
15:7,19
manner 76:11
128:19 130:4
130:15,21
131:9
manual 34:17
mark 113:14
116:13,15
144:9
marked 31:16
32:9 33:8 34:12
35:3 37:9 38:2
38:20 113:7,9
137:22 144:10
144:12
marks 159:5
160:13,21
161:8

matches 120:21
matter 135:3
Matthew 68:23
Mattioli 1:11,15
2:10 4:2,7
69:20 117:19
118:1,3,9,10
129:1 140:24
144:10 157:23
168:8
mean 4:18 9:11
13:12 20:9
24:19 25:17
31:25 32:15
36:3 38:15
39:23 45:3 46:5
50:19 56:7
59:15 60:25
62:23 67:16
85:23 87:13
89:23 97:3 99:4
106:5 109:4
116:7 122:1,18
123:19 131:1
131:21 136:8
136:11,16
137:8 149:18
159:22 160:6
164:9 165:24
meaning 7:3 8:7
15:6 26:16
27:25 32:22
41:22 44:3
46:20 51:17
58:22 59:12
60:19,20 112:9
132:25
means 32:19 39:9
39:9 134:10
138:24
meant 33:3 38:14
39:6
measures 153:2
Mechanicsburg
2:3
media 29:22 30:8

media-type 29:25
medical 7:3
  41:14,19 42:2
  44:24 45:8
  91:23 92:4
  128:10,22,25
  128:25 129:14
  129:16,23,25
  134:6 158:22
  161:22 162:2,3
  162:12
medically 42:17
  43:1,11 46:4
  106:15
medication 7:3
meet 17:5 64:19
member 23:2
  29:15,18
memorial 68:15
  68:23 145:19
memory 6:18
  144:3,25
  152:11
mental 26:14
  27:19
mentality 52:3
mere 136:6
merely 94:7
message 103:22
messages 30:3,11
  30:13,17
met 64:24,24
  65:2,7,25 66:9
  66:14,22 142:2
Michael 1:11,15
  2:10 4:2,7
  168:8
middle 4:9
midnight 154:14
military 8:10,13
  8:14 9:8,13,15
  9:24 10:3,4,9
  10:11,20,22
  11:19 12:2,3,5
  12:5,15,15,17
  12:24 13:5,15

14:18 15:4,14
  23:5 42:16
Milwaukee 1:3
  2:11,13,14 8:2
  20:25 27:5,7
  31:20 32:13,17
  38:6 53:3 63:19
  65:4,13 122:2,3
  122:22 125:5
  142:9 145:23
  146:1 147:20
  152:10 168:2
  168:17
mind 83:16 163:5
mine 64:23
minimal 10:2
  29:6
minute 22:21
  95:2 105:9
  106:23
minutes 40:20
  56:22 96:2
  114:18 166:24
mischaracterize
  51:21
mischaracterizes
  98:7
misdemeanor
  80:18
misplaced 59:1,4
missing 74:19
  131:23
misstates 98:6
  112:17
misunderstand...
  149:12
MMA 16:10,12
  16:17
MMA-type 16:8
molded 28:11
moment 33:9
  75:18 83:1,10
  83:18 85:6,16
  85:19 86:5
  89:10 91:24
  106:4 122:19

139:16
money 74:15
monitor 46:3
monitoring 37:21
month 8:20
  11:13 21:8
  138:19
monthly 11:12
months 9:17,19
  9:22
Morales 2:14
  51:4,7
morning 63:1,3
  63:10,12,13
  72:23 140:24
  141:4 145:15
  147:14 150:7
  154:17 165:1
motor 146:21
mouth 36:24
  103:14
move 157:11
moved 28:8,9
movement 45:6
  46:2 73:12
moving 73:10
  100:4,5,19
  101:2 102:7,22
  105:1,24 106:6
  106:8,13
MPD 68:18
  127:16 128:4
Muche 2:12 3:3
  51:20 113:11
  123:8 140:23
  147:4,12,18
  149:1,14,17
  150:14,19
  152:18 153:10
  153:19 154:3
  154:13 155:25
  167:15
muscular 77:20
Mutual 65:3

———————
      N
———————

N 2:1 3:1
naked 19:13 20:4
  109:25 115:23
  117:20 164:19
  164:20,22
  167:10
name 4:9 30:22
  30:23 33:23
  141:24
narrow 58:3
National 8:14
  10:13 11:7,11
naturally 7:15
nature 15:8,11
  17:18 21:18
  29:20 146:8
navigate 92:17
necessarily 45:13
  48:20 51:13
  111:7 136:10
  144:16
necessary 141:5
neck 16:4 17:24
  18:18 19:10,21
  19:21 20:1,15
  42:25 44:4,7
  55:21,24 56:5
  56:17 79:2 95:8
  95:21,22 96:6
  96:16,20 97:8
  97:11 98:25
  99:1,8,12,14
  100:17 101:1,5
  107:5,23 108:1
  108:4 110:4,13
  111:2,4,7,8,24
  113:5 118:4,5
  127:15 159:5
  160:3,13,21
  161:2,8 166:23
need 5:14,15,16
  5:23 8:24 36:3
  36:5 42:2,18
  43:1 46:3 49:20
  58:23 75:10,12
  76:2 85:10

86:20,25 87:2
  93:19 118:18
  120:1 129:18
  137:5
needed 11:4
  57:24
neighbor 64:22
  124:20
neighbor's 125:8
neighborhood
  53:3
neighborhoods
  52:25
never 10:6,7,24
  11:1,4 12:12,19
  16:10,11,12,15
  19:25 20:17,19
  20:21 21:2 24:6
  25:24 26:22
  33:13 34:10
  35:7,14 39:10
  42:10,13 46:24
  56:4,9,14,17
  66:24 71:24
  74:16 83:14
  85:8 93:24 99:8
  99:12 107:6
  110:19,20
  121:2,9 123:21
  133:1,2,5
  151:21 161:19
  163:3,5,10
  166:1
new 31:6 151:24
news 138:23
  139:1
night 40:24 61:8
  61:22,24 62:7
  62:11,15,17,20
  62:23,24 64:3
  64:14 67:9 70:7
  70:11,12,14,20
  71:17 72:1
  121:10 126:12
  126:13 135:13
  146:16 162:7

165:1
nods 5:10
noise 121:10
noises 94:17,18
non-sanctioned
128:7
normal 65:19
70:11,11 75:7
normally 36:18
59:9
North 2:13
Northwestern
65:3
Notary 1:19
168:6,22
note 16:6
notes 159:2
notice 98:10
113:4
noticeably 53:12
noticed 112:23
number 22:23
32:10 33:8
34:13 35:4
37:10 38:3,21
113:9 115:3
117:15,15,15
117:16,19,25
118:1,9 121:6
137:22 149:12
150:8 156:25
156:25 157:19
167:6
numbers 157:19

O

oath 4:3 31:21
32:1,5 87:23
149:15
obese 77:20,21
77:24
object 18:19 47:7
50:22 51:20
85:20 115:10
123:4 132:15
136:20 138:6

