**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| JOSE ACEVEDO, individually, and as a Special Administrator of the ESTATE OF JOEL ACEVEDO, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL MATTIOLI and CITY OF MILWAUKEE, WISCONSIN, <br><br> Defendants. | **CASE NO. 23-cv-00489** |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT CITY'S PROPOSED FINDINGS OF FACT**
**AND PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF FACT**

COMES NOW the Plaintiff, Jose Acevedo, Individually, and as a Special Administrator of the Estate Of Joel Acevedo, by and through the undersigned counsel, submit the following Proposed Findings of Fact for the Plaintiff's Response in Opposition to Defendant City of Milwaukee's Motion for Summary Judgment.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACTS**

1. At the time of his death, Joel Acevedo (Acevedo) was an adult resident of the State of Wisconsin. (ECF No. 23   4).

   Response: **Undisputed.**

2. Plaintiff Jose Acevedo (Plaintiff) is Joel Acevedo's father and special administrator of the Estate of Joel Acevedo. (ECF 23   5).

   Response: **Undisputed.**

1

3. Defendant Michael Mattioli (Mattioli) is an adult resident of the State of Wisconsin and was employed with the City of Milwaukee Police Department ("MPD") on April 19, 2020. (Muche Decl., 3, Ex. 1, Mattioli's Response to Request for Admission ("RFA") No. 1).

   Response: **Undisputed.**

4. Mattioli had been employed by the MPD for more than a decade at the time of the incident. (Mattioli Dep. 27:21-23).

   Response: **Undisputed.**

5. Mattioli participated in annual in-service trainings during his time as a Milwaukee police officer. (Mattioli Dep., 28:13-29:11; 33:8-34:10).

   Response: **Undisputed.**

6. Following the incident, Mattioli was placed on administrative leave and later resigned. (Mattioli Dep., 23:24-24:8).

   Response: **Undisputed.**

7. Mattioli was not scheduled for duty as a Milwaukee police officer on Saturday, April 18, or Sunday, April 19, 2020. (RFA Nos. 29-31).

   Response: **Undisputed.**

8. Mattioli is 6'3" and weighed around 230 pounds in April 2020. (Mattioli Dep., 27:10-17).

   Response: **Undisputed.**

9. Acevedo was about as tall as Mattioli, but outweighed him by twenty-five pounds or more. (Mattioli Test., 39:16-20; Mattioli Dep., 77:12-25).

   Response: **Undisputed.**

10. Defendant City of Milwaukee is a Wisconsin municipal corporation whose principal offices are located in Milwaukee, Wisconsin. (ECF No. 23    9; ECF No. 28,    9).

Response: **Undisputed.**

11. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction over the Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343. (ECF No. 23 ¶¶ 1-2).

Response: **Undisputed.**

12. The Eastern District of Wisconsin is the proper federal venue for this action under 28 U.S.C. § 1391(b) because it is where all acts alleged in the Amended Complaint occurred. (ECF No. 23    3).

Response: **Undisputed.**

13. City of Milwaukee records do not reflect that notice of circumstances of claim or an itemized statement of damages was served upon the City prior to filing suit as required under Wis. Stat. § 893.80(1d)(a) and (b). (Owczarski Decl.,    6).

Response: **Undisputed.**

14. On Saturday, April 18, 2020, Michael Mattioli invited three friends to come over to his house in Milwaukee to sit by the fire and have some alcoholic beverages. (Muche Decl, 4, Ex. 2 (hereinafter "Mattioli Dep."), 64:3-8, 64:9-15).

Response: **Undisputed.**

15. Mattioli's guests included Christopher Peters ("Peters"), a childhood friend, Andrew Janowski ("Janowski"), who Mattioli met through Peters, and Joel Acevedo ("Acevedo"), who Mattioli knew through work and had recently introduced to Peters and Janowski. (Mattioli Dep., 64:9-65:7; Muche Decl.,    5, Ex. 3, (hereinafter, "Peters Test."), 7:9-17,

8:6-25, 9:24-10:18, 30:15-31:15; Muche Decl., 6, Ex. 4 (hereinafter, "Janowski Test."), 67:23-25, 70:25-72:3, 91:4-92:5, 92:25-93:3; Muche Decl., 12, Ex. 10 (hereinafter, "Mattioli Test."), 27:5-28:10, 28:13-16, 29:18-21, 30:14-31:2).

Response: **Undisputed.**

16. Mattioli and Acevedo were already in the backyard when Janowski arrived; Peters arrived last and joined the others by the fire pit. (Peters Test., 9:20-23, 10:4-8, 11:4-17, 34:12-16; Janowski Test., 72:7-22, 73:2-3, 93:4-7).

Response: **Undisputed.**

17. The four men stayed outside drinking and talking until around midnight, then moved inside to Mattioli's kitchen table. (Peters Test., 11:4-13, 12:25-13:2, 14:5-15:6; Janowski Test., 73:4-21, 74:5-12, 74:25-75:16, 94:17-19; Mattioli Test., 32:10-13; Mattioli Dep., 70:16- 24).

Response: **Undisputed.**

18. They continued drinking after they went inside, and Mattioli talked with another friend over FaceTime. (Peters Test., 15:18-22, 16:5-12, 36:14-37:9; Janowski Test., 75:15-20, 94:20-95:6; Mattioli Test., 32:14-15)

Response: **Undisputed.**

19. Mattioli, Peters, Janowski, and Acevedo all consumed alcohol and spent the night at Mattioli's house. (Mattioli Test., 31:7-23, 32:5-7; Janowski Test., 72:7-22, 76:10-23; Peters Test., 11:14-17, 16:17-22, 34:12-16; Mattioli Dep., 71:15-72:4).

Response: **Undisputed.**

20. Peters secretly used cocaine, unbeknownst to Mattioli and Janowski, during the night. (Peters Test., 12:6-24, 13:7-9; Janowski Test., 73:4-21, 74:5-12, 74:22-24).

Response: **Undisputed.**

21. Peters saw Acevedo went to his car alone more than once. (Peters Test., 35:16-36:13).

    Response: **Undisputed.**

22. Acevedo sent Peters a text message about buying cocaine together—but Peters did not respond. (Peters Test., 13:10-14:1, 62:14-63:9).

    Response: **Undisputed.**

23. At some point, Janowski went to sleep on the couch in the living room, Peters went to the basement, and Mattioli went to his bedroom on the second floor. (Janowski Test., 76:25-77:10; Peters Test., 17:1-7; Mattioli Test., 33:19-21, 40:3-11; Mattioli Dep., 71:5-14).

    Response: **Undisputed.**

24. Mattioli laid down in his clothes and went to sleep on his bed. (Mattioli Test., 33:22-34:7).

    Response: **Undisputed.**

25. Mattioli was wearing the same clothes he had worn the night before, i.e. jeans and a t-shirt, the next morning. (Mattioli Dep., 68:10-13).

    Response: **Undisputed.**

26. The shirt bore the name of a Milwaukee police officer who had been killed in the line of duty and included MPD logos and designs. (Mattioli Dep., 68:14-25).

    Response: **Undisputed.**

27. The shirt was not department-issued – it was "just a shirt." (Mattioli Dep., 145:14-146:2).

    Response: **Undisputed.**

28. In the morning Mattioli and Acevedo began to argue. Their verbal argument escalated into a physical confrontation involving Mattioli, Peters, Janowski, and Acevedo. (Peters

Test., 21:23-22:8, 24:1-7, 24:23-24, 50:12-51:24, 55:4-6; Janowski Test., 81:4-82:7, 82:18- 83:11, 85:5-10, 101:1-25; Mattioli Test., 43:18-44:2, 54:16-19; Mattioli Dep., 95:21- 97:10).

Response: **Undisputed.**

29. Mattioli woke up because he felt someone's hand inside his right front pants pocket. (Mattioli Test., 34:10-15; Mattioli Dep., 72:9-73:25).

Response: **Undisputed.**

30. When he opened his eyes he saw Acevedo in his bedroom. (Mattioli Test., 34:16-22; Mattioli Dep., 72:9-73:25).

Response: **Undisputed.**

31. Mattioli asked "what are you doing," and asked why Acevedo was stealing from him. Acevedo became loud, defensive, and angry; he denied that he had stolen from Mattioli, and began taking things out of his pockets and throwing them onto Mattioli's bed. (Mattioli Test., 34:15-36:11; Mattioli Dep., 72:9-73:25).

Response: **Undisputed.**

32. Investigators found a rolled up dollar bill on Mattioli's bed that tested positive for cocaine. DNA testing implicated Acevedo but excluded the others. (Muche Decl.,  9, Ex. 7 (hereinafter, "Dalland Test."), 59:2-19, 60:20-63:3).

Response: **Undisputed.**

33. When Mattioli stood up and told him to leave, Acevedo began walking down the stairs and Mattioli followed behind. (Mattioli Test., 36:12-23; Mattioli Dep., 74:23-75:12, 75:24- 76:12).

Response: **Undisputed.**

34. Mattioli told Acevedo to leave repeatedly after they reached the first floor, but Acevedo refused. (Mattioli Test., 37:2-4, 37:22-38:3; Mattioli Dep., 76:13-21).

Response: **Undisputed.**

35. The argument woke Janowski on the couch, who stood up but did not immediately intervene. (Janowski Test., 77:22-78:23, 79:19-25; 98:3-24; Mattioli Test., 38:12-25; Mattioli Dep., 76:22-77:11).

Response: **Undisputed.**

36. The argument also woke Peters, who came upstairs and saw Mattioli, Acevedo, and Janowski in Mattioli's living room. (Peters Test., 17:17-18:25, 39:16-21; Mattioli Test., 39:1-9).

Response: **Undisputed.**

37. Mattioli and Acevedo were screaming at each other; Mattioli was accusing Acevedo of stealing from him and telling him to leave, and Acevedo was refusing to go. (Peters Test., 19:4-10, 42:21-43:10; Janowski Test., 78:18-79:9).

Response: **Undisputed.**

38. Mattioli forcefully told Acevedo to leave telling him "If you don't, I'm going to call the police." (Janowski Test., 100:11-25).

Response: **Undisputed.**

39. Mattioli pointed at Acevedo, telling Peters, "He was stealing from me." (Mattioli Test., 42:5-10; Mattioli Dep., 78:8-24).

Response: **Undisputed.**

40. Acevedo shoved Mattioli in the chest. (Peters Test., 20:18-21:19, 47:5-20, 49:6-11; Janowski Test., 80:13-21; Mattioli Test., 39:1-15; Mattioli Dep., 78:25-79:17).

Response: **Undisputed.**

41. Peters yelled at Acevedo to "get the fuck out of the house," then Acevedo struck Peters in the face causing him to fall backwards into the kitchen. (Peters Test., 21:23-22:8, 50:12-51:24; Janowski Test., 81:4-82:7, 101:1-25; Mattioli Dep., 79:18-20).

Response: **Undisputed.**

42. Acevedo lost his balance in the process and fell to the ground. (Mattioli Test., 42:22-43:7; Mattioli Dep., 79:18-80:15).

Response: **Undisputed.**

43. As Acevedo tried to stand back up, Mattioli got on top of him. (Mattioli Test., 43:18-44:2; Peters Test., 22:12-14, 23:2-10, 53:1-54:11; Janowski Test., 82:8-17; Mattioli Dep., 80:21-81:2).

Response: **Undisputed.**

44. Mattioli got on top of Acevedo because he "didn't want him to get up and keep punching people." (Mattioli Dep., 86:3-11).

Response: **Undisputed.**

45. Everyone ended up in the kitchen; Mattioli and Janowski, who had wrestled Acevedo to the floor, were trying to keep him down while Acevedo tried to get up. (Peters Test., 22:12- 14, 23:2-16, 24:8-22, 53:1-54:11, 55:7-9; 56:19-57:6; Janowski Test., 85:11-22, 105:3- 106:1; Mattioli Test., 44:21-45:2, 46:2-11; Mattioli Dep., 86:8-18).

Response: **Undisputed.**

46. Mattioli was on Acevedo's back straddling his upper torso, and Janowski was laying across Acevedo's legs. (Peters Test., 24:1-7, 24:23-24, 55:4-6; Janowski Test., 82:18-83:11, 85:5-10; Mattioli Test., 43:18-44:2, 54:16-19; Mattioli Dep., 95:21-97:10).

Response: **Undisputed.**

47. Mattioli testified, "all I basically did was use my body-weight to keep him on the ground." (Mattioli Dep., 92:16-22).

    Response: **Disputed. Although Mattioli testified that "all [he] basically did was use [his] body-weight to keep him on the ground" (Mattioli Dep., 92:16–22), the broader record demonstrates that his restraint went beyond mere body-weight pressure. Mattioli admitted that his right arm was positioned across Mr. Acevedo's neck and chin area while applying body-weight to keep him down (Mattioli Dep., 95:21–97:10; Exhibit A). Mattioli admitted to investigators that he squeezed and pressed on Joel Acevedo's neck when he told investigators, "I didn't press hard enough" and "I wasn't squeezing tight enough where he couldn't breathe." (Mattioli Dep., 98:22-24; 111:22-24).–Officer Roach further testified that Mattioli's right arm was underneath and around Joel Acevedo's neck and that he appeared to have his full bodyweight on Joel's upper body (Roach Dep., 66:10–16; Exhibit D). The Milwaukee Fire and Police Commission, relying on body-worn camera evidence, found that Mr. Acevedo was face-down with Mattioli straddling his neck in what was described as a rear-naked chokehold, while Janowski restrained his legs (FPC Charges, June 15, 2020, p. 5; Exhibit B).**

48. Mattioli retrieved his cell phone from his pants pocket and called 911 at 7:28 a.m. (Carsky Decl., ¶¶ 9, Ex. 3 (hereinafter, "CAD Sheet") and 10, Ex. 4 (hereinafter, "911 Call"); Mattioli Dep., 86:8-18; Janowski Test., 85:5-8; Mattioli Test., 47:2-6; Muche Decl., 7, Ex. 5 (hereinafter, "Blomme Test."), 116:5-117:8;).

    Response: **Undisputed.**

49. Mattioli told the operator, "I'm an off duty officer, and I need help at my house." (911 call; Mattioli Test., at 48:8-10; Mattioli Dep., 86:19-87:3).

Response: **Undisputed.**

50. Mattioli did not hear Acevedo say "Let me go. I want to go home," during the 911 call. (Mattioli Test., 76:20-24; Mattioli Dep., 88:16-89:10, 159:11-24).

Response: **Disputed. The 911 recording establishes that Mr. Acevedo was conscious and speaking when the call began and that audible gasping/snorting and the sounds of a struggle could be heard; a voice—believed to be Janowski—says, "*we got him Michael, don't worry.*" Despite this, Mattioli continued restraining Acevedo and did not deescalate. (Mattioli Dep., 100:10-101:10). Accordingly, whether Mattioli claims he did not hear the precise words "Let me go. I want to go home" does not negate the objective evidence of audible distress and his failure to deescalate. (Exhibit B).**

51. Mattioli was intoxicated and angry during the incident. (Mattioli Test., 72:3-8; Mattioli Dep., 147:1-17).

Response: **Disputed. Mattioli testified that he was intoxicated before he went to bed and "somewhat" intoxicated when he woke up in the morning, but there is no evidence establishing his level of intoxication during the incident. (Mattioli Dep., 147:1-17). To the contrary, Mattioli testified that he had not consumed alcohol to a point where he was impaired to where his judgment was clouded. (Mattioli Dep., 61:7 to 62:13).**

52. Mattioli believed Acevedo was trying to steal from him, had refused to leave, and had attacked him and his friend. (Mattioli Dep., 81:3-23).

Response: **Undisputed.**

53. Mattioli stayed on top of Acevedo until the police arrived. (Mattioli Dep., 99:13-100:24).

Response: **Undisputed.**

54. Mattioli explained, "[Acevedo] was – he was throwing punches at people, and I wanted to keep him on the ground so he couldn't do that anymore until the police could show up and arrest him." (Mattioli Dep., 164:2-8).

Response: **Undisputed.**

55. He stated, "I just wanted to hold him there until the police could get there." (Mattioli Dep., 165:22-166:5; see also Mattioli Dep., 121:22-122:5).

Response: **Undisputed.**

56. Mattioli never told Acevedo he was under arrest or ordered him to "stop resisting." (Mattioli Dep. 155:11-24).

Response: **Undisputed.**

57. Mattioli did not direct Janowski to lay across Acevedo's legs; Janowski did so to prevent Acevedo from harming anyone else. (Janowski Test., 106:2-15; Mattioli Test., 54:16-55:1).

Response: **Undisputed.**

58. Although plaintiff's counsel tried repeatedly to get Mattioli to adopt his framing that Mattioli "arrested" Acevedo, Mattioli replied, "I mean, I didn't see it that way. In the heat of the moment, which was chaotic, I didn't – I wasn't thinking, 'okay, I am arresting this man on behalf of the [City] of Milwaukee.'" (Mattioli Dep., 121:15-122:5).

Response: **Disputed. Mattioli admits that he did not lie to criminal investigators or when he testified at his criminal trial, when he admitted that he used force against Joel Acevedo during the performance of an arrest. (Mattioli Dep., Exhibit A, at pp.**

87:4 to 87:9; 89:25 to 90:21). On scene, Mattioli placed Acevedo's arms behind his back "as if ... to put handcuffs on him," telling officers, "Cuff this guy" (Roach Dep., 64:6–21; Exhibit D). He also identified himself as a police officer during the 911 call (Mattioli Dep., 86:17–87:3; Mattioli's RFA Resp. No. 4; Exhibits A and C). Mattioli admits that other police officers responded to his "request for backup." (Mattioli Answer (Doc. 26) at   14). When the first arriving officer asked, "Who is the police officer?" Mattioli responded, "I am." (Taylor Expert Report, ¶8, p. 4; Exhibit F). In any event, MPD SOP 220.10(A) defines arrest by custodial control and intent and expressly states no formal declaration of arrest is required; thus, Mattioli's subjective after-the-fact framing is effectively rebutted by his own admissions, his conduct verified by Officer Roach, and conduct consistent with an arrest. (SOP 220.10(A); Exhibit I)..

59. Mattioli only said he was attempting to arrest Acevedo after the fact. (Mattioli Dep., 87:4-88:15).

Response: **Disputed. The record contains contemporaneous statements and conduct showing Mattioli was effecting an arrest, not merely an after-the-fact characterization. During the 911 call he identified himself as a police officer (Mattioli Dep., 86:17–87:3; Mattioli's RFA Resp. No. 4; Exhibits A and C); upon entry, when asked "Who is the police officer?" he replied "I am." (Taylor Expert Report, ¶8, p. 4;Exhibit F). While restraining Mr. Acevedo, Mattioli took Acevedo's arms behind his back "as if ... to put handcuffs on him," and directed officers, "Cuff this guy." (Roach Dep., 64:6–21; Exhibit D). He also told a DA investigator he had arrested Acevedo (Taylor Expert Report, ¶14, p. 5; Exhibit F), and admits that**

**he did not lie to criminal investigators or when he testified at his criminal trial, when he admitted that he used force against Joel Acevedo during the performance of an arrest. (Mattioli Dep., Exhibit A, at pp. 87:4 to 87:9; 89:25 to 90:21). In any event, MPD SOP 220.10(A) defines arrest by custodial control and intent and states no formal declaration is required; Mattioli's on-scene statements and actions satisfy that standard. (SOP 220.10(A); Exhibit I).**

60. During the 911 call, Acevedo knocked Mattioli's phone from his hand and Peters picked it up. (Peters Test., 25:4-24; 57:25-58:10).

   Response: **Undisputed.**

61. Acevedo fought to break free from Mattioli and Janowski's grasp during the remainder of the call. (Mattioli Test., 49:1-20, 50:22-24; 911 Call; Tlomak Test., 11:7-12:4, 56:9-18, 12:5-12).

   Response: **Undisputed.**

62. Peters told the dispatcher "This man is attacking us." He meant Mattioli, Janowski, and himself by "us." (911 call; Peters Test., 58:11-22; Mattioli Test., 50:25-51:5).

   Response: **Undisputed.**

63. After the 911 call ended at 7:32 a.m., Peters went outside to wait for officers to arrive. (Peters Test., 25:25-26:7, 58:11-22; Mattioli Test., 50:25-51:5; Blomme Test., 117:9-10).

   Response: **Undisputed.**

64. Officer Robert Roach ("Roach") and Officer Mark Sheremeta ("Sheremeta") were dispatched to Mattioli's house at 7:34 a.m. in response to the 911 call. (CAD Sheet, Carsky Decl., 11, Ex. 5 (hereinafter, "Roach BWC"), 2:30-40).

   Response: **Undisputed.**

65. When they arrived Roach and Sheremeta saw Peters outside with visible injuries to his face. (Roach BWC, 2:40-3:04).

Response: **Undisputed.**

66. Peters met Roach and Sheremeta by the sidewalk and brought them to Mattioli's kitchen door. (Peters Test., 60:17-19).

Response: **Undisputed.**

67. Peters told them that Joel was "subdued" inside, and led officers up the driveway to a side door. (Roach BWC, 3:05-3:30).

Response: **Undisputed.**

68. Roach entered Mattioli's kitchen and saw Mattioli and Janowski on top of Acevedo. (Roach BWC, 3:30-4:10).

Response: **Undisputed.**

69. After the parties were separated, Roach checked Acevedo's pulse and requested an emergency medical response. (Roach BWC, 4:10-4:24).

Response: **Undisputed.**

70. Acevedo was rolled onto his back, then Officer Sheremeta started cardio-pulmonary resuscitation ("CPR"). (Roach BWC, 4:25-4:55).

Response: **Undisputed.**

71. Officers continued CPR until EMTs arrived. (Muche Decl., ¶8, Ex. 6 (hereinafter, "Deford Test."), 28:10-31:12).

Response: **Undisputed.**

72. EMTs detected that Acevedo had a pulse at 8:01 a.m. He was loaded and transported to St. Luke's Hospital shortly thereafter. (Deford Test., 31:4-12; Muche Decl., ¶11, Ex. 9 (hereinafter, "Tlomak Test.,"), 17:10-20).

    Response: **Undisputed.**

73. Acevedo never regained consciousness after he was admitted to the hospital. (Tlomak Test., 19:22-18:5).

    Response: **Undisputed.**

Additional Relevant Facts

74. Investigators from the Milwaukee County District Attorney's Office responded to Mattioli's house and conducted a criminal investigation into the incident. (Blomme Test., 112:8-23).

    Response: **Undisputed.**

75. Mattioli, Janowski, and Peters each separately made recorded statements on-scene, immediately after the incident. (Carsky Decl., 12, Ex. 6 (hereinafter, "Bouzek BWC"); Carsky Decl., 13, Ex. 7 (hereinafter, "Romero-Perez BWC"); Carsky Decl., 14, Ex. 8 (hereinafter, "Dathe BWC")).

    Response:**Undisputed.**

76. Acevedo was pronounced brain dead on April 25, 2020. (Tlomak Test., 9:2-3).

    Response: **Undisputed.**

77. Mattioli was charged with 1st Degree Reckless Homicide in State of Wisconsin v. Michael A. Mattioli, Milwaukee County Circuit Court Case No. 2020CF1991. See https://wcca.wicourts.gov/caseDetail.html?caseNo=2020CF001991&countyNo=40&indx=0&mode=details.

Response: **Undisputed.**

78. The criminal trial was conducted between November 6 and November 10, 2023, and resulted in a verdict of "not guilty" verdict. *Id*.

Response: **Undisputed.**

Milwaukee Police Department Policies and Procedures

79. Mattioli was aware of the Department's use of force and arrest policies. (Mattioli Dep., 34:11-35:22; 38:2-40:7).

Response: **Undisputed.**

80. Mattioli understood Standard Operating Procedures ("SOP") to be the Department's expectation about how things should be done, and attended trainings about how to implement policies in the field. (Mattioli Dep., 48:8-15).

Response: **Disputed in part; disputed as incomplete and misleading. While Mattioli acknowledged that SOPs reflect the Department's expectations and that he attended trainings (Mattioli Dep., 48:8–15; Exhibit A), the record shows material deficiencies in MPD policy/training and in Mattioli's implementation: he was required to sign for receipt of SOPs but was not required to read them, was not given time during shift to do so, and no one explained them to him or asked if he had questions (Taylor Expert Report, ¶¶ 18–20, pp. 5; Exhibit F); he was never told he could not use non-sanctioned techniques (Taylor Expert Report, ¶21, p. 5; Exhibit F); MPD had no neck-restraint/chokehold policy and SOP 460 lacked warnings about head/neck force, prone compression, non-sanctioned techniques, and de-escalation (Taylor Expert Report, ¶¶ 16–17, p. 5; Exhibit F); and SOP 220's off-duty provisions are "vague," leaving "discouraged" action to the officer's discretion (Taylor Expert**

**Report, ¶15, p. 5; Lewis Dep., 51:8–22; Exhibits F and G). Consistent with those gaps, Mattioli testified he learned the body-weight prone restraint on the job and used it many times in front of supervisors without correction (Mattioli Dep., 92:17–93:3; 93:11–20; Exhibit A). He also failed to request medical aid during the 7:28 a.m. 911 call despite audible distress, contrary to SOP 460.40 (FPC Charges, June 15, 2020, p. 5; SOP 460.40; Exhibits B and J).**

81. Mattioli was never taught to use neck restraints in the course of his duties by the Milwaukee Police Department, and never saw or was aware of other Milwaukee police officers using neck restraints. (Mattioli Dep., 17:13-18:15; 20:13-23; 55:19-56:20).

    Response: **Disputed. Mattioli testified that he learned the restraint that he used on Joel Acevedo (body-weight with arm across the neck) on the job and used it many times in front of supervisors without correction; it was sanctioned by supervisors, and not precluded by policy. (Mattioli Dep., 92:17–93:3; 93:11–20; Exhibit A).**

82. Mattioli opined that it was not "realistic" to read every page of every policy, but he always tried to "do the right thing." (Mattioli Dep., 54:9-21).

    Response: **Disputed. Whether Mattioli believed it was not "realistic" to read every policy and that he tried to "do the right thing" is not the issue. The record establishes material policy/training deficiencies both in text and implementation. Mattioli was required to sign for SOPs but was not required to read them, was not given time during shift to do so, and no one explained them or checked understanding (Taylor Expert Report, ¶¶ 18–20, pp. 5–6; Exhibit F); he was never told he could not use non-sanctioned techniques (Taylor Expert Report, ¶21, p. 6; Exhibit F); MPD had no neck-restraint policy, and SOP 460 did not warn against**

17

Case 2:23-cv-00489-BHL    Filed 09/02/25    Page 17 of 34    Document 72

**Report, ¶15, p. 5; Lewis Dep., 51:8–22; Exhibits F and G). Consistent with those gaps, Mattioli testified he learned the body-weight prone restraint on the job and used it many times in front of supervisors without correction (Mattioli Dep., 92:17–93:3; 93:11–20; Exhibit A). He also failed to request medical aid during the 7:28 a.m. 911 call despite audible distress, contrary to SOP 460.40 (FPC Charges, June 15, 2020, p. 5; SOP 460.40; Exhibits B and J).**

81. Mattioli was never taught to use neck restraints in the course of his duties by the Milwaukee Police Department, and never saw or was aware of other Milwaukee police officers using neck restraints. (Mattioli Dep., 17:13-18:15; 20:13-23; 55:19-56:20).

    Response: **Disputed. Mattioli testified that he learned the restraint that he used on Joel Acevedo (body-weight with arm across the neck) on the job and used it many times in front of supervisors without correction; it was sanctioned by supervisors, and not precluded by policy. (Mattioli Dep., 92:17–93:3; 93:11–20; Exhibit A).**

82. Mattioli opined that it was not "realistic" to read every page of every policy, but he always tried to "do the right thing." (Mattioli Dep., 54:9-21).

    Response: **Disputed. Whether Mattioli believed it was not "realistic" to read every policy and that he tried to "do the right thing" is not the issue. The record establishes material policy/training deficiencies both in text and implementation. Mattioli was required to sign for SOPs but was not required to read them, was not given time during shift to do so, and no one explained them or checked understanding (Taylor Expert Report, ¶¶ 18–20, pp. 5–6; Exhibit F); he was never told he could not use non-sanctioned techniques (Taylor Expert Report, ¶21, p. 6; Exhibit F); MPD had no neck-restraint policy, and SOP 460 did not warn against**

17

using force in the head/neck region, did not preclude the use of chokeholds/neck restraints, did not warn against unsafe body positions (i.e., face down, being compressed, etc.), did not preclude the use of non-sanctioned techniques, and did not discuss de-escalation. (Taylor Expert Report,    40p. 8; Exhibit F). MPD's Off-Duty policy was vague and did not preclude Mattioli from acting in his capacity as a police officer when he did so, leaving it to his discretion whether to attempt to arrest a person while off-duty after having consumed alcohol. (Taylor Expert Report,    37 p. 8; Exhibit F). Consistent with those deficiencies, Mattioli learned and repeatedly used the restraint technique on duty in front of supervisors without correction (Mattioli Dep., 92:17–93:3; 93:11–20; Exhibit A). Thus, his subjective "do the right thing" assertion neither excuses unreasonable force nor failure to render aid under the governing policies.

83. Mattioli learned what a "rear-naked chokehold" was after this incident, but denied that is what he did during the incident. (Mattioli Dep., 19:13-20:12; 96:9-97:14; 98:22-99:17; 107:19-108:24; 109:24-111:4; 115:2-24).

Response: **Disputed. Regardless of when Mattioli says he learned the term "rear-naked chokehold," the objective evidence shows he used a neck restraint. Officer Roach testified he saw Mattioli's right arm underneath and around Mr. Acevedo's neck and that Mattioli appeared to have his full bodyweight on Mr. Acevedo's upper body; Roach also stated he believed he observed a rear-naked chokehold. (Roach Dep., 64:22–65:9; 66:10–16; Exhibit D) The FPC charging memorandum, based on body-worn camera, likewise describes Mr. Acevedo face-down with Mattioli straddling his neck in what was described as a rear-naked**

**chokehold, while Janowski restrained the legs. (FPC Charges, June 15, 2020, p. 5.; Exhibit B) Plaintiff's expert concludes Mattioli placed Mr. Acevedo in a chokehold. . (Taylor Expert Report, ¶¶ 33–34, p. 8.; Exhibit F) Expert further notes Roach told Mattioli, "I'm making sure you don't have your arm around his neck," to which Mattioli responded, "Oh yeah," then withdrew his arm—after which Mr. Acevedo's head rolled to the side and he appeared lifeless. (Taylor Expert Report, ¶10, p. 5.; Roach Dep., 59:8-60:18; Exhibits D and F) Mattioli admitted that his right arm was positioned across Acevedo's "neck and chin area" while using his body weight to push downward and prevent Acevedo from rising. (Mattioli Dep., 95:21–97:10; Exhibit A) Mattioli admitted that he cannot state with certainty that the neck restraint technique that he used did not restrict bloodflow to Joel Acevedo's brain. (Mattioli Dep., 108:25 – 109:9; Exhibit A) Finally, the IACP 2017 Consensus Policy defines chokeholds as maneuvers that restrict breathing and permits them only when deadly force is authorized—a standard not met here. (Taylor Expert Report, ¶32, p. 8; Exhibit F) Thus, the record contradicts Defendant's assertion and supports that Mattioli employed a neck restraint consistent with a chokehold.**

84. MPD Standard Operating Procedure 460 – Use of Force ("SOP 460") was effective June 21, 2019. (Carsky Decl.,   7, Ex. 1 (hereinafter, "SOP 460")).

    Response: **Undisputed.**

85. Section 460.05 states: "[i]t is the policy of the department to accomplish the department's mission with cooperation of the public and with minimal reliance upon the use of physical force. Members shall only use the force necessary to perform their duties in accordance with department policy." (SOP 460).

Response: **Undisputed.**

86. Section 460.15 states: "[t]he use of force by a police member must be objectively reasonable. Police members shall use only the force necessary to effectively maintain control of a situation and protect the safety of police members and the public." (*Id.*).

Response: **Undisputed.**

87. MPD Standard Operating Procedure 220 – Arrest Authority ("SOP 220") was also in effect on April 19, 2020. (Carsky Decl., 8, Ex. 2 (hereinafter, "SOP 220")).

Response: **Disputed. The MPD Standard Operating Procedure 220 – Arrest Authority ("SOP 220") was effective on April 24, 2017. (Exhibit I).**

88. Section 220.05 states: "[i]t is the policy of the Milwaukee Police Department that all arrests made by members both on or off duty shall be conducted professionally and in accordance with established legal principles." (SOP 220).

Response: **Undisputed.**

89. Section 220.30(B) imposes limitations upon MPD officers' authority to make off-duty arrests. (SOP 220).

Response: **Undisputed.**

90. Section 220.30(B)(2) states: "[m]embers are discouraged from taking police action when the member has consumed alcohol or any other substance which could impair rational action or conduct." (SOP 220).

Response: **Undisputed.**

91. Section 220.30(B)(3) states: "[t]he member shall not be personally involved in the incident underlying the arrest." (SOP 220).

Response: **Undisputed. Section 220.10 of the policy, however, excludes from the definition of "personally involved" "situations where the off-duty member is a victim of a crime." (SOP 220).**


## PLAINTIFF'S PROPOSED FINDINGS OF FACT (PPFOF)

1. Mattioli physically restrained Joel Acevedo by straddling him on the floor and pressing his upper body down against Acevedo's back, neck, and head area. (Mattioli Dep., 95:21–97:10; Exhibit A).

2. Mattioli admitted that his right arm was positioned across Acevedo's "neck and chin area" while using his body weight to push downward and prevent Acevedo from rising. (Mattioli Dep., 95:21–97:10; Exhibit A).

3. Mattioli admitted that after Joel Acevedo fell to the ground, he got on top of him and used his bodyweight to keep him down, expressly stating that his "goal" was to prevent Acevedo from getting back up and continuing to throw punches. (Mattioli Dep., 80:22–81:2; Exhibit A).

4. While restraining Acevedo, Mattioli acknowledged that he was evaluating Acevedo's conduct in terms of "crimes," testifying that he believed Acevedo had committed robbery with use of force, theft from person, and property damage, all felony-level offenses, and that this belief was "going through [his] head at the time." (Mattioli Dep., 81:9–23; Exhibit A).

5. After Acevedo fell, Mattioli got on top of him to prevent him from rising and "keep[ing] punching people." He admitted he used his body weight to restrain Acevedo on the ground. (Mattioli Dep., 86:9–15; Exhibit A).

6. Mattioli called 911, during which he identified himself by telling the dispatcher, "I'm an off-duty police officer and I need help at my house." (Mattioli Dep., 86:17–87:3; Exhibit A).

7. Mattioli acknowledged that during his criminal trial testimony, he admitted he was "in a way" performing an arrest, explaining that he "detained [Acevedo] until the police got there" because he wanted Acevedo arrested. (Mattioli Dep., 87:4–88:15; Exhibit A).

8. Mattioli admitted that when questioned by the prosecutor, he acknowledged he was "in a way" performing an arrest and specifically did not deny making an arrest. (Mattioli Dep., 89:25–90:5; Exhibit A).

9. Mattioli further admitted that after the incident he explained to law enforcement that he was arresting Acevedo for his conduct, and he confirmed under oath that he was not lying when he made that statement. (Mattioli Dep., 90:6–13; Exhibit A).

10. Mattioli acknowledged that, as a police officer, he has the legal privilege to use objectively reasonable force to effectuate an arrest. (Mattioli Dep., 90:22–91:1; Exhibit A).

11. Mattioli admitted that he used force against Joel Acevedo in effecting an arrest. (Mattioli Dep., 91:2–4; Exhibit A).

12. Mattioli admitted that the restraint technique he used on Joel Acevedo, holding him on the ground with his bodyweight, was a method he learned from his police experience. (Mattioli Dep., 92:17–93:3; Exhibit A).

13. Mattioli admitted that restraining a person on their stomach by using his bodyweight was a tactic he had employed before as a police officer. (Mattioli Dep., 93:4–10; Exhibit A).

14. Mattioli confirmed that he had used this restraint technique while on duty in front of other police officers, and no officer ever told him the tactic was dangerous or constituted excessive force. (Mattioli Dep., 93:11–20; Exhibit A).

15. Mattioli admitted that after Joel Acevedo stopped moving, he continued restraining him by staying on top with his knees and elbows on the ground until police arrived. (Mattioli Dep., 100:2–24; Exhibit A).

16. When asked whether Joel Acevedo was breathing before Mattioli got up, Mattioli admitted he responded, "I don't know. Handcuff him," explaining that he assumed Acevedo was fine. Mattioli Dep., 103:5–10; Exhibit A).

17. When confronted with his prior statement that he "wasn't squeezing tight enough where [Acevedo] couldn't breathe," Mattioli admitted that was a "poor choice of words" and conceded he was "very worked up" and "yelling at the officers" at the time. (Mattioli Dep., 111:14–21; Exhibit A).

18. Mattioli admitted that the arrest of Joel Acevedo could have been for a state crime or a local ordinance violation. (Mattioli Dep., 124:10–16; Exhibit A).

19. Mattioli further testified that when performing arrests as a police officer, he does so "on behalf of the police department," and specifically identified the Milwaukee Police Department as the department he represents. (Mattioli Dep., 124:17–125:5, Exhibit A).

20. Mattioli admitted that he identified himself as a police officer during the 911 call. (Mattioli's RFA Response No. 4; Exhibit C).

21. Mattioli admitted that when the responding police officers, including Officer Robert Roach, arrived at his home, he was physically restraining Joel Acevedo inside the residence. (Mattioli's RFA Resp. No. 10; Exhibit C).

22. The Fire and Police Commission's (FPC) assumption of the investigation into Officer Michael Mattioli's conduct was the first time the Commission had ever stepped in to take over an internal investigation from the Milwaukee Police Department. Aldrete further stated that the takeover of the Mattioli investigation was a "very unique" action by the FPC. (Aldrete Dep., 24:22–25:13; Exhibit H).

23. At the time of the Mattioli incident, the Chief of Police was Alfonso Morales. She further explained that it was her understanding that it was unprecedented for the Fire and Police Commission to take over an internal affairs investigation from a police chief, and confirmed that the FPC's intervention occurred because "something had to go awry or there had to be some concern" that warranted stepping in. (Aldrete Dep., 26:4–18; Exhibit H).

24. The Fire and Police Commission took over the Mattioli investigation from Chief Alfonso Morales in 2020 due to extraordinary circumstances, including the MillerCoors mass shooting, the killing of George Floyd, COVID-19, civil unrest, the upcoming DNC, and national demands for police accountability. She explained there was intense public and political pressure, and the commissioners felt they had to act to ensure oversight and prevent further casualties. (Aldrete Dep., 27:7–28:11; Exhibit H).

25. The Fire and Police Commission informed Chief Morales it wanted to ensure due diligence in the Mattioli investigation so that, if wrongdoing was found, appropriate discipline would be imposed. Aldrete confirmed that there was a concern as to whether the Chief would fulfill his duties in conducting due diligence and issuing appropriate discipline. (Aldrete Dep., 36:1–10; Exhibit H).

26. During the investigation into Officer Mattioli, Aldrete reviewed his personnel file and observed prior internal affairs investigations and past discipline. Aldrete confirmed that one such discipline involved Mattioli's reckless firing of a firearm while off duty in an incident involving a neighbor. (Aldrete Dep., 40:6–41:3; Exhibit H).

27. The conclusion of the Fire and Police Commission's investigation into Officer Michael Mattioli was that he should be removed from the department and fired. (Aldrete Dep., 45:11–16; Exhibit H).

28. A physical altercation involving an officer is ordinarily classified as a Priority One call, the most urgent police response, which may involve the threat of loss of life. (Roach Dep., 24:8–22; Exhibit D).

29. Upon arrival at Mattioli's residence, Officer Robert Roach first encountered a male in a blue shirt with a cut under his eye, whom he accepted as Chris Peters, and, after asking initial questions to ascertain the situation (including where everyone was), Peters informed Roach that "Joel was subdued" inside the residence. (Roach Dep., 25:13–26:5; Exhibit D).

30. A subject who is "subdued" is no longer fighting, but the term "subdued" indicates that force is being used in the form of restraint. (Roach Dep., 25:13–26:5; Exhibit D).

31. A person who is "subdued" could have their ability to breathe impeded. (Roach Dep., 36:16–18; Exhibit D).

32. Upon opening the door to Mattioli's residence, Officer Robert Roach immediately observed Michael Mattioli on top of Joel Acevedo, exerting force by holding him down. Roach acknowledged that at that moment he did not issue a command for the two individuals to separate, despite agreeing that in a physical altercation one of the most

minimal uses of force available to an officer is to give a verbal command. (Roach Dep., 43:11–44:9; Exhibit D).

33. Use of force must be proportionate to the type of force or restraint an individual is posing. (Roach Dep., 53:17–21; Exhibit D).

34. Officer Roach received use-of-force training with the Milwaukee Police Department and the training informed him that the use of neck restraints can constitute deadly force because it can lead to death. (Roach Dep., 56:5–19; Exhibit D).

35. Officer Roach walked up to where Mattioli and Joel Acevedo were positioned and observed Mattioli on his knees straddling Acevedo, with his body over Acevedo specifically, Mattioli's stomach on Acevedo's back. (Roach Dep., 57:16-58:13; Exhibit D).

36. Officer Robert Roach testified that use of force around the neck is improper; upon witnessing Mr. Mattioli's arms around Mr. Acevedo's neck, Roach stated, "I want to make sure that your arms aren't around his neck," explaining he asked to clarify and accurately describe the conduct for a superior or report. Roach recalled that Mattioli responded with "Oh" and then moved back, after which Roach observed no response from Mr. Acevedo. (Roach Dep., 59:8-60:18; Exhibit D).

37. Michael Mattioli took Joel Acevedo's arms behind his back "as if … to put handcuffs on him," and though Mattioli did not have cuffs he told the responding officers, "Cuff this guy," which Roach understood to mean effectuate an arrest or, at minimum, detain Acevedo in handcuffs. (Roach Dep., 64:6–21; Exhibit D).

38. A rear-naked chokehold is when one arm is placed around the front of someone's neck, the other arm is held onto to create a fulcrum, and pressure is applied. During the

questioning by investigators following the April 19, 2020 incident involving Officer Mattioli and Joel Acevedo, Officer Roach stated that he believed that is what he had observed. (Roach Dep., 64:22–65:9; Exhibit D).

39. Mattioli's right arm was positioned underneath Joel and around Joel's neck, and that Mattioli appeared to have his full body weight on Joel's upper body. (Roach Dep., 66:10–16; Exhibit D).

40. In 2020, the policymakers for the City of Milwaukee as it relates to the Milwaukee Police Department were the Board of Fire and Police Commissioners (FPC), and the policymakers for the City as a whole were the Common Council and the Mayor. (Lewis Dep., 9:2–15; Exhibit G).

41. Policies function as rules that must be followed by officers, and there are penalties if the rules are not followed; policies are necessary to hold officers accountable when their violations affect citizens. (Lewis Dep., 26:1-11; Exhibit G).

42. MPD SOP 220.30, the off-duty arrest and aid policy, provides that members are discouraged from taking police action when they have consumed alcohol or any substance that could impair rational action or conduct. (Lewis Dep., 43:2–21; Exhibit G).

43. The City admits that MPD SOP 220.30 permits an officer who has consumed alcohol to take police action on behalf of MPD. (Lewis Dep., 46:12–22; Exhibit G).

44. The City admits that MPD SOP 220.30 is vague in that it does not provide a formula for determining impairment as it pertains to the policy. (Lewis Dep., 47:22–48:11; Exhibit G).

45. The City admits that MPD SOP 220.30 is vague because as drafted, an officer may not know whether they are complying with the policy. (Lewis Dep., 51:8–22; Exhibit G).

46. MPD SOP 220 imposes additional limitations on off-duty arrests: members must comply with state and federal law; a member cannot be personally involved in the incident underlying the arrest (unless the member is a victim of a crime), and a member may not take police action while working off-duty where the arrest furthers the interests of a private employer. (Lewis Dep., 113:20–114:8; Exhibit G).

47. Pursuant to MPD SOP 220, an officer making an arrest must identify with a badge or ID card—merely saying "I'm a cop" is insufficient—so the person has reasonable assurance the officer has put themself on duty and is lawfully detaining them; attempting an arrest without an ID card would violate the policy. (Lewis Dep., 121:5–122:4; Exhibit G).

48. The City admits that when the investigation concluded, there was a preponderance of evidence that Mattioli violated state law against chokeholds. (Lewis Dep., 140:15–20).

49. The City admits that its investigation concluded that there was a preponderance of evidence that Mattioli committed first-degree reckless homicide by placing Joel Acevedo in a chokehold causing asphyxiation and death, and that Mattioli's acquittal in the criminal case is not relevant to his employment status. (Lewis Dep., 140:15–20; 143:7–144:17; Exhibit G).

50. The Milwaukee County Medical Examiner's Autopsy Protocol for Joel A. Acevedo lists the Cause of Death as "Anoxic Encephalopathy due to Traumatic Asphyxia." (Autopsy Protocol, p. 1; Exhibit E).

51. MPD SOP 220.10(A) defines "Arrest" as taking or detaining a person into custody so their liberty is under the arrester's control, requiring intent to take into custody and the person's understanding they are in custody; no formal declaration of arrest is required. (SOP 220.10(A); Exhibit I).

52. MPD SOP 220.30(A) provides that an off-duty member may arrest or provide aid/assistance anywhere in Wisconsin if: (1) responding to an emergency that poses a significant threat to life or bodily harm, or (2) taking action the member would be authorized to take while on duty in Milwaukee County under the same circumstances. (MPD SOP 220.30(A); Exhibit I).

53. The International Association of Chiefs of Police (IACP) 2017 Consensus Policy and Discussion Paper on the Use of Force states "a choke hold is defined as a physical maneuver that restricts an individual's ability to breathe for the purposes of incapacitation." In the most common choke hold, referred to as an arm-bar hold, an officer places his or her forearm across the front of the individual's neck and then applies pressure for the purpose of cutting off air flow. These are extremely dangerous maneuvers that can easily result in serious bodily injury or death. Therefore, the Consensus Policy allows their use only when deadly force is authorized. (Taylor Expert Report, 32, p. 7; Exhibit F)

54. MPD SOP 460 does not warn against using force in the head/neck region, does not preclude the use of chokeholds/neck restraints, does not warn against unsafe body positions (i.e., face down, being compressed, etc.), does not preclude the use of non-sanctioned techniques, and does not discuss de-escalation. (Taylor Expert Report, 15, p. 5; Exhibit F)

55. Officer Mattioli believed that Mr. Acevedo was attempting to steal something from his pants pocket. An affray erupted between Officer Mattioli, Chris, Andrew, and Mr. Acevedo. Officer Mattioli wrestled with Mr. Acevedo and placed him in a chokehold,

which constituted an unauthorized use of force. Mr. Acevedo was unarmed and became unconscious. (Taylor Expert Report, 33, p. 8; Exhibit F)

56. The IACP (1993) review of 94 restraint-related, in-custody deaths underscores that forcibly holding struggling, intoxicated, or medically-compromised arrestees face-down—especially when hog-tied or pinned by officers' body-weight—can restrict the "bellows" action of the diaphragm, mask early signs of distress, and precipitate fatal positional asphyxia; the report therefore urges officers to avoid transporting prisoners in the prone position, to relieve downward pressure immediately after handcuffing, and to reposition individuals to a seated or lateral posture while closely monitoring breathing and skin color. (Taylor Expert Report, 36, p. 8; Exhibit F).

57. MPD's Use of Force policy did not warn against using force in the head/neck region, did not preclude the use of chokeholds/neck restraints, did not warn against unsafe body positions (i.e., face down, being compressed, etc.), did not preclude the use of non-sanctioned techniques, and did not discuss de-escalation. As such, MPD's policy permitted Mattioli's conduct and did not warn Mattioli that the force he was using was inconsistent with current professional practices. The City should have used nationally accepted policies such as those recommended by the 2017 IACP Consensus Policy. (Taylor Expert Report, 40, p. 8; Exhibit F).

58. The force used was sanctioned by the City because Mattioli testified that he had used the same restraint techniques on previous occasions in the presence of police supervisors who did not advise him that he should not do so. Therefore, he believed he was acting in accordance with policy and training. (Taylor Expert Report, 41, p. 8; Exhibit F).

59. Officer Mattioli's actions that were not precluded by policy and sanctioned by supervisors directly caused Joel Acevedo's fatal anoxic brain injury. (Taylor Expert Report, 42, p. 8; Exhibit F).

60. Officer Michael Mattioli's application of a choke hold and failure to move Mr. Acevedo from a prone position once under control, and provide medical aid fell below the standard of care for a properly trained officer and were substantial factors in Joel Acevedo's death. (Taylor Expert Report, 43, p. 9; Exhibit F).

61. During the struggle with Joel Acevedo, Mattioli was wearing jeans and a memorial "Officer Matthew Rittner" T-shirt displaying an MPD badge insignia over the left chest and a tactical enforcement design on the back; he had no shoes and was wearing socks. Mattioli agreed it was possible that, seeing the T-shirt, Joel would perceive he was a police officer. (Mattioli Dep., 68:10–69:6; Exhibit A).

62. During cross-examination at his criminal trial Mattioli acknowledged he was "in a way" making an arrest, and that he wanted Joel Acevedo arrested for crimes he believed had been committed. (Mattioli Dep., 87:4–88:12; Exhibit A).

63. Per the Fire and Police Commission, in order to violate an SOP policy such as Rule No. 3, there must be a perceived violation of departmental policy by a member of the fire or police department acting on duty. (Aldrete Dep., 128:13–25; Exhibit H).

64. Before charges could be issued by the Fire and Police Commission, a fact investigation had to be performed, and at its conclusion the commissioners reviewed the evidence and determined which charges they felt comfortable issuing. (Aldrete Dep., 129:8–22; Exhibit F).

65. On June 15, 2020, the Milwaukee Fire & Police Commission (FPC) issued a five-page charging document against Officer Michael Mattioli alleging violations of MPD rules and procedures. (FPC Charges, June 15, 2020, p. 1; Exhibit B).

66. The FPC charged Mattioli with violating Rule 3 (Integrity) §3.00, citing that he used his law-enforcement training to restrain Mr. Acevedo in a manner disproportionate to the alleged danger. (FPC Charges, June 15, 2020, p. 1; Exhibit B).

67. Under Rule 3 (Integrity) §3.03, the FPC cited Mattioli's own description that he was effecting an arrest of Mr. Acevedo, which resulted in great bodily harm. (FPC Charges, June 15, 2020, p. 2; Exhibit B).

68. The FPC cited Mattioli's statements in which he admitted he was effecting an arrest that resulted in great bodily harm. Body-worn camera footage captured witness Andrew Janowski stating that Mr. Acevedo had "nearly left the house and he was brought back in and they laid on his legs so he would not get away." (FPC Charges, June 15, 2020, p. 3; Exhibit B).

69. The FPC found that Mattioli continued to restrain Mr. Acevedo despite clear signs of control and audible distress. (FPC Charges, June 15, 2020, p. 4; Exhibit B).

70. Officer Roach reported that Mattioli had to be commanded several times to disengage and was physically pulled off Mr. Acevedo's back, even after multiple officers had arrived. (FPC Charges, June 15, 2020, p. 4; Exhibit B).

71. The FPC found that Mattioli's did not request medical assistance, instead requesting police backup for what he characterized as an arrest. The 911 recording establishes that Mr. Acevedo was conscious and speaking when the call began and that audible gasping/snorting and the sounds of a struggle could be heard; a voice—believed to be

Janowski—says, "we got him Michael, don't worry." (MPD SOP 460.40; FPC Charges, June 15, 2020, p. 5; Exhibit B and J).

72. Body-worn camera from Officers Roach and Sheremeta shows Mr. Acevedo face-down with Mattioli straddling his neck (described as a rear-naked chokehold) while Janowski restrained his legs. There was an obvious change in Mr. Acevedo's condition requiring immediate first aid and a medical request, and Mattioli did neither. (FPC Charges, June 15, 2020, p. 5; Exhibit B).

73. Before engaging with anyone, Officer Robert Roach asked, "Who is the officer?" (Roach Dep., 46:8–11; Exhibit D).

74. Officer Roach asked, "Who is the police officer?" and Mattioli stated, "I am." (Taylor Expert Report, ¶8, p. 4; Exhibit F).

75. On scene, Officer Robert Roach instructed Michael Mattioli to "get up" and addressed him as "Officer," explaining he was referring to Mattioli in his official capacity to get his attention because Mattioli did not appear responsive, consistent with Roach's experience that calling out an officer's rank draws their attention. (Roach Dep., 61:25–62:17; Exhibit D).

Dated this 2nd day of September 2025.

Respectfully submitted,

By: /s/ B'Ivory LaMarr
**B'IVORY LAMARR, ESQUIRE**
Wisconsin Bar No. 1122469
blamarr@lamarrfirm.com
THE LAMARR FIRM
5718 Westheimer Road, Suite 1000
Houston, TX 77057
800.679.4600, Ext. 700

By: /s/ Devon m. Jacob
**DEVON M. JACOB, ESQUIRE**
Pennsylvania Bar No. 89182
djacob@jacoblitigation.com
JACOB LITIGATION, INC.
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733

**KIRK M. CLAUNCH, ESQUIRE**
Texas Bar No. 1039975
claunchlaw3@earthlink.net
THE CLAUNCH LAW FIRM
301 W. Central Avenue, Forth Worth, TX 76164
817.335.4003

**BENJAMIN L. CRUMP, ESQUIRE**
Washington, D.C. Bar No. 1552623
court@bencrump.com
PRECIOUS CHAVEZ, ESQUIRE
precious@bencrump.com
**BEN CRUMP LAW, PLLC**
122 S. Calhoun Street, Tallahassee, FL 32301
800.959.1444

*Counsel for Plaintiff*

34