# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

JOSE ACEVEDO, individually, and as
Special Administrator of the
Estate of JOEL ACEVEDO

        Plaintiffs,

v.

CITY OF MILWAUKEE, et al.,

        Defendants.

Case No. 23-CV-0489

---

## DEFENDANT CITY OF MILWAUKEE'S
## RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

---

NOW COMES the Defendant City of Milwaukee, through its counsel, City Attorney Evan

Goyke, represented by Assistant City Attorney Clint B. Muche, pursuant to Fed. R. Civ. P. 56 and

Civil L. R. 56, in response to Plaintiff's proposed findings of fact, *see* ECF No. 56, in support of

the plaintiff's motion for partial summary judgment (ECF No. 55):

<u>PLAINTIFF'S PROPOSED FINDINGS OF FACT[1]</u>

1.     Mattioli admits that on the date of the incident he was employed by the Milwaukee Police
Department, as a police officer, in good standing. *Mattioli Dep., Exhibit 1, at pp. 63:6 to 64:2.*

---

[1] Plaintiff has styled their proposed findings of fact as "Plaintiff's Statement of Material and Undisputed Facts." The
Local Rules contemplate that the moving party may file "a statement setting forth any material facts to which all
parties have stipulated" on the one hand, *see* Civil L.R. 56(b)(1)(B), or "a statement of proposed material facts as to
which the moving party contends there is no genuine dispute …" on the other. *See* Civil L.R. 56(b)(1)(C). Because
Defendants have not stipulated to Plaintiff's "facts" these are proposed findings, and not undisputed facts.

63

Q. Sorry. Fair. Yes, fair.
   Now, on the date in question -- and let's just put that on the record -- it was Sunday, April 19th, 2020; correct?
A. Correct. That was the morning.
Q. Okay.
A. Sunday morning.
Q. So that's the morning when Joel Acevedo and yourself and others had this incident that results in police coming to your residence; correct?
A. Right.
Q. And on that date, you were employed by the City of Milwaukee Police Department as a police officer; correct?
A. I was.
Q. And you were still in good standing as a police officer; correct?
A. I was.
Q. Your certification wasn't suspended or anything

64

   like that; correct?
A. No, it was not.

**RESPONSE:** The City does not dispute that Mattioli was employed as a Milwaukee police officer on that date, but affirmatively asserts that he was not scheduled for or otherwise fit for duty during the incident with Acevedo. *See* Defendant City of Milwaukee's Proposed Findings of Fact ("CPFOF"), ¶ 3, 7, 51, 90 (appended below); Defendant Michael Mattioli's Proposed Findings of Fact ("MPFOF"), ¶ 56.

2.      At around 7:29 AM, Mattioli called 911 and stated, "I am a police officer and I need help" at 4502 W. Cleveland Avenue, Milwaukee, Wisconsin (Mattioli's home). *Mattioli Answer, Doc. 26, at ¶ 11.*

**RESPONSE:** The City does not dispute that Mattioli called 911 "[a]t around 7:29 a.m." requesting assistance at his home at 4502 W. Cleveland Avenue in Milwaukee, Wisconsin, *see* ECF No. 61-3 ("CAD Sheet"), but disputes that he stated "I am a police officer and I need help." *Compare* ECF No. 23, ¶ 11 ("At around 7:29 AM [sic], MATTIOLI called 911 and stated, 'I am a police officer and I need help' at 4502 W. Cleveland Avenue, Milwaukee Wisconsin (MATTIOLI's home)[,]") and ECF No. 26, ¶ 11 ("Answering paragraph 11, upon information and

belief, admits."), *with* ECF No. 61-4 ("911 Call"), 00:15-00:25 ("Hey, I'm an **off-duty** police officer and I need help at my house …") (emphasis added); ECF NO 63-2 ("Mattioli Dep."), 86:12-87:3; CPFOF, ¶ 49. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 381, 127 S.Ct. 1769 (2007) ("The Court of Appeals … should have viewed the facts in the light depicted by the videotape."). In *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018), the Seventh Circuit explained: "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stores clearly contradicted by the footage." *Id*. at 944. *See also Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018) ("[T]o the extent that [the plaintiff's] story is 'blatantly contradicted' by the video … we do not credit his version of events."). The recorded 911 speaks for itself. The logic of *Scott*, *Horton*, and *Dockery* applies with equal force here as to what was said on the call. *See generally Kailin v. Village of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) (stating a recording "can evaporate any factual dispute that would otherwise exist.").

3.      Mattioli admits that other police officers responded to his "request for backup." *Mattioli Answer, Doc. 26, at ¶ 14.*

 **RESPONSE:** The City does not dispute that Officer Roach and Officer Sheremeta arrived at Mattioli's residence around 7:38 a.m., *see* CAD Sheet, but disputes that the cited materials supports a finding that these officers "responded to [Mattioli's] 'request for backup.'" *Compare* ECF No. 23, ¶ 14 ("Police officers, ROBERT ROACH ("ROACH") and Mark Sheremeta ("Sheremeta"), both employed by the CITY, responded to MATTIOLI's request for back up at his house, and arrived at around 7:38 AM[,]") and ECF No. 26, ¶ 14 ("Answering paragraph 14, upon information and belief, admits[,]" *with* ECF NO 63-2 ("Mattioli Dep."), 86:12-87:21 (reproduced below). *See also* City Resp. to Pl.'s Proposed Findings No. 2; CPFOF, ¶ 34, 37-38, 54-55, 60, 62-63 (appended below).

person would say you are not allowed.

BY MR. JACOB:

Q   I'm not asking that.  I'm asking you would it have been your belief that using deadly force would have been lawful in that moment when he was on the ground?

A   No.

Q   Now, you, though, go to him; correct?

A   I -- when he fell over, I got on top of him, because like I said, I didn't want him to get up and keep punching people.

Q   Okay.  And then what happens?

A   We wrestled around a little bit on the ground. He was trying to stand up and I was trying to keep him down on the ground.  And he stopped struggling with me for a second, so I stood up over him and I got my phone out and I called 911.

Q   All right.  And what happens then?

A   I told the dispatcher I need help at my house. And shortly after that, Joel started to -- he tried to get back up again, and I tried to keep him back down on the ground.

Q   Am I correct, though, during the 911 call, you said I am a police officer and I need help?

A   I think -- yes.  My words I think I said, "I'm an off-duty police officer and I need help at my house."  That is what I said.

Q   And you admitted during cross-examination at your criminal trial you were attempting an arrest.  You don't -- you didn't testify falsely at your criminal trial; correct?

A   No.  I believe I said that to the police officers afterwards.

Q   Okay.  So you're attempting at this point to arrest him because now he has done the various crimes that you had observed; correct?

A   Well, I mean, that's kind of a gray area.  It -- I wanted him -- I wanted him arrested for sure --

Q   No, I understand.

A   -- because of the crimes that he did commit.  I was off duty in my house.  I didn't have -- like I'm not the police officer who can handcuff him and book him into the -- you know, because I was off.

Q   I understand that.  But my question is when you testified at your criminal trial under oath and you are cross-examined by the prosecutor and asked if you were performing an arrest and you

4.      Mattioli admits that he did not lie to criminal investigators or when he testified at his criminal trial, when he admitted that he used force against Joel Acevedo during the performance of an arrest. *Mattioli Dep., Exhibit 1, at pp. 87:4 to 87:9; 89:25 to 90:21.*

Mattioli Dep., at pp. 87:4 to 87:9

87

Q.  And you admitted during cross-examination at
   your criminal trial you were attempting an
   arrest.  You don't -- you didn't testify
   falsely at your criminal trial; correct?
A.  No.  I believe I said that to the police
   officers afterwards.

Mattioli Dep., at pp. 89:25 to 90:21

89

Q.  Right.  And you told the prosecutor you agreed

90

   that it was in the performance of an arrest;
   correct?
A.  I said, "In a way."  Yes, that's what I said.
Q.  Well, you didn't say no; correct?
A.  Right, I did not say no.
Q.  And after the incident when you were asked, you
   explained you were arresting him for his
   conduct; correct?
A.  I did say that, yes.
Q.  And you weren't obstructing justice and lying
   to law enforcement when you were saying those
   things after the incident; correct?
A.  No.
       MS. BAYNARD:  Objection to form.
       THE WITNESS:  Sorry.
       MS. BAYNARD:  Go ahead.  He already
   answered.
BY MR. JACOB:
Q.  You weren't obstructing justice, you were being
   truthful at that time; correct?
A.  I was truthful through this entire process.

**RESPONSE:** The City does not dispute that Mattioli did not lie to criminal investigators or when he testified at his criminal trial, <u>however</u> the proposed fact that "Mattioli … used force … during the performance of an arrest" is not supported by the materials cited or otherwise. *See* City Resp. to Pl.'s Proposed Findings Nos. 2-3; *see also* ECF No. 63-2, ("Mattioli Dep."), 88:4-88:15 (reproduced below), 89:20-90:5 ("I said, 'in a way.' Yes, that's what I said.").

```
said you were, were you telling them the truth
when you testified?
A    Is that the words that I said?  I'm not sure --
Q    You were asked --
A    -- that's correct.
Q    -- were you making an arrest and you said well,
     yeah.
A    I think I said, "In a way I was."
Q    Yeah.
A    I think those were my --
Q    Right.
A    -- exact words at the trial.
Q    Yeah.  So you admitted it; correct?
A    I said -- I said "in a way" because I wanted --
     I detained him until the police got there.
```

5.      Mattioli admits that when he used force against Joel Acevedo, he was making an arrest for a possible violation of Wisconsin state and local law. *Mattioli Dep., Exhibit 1, at p. 124:10-16.*

Mattioli Dep., at p. 124:10-16

124

```
Q.  So you were making an arrest.  Would it have
    been for a federal crime?
A.  I don't think so, but --
Q.  Would it have been for a state crime?
A.  Possibly, yes.
Q.  Would it have been for a local ordinance?
A.  Possibly, yes.
```

**RESPONSE:** The City affirmatively asserts that no rational factfinder could conclude, based on the quoted exchange above, that Mattioli adopted counsel's framing at deposition; the City does not dispute that the text quoted above is a partial recitation of a portion of Mattioli's deposition, but objects to its presentation here because it is inaccurate, incomplete, and tends to mischaracterize Mattioli's testimony about whether he intended to perform an arrest at the time. *See* City Resp. to Pl.'s Proposed Findings Nos. 2-4; ECF No. 63-1 ("Mattioli Disc. Resp."), ¶ 7-9, 17-18, 22, 29-35; ECF NO 63-2, ("Mattioli Dep."), 121:15-122:5 (reproduced below). *See also* CPFOF, ¶ 38, 54-59, 60-63 (appended below).

Q  Okay. Now, you've admitted that you are attempting an arrest. On whose behalf would you be attempting that arrest?

A  I was -- I held Joel down until the police could come and get him on behalf of everybody, on behalf of me, on behalf of Christopher who got punched in it the face.

Q  My question is more on are you arresting on behalf of the state, are you arresting on behalf of a local county, are you arresting on behalf of another entity? That's my question.

Page 122

A  Well, I mean, it really wasn't like that, but it happened in the city of Milwaukee, my house was in the city and county of Milwaukee. I was just -- like I said before, I just detained him until the police could get there.

6.      Mattioli admits that when he was performing the arrest, "what was going through my head at the time was that Joel (Acevedo) had just tried to steal from me" . . . "was thinking of the crime of robbery with use of force, which is a felony." *Mattioli Dep., Exhibit 1, at pp. 81:8 to 81:23.*

Mattioli Dep., at pp. 81:8 to 81:23

81

Q.  You would say so what?

A.  If you want to talk about crimes, what was going through my head at the time was that Joel had just tried to steal from me. I don't know if he did try to -- I don't know if he did steal anything or if he just attempted to steal anything. But he did that, and then he refused to leave my house, and then he started physically assaulting people. So in my head, I was thinking of the crime of robbery with use of force, which is a felony. Also, could be interpreted of theft from person, which is a felony, upstairs in my room.
    He damaged property in my -- in my house. There's different crimes that you could say he committed and I think he committed.

**RESPONSE:** The City affirmatively asserts that no rational factfinder could conclude, based on

the quoted exchange above, that Mattioli adopted counsel's framing at deposition; the City does

not dispute that the text quoted above is a partial recitation of a portion of Mattioli's deposition, but objects to its presentation here because it is inaccurate, incomplete, and tends to mischaracterize Mattioli's testimony about whether he intended to perform an arrest at the time. *See* City Resp. to Pl.'s Proposed Findings Nos. 2-5; ECF NO 63-2, ("Mattioli Dep."), 80:16-81:23 (reproduced below).

Q So this has now gone from somebody you want to leave your house to now you witnessing, what, a misdemeanor assault in your presence. Is that fair?

A He assaulted me and Christopher, yes.

Q Okay. What happens next?

A After Joel fell onto the ground, I got on top of him and I used my bodyweight to keep him on the ground because I knew that as soon as he got back up, he was going to continue throwing

Page 81

punches. It was my goal to not let that happen.

Q Now, at this point you've seen this assault, it's not -- would you agree with me you didn't witness something that you would consider to be a felony level assault at this point?

A I would say so, yes.

Q You would say so what?

A If you want to talk about crimes, what was going through my head at the time was that Joel had just tried to steal from me. I don't know if he did try to -- I don't know if he did steal anything or if he just attempted to steal anything. But he did that, and then he refused to leave my house, and then he started physically assaulting people. So in my head, I was thinking of the crime of robbery with use of force, which is a felony. Also, could be interpreted of theft from person, which is a felony, upstairs in my room.

He damaged property in my -- in my house. There's different crimes that you could say he committed and I think he committed.

7.      Mattioli admits that in addition to acting on behalf of himself, he acted on behalf of another crime victim. *Mattioli Dep., Exhibit 1, at p. 80:16-20; see also Mattioli Answer to Cross-Claim, Doc. 35, at ¶ 150.*

Mattioli Dep., at p. 80:16-20

80

Q.  So this has now gone from somebody you want to leave your house to now you witnessing, what, a misdemeanor assault in your presence.  Is that fair?
A.  He assaulted me and Christopher, yes.

**RESPONSE:** The City does not dispute that Mattioli acted in self-defense and defense of others, but affirmatively asserts that no rational factfinder could conclude, based on the cited materials, that Mattioli was acting as a police officer or pursuant to his official duties at the time. *See* City Resp. to Pl.'s Proposed Findings Nos. 2-6; ECF NO 63-2, ("Mattioli Dep."), 86:8-11 ("[W]hen he fell over, I got on top of him, because like I said, I didn't want him to get up and keep punching people); 122:6-122:22 (reproduced below), 136:10-12 ("Me acting in self-defense doesn't necessarily mean I was acting as a police officer. You know, it was a fast and fluid situation.").

Q    I understand that, but we're past that where we already talked about the criminal trial where you admitted where you were making an arrest as well, where you told the investigators you were making that arrest.  We are past that.  My question is when you are making that arrest, you are doing that on behalf of someone, the king, the state, the federal government.  I'm just asking you on behalf of whom?
        MS. BAYNARD:  Objection to the form of the question.
        Go ahead.
        THE WITNESS:  I mean, I didn't see it that way.  In the heat of that moment, which was chaotic, I didn't --- I wasn't thinking, okay, I am arresting this man on behalf of the county of Milwaukee.

8.      Mattioli admits that when he is making an arrest, he is doing so on behalf of the Milwaukee Police Department. *Mattioli Dep., Exhibit 1, at pp. 124:10 to 125:5.*

Mattioli Dep., at pp. 124:10 to 125:5
124

Q. Okay. And when you are functioning as a police
   officer, performing your law enforcement duties
   as a police officer, are you doing it on behalf
   of, let's say, your neighbor said, hey, you are
   going to be a police officer today, or are you
   doing it on behalf of a police department that
   says, hey, we are going to swear you in as a
   police officer, we are going to ask you to
   perform as a police officer on our behalf?

125

A. The second part, on behalf of the police
   department whatever.
Q. And which police department was that?
A. Well, the only police department I've ever
   worked for was Milwaukee.

**RESPONSE:** The City affirmatively asserts that no rational factfinder could conclude, based on the quoted exchange above, that Mattioli adopted counsel's framing at deposition; the City does not dispute that the text quoted above is a partial recitation of a portion of Mattioli's deposition, but objects to its presentation here because it is inaccurate, incomplete, and tends to mischaracterize Mattioli's testimony about whether he intended to perform an arrest at the time. *See* City Resp. to Pl.'s Proposed Findings Nos. 2-7; ECF NO 63-2, ("Mattioli Dep."), 122:24-125:11. Furthermore, the question, "when you *are* functioning as a police officer …", by its own terms, posits a hypothetical or counterfactual circumstance to the witness as demonstrated by the preceding testimony. *Id*.

9.      Mattioli admits that when he is making an arrest, he is acting pursuant to the policies of the Milwaukee Police Department. *Mattioli Dep., Exhibit 1, at p. 125:6-11.*

Mattioli Dep., at p. 125:6-11
125

Q. Okay. And were you acting pursuant to -- or
   when you are a police officer, are you acting
   pursuant to your neighbor's book of rules, or
   does your police department give you a set of
   policies that you are acting pursuant to?
A. The police department.

**RESPONSE:** The City affirmatively asserts that no rational factfinder could conclude, based on the quoted exchange above, that Mattioli adopted counsel's framing at deposition; the City does not dispute that the text quoted above is a partial recitation of a portion of Mattioli's deposition, but objects to its presentation here because it is inaccurate, incomplete, and tends to mischaracterize Mattioli's testimony about whether he intended to perform an arrest at the time. *See* City Resp. to Pl.'s Proposed Findings Nos. 2-8. Furthermore, the question, "when you *are* a police officer …", by its own terms, posits a hypothetical or counterfactual circumstance to the witness as demonstrated by the preceding testimony. *Id*.

10. Milwaukee Police Department Standard Operating Procedure (SOP) 220 – Arrest Authority – governs the authority the City of Milwaukee provides to its police officers to perform arrests. *See SOP 220, Exhibit 2.*

**RESPONSE:** The City does not dispute that the complete text of Milwaukee Police Department ("MPD") Standard Operating Procedure ("SOP") 220 establishes departmental policy, but not constitutional standards, relative to arrests, but denies that any recitation of any portion thereof is necessarily accurate unless complete.

11. SOP 220.10 – Definitions – defines "Personally Involved" as used in the policy as follows:

> A situation where the off-duty member, a family member, or friend becomes engaged in a dispute or incident involving a personal matter with the person to be arrested or any other person connected with the incident. *This does not apply to situations where the off-duty member is a victim of a crime.* (Emphasis Added).

**RESPONSE:** The City does not dispute that the text quoted above accurately reproduces MPD SOP 220.10(G), but denies that any recitation of portions of SOP 220 are necessarily accurate unless complete.

12. SOP 220.15 – On Duty Arrests and Procedure – provides in relevant part, the following:

## A. PROCEDURES FOR ARRESTS

1. In order for an arrest to occur, an officer must have the intent to take a person into custody and the person should have an understanding that he/she is arrested and is in custody. When making an arrest, an officer shall:

    a. Identify him/herself as a police officer. (If it is apparent by the wearing of a uniform or other means that the person making the arrest is a police officer, no further identification is necessary.)

    b. Restrict the arrested subject's movement using only the amount of reasonable force necessary to overcome their resistance.

    c. When an arrested person is taken into physical custody, the arresting officer shall be responsible for completing the required reports. (WILEAG 1.7.4.4)

Note: Although officers may inform the subject that they are under arrest no formal declaration of arrest is required.

\*\*\*\*\*

3. Arrests without a warrant

    a. An officer may make an arrest without a warrant if the officer has probable cause to believe a person is committing or has committed a crime.

\*\*\*\*\*

B. Members may conduct official investigations and make arrests within Milwaukee County.

    1. Members may arrest a subject whom the member has observed committing a crime.

**RESPONSE:** The City does not dispute that the text quoted above accurately reproduces portions of MPD SOP 220.15, but denies that any partial recitation thereof is necessarily accurate unless complete.

13.    SOP 220.30 – Off Duty Arrests and Aid – provides in relevant part, the following:

### A. ARREST AUTHORITY

An off-duty member may arrest or provide aid or assistance anywhere within the state of Wisconsin if:

1. The member is responding to an emergency situation that poses a significant threat to life or bodily harm.

2. The member is taking action that the member would be authorized to take under the same circumstances in Milwaukee County while on-duty.

**RESPONSE:** The City does not dispute that the text quoted above accurately reproduces MPD SOP 220.30(A), but denies that any recitation of portions of SOP 220 are necessarily accurate unless complete.

14. SOP 220.30 – Off Duty Arrests and Aid – provides in relevant part, the following:

### B. ARREST LIMITATIONS

1. The member's actions must be objectively reasonable. All aspects of the situation, including the member's abilities, training, experience, availability of equipment, communications, as well as a tactical risk assessment, shall be taken into consideration prior to deciding to act. The opportunity and/or means to have on-duty officers safely respond prior to acting must be weighed. When practicable, the member should contact the law enforcement jurisdiction in lieu of, or prior to, intervening. In some instances, it may be more beneficial to be a good witness rather than attempt to physically intervene.

2. Members are discouraged from taking police action when the member has consumed alcohol or any other substance which could impair rational action or conduct.

3. The member shall not be personally involved in the incident underlying the arrest.

4. The member shall not be engaged in off-duty employment where the member's actions are in furtherance of the interests of the private employer.

5. If the member is unarmed, at minimum, the member shall possess a department issued identification card. If the member is armed with his or her duty weapon or other approved handgun, the member must possess both badge and identification card. The member shall display these identifiers as soon as practicable.

6. The member shall abide by federal and state laws, as well as department standard operating procedures.

**RESPONSE:** The City does not dispute that the text quoted above accurately reproduces MPD SOP 220.30(B), but denies that any recitation of portions of SOP 220 are necessarily accurate unless complete.

15. SOP 220.30 – Off Duty Arrests and Aid – provides in relevant part, the following:

> C. RESPONSE TO ON-DUTY PERSONNEL
>
> 1. On-duty personnel have primary authority at any scene.
>
> 2. The off-duty member shall immediately identify him or herself as an off-duty officer and comply with all the commands of the on-duty personnel.
>
>> Note: There have been a number of documented incidents of off-duty officers killed by on-duty officers who were unaware the individual was an off-duty officer.
>
> 3. The member shall be cooperative, provide all requested information to on duty personnel and remain on scene until released by on-duty personnel.

**RESPONSE:** The City admits only that the text quoted above accurately reproduces MPD SOP 220.30(C), but denies that any recitation of portions of SOP 220 are necessarily accurate unless complete.

DEFENDANT'S ADDITIONAL PROPOSED FINDINGS OF FACT[2]

*The Parties*

1. At the time of his death, Joel Acevedo (Acevedo) was an adult resident of the State of Wisconsin. (ECF No. 23 ¶ 4).

2. Plaintiff Jose Acevedo (Plaintiff) is Joel Acevedo's father and special administrator of the Estate of Joel Acevedo. (ECF 23 ¶ 5).

---

[2] The Local Rules contemplate that the non-moving party may file "a statement … of any additional facts that require the denial of summary judgment . . . ." *See* Civil L.R. 56(b)(2)(B)(ii). Here, the parties have filed cross-motions. *Compare* ECF No. 55 ("Plaintiff's Motion for Partial Summary Judgment"), *with* ECF No. 59 ("Defendant City of Milwaukee's Motion for Summary Judgment"). The Defendant City has filed proposed findings of fact in support of its motion for summary judgment, *see* ECF No. 60, which it incorporates by reference as "additional facts" and reproduces herein, numbered as in the original, for clarity.

3. Defendant Michael Mattioli (Mattioli) is an adult resident of the State of Wisconsin and was employed with the City of Milwaukee Police Department ("MPD") on April 19, 2020. (Muche Decl., ¶ 3, Ex. 1, Mattioli's Response to Request for Admission ("RFA") No. 1).

4. Mattioli had been employed by the MPD for more than a decade at the time of the incident. (Mattioli Dep. 27:21-23).

5. Mattioli participated in annual in-service trainings during his time as a Milwaukee police officer. (Mattioli Dep., 28:13-29:11; 33:8-34:10).

6. Following the incident, Mattioli was placed on administrative leave and later resigned. (Mattioli Dep., 23:24-24:8).

7. Mattioli was not scheduled for duty as a Milwaukee police officer on Saturday, April 18, or Sunday, April 19, 2020. (RFA Nos. 29-31).

8. Mattioli is 6'3" and weighed around 230 pounds in April 2020. (Mattioli Dep., 27:10-17).

9. Acevedo was about as tall as Mattioli, but outweighed him by twenty-five pounds or more. (Mattioli Test., 39:16-20; Mattioli Dep., 77:12-25).

10. Defendant City of Milwaukee is a Wisconsin municipal corporation whose principal offices are located in Milwaukee, Wisconsin. (ECF No. 23 ¶ 9; ECF No. 28, ¶ 9).

*Jurisdiction and Venue*

11. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction over the Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343. (ECF No. 23 ¶¶ 1-2).

12. The Eastern District of Wisconsin is the proper federal venue for this action under 28 U.S.C. § 1391(b) because it is where all acts alleged in the Amended Complaint occurred. (ECF No. 23 ¶ 3).

13. City of Milwaukee records do not reflect that notice of circumstances of claim or an itemized statement of damages was served upon the City prior to filing suit as required under Wis. Stat. § 893.80(1d)(a) and (b). (Owczarski Decl., ¶ 6).

*The Incident*

14. On Saturday, April 18, 2020, Michael Mattioli invited three friends to come over to his house in Milwaukee to sit by the fire and have some alcoholic beverages. (Muche Decl, ¶ 4, Ex. 2 (hereinafter "Mattioli Dep."), 64:3-8, 64:9-15).

15. Mattioli's guests included Christopher Peters ("Peters"), a childhood friend, Andrew Janowski ("Janowski"), who Mattioli met through Peters, and Joel Acevedo ("Acevedo"), who Mattioli knew through work and had recently introduced to Peters and Janowski. (Mattioli Dep., 64:9-65:7; Muche Decl., ¶ 5, Ex. 3, (hereinafter, "Peters Test."), 7:9-17, 8:6-25, 9:24-10:18, 30:15-31:15; Muche Decl., ¶ 6, Ex. 4 (hereinafter, "Janowski Test."), 67:23-25, 70:25-72:3, 91:4-92:5, 92:25-93:3; Muche Decl., ¶ 12, Ex. 10 (hereinafter, "Mattioli Test."), 27:5-28:10, 28:13-16, 29:18-21, 30:14-31:2).

16. Mattioli and Acevedo were already in the backyard when Janowski arrived; Peters arrived last and joined the others by the fire pit. (Peters Test., 9:20-23, 10:4-8, 11:4-17, 34:12-16; Janowski Test., 72:7-22, 73:2-3, 93:4-7).

17. The four men stayed outside drinking and talking until around midnight, then moved inside to Mattioli's kitchen table. (Peters Test., 11:4-13, 12:25-13:2, 14:5-15:6; Janowski Test., 73:4-21, 74:5-12, 74:25-75:16, 94:17-19; Mattioli Test., 32:10-13; Mattioli Dep., 70:16-24).

18. They continued drinking after they went inside, and Mattioli talked with another friend over FaceTime. (Peters Test., 15:18-22, 16:5-12, 36:14-37:9; Janowski Test., 75:15-20, 94:20-95:6; Mattioli Test., 32:14-15).

19. Mattioli, Peters, Janowski, and Acevedo all consumed alcohol and spent the night at Mattioli's house. (Mattioli Test., 31:7-23, 32:5-7; Janowski Test., 72:7-22, 76:10-23; Peters Test., 11:14-17, 16:17-22, 34:12-16; Mattioli Dep., 71:15-72:4).

20. Peters secretly used cocaine, unbeknownst to Mattioli and Janowski, during the night. (Peters Test., 12:6-24, 13:7-9; Janowski Test., 73:4-21, 74:5-12, 74:22-24).

21. Peters saw Acevedo went to his car alone more than once. (Peters Test., 35:16-36:13).

22. Acevedo sent Peters a text message about buying cocaine together—but Peters did not respond. (Peters Test., 13:10-14:1, 62:14-63:9).

23. At some point, Janowski went to sleep on the couch in the living room, Peters went to the basement, and Mattioli went to his bedroom on the second floor. (Janowski Test., 76:25-77:10; Peters Test., 17:1-7; Mattioli Test., 33:19-21, 40:3-11; Mattioli Dep., 71:5-14).

24. Mattioli laid down in his clothes and went to sleep on his bed. (Mattioli Test., 33:22-34:7).

25. Mattioli was wearing the same clothes he had worn the night before, i.e. jeans and a t-shirt, the next morning. (Mattioli Dep., 68:10-13).

26. The shirt bore the name of a Milwaukee police officer who had been killed in the line of duty and included MPD logos and designs. (Mattioli Dep., 68:14-25).

27. The shirt was not department-issued – it was "just a shirt." (Mattioli Dep., 145:14-146:2).

28. In the morning Mattioli and Acevedo began to argue. Their verbal argument escalated into a physical confrontation involving Mattioli, Peters, Janowski, and Acevedo. (Peters Test., 21:23-22:8, 24:1-7, 24:23-24, 50:12-51:24, 55:4-6; Janowski Test., 81:4-82:7, 82:18-83:11, 85:5-10, 101:1-25; Mattioli Test., 43:18-44:2, 54:16-19; Mattioli Dep., 95:21-97:10).

29. Mattioli woke up because he felt someone's hand inside his right front pants pocket. (Mattioli Test., 34:10-15; Mattioli Dep., 72:9-73:25).

30. When he opened his eyes he saw Acevedo in his bedroom. (Mattioli Test., 34:16-22; Mattioli Dep., 72:9-73:25).

31. Mattioli asked "what are you doing," and asked why Acevedo was stealing from him. Acevedo became loud, defensive, and angry; he denied that he had stolen from Mattioli, and began taking things out of his pockets and throwing them onto Mattioli's bed. (Mattioli Test., 34:15-36:11; Mattioli Dep., 72:9-73:25).

32. Investigators found a rolled up dollar bill on Mattioli's bed that tested positive for cocaine. DNA testing implicated Acevedo but excluded the others. (Muche Decl., ¶ 9, Ex. 7 (hereinafter, "Dalland Test."), 59:2-19, 60:20-63:3).

33. When Mattioli stood up and told him to leave, Acevedo began walking down the stairs and Mattioli followed behind. (Mattioli Test., 36:12-23; Mattioli Dep., 74:23-75:12, 75:24-76:12).

34. Mattioli told Acevedo to leave repeatedly after they reached the first floor, but Acevedo refused. (Mattioli Test., 37:2-4, 37:22-38:3; Mattioli Dep., 76:13-21).

35. The argument woke Janowski on the couch, who stood up but did not immediately intervene. (Janowski Test., 77:22-78:23, 79:19-25; 98:3-24; Mattioli Test., 38:12-25; Mattioli Dep., 76:22-77:11).

36. The argument also woke Peters, who came upstairs and saw Mattioli, Acevedo, and Janowski in Mattioli's living room. (Peters Test., 17:17-18:25, 39:16-21; Mattioli Test., 39:1-9).

37. Mattioli and Acevedo were screaming at each other; Mattioli was accusing Acevedo of stealing from him and telling him to leave, and Acevedo was refusing to go. (Peters Test., 19:4-10, 42:21-43:10; Janowski Test., 78:18-79:9).

38. Mattioli forcefully told Acevedo to leave telling him "If you don't, I'm going to call the police." (Janowski Test., 100:11-25).

39. Mattioli pointed at Acevedo, telling Peters, "He was stealing from me." (Mattioli Test., 42:5-10; Mattioli Dep., 78:8-24).

40. Acevedo shoved Mattioli in the chest. (Peters Test., 20:18-21:19, 47:5-20, 49:6-11; Janowski Test., 80:13-21; Mattioli Test., 39:1-15; Mattioli Dep., 78:25-79:17).

41. Peters yelled at Acevedo to "get the fuck out of the house," then Acevedo struck Peters in the face causing him to fall backwards into the kitchen. (Peters Test., 21:23-22:8, 50:12-51:24; Janowski Test., 81:4-82:7, 101:1-25; Mattioli Dep., 79:18-20).

42. Acevedo lost his balance in the process and fell to the ground. (Mattioli Test., 42:22-43:7; Mattioli Dep., 79:18-80:15).

43. As Acevedo tried to stand back up, Mattioli got on top of him. (Mattioli Test., 43:18-44:2; Peters Test., 22:12-14, 23:2-10, 53:1-54:11; Janowski Test., 82:8-17; Mattioli Dep., 80:21-81:2).

44. Mattioli got on top of Acevedo because he "didn't want him to get up and keep punching people."  (Mattioli Dep., 86:3-11).

45. Everyone ended up in the kitchen; Mattioli and Janowski, who had wrestled Acevedo to the floor, were trying to keep him down while Acevedo tried to get up. (Peters Test., 22:12-14, 23:2-16, 24:8-22, 53:1-54:11, 55:7-9; 56:19-57:6; Janowski Test., 85:11-22, 105:3-106:1; Mattioli Test., 44:21-45:2, 46:2-11; Mattioli Dep., 86:8-18).

46. Mattioli was on Acevedo's back straddling his upper torso, and Janowski was laying across Acevedo's legs. (Peters Test., 24:1-7, 24:23-24, 55:4-6; Janowski Test., 82:18-83:11, 85:5-10; Mattioli Test., 43:18-44:2, 54:16-19; Mattioli Dep., 95:21-97:10).

47. Mattioli testified, "all I basically did was use my body-weight to keep him on the ground." (Mattioli Dep., 92:16-22).

48. Mattioli retrieved his cell phone from his pants pocket and called 911 at 7:28 a.m. (Carsky Decl., ¶¶ 9, Ex. 3 (hereinafter, "CAD Sheet") and 10, Ex. 4 (hereinafter, "911 Call");

Mattioli Dep., 86:8-18; Janowski Test., 85:5-8; Mattioli Test., 47:2-6; Muche Decl., ¶ 7, Ex. 5 (hereinafter, "Blomme Test."), 116:5-117:8;).

49. Mattioli told the operator, "I'm an off duty officer, and I need help at my house." (911 call; Mattioli Test., at 48:8-10; Mattioli Dep., 86:19-87:3).

50. Mattioli did not hear Acevedo say "Let me go. I want to go home," during the 911 call. (Mattioli Test., 76:20-24; Mattioli Dep., 88:16-89:10, 159:11-24).

51. Mattioli was intoxicated and angry during the incident. (Mattioli Test., 72:3-8; Mattioli Dep., 147:1-17).

52. Mattioli believed Acevedo was trying to steal from him, had refused to leave, and had attacked him and his friend. (Mattioli Dep., 81:3-23).

53. Mattioli stayed on top of Acevedo until the police arrived. (Mattioli Dep., 99:13-100:24).

54. Mattioli explained, "[Acevedo] was – he was throwing punches at people, and I wanted to keep him on the ground so he couldn't do that anymore until the police could show up and arrest him." (Mattioli Dep., 164:2-8).

55. He stated, "I just wanted to hold him there until the police could get there." (Mattioli Dep., 165:22-166:5; *see also* Mattioli Dep., 121:22-122:5).

56. Mattioli never told Acevedo he was under arrest or ordered him to "stop resisting." (Mattioli Dep. 155:11-24).

57. Mattioli did not direct Janowski to lay across Acevedo's legs; Janowski did so to prevent Acevedo from harming anyone else. (Janowski Test., 106:2-15; Mattioli Test., 54:16-55:1).

58. Although plaintiff's counsel tried repeatedly to get Mattioli to adopt his framing that Mattioli "arrested" Acevedo, Mattioli replied, "I mean, I didn't see it that way. In the heat of the moment, which was chaotic, I didn't – I wasn't thinking, 'okay, I am arresting this man on behalf of the [City] of Milwaukee.'" (Mattioli Dep., 121:15-122:5).

59. Mattioli only said he was attempting to arrest Acevedo after the fact. (Mattioli Dep., 87:4-88:15).

60. During the 911 call, Acevedo knocked Mattioli's phone from his hand and Peters picked it up. (Peters Test., 25:4-24; 57:25-58:10).

61. Acevedo fought to break free from Mattioli and Janowski's grasp during the remainder of the call. (Mattioli Test., 49:1-20, 50:22-24; 911 Call; Tlomak Test., 11:7-12:4, 56:9-18, 12:5-12).

62. Peters told the dispatcher "This man is attacking us." He meant Mattioli, Janowski, and himself by "us." (911 call; Peters Test., 58:11-22; Mattioli Test., 50:25-51:5).

63. After the 911 call ended at 7:32 a.m., Peters went outside to wait for officers to arrive. (Peters Test., 25:25-26:7, 58:11-22; Mattioli Test., 50:25-51:5; Blomme Test., 117:9-10).

64. Officer Robert Roach ("Roach") and Officer Mark Sheremeta ("Sheremeta") were dispatched to Mattioli's house at 7:34 a.m. in response to the 911 call. (CAD Sheet, Carsky Decl., ¶ 11, Ex. 5 (hereinafter, "Roach BWC"), 2:30-40).

65. When they arrived Roach and Sheremeta saw Peters outside with visible injuries to his face. (Roach BWC, 2:40-3:04).

66. Peters met Roach and Sheremeta by the sidewalk and brought them to Mattioli's kitchen door. (Peters Test., 60:17-19).

67. Peters told them that Joel was "subdued" inside, and led officers up the driveway to a side door. (Roach BWC, 3:05-3:30).

68. Roach entered Mattioli's kitchen and saw Mattioli and Janowski on top of Acevedo. (Roach BWC, 3:30-4:10).

69. After the parties were separated, Roach checked Acevedo's pulse and requested an emergency medical response. (Roach BWC, 4:10-4:24).

70. Acevedo was rolled onto his back, then Officer Sheremeta started cardio-pulmonary resuscitation ("CPR"). (Roach BWC, 4:25-4:55).

71. Officers continued CPR until EMTs arrived. (Muche Decl., ¶ 8, Ex. 6 (hereinafter, "Deford Test."), 28:10-31:12).

72. EMTs detected that Acevedo had a pulse at 8:01 a.m. He was loaded and transported to St. Luke's Hospital shortly thereafter. (Deford Test., 31:4-12; Muche Decl., ¶ 11, Ex. 9 (hereinafter, "Tlomak Test.,"), 17:10-20).

73. Acevedo never regained consciousness after he was admitted to the hospital. (Tlomak Test., 19:22-18:5).

*Additional Relevant Facts*

74. Investigators from the Milwaukee County District Attorney's Office responded to Mattioli's house and conducted a criminal investigation into the incident. (Blomme Test., 112:8-23).

75. Mattioli, Janowski, and Peters each separately made recorded statements on-scene, immediately after the incident. (Carsky Decl., ¶ 12, Ex. 6 (hereinafter, "Bouzek BWC"); Carsky Decl., ¶ 13, Ex. 7 (hereinafter, "Romero-Perez BWC"); Carsky Decl., ¶ 14, Ex. 8 (hereinafter, "Dathe BWC")).

76. Acevedo was pronounced brain dead on April 25, 2020. (Tlomak Test., 9:2-3).

77. Mattioli was charged with 1st Degree Reckless Homicide in *State of Wisconsin v. Michael A. Mattioli*, Milwaukee County Circuit Court Case No. 2020CF1991. *See* https://wcca.wicourts.gov/caseDetail.html?caseNo=2020CF001991&countyNo=40&index=0&mode=details.

78. The criminal trial was conducted between November 6 and November 10, 2023, and resulted in a verdict of "not guilty" verdict. *Id*.

*Milwaukee Police Department Policies and Procedures*

79. Mattioli was aware of the Department's use of force and arrest policies. (Mattioli Dep., 34:11-35:22; 38:2-40:7).

80. Mattioli understood Standard Operating Procedures ("SOP") to be the Department's expectation about how things should be done, and attended trainings about how to implement policies in the field. (Mattioli Dep., 48:8-15).

81. Mattioli was never taught to use neck restraints in the course of his duties by the Milwaukee Police Department, and never saw or was aware of other Milwaukee police officers using neck restraints. (Mattioli Dep., 17:13-18:15; 20:13-23; 55:19-56:20).

82. Mattioli opined that it was not "realistic" to read every page of every policy, but he always tried to "do the right thing." (Mattioli Dep., 54:9-21).

83. Mattioli learned what a "rear-naked chokehold" was after this incident, but denied that is what he did during the incident. (Mattioli Dep., 19:13-20:12; 96:9-97:14; 98:22-99:17; 107:19-108:24; 109:24-111:4; 115:2-24).

84. MPD Standard Operating Procedure 460 – Use of Force ("SOP 460") was effective June 21, 2019. (Carsky Decl., ¶ 7, Ex. 1 (hereinafter, "SOP 460")).

85. Section 460.05 states: "[i]t is the policy of the department to accomplish the department's mission with cooperation of the public and with minimal reliance upon the use of physical force. Members shall only use the force necessary to perform their duties in accordance with department policy." (SOP 460).

86. Section 460.15 states: "[t]he use of force by a police member must be objectively reasonable. Police members shall use only the force necessary to effectively maintain control of a situation and protect the safety of police members and the public." (*Id*.).

87. MPD Standard Operating Procedure 220 – Arrest Authority ("SOP 220") was also in effect on April 19, 2020. (Carsky Decl., ¶ 8, Ex. 2 (hereinafter, "SOP 220")).

88. Section 220.05 states: "[i]t is the policy of the Milwaukee Police Department that all arrests made by members both on or off duty shall be conducted professionally and in accordance with established legal principles." (SOP 220).

89. Section 220.30(B) imposes limitations upon MPD officers' authority to make off-duty arrests. (SOP 220).

90. Section 220.30(B)(2) states: "[m]embers are discouraged from taking police action when the member has consumed alcohol or any other substance which could impair rational action or conduct." (SOP 220).

91. Section 220.30(B)(3) states: "[t]he member shall not be personally involved in the incident underlying the arrest." (SOP 220).

Dated and signed at Milwaukee, Wisconsin this 30th day of August, 2025.

EVAN GOYKE
City Attorney

ADDRESS:
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
Telephone: (414) 286-2601
Fax: (414) 286-8550
Email: cmuche@milwaukee.gov

/s/ Clint B. Muche
CLINT B. MUCHE
Assistant City Attorney
State Bar No. 1131629

*Attorneys for City of Milwaukee*

1032-2023-681