139:24 152:14
153:5
objection 22:16
25:9 49:22
52:13 82:3,8
88:20 90:14
91:15 98:4
102:8 104:8,10
111:9,25
112:16 115:14
115:14 122:15
123:17 128:25
129:7 130:11
147:3,15
148:18 152:15
153:7,18,23
154:6 156:19
157:2 161:24
163:20 164:14
165:7
objections
115:12 147:9
objectively 90:24
observed 87:12
102:18
obstructing
90:10,19
obviously 7:10
22:25 115:17
141:9
occurred 68:10
93:21
odd 67:17
off-duty 65:9
87:2 139:21
140:5
offense 138:10
offered 135:1
offering 144:17
office 2:12 31:21
32:2,2 58:6
67:24 163:1
168:17
officer 10:23
12:5 13:23 23:6
26:6 27:25 28:2

28:25 32:3,20
33:12,22 35:10
37:21 42:13
47:18,20,25
48:3,18,22 49:7
53:20 57:5
59:23,25 60:5
60:14 63:20,23
65:6,8,15,23
66:19,21 67:1,5
67:8,13 68:16
68:23 69:2,4,9
69:21 74:9
76:15 83:9,10
85:12,16 86:25
87:2,19 90:22
96:10 100:6,12
100:21,25
101:11,14,23
102:25 103:24
104:5,21
105:25 106:5
106:10,14
107:2,11
113:21 123:21
123:24 124:18
124:19,21,24
124:25 125:7
125:23 126:3,6
126:17,23
135:13,19
136:9,11,17
137:2,5,9,17
138:2 145:14
145:14,20
146:1 147:20
148:24 149:7
150:10 151:2,7
152:10,21
157:13 165:19
officers 20:13
47:15 53:17
56:2,4 68:16
87:9 93:12
111:21 136:2
140:6 152:22

officially 14:10
oh 9:25 64:5 80:7
82:15 104:9
113:11,13
119:1,1 137:20
157:8
okay 5:5,6,12,18
5:19 6:1,2,11
6:12,23,24 7:15
8:22 9:18 10:17
11:17 13:1 14:2
15:4 16:24
17:17 18:2,16
19:3,16,20
20:24 26:10
28:25 29:15
30:11 31:1 32:9
33:18 34:8
37:13 38:2,8,20
39:19 40:8,13
41:1,17 42:14
43:15,21 44:11
44:18 45:20
46:12 47:13
48:21 49:8,19
56:21 57:16
59:20 61:3
62:11 63:11
66:24 67:11,22
68:10 69:18
70:25 71:2 72:2
72:9 74:23
76:10,22 78:8
79:18 80:21
81:24 84:6
86:12 87:10
90:22 92:8,23
96:19 97:3,20
98:22 99:11
100:16 101:8
104:4,16,17,20
104:24 105:9
105:24 106:16
106:21,22,25
107:1,7 108:3
109:10,24

110:7,14
111:22 112:23
114:23,24
115:25 116:23
117:24 118:8
119:25 120:10
121:5,13,15
122:21 124:17
125:6 126:24
126:25 127:20
129:6 130:3
131:6 132:3,9
133:24 134:12
135:23 136:2
137:3,20 139:7
140:14,17,17
140:19,24
141:1,6,21
142:11 143:12
144:3,8,20,23
145:3,14,22
147:7,10,19
148:5,9 149:9
149:18 150:6
150:17 151:16
155:21 157:17
158:17 159:23
160:10,16
161:10 162:1,9
164:18 165:22
166:21 167:13
old 27:8 30:10,11
30:20
on-duty 123:20
once 11:13 22:4
29:7 35:23,24
40:11,11 41:25
65:2 66:10
104:25 144:9
ones 7:20 36:17
operate 42:24
146:20
operating 38:5
38:22
opinion 119:24
129:1 131:16

opportunity 54:23 57:2 115:2 150:6
opposed 40:15 111:23
order 31:13 106:11 141:2
orders 12:22
ordinance 124:15
ordinary 159:6
organizations 29:16
original 3:9,10 145:5
originally 27:3 106:17
outside 17:2 70:19 131:16

**P**

P 2:1,1
p.m 1:22 167:16
P.O 2:3
PABICH 1:18 168:5
pacing 77:2,3,3
page 3:2,6 4:21 117:14 144:16 149:10,24 156:22 157:10 157:18 158:23
pages 34:3 54:16 54:19 144:11
pair 145:16
pants 72:13
paper 34:14,19 34:24
paragraph 117:10,10
paramilitary-t... 12:14
parking 50:15
part 9:15 21:22 25:22 34:2 51:12 91:12 112:7 114:5

117:18 118:11 125:1 132:1,7 145:25
partially 156:12
participated 16:12
particular 65:16 143:16 145:2,6
parties 168:13
parts 54:5,6
passage 6:13,22
passes 106:9
path 16:24
patient 159:4
patient's 159:5,6
Patrick's 142:3
patrol 27:25
pause 22:21
pay 134:21
pays 65:15
pending 5:17
Pennsylvania 2:3
people 9:4 13:4 13:14 14:16 15:12,15 17:19 25:5 30:2 52:22 52:24 53:2,7,9 54:7,8 56:15 69:7 71:21 81:16 86:11 92:25 135:20 137:15 161:14 164:5
people's 143:6
pepper 17:21 41:22,23,25 42:4 44:5
perceive 53:16 78:5 84:6 162:17
perceived 25:6 162:18
percent 54:14 75:15 80:2 107:14 164:15
perception 82:20

82:23 84:11
perform 19:21 47:19 59:22,24 60:4 124:25 126:16,23 137:13 167:10
performance 90:1
performed 110:1 110:8 126:16 128:2,11 164:19
performing 60:9 83:9 87:25 92:9 124:18 136:3
period 22:5 25:2 51:7 59:21
permitted 46:16 47:1 51:18 52:1 55:22 56:5 165:17,22
person 23:5 44:17,20,25 45:10 48:23 75:13,15 77:12 81:19 85:25 86:1 89:9 93:2 133:7,8 135:24 143:9 160:16
personal 168:10
personally 42:10 54:19 62:2 138:13
persons 13:25 48:3 69:23 70:4
pertains 85:14
pertinent 39:25
Peters 64:17 166:11
Peterson 128:10 129:25
phone 86:17
phrase 98:5
physical 21:16 22:2 27:18 29:9 78:6 79:1 81:25

89:19
physically 15:5 81:16
pick 141:3
piece 34:14
place 141:9
placed 108:16 161:17
places 7:19 30:6 71:7
plain 146:7
plaintiff 1:8,16 2:4,7 160:7
plaintiffs 166:13 166:14,15,22
play 6:3 17:5 143:22
played 16:22 142:17
playing 6:20 70:17,23,23 119:11
please 5:1 19:5 126:1 130:3
plus 129:15
pocket 72:19,21 74:4,6
pockets 72:12 73:21,24 74:1 75:2
point 5:14,20 13:8 22:14 39:17 61:13 62:8,15,18 63:2 70:7 71:5 72:1 76:13,22 78:11 78:20 81:3,6 83:18 84:5 87:10 88:19 89:12 96:24 99:15,18 100:3 102:7,22 105:23 108:10 108:21 109:3 110:18 111:19 128:9 136:6,13

136:15 141:13 141:19,21 142:3 144:4 154:21 155:8 155:11,22 156:23 157:11 158:24,25 159:8 162:9,14
pointed 83:22
pointing 76:19
points 141:3 157:14
police 7:14 8:3,14 8:19,20 9:9,13 9:24 10:3,23 11:17,19 12:5 17:13 18:9,10 18:11 20:24,25 21:1 23:2,6 26:5 28:2,25 29:9 31:20 32:3 32:13,17,20 34:16 35:9 37:21 38:6 40:8 42:12,13,22 47:15,24 48:3 48:18,22,24 49:7 51:13 52:4 52:11,12,23,23 53:6,10,11,11 53:17,20,25 55:23 56:1,2,4 57:5 59:23,25 60:4,13 63:15 63:19,19,22 65:6,8,13,15,22 66:18,21,25 67:5,8,13 69:2 69:4,8,20 74:9 74:21 76:15 83:9,10 85:3,12 85:16 86:25 87:2,8,19 88:15 89:23 90:22 92:24 93:12,22 100:8 105:8,11

106:23 107:21
113:21 121:18
122:5 123:20
123:24 124:17
124:19,21,22
124:24,25
125:1,3,4,7,9
125:11,18,18
125:23 126:3,6
126:17,23
135:12,19
136:9,11,17
137:2,4,9,17,25
138:2,16 140:6
141:17 145:23
146:1 147:20
147:21,21
148:4,6,7,17,24
149:3,5,6,7,8
150:2,10 151:1
151:2,7 152:10
152:21 158:2
158:12,12,14
160:23 162:21
164:4,7 165:19
166:4
**policies** 35:6,10
35:15,18 36:8
36:11,14,15
37:23 39:15
44:3,9 54:9,15
54:19,24
125:10,15
149:4 151:6
**policing** 7:15 8:6
8:16,17 9:8,15
10:11,20 11:18
12:13 23:5 26:4
29:20 31:2
**policy** 36:25
37:16,17,20
38:10,14,15,19
38:25 39:4,8,20
43:16 44:2,4,5
44:5,10 47:4,5
47:6,10,14,18

47:23 48:2,5,9
48:14 54:10,11
55:7,11,14,17
56:7 60:2,3,8
60:12,15,22
139:21 140:3,4
140:6,9,12
153:2
**poor** 25:22,25
51:23 99:9
111:18 112:6
**population** 52:7
52:11
**portal** 151:13
**portions** 144:16
144:19
**position** 15:16
44:16,25 96:4
100:6,18
103:23 112:13
135:12,14,15
**positioned** 96:18
**positioning** 44:12
45:10 111:6
160:2
**positive** 28:19
**possible** 40:2
43:24 45:18
50:18 59:15
69:6 83:6 98:21
**possibly** 9:17
39:23 48:5 78:4
124:14,16
**posted** 31:6
**posting** 31:5
**potential** 81:24
**potentially** 25:6
**pounds** 77:19
**power** 135:24
**practice** 10:8
29:2 58:5
**practices** 29:5
46:21
**pre-dentistry**
148:22
**precluded** 60:12

**Preparatory**
33:12,21
**prepared** 7:6
50:16 57:3
**presence** 80:18
**presented** 82:1
162:3
**press** 95:10
111:22 112:14
161:4
**pressure** 45:21
99:4,5 108:1
110:4,11,18,22
111:2,4,8,16,24
**presumably** 62:2
78:2 97:12
114:14
**pretty** 6:3,4
12:22,24,25
29:14 129:17
**prevent** 7:4 97:4
139:8 166:7
**prevented** 61:4
**previously** 142:1
142:12 150:22
**principles** 32:17
**print-off** 150:25
**prior** 112:18
142:4 144:24
147:19
**private** 8:7 65:9
65:11 66:1 78:2
**privilege** 90:23
138:8
**probable** 114:1
114:11
**probably** 20:5
39:24 76:20
78:14 85:4
116:11 140:25
**probation** 65:1
**probationary**
22:5
**problem** 72:4
107:24 108:2
**procedure** 1:17

38:5,22
**procedures** 34:16
35:6 149:5
**proceed** 7:6 57:3
**proceeded**
154:24 155:17
**proceedings** 4:1
144:1 167:16
**process** 21:9,10
24:9 90:21
**profanity** 118:25
**professional**
29:16
**profile** 30:22
**program** 39:12
39:14
**prompted** 79:21
**pronounced**
19:14
**property** 81:21
**prosecutor** 87:24
89:25
**protect** 47:15,24
48:3,17 139:12
**protected** 138:7
**protection** 22:10
22:13
**proven** 131:9,24
132:4,9,13,19
132:24 133:15
133:17,22,25
**provide** 13:24
14:7,11 15:15
128:4,5 134:17
**provided** 18:16
19:9 35:10,16
35:19 41:14
54:22 55:11
126:5,18
**provides** 55:6
**providing** 13:17
**psychological**
21:20
**pub** 142:3
**public** 1:19 30:7
168:6,22

**punch** 79:3,7,7
80:5,9,10,12
84:3 163:9
**punched** 79:19
80:3 121:21
155:5 163:6
**punches** 17:18
81:1 82:12 83:3
164:5
**punching** 83:4
86:11 91:22
92:9
**purpose** 47:6,14
48:17 164:2
**purposes** 42:14
**pursuant** 1:17
125:6,8,10,12
**push** 79:3 163:11
**pushed** 79:15,17
**pushing** 84:3
97:7,7 110:24
**put** 7:19,24 36:23
58:6,15 59:10
63:8 94:22
103:2 111:16
111:23 125:19
139:10 144:6
164:22
**puts** 7:21
**putting** 45:21
110:4,11
133:14

---

### Q

**question** 5:4,17
5:18,21,25
18:20,23 19:5
22:17 39:3
45:20 49:23
50:10,23 51:23
52:14 61:9,11
63:7 66:17,19
67:9,11,17
69:19 82:4,11
83:24 84:1,13
85:15,21 87:22

88:21 91:16
98:5 100:2
102:2,9 103:17
103:17 104:11
108:17,25
109:5 111:10
112:1,17
114:21 115:10
121:22,25
122:11,16,24
123:1,6 125:13
130:3,15,25
131:19 132:16
136:20,23
137:4 139:24
143:20 145:5
148:19 152:8
152:17,17,19
153:5,24 154:7
157:3 163:21
163:22,25
165:6,10
**questioned** 25:16
**questioning**
158:21 160:5
160:18
**questions** 4:19,25
7:1 36:11 37:2
55:16 114:20
126:20 142:18
142:21 149:22
159:25 160:10
167:6,14
**quick** 40:20
156:4
**quickly** 10:6
72:21 138:16
**quite** 42:6 158:1
**quote** 157:22
**quoted** 156:12,16
158:4 161:1

---

**R**

**R** 2:1
**ramped** 53:9,11
**random** 24:15

**re-trainings**
40:10
**reaction** 36:18
42:2
**reacts** 62:3
**read** 36:3 54:18
54:25 55:5
114:16 115:6
117:18 119:19
144:21 151:19
151:24 152:1
**reader** 118:17
**readily** 58:20
**reading** 37:1
54:16 159:10
**ready** 11:3 50:20
**real** 49:3,5
**realistic** 54:17
**realize** 6:21 26:1
150:2
**realized** 75:18
**really** 12:20
28:18 41:21
43:2 45:11 61:1
66:25 67:4
70:15 73:5,7
75:5,5 76:14,20
77:22,23 84:12
97:17 106:2
109:4 118:22
119:3 121:8,12
121:12 122:1
130:19 133:1
140:13 149:6
151:14,21
153:12 167:12
**rear** 19:13 20:3
109:25 115:23
117:20 164:18
164:20,22
167:10
**reason** 6:25
33:24 47:4 59:8
59:18 95:16
123:1 129:11
138:14 146:23

148:24 151:3
**reasonable** 90:25
**recall** 6:15,16
36:15 37:15
39:4 40:16 41:2
43:8,15 44:2,11
44:15,23 45:7
45:14,22 46:1
46:15 49:16,20
50:3,6 51:24
77:15,18 94:19
94:20 95:5,7,10
97:17,19
105:12 112:25
127:8,24
153:13 157:20
158:5,23 159:2
159:7 165:6
**receipt** 36:1,14
**receive** 36:8,24
127:24 151:7
**received** 26:22
34:15 35:6,23
35:24 36:10
39:4 46:12
125:25 149:4
**receiving** 127:25
**Recess** 56:25
95:3 114:25
139:17
**recognized** 24:24
62:19
**recollection** 40:4
144:1 145:3,9
**record** 5:2,12
18:4 63:8
**recorded** 168:8
**recording** 142:17
142:23 145:1,8
**records** 13:11,21
150:25
**recreation**
119:10
**reduced** 168:9
**refer** 18:5
**referring** 99:7

**refresh** 144:1
**refreshed** 6:18
145:1,4
**refused** 81:14
**regarding** 11:25
**Regardless** 133:8
**region** 18:18
19:11 110:5
**regularly** 66:12
**reinstatement**
141:18
**related** 25:15
26:5 31:2 39:15
127:5 145:19
**relating** 160:2
**relative** 152:24
168:12,13
**relax** 105:11
**relief** 106:21
**remain** 47:20
**remained** 28:12
**remember** 6:14
6:16 9:16 10:1
14:15 15:13
17:17 19:12
21:7,15,18
23:13 24:16,17
26:7 27:23 29:8
31:25 32:7 33:4
37:19,22,22,25
38:17,18 39:16
39:23 40:3,7,12
41:15,21 43:2,5
43:6,9,13,17,17
43:18,22 44:19
45:11,19,25
46:11,13 48:25
49:8,15,25 52:3
54:25 56:20
59:5,16 66:8
68:15 74:3,10
74:10 80:1
98:20 105:5,16
105:19,22
127:12 128:3,8
129:13 140:3

140:13,14,16
140:18 142:15
142:24 143:19
143:20,23
144:5 148:14
149:6,7 151:14
151:15 153:12
158:8 159:10
159:18,20
160:4,6,6,22
**remembering**
45:13
**remove** 22:12
**render** 129:2
131:16
**rephrase** 5:23
60:17
**report** 158:22
**reported** 30:13
**reporter** 1:18
4:22 168:6
**reports** 129:14
**represent** 33:20
150:24 166:13
166:21
**representative**
31:9
**represents** 33:19
**request** 101:24
140:2
**require** 32:5
**required** 10:12
32:22 33:3
35:11 38:10,12
39:1 46:9 55:7
55:10,14 95:19
**research** 19:18
**reservation**
135:7
**residence** 63:15
**resign** 138:4,12
138:15
**resignation**
137:24 141:9
**resigned** 138:15
139:7 141:14

resist 53:10
resisting 155:23
respect 9:24
    10:20 11:24
    14:23 15:5,18
    15:21,24 16:3
    18:17 19:8 24:9
    26:3 29:22 33:2
    33:5 38:13 41:9
    41:17 42:8,21
    43:11,16 44:1
    44:23 45:8,20
    45:23 46:1
    51:12 60:2,16
    119:5 125:17
    130:15 140:6
respected 52:22
Respectfully
    133:22
respiratory 98:2
    98:6,10
respond 126:21
responded
    118:10
response 105:18
    153:14,22
    161:5
responses 139:19
    139:25 140:10
    140:20
responsible
    151:22
rest 140:19
restate 5:23
restrain 93:6
restrained 45:7
restraining 92:19
    94:9
restraint 15:22
    19:21 44:4,8
    55:21 127:15
    166:23
restraint-type
    100:11
restraints 16:4

17:25 20:15
    46:25 55:25
    56:5
restrict 108:14
    108:20 109:2
    109:22
restricted 46:3
result 23:6 44:24
    45:9 91:5,8,9
    153:21
resulted 91:13
results 63:15
retrain 11:10
return 145:4
reverse 141:2
review 39:19
    54:24 55:12
    114:19 115:2
    143:25 150:7
    156:6
reviewed 114:14
    144:24
reviewing 120:23
    159:1
revised 35:15,18
ridiculous 80:14
rifle 14:17
right 5:13 7:8,22
    8:18 11:6 12:16
    17:1 20:2 21:5
    22:3 23:13 24:4
    27:8 31:20
    32:16 33:24
    37:18 40:5
    43:14,22 47:2
    54:13,20 55:18
    56:3,11,13 58:9
    58:25 59:11,17
    62:5 63:4,17
    65:20,24 66:3
    67:3,10 68:25
    69:22 71:8
    74:23 75:12,23
    76:2 77:1,14
    78:5 79:9,13
    80:3,11 86:19

88:11,16 89:15
    89:18,20,25
    90:5 91:1,21
    93:11 95:13,17
    95:19,20 96:5
    96:20 97:4,5
    98:2,16 100:23
    101:11,14
    102:7 104:23
    109:15,18,19
    110:23 114:8
    114:13,18
    115:5 117:7,14
    119:11 120:14
    120:19,24
    121:14 125:17
    125:20 126:22
    128:17 130:5
    131:8 133:12
    135:20 137:11
    140:12,21
    141:11,12,16
    142:4,13,14,25
    143:11,14
    144:4 145:17
    145:18 146:12
    146:16,17,22
    146:24,25
    147:22,23
    149:5,22,23
    150:10,22,23
    151:9,10 152:7
    152:13 153:16
    153:17 154:15
    154:16,21,25
    155:3,6,7,18,19
    155:19 157:16
    158:16,20
    160:22 162:16
    163:2 166:17
rights 135:7
    139:9,12
rigorous 21:9
rise 82:16,24
    106:19
rising 97:4

Rittner 68:23
Roach 2:14
    145:14 157:13
    157:15
road 1:20 2:6,9
    84:14
robbery 28:10,16
    81:17
Robert 2:14
roll 39:18,24
    40:13,15,17
room 2:13 67:23
    69:18,20 71:12
    76:6,24 81:20
    83:14 109:11
    109:13,18,19
    155:16
roughly 21:6
    27:15,22 66:4
rule 47:10,13
rules 1:17 11:20
    12:10 34:16
    46:15 125:8
run 92:25
running 131:3

_____
            S
_____
S 2:1
safe 47:20 54:11
    60:19 146:20
Sarah 157:12,15
sat 39:7,23 55:15
    70:21 72:16,19
    77:9 162:1
Saturday 64:4,5
saved 30:13
saw 13:11 16:6
    20:17,21 59:20
    60:2 69:13
    72:20 77:19
    80:8 92:6 96:9
    101:4 106:18
    106:19 119:19
saying 13:20 26:5
    40:6 49:14
    60:16,18 62:23

68:2 73:17,22
    78:17 88:17
    89:5,16 90:11
    95:7,11 98:20
    102:3 104:22
    105:17 111:15
    112:22 119:6,7
    119:15,25
    120:6,20,21
    127:11,25
    129:10,21,22
    129:22 130:8
    132:4,6 136:13
    136:25 140:4
    140:16 150:13
    159:18,20
says 31:20 32:16
    33:13,21 38:5
    99:2 115:22
    118:25 120:4,4
    121:7 124:23
    128:21 138:11
    159:3
scan 57:24
scared 53:3
scenarios 48:21
    109:15
scene 23:7
scenes 93:15
schedule 65:19
scheduled 146:3
school 7:10 16:19
    17:2 148:2
science 7:14
scores 159:13,15
    159:19
screening 24:10
seal 168:17
second 31:14
    41:9 84:21
    86:16 92:16
    94:21 102:3
    117:16 118:11
    125:1 128:24
    139:23 149:9
    154:15,24

156:22,24,25
157:17
**seconds** 166:24
**secret** 61:7
**section** 39:15
56:23 145:2
**security** 8:8 65:4
65:10,11 66:1
78:2
**see** 31:11 58:23
64:4 65:1,14
66:10,11 67:12
67:21 77:22
91:18,22 94:13
101:18 106:15
107:7,17
117:21 122:18
123:19 149:24
150:1,5,11
159:5
**seeing** 107:4
159:2
**seeking** 141:18
**seen** 31:17 32:7
32:10 33:11,14
34:10 35:4,7
37:10 69:3,12
69:13,14 81:3
110:2 150:21
**self-defense**
133:3 135:16
136:3,7,10
137:1,6,9
**sending** 30:3
**senior** 4:11
**sense** 65:18,21
**sentence** 118:12
**separate** 9:9 13:1
18:9 44:4
166:18
**serious** 23:22
**seriously** 131:21
**serves** 152:11
**service** 150:10
**serving** 53:18
**session** 160:18

**set** 125:9 157:18
157:19 168:16
**shakes** 5:9
**shape** 104:3
**shattered** 80:13
**Sheremeta**
145:14
**shift** 40:1,18,24
41:3 49:21 55:1
**shirt** 68:24 146:2
**shock** 79:8
**shoes** 68:13
**shook** 77:5
**shoot** 53:11
85:18
**shooting** 23:17
23:18
**Shorthand** 1:18
168:5
**shortly** 79:19
86:21
**shot** 83:18 84:4
84:18,19,24
**show** 31:11,15
35:3 37:9 38:2
38:20 67:19
164:8
**showed** 158:2,14
164:4
**showing** 32:9
33:8 34:11,12
113:9 137:21
**shown** 67:15,20
**side** 17:15,15
96:8
**sign** 35:11,21
36:1,6 55:7
**signature** 34:15
**signed** 34:24
149:3,25
**significant** 6:13
154:4
**signing** 36:14
**silent** 73:3
**similar** 35:5
121:7

**similar-type** 8:7
**simply** 36:14
60:8
**single** 6:23
**sit** 36:7 37:15
45:15 59:17
108:8 109:7
120:18,22
129:13,18,19
129:21 130:7
130:16 140:14
143:1 151:23
**sitting** 39:5 64:12
67:3 70:16 75:3
**situation** 7:23
12:19 14:2,20
43:20 48:6 49:4
49:5 51:5 54:20
65:14 67:25
68:7 85:24 94:7
98:12 136:12
164:13
**situations** 61:3
**six** 49:10
**sleep** 70:7,9 71:6
71:10,11,15,20
71:21 72:9,10
72:11,18
146:11,14
157:25
**sleeping** 71:13
72:13 73:14,14
77:1,4
**slept** 71:9,22 72:2
73:12
**slow** 41:5 104:25
109:11 118:17
**slurred** 61:18
**small** 14:19
77:12 80:15
83:3
**small-level** 14:13
**smart** 126:10
**snorting** 121:8,9
**social** 29:22,24
30:8 64:6

**socks** 68:13
**somebody** 10:22
15:5 16:16
23:22 42:1 45:6
46:2 50:13
58:22 72:15,17
72:19 79:10
80:16 82:17
83:5 91:22 93:5
94:3,9 123:21
131:23 134:2
**somebody's**
45:21
**somewhat** 146:10
147:17
**soon** 55:2,2 80:24
**SOP** 36:20,21
**SOPs** 37:11
150:18
**sorry** 9:7,20 15:1
19:1 22:16 34:2
50:22 60:17
62:14,25 63:6
82:18 89:2,5
90:15 96:15
98:4 104:9
107:15 114:4
118:16 119:9
134:5 137:21
137:21 150:12
157:8 160:5
163:20
**sort** 11:15 15:10
19:19 29:8
70:13 92:4
96:24 141:7
154:23 155:16
**sorts** 138:19
**sought** 24:25
**sound** 56:23
121:7 152:13
**sounds** 59:11
91:1 94:15
114:8 128:17
142:25 143:10
157:16

**sources** 6:11
**speak** 120:12
153:9
**speaker** 142:24
143:3
**speaking** 84:23
95:5 115:12,13
153:13
**Special** 1:6 28:11
28:16
**specialized** 9:13
28:3,14
**specific** 38:1,18
38:19 41:3
43:13 142:21
144:25
**specifically**
127:14,22
**specifics** 43:5,6
43:22 45:11,13
45:19 46:11
**speculate** 52:17
82:22
**speculating**
22:22
**speculation**
22:17 25:10
52:14 82:19
**spelling** 128:15
**sport-type** 17:2
**sports** 16:21
**spot** 80:15 82:13
83:3
**spray** 17:21
41:22,23 42:1
44:5
**sprayed** 42:5
**squared** 76:12,25
76:25 78:8
**squeeze** 99:1,8,12
160:4
**squeezing** 98:23
98:24 99:2
110:17 111:14
**squirm** 89:12
**SS** 168:1

**St** 142:3
**stairs** 76:4
**stand** 86:14
  148:12
**standard** 38:5,22
**standards** 129:15
**standing** 15:16
  44:21 63:22
  73:9 78:11
  91:22 109:10
  109:12,17,19
**stands** 18:6
**start** 5:3 21:6
**started** 34:18
  52:22 53:20
  73:7,16 81:15
  86:21 104:25
  148:4,22
**starting** 148:6
**startled** 72:17
**state** 1:19 114:4
  121:23 122:13
  123:15 124:5
  124:13 134:21
  135:21 168:1,6
  168:22
**stated** 115:7
  120:15 129:23
**statement** 54:7
  118:5,7 157:20
  157:22 158:6,9
  158:10,19
  159:12 160:25
**statements**
  142:22 144:25
  145:6,6 156:12
  156:15 157:14
  159:25 160:19
**STATES** 1:1
**stateside** 10:18
**stating** 118:25
**station** 160:24
**statute** 135:22
**stay** 72:4 100:2
  146:24
**stayed** 100:8,13

148:23
**steal** 73:5,16,23
  74:25 81:11,13
  81:13
**stealing** 73:18,18
  78:23
**step** 21:15 72:22
  79:6,13
**steps** 21:12 43:19
**stolen** 74:16
**stomach** 45:22
  93:5 94:13
  95:23
**stood** 73:3 76:3
  77:6,9 86:16
**stop** 28:18 105:1
  105:24 108:20
  155:23
**stopped** 76:10
  86:15 106:6,8
**stops** 99:16 100:3
  100:5,19
  106:13,17
**story** 83:20
**straddling** 96:13
  96:15
**straightforward**
  6:4
**strange** 72:18
  75:5,17 111:17
  119:3 121:3
  130:25
**strangling**
  154:10
**street** 21:6 24:6
  49:5 52:6 53:7
  55:3
**strike** 29:11 49:1
  161:20 162:23
  163:15
**strikes** 15:25,25
  16:1 17:17
**striking** 18:14
**struck** 79:2 155:2
**structure** 12:14
  12:15

**struggle** 68:11
  97:6 99:16
**struggling** 86:16
  105:7,13
  106:18 155:22
**stuck** 115:22
  116:2,10
**stuff** 29:4 71:16
  74:24 75:2
  116:19 138:19
  158:4
**subjected** 37:19
**sudden** 53:23
**suddenly** 69:1
  136:17 137:8
**sued** 112:12
  135:3
**suffered** 23:22
  112:10
**suffering** 92:3
**suffers** 91:5
**suffocate** 95:7,9
  161:1,3
**Suite** 1:20 2:6,9
**summertime**
  11:15
**sun** 72:24
**Sunday** 63:9,12
**super** 75:8
**supervises** 93:24
**supervising**
  152:22
**supervision**
  51:14
**supervisor** 40:21
  94:2
**supervisors**
  93:22
**supervisory**
  153:22
**support** 114:11
**suppose** 22:11
  28:15 61:6
  116:20 120:13
  124:7 127:3
  136:1 156:20

**supposed** 47:19
  48:11 64:10
  114:10
**sure** 4:20 5:21
  9:19 19:7 26:10
  29:12 33:7 34:8
  39:6 41:15
  46:10,12 54:8
  59:7 62:10
  87:15 88:3
  118:14,21
  120:1,14
  138:14 143:7
  143:13
**suspended** 63:25
**suspicions** 51:11
**suspicious** 52:12
**swear** 124:23
**switched** 34:21
**sworn** 4:3 114:6
  147:19
**swung** 80:3

---

## T

**T-shirt** 68:13,14
  68:15,17
  145:17,19,19
  146:5,8,8
**table** 70:21
**tactic** 17:15
**tactical** 68:21
**tactics** 13:3 41:11
  46:17,17
  152:11,24
**take** 5:16,18 15:5
  15:15 32:1 33:9
  43:19 55:4 57:2
  57:25 60:13
  85:5,8,10 94:24
  95:1 103:1
  114:18 116:12
  117:10 118:15
  118:18 137:20
  139:16 156:22
  157:17
**takedowns** 15:7

**taken** 1:16 16:10
  44:13,17 58:12
  74:17 152:22
  158:15
**takes** 151:12
**talk** 56:8 81:9
  143:10
**talked** 40:8,9,13
  70:21 122:7
  142:1 161:11
**talking** 53:13
  67:25 70:17,24
  105:2,5,14
  119:10 126:11
  130:4,5
**tall** 27:10 80:11
**tape** 89:8 118:20
  119:5,17,21,22
  119:23 120:4,6
  121:6,11 143:5
  143:6,10,21,22
**Taser** 42:10,11
  42:16 44:5
**Tasers** 42:8,9
**task** 14:10 28:10
  28:16
**taught** 12:21
  13:2 15:3 17:16
  17:17 46:20
  56:2
**teach** 9:23 17:24
**teaching** 12:6
  48:25
**team** 28:8
**teams** 28:3,5
**technical** 7:14
**technique** 92:19
  100:11 108:20
  109:20 153:16
  154:2 161:12
  161:14
**techniques** 14:24
  18:7 29:3 42:21
  128:7 153:21
**televise** 138:21
  138:22

**televised** 138:22
**tell** 4:25 12:21
  17:13 19:16
  21:12 25:5,24
  29:18 33:18
  45:15 59:7 64:9
  73:11 76:13
  79:22 95:19,22
  98:20 102:15
  102:17 106:2
  109:16 117:12
  119:18 152:6
  154:11 157:21
  157:24 158:7
  158:11 160:17
  167:10
**telling** 48:10
  76:17 77:10
  88:1 99:24
  107:20 158:5
**tells** 102:25
  160:17
**ten** 40:20 53:22
**term** 14:3 20:5,8
  20:10,12 41:18
  164:18
**test** 21:16,17,25
  22:1,2 24:14,15
**testified** 4:4
  87:23 88:2
  143:16 146:10
**testify** 87:6
  143:21
**testifying** 4:19
**testimony** 19:23
  51:21 98:7
  112:18 142:20
  143:1,19
  144:24 145:8
  150:20 159:7
**testing** 21:20
**Texas** 2:6
**thank** 106:21
  107:19,20
  149:14,18
**theft** 81:19

**They'd** 12:9
**thing** 11:11,12
  14:18,19 17:6
  29:23 44:8
  54:13,20 58:15
  71:18 72:11
  73:4 84:16
  97:25 111:17
  115:21 116:10
  121:3 141:7
**things** 4:22 9:23
  15:8,12 17:16
  17:18 18:13
  21:16,18 29:11
  29:20 31:11
  40:1,3 42:25
  43:10 49:1,2,25
  53:8 57:13
  73:17 74:19
  78:17 83:21,25
  90:12 97:23
  105:20 106:11
  115:21 116:1,3
  118:19 148:10
  156:24
**think** 6:20 7:17
  8:19 9:25 10:20
  14:8 15:17,20
  17:3,7,12,21
  18:1,6 19:14,15
  19:22 20:7,12
  21:20,21 23:11
  24:12 25:2,4,6
  25:21 27:15,23
  28:20 30:15,19
  30:23 31:24
  33:1,11,14 36:5
  39:7 41:10
  42:20 44:1,8,9
  45:16 47:13,22
  48:8 53:21
  55:24 56:1
  57:13,18,18
  58:13 59:19
  61:16,18,23
  62:21 66:4,14

  69:24 70:22
  71:1,5 72:24
  74:5,6 76:4
  78:13 79:12
  81:23 83:15
  87:1,1 88:8,10
  92:10 94:23
  97:1,2,13,14,15
  101:10 103:9
  105:5 107:18
  107:19,24
  108:2,7,12
  110:2,9,10
  114:3 118:13
  121:4,14 123:5
  123:6,7,22
  124:12 127:12
  131:15 132:11
  132:18 133:13
  135:17 138:19
  141:7 142:20
  143:10 144:19
  147:25 148:3
  149:10,20
  150:20 152:7
  155:15,25
  158:21 162:24
  166:1
**thinking** 81:17
  122:20
**third** 4:11 157:18
**thought** 44:6
  49:3 73:13,14
  75:19 76:8
  102:20 103:9
  104:16,17,20
  105:9 106:20
  106:25 119:14
  119:20 158:11
  160:22,22
  162:20 163:3
**thousand** 39:24
**thousands** 54:16
  54:18
**threat** 50:7,13
  78:6 82:1,2,11

  82:13,15,16,23
  84:7,9 101:17
  102:5
**threatened** 83:17
**threatening** 30:3
  30:12 50:17
**three** 9:19,22
  53:23 64:20
**threw** 80:8,10,12
**throat** 9:2
**throw** 79:7
**throwing** 73:22
  73:24 75:1
  80:25 82:12
  83:3 84:2 164:5
**thrown** 74:23
  164:18
**ticket** 50:15
**tight** 80:14 82:12
  83:3 98:23 99:3
  111:14
**time** 5:14,20 6:13
  6:22 10:17 13:8
  20:14 23:13
  24:18 25:2
  26:13 27:18
  29:23 38:8,25
  39:17 42:23
  43:4 51:8 52:21
  53:4 54:22 55:5
  55:10,12,19
  56:22 58:13
  59:21 65:25
  70:3 71:25 74:2
  75:7,7 76:13
  81:10 82:7
  90:20 92:14
  93:4,9,10 95:14
  97:21,25 98:10
  102:3 106:3,8
  106:13,17
  107:11 108:16
  108:21 109:3
  112:4 116:4,11
  118:13,18
  126:9 143:17

  148:14 151:2,7
  151:17,18,23
  152:9,20
  155:21 159:3
  159:24 162:9
  164:16
**times** 23:11 35:9
  66:11 93:21
  97:5 103:1
  121:11 137:4
  146:7
**titled** 30:20
**today** 7:1 29:23
  37:15 38:9
  39:19 45:15
  124:21 130:7
  130:16 140:15
  143:1 160:6
**told** 18:13 26:19
  32:19 35:23
  36:3 37:3 46:24
  49:20 50:3,6,11
  50:19 56:4,18
  69:16 76:1
  78:20 83:23
  84:18 86:20
  89:25 93:15
  94:2 98:14,18
  104:5,21 122:9
  146:23 158:2
  160:12,14,23
**tons** 74:9
**top** 33:21 73:24
  80:22 86:9
  95:24 96:4,11
  99:15 100:8,13
  101:7 107:13
  111:3,5
**topic** 150:8 151:1
**totally** 79:23
  117:4
**touching** 72:15
  72:18 131:22
**track** 116:18
**train** 10:12 15:18
  15:21,24 16:3

**trained** 10:10
11:3,24 13:22
14:9 15:4 16:16
19:20 20:22
29:1 33:5 38:13
41:11,25 42:23
43:10,15 44:12
45:15,17,18
46:8,17 85:15
152:9,10
153:15 154:2
**trainer** 13:9,9
14:4
**training** 8:21 9:9
9:12,13,24 10:2
10:5,8 11:1,16
12:12 13:12,13
13:24 14:7,11
14:13,14,16,16
14:23 15:10,11
15:15 16:8
17:14 18:4,11
18:12 19:9,25
28:14,17 29:3,7
29:9 33:2,12,16
33:22,23,25
36:18 37:1
38:18 39:12,14
39:16,18,18,22
40:15,19 41:3,6
41:10,14,18
42:11,16 44:20
44:23 45:8,23
46:1,15 48:13
48:13,16,17,21
54:9 56:14 78:3
125:17,22,24
126:4,14,18
127:2 152:25
**transcribe**
142:13
**transcript** 3:7,10
4:1 33:13,22,23
33:25 34:7
143:25
**traumatic** 128:16

**treated** 26:16
**treatment** 24:25
26:22
**trial** 3:7 4:18
87:5,7,23 88:12
112:23 122:7
129:20 132:20
133:1,23
134:18 138:18
138:25 139:9
141:10 142:16
143:3,8,16,22
159:1,8 162:1
**trick** 6:6
**tricked** 126:19
**tried** 81:11 85:4
85:5,8 86:22,22
94:4 99:21,22
99:24
**true** 156:7,8
158:19 161:15
162:4,15 163:4
163:5,7,8
**trusted** 52:11,20
52:20
**truth** 88:1 95:19
**truthful** 90:20,21
143:4 145:8,10
**truthfully** 7:1
131:21
**try** 54:11,13,20
75:24 81:12
92:25 152:19
**trying** 5:11,24
42:15 54:25
75:3,8 82:17,25
84:16 86:14,14
89:11 97:3
103:16 115:13
126:9,15,16
127:1 136:16
136:22 139:21
140:4,11 154:5
154:11
**turn** 16:24 50:4
**turned** 76:10,24

89:20
**tussle** 96:1
**TV** 20:11 70:17
110:2 148:12
**twelve** 49:10
**twice** 40:11
**two** 4:23 9:16,19
9:21 11:14
22:23 92:8
120:2 131:6,22
138:19 139:2
167:6
**type** 14:23 15:24
16:3 19:10,21
23:15 25:23
39:22 41:2,18
55:21 85:6,10
**types** 9:23 17:16
28:5 41:20
43:11 46:25
51:18

—————————
**U**
**ultimately**
134:14 155:2
**underline** 116:21
**underneath**
97:11 99:5,6
110:3
**understand** 5:20
5:24 6:1 25:18
29:17 32:5
37:24 87:16,22
99:23 108:8
122:6 123:12
125:13 136:14
136:23 154:5
**understanding**
43:21 47:4 48:8
59:24 60:1,6,10
71:5,21 110:7
110:14 129:18
142:10 146:13
151:18 152:4
**understood** 39:6
123:13 146:11

**uneventful** 64:14
**uniform** 65:13,22
66:23,23,24
69:13 83:10
145:25 146:5
167:7
**union** 22:7 23:2
**unit** 22:14,23
28:9
**UNITED** 1:1
**unlawful** 82:25
132:25 133:9
133:14
**unnerving** 75:16
**unprovoked**
79:23 80:2
**unrealistic** 49:3
152:1
**unreasonable**
152:1
**untrained** 152:24
153:21
**upper** 96:5,11,16
97:8 99:6 101:4
101:5 107:2
118:2
**upstairs** 72:6
78:12,21 81:20
**use** 10:21 14:4
17:19 19:8
23:21 24:11,13
28:14,20,23
29:2 31:13
38:23 39:20
43:12 44:1,3,7
44:10 46:16
47:1 65:15 76:8
81:17 83:8
90:24 91:2
92:21 93:1
116:17 117:2
152:10,24
153:20 165:5
165:23
**use-of-force-type**
17:14

**username** 30:21
**uses** 41:20
**usually** 36:22
40:20,21 58:6
**utilize** 42:14

—————————
**V**
**valid** 26:4
**value** 127:10
**values** 32:16
**various** 11:25
15:21 21:12
35:8 87:11
**vehicle** 28:19
146:21
**venue** 12:1 13:2
**verbal** 154:21
**verbalizing** 5:7
**version** 21:14
**victim** 117:20
118:9
**victim's** 117:22
118:2,4
**victims** 52:24
**video** 96:9 101:4
**violated** 127:11
134:20
**violating** 139:8
**violations** 127:8
**visit** 71:2
**voice** 143:16
**voices** 143:6,15
**vs** 52:3
**vs-** 1:9

—————————
**W**
**W** 1:20
**wait** 5:3 137:20
**wake** 77:5
**walk** 53:7
**walked** 76:4,5,5
76:23 101:14
106:5
**walking** 76:7
**walks** 103:24
**wallet** 57:14,19

57:19 58:10,12 74:4,6,7,11
**want** 5:25 6:7 7:8 22:24 31:10 36:23 38:16 43:19 62:22 66:8 67:12 76:14 80:5,16 81:9 82:22 86:10 88:18 89:5,7 94:24 97:16 103:2 116:7,16,25 117:5 120:14 138:15 139:4 141:3 143:25 153:9 161:5
**wanted** 53:1 87:14,14 88:14 164:6 166:3,6
**wants** 47:11
**wash** 148:14
**wasn't** 6:10 9:11 10:5 14:14 20:6 35:14 56:10 59:1,9,12,18 63:25 66:13 70:23 73:18,18 98:22 99:2 103:9 106:4,5,7 107:13,25,25 108:9 111:14 117:22 122:1 122:20 132:19 144:16 152:12 160:14 161:7 162:22 166:2
**watch** 43:1
**watching** 70:17
**water** 8:25
**Wauwatosa** 1:21 2:9
**way** 5:1 35:24 46:3 49:19 56:12 61:22 62:16,17 69:15

77:22 79:25 88:8,14 90:3 91:19,21 103:21 104:3 117:7 119:13 119:22 122:19 123:20 126:22 131:2 141:18 152:20 161:11 161:11,11 162:21
**ways** 17:20
**we're** 76:23 122:6 143:13
**we've** 71:16 72:3 164:18
**weapon** 162:25 162:25 163:4
**weapons** 14:16 14:22,25 15:6
**wear** 57:15 146:7
**wearing** 58:14 68:12 69:3 145:16 146:4
**week** 17:5
**weekend** 11:13
**weekends** 10:12
**weeks** 11:15
**weighed** 27:15
**weight** 110:25 111:1,3,5 118:2
**weight-wise** 77:18
**weird** 118:24 148:15
**went** 4:18 7:12 7:15,24 8:18,21 9:12 11:17,18 15:10 24:6 26:22 31:12 34:1 42:15 53:4 70:9 71:9,10,11 72:5,6,11 78:22 125:18 147:2 147:11 154:14
**weren't** 14:9

26:16 89:11 90:10,19 95:13 103:13 110:17 136:8,17
**West** 2:9
**Westheimer** 2:6
**whatsoever** 70:14
**wheezing** 94:17 97:13,15,18,24 98:15,19
**whereof** 168:16
**wholeheartedly** 123:8
**Wirth** 1:20 2:8
**Wisconsin** 1:2,19 1:21 2:9,13 27:3 168:1,7,18 168:22
**withdraw** 152:19
**withdrawn** 100:20
**witness** 4:2 9:1 16:7 18:22 19:1 19:4 22:19 25:12 47:10 49:25 81:5 82:9 85:23 90:15 91:18 98:9 104:16 111:12 112:3 116:20 117:6 122:18 123:19 130:13 131:18 132:18 134:5,9 136:22 138:14 144:13 147:7,10,17 148:21 150:17 153:8 154:1,9 156:20 164:15 168:16
**witnessed** 81:25
**witnessing** 80:17
**woke** 72:11,15,16 78:10 147:14 159:13,16,19

**woken** 78:9
**wondering** 25:20
**word** 22:13 43:17 80:1 134:13 140:18
**words** 36:24 61:18 87:1 88:3 88:12 99:10 103:13 105:19 105:22 111:18 112:7 118:16 118:16 152:13 155:12,23
**work** 7:21,24 12:7 55:3 57:21 57:25 59:14 65:1,5,10 66:12 66:13 69:12 131:21 146:4,6 151:11
**worked** 8:4 10:24 51:7 57:22 78:1 111:19 112:5 125:5 148:11 148:12,13,14
**working** 54:17 67:5 152:2
**works** 12:24 120:25
**worried** 73:13
**wouldn't** 6:25 66:12 84:19,23 84:24 159:21
**wow** 119:20
**wrestle** 16:19 17:8
**wrestled** 86:13
**wrestlers** 17:11
**wrestling** 56:16 96:2,3 155:15 155:22
**writing** 118:19 168:9
**written** 5:12 21:23,25 22:1 37:16 119:14

119:16
**wrong** 101:21 121:4 138:1

**X**

**X** 3:1 25:21 37:7

**Y**

**Y** 25:21 37:7
**yeah** 9:1 18:24 22:1,12 24:2 34:4 42:4 43:9 44:22 56:24 57:15 62:8,16 63:1 66:15 71:20 73:25 78:24 80:7 88:7 88:9,13 89:1 95:1 98:9 102:13 116:6 117:23 119:1,1 120:11,18 126:7 129:8,10 138:13 139:5 140:2,8 144:15
**year** 29:7 40:11 53:12,23 58:4 66:9,11,14 148:1
**yearly** 11:11 40:10
**years** 27:23 32:8 33:17 34:4 49:16 53:21,22 57:12 144:6
**yell** 53:8
**yelling** 73:8,9,16 73:19 75:1 77:2 78:14,14,15 111:20 112:6
**yesterday** 18:3 51:3,10 113:15

**Z**

**Z** 25:21 37:7

**0**

**06** 148:3

---
**1**

**1** 157:10
**1:33** 1:22 167:16
**100** 54:14 75:15
  80:2 107:14
  164:15
**1000** 2:6
**11** 137:22 166:24
**113** 3:7
**12** 157:10
**13** 27:23
**14** 27:23 113:10
**140** 3:3
**144** 3:7
**156** 3:4
**16** 3:7 113:7,11
  113:13 115:3
  117:1 156:5
**167** 3:4
**16A** 117:1
**17** 3:7 144:9,12
**17055-0837** 2:3
**18th** 64:5 141:22
  146:12
**19th** 63:9 64:4
  145:16 165:2
**1st** 168:18

---
**2**

**2** 1:20 2:9 38:3
  117:15
**20** 121:6
**2005** 148:3
**2006** 147:25
  150:1,5
**2009** 9:25 15:9
  21:7 34:5 49:18
**2017** 34:4
**2018** 34:4
**2020** 53:4,12
  58:14 63:9
  114:17 141:23
  165:2
**2025** 1:21 168:9

  168:18
**23-cv-00489** 1:9
**230** 27:17
**25** 1:21 168:9
**27** 166:24
**270** 77:19

---
**3**

**3** 38:21 157:19
**37** 27:9

---
**4**

**4** 3:3 37:10
  158:23

---
**5**

**5** 33:8 158:25
**53202** 2:13
**53226** 2:9
**5718** 2:6

---
**6**

**6** 35:4 117:15,15
  117:16,19,25
  118:1,24 150:8
  150:14,15
  156:25
**6'3** 27:11,12
  77:16

---
**7**

**7** 28:6,9 34:13
  149:15,18
**7:30** 63:2
**716** 2:13
**72** 144:11,13,19
**73** 144:11,13,19
**77057** 2:6

---
**8**

**8** 31:16 118:9
  149:12,15
  156:25
**837** 2:3
**841** 2:13

---
**9**

**9** 32:10
**9:36** 1:22
**911** 86:18,24
  118:20 119:5
  120:6 121:6
  142:13,17
  144:25 159:11
**9898** 1:20 2:9