**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| JOSE ACEVEDO, individually, and as a Special Administrator of the ESTATE OF JOEL ACEVEDO, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL MATTIOLI, et al. <br><br> Defendants. | **CASE NO. 23-cv-00489** |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MICHAEL MATTIOLI'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, Jose Acevedo, Individually, and as a Special Administrator of the Estate of Joel Acevedo, by and through the undersigned counsel, submit this Response in Opposition to Defendant Michael Mattioli's Motion for Summary Judgment.

**INTRODUCTION**

This case arises from the death of Joel Acevedo, who was fatally restrained by then Milwaukee Police Officer Michael Mattioli on April 19, 2020. What began as a private gathering at Mattioli's home escalated into a police incident during which Mattioli, invoking his role as a police officer, used deadly force to arrest Mr. Acevedo by pinning him face-down, applying his body weight across Mr. Acevedo's back and neck, and directing that he be handcuffed upon the arrival of other police officers. Mr. Acevedo never regained consciousness, and the Milwaukee County Medical Examiner determined that the cause of death was anoxic encephalopathy due to traumatic asphyxia.

Mattioli now seeks to escape accountability by characterizing his conduct as the actions of a private citizen defending himself. But the record is clear that Mattioli acted under color of law and within the scope of his employment when he used force during the performance of an arrest. The record contains overwhelming evidence definitively establishing that Mattioli acted under color of law: he identified himself to 911 as an off-duty police officer, expressly framed Mr. Acevedo's conduct in terms of criminal violations, used law-enforcement restraint techniques he had learned and employed in his capacity as an officer, ordered responding officers to "cuff" Mr. Acevedo as if effectuating an arrest, and told investigators that he performed an arrest. These are not the acts of a private bystander, they are the hallmarks of a police officer invoking official authority.

Nor can Mattioli obtain judgment as a matter of law on the reasonableness of his force or on causation. A witness described Mr. Acevedo as appearing lifeless while still pinned beneath Mattioli, and Officer Roach initially described Mattioli's hold as a "rear-naked chokehold." The medical examiner concluded that death resulted from traumatic asphyxia due to restraint, notwithstanding defense experts[1] who attempted to attribute it to alcohol, cocaine, or asthma. These competing accounts create genuine disputes of material fact that only a jury can resolve.

The questions of whether Mattioli's use of force was objectively unreasonable under the Fourth Amendment, and whether his conduct caused Joel Acevedo's death, are quintessentially fact-intensive determinations that belong to a jury. At this stage, the Court must view the record in the light most favorable to Plaintiff, and doing so makes clear that this case is full of genuine disputes of material fact. Reasonable jurors could find that Mattioli used force far beyond what was necessary or reasonable under the circumstances, and that his actions directly caused Mr.

---

[1] Who are presently the subject of a motion in limine.

Acevedo's death. Because the evidence supports these conclusions, summary judgment is improper. Defendant Mattioli's motion should therefore be denied in its entirety, and this case should proceed to trial.

## LEGAL STANDARD

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)). A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case. (*Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024)).

Summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (*Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The court must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true. (*Id*.). In determining whether a genuine issue of material facts exists, all facts are construed in favor of the nonmoving party. (*Springer v. Durflinger*, 518 F.3d 479, 483–84 (7th Cir. 2008)).

## ARGUMENT

### I. Genuine Issues of Material Fact Preclude Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when the evidence is such that a reasonable jury

could return a verdict for the non-moving party. (*Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 609 (7th Cir. 2023)). The court reviews all evidence in the light most favorable to the non-moving parties—here, the plaintiffs—and gives them the benefit of all reasonable inferences from the evidence in their favor. (*Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

This is especially true in excessive force cases, where the test of reasonableness under the Fourth Amendment is inherently fact-specific and often requires a jury to sift through disputed factual contentions. The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. (*Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021). Its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. (*Id*.) And because of this fact-intensive nature of the inquiry, this reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, the court have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. (*Id*.)

The Seventh Circuit has emphasized that "[w]hen material facts are in dispute, then the case must go to a jury, whether the argument is that the police acted unreasonably because they lacked probable cause, or that they acted unreasonably because they responded overzealously and with too little concern for safety." (*Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010)). And the court has recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible to different interpretations. (*Id*.) This principle is particularly relevant where, as here, the one against

whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify. (*Id*.)

The record here brims with factual disputes going to the core of Plaintiff's claims: the type and severity of the force applied, whether Joel Acevedo was resisting or subdued, whether Mattioli recognized and disregarded signs of medical distress, and whether Mattioli's conduct caused Acevedo's death..

A. <u>Dispute over whether Mattioli used a chokehold and neck restraint.</u>

Mattioli admitted positioning his arm across Acevedo's "neck and chin area" while straddling him on the floor and pressing down with his body weight (PPFOF ¶¶1–2). He further admitted using his knees and elbows to hold Acevedo down until police arrived (PPFOF ¶15). Officer Robert Roach testified that upon entering the home he observed Mattioli on top of Acevedo with his stomach pressed against Acevedo's back, arms around Acevedo's neck, and initially described the restraint as a "rear-naked chokehold" (PPFOF ¶¶35–39). Officer Robert Roach testified that use of force around the neck that he saw was not proper. (PPFOF ¶36). Mattioli disputes that characterization, insisting he never applied a chokehold. This is a paradigmatic factual dispute for a jury. Whether Mattioli employed a neck restraint or chokehold is material to whether his use of force was objectively reasonable.

This is a paradigmatic factual dispute for a jury. Whether Mattioli employed a neck restraint or chokehold is material to whether his use of force was objectively reasonable. The Seventh Circuit has held that summary judgment is improper where, as here, the evidence conflicts on whether deadly-level restraint was used. (See *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005) (reversing summary judgment because there was a genuine issue of material fact as to whether the officer's prone restraint constituted unreasonable force).

B. Dispute over whether Acevedo was subdued or still resisting.

Mattioli asserts he continued applying pressure because Acevedo remained combative. But the record shows otherwise. Roach testified that Peters told him Acevedo was "subdued" when officers arrived, meaning no longer fighting though under restraint (PPFOF ¶¶29–30). Roach conceded that a subdued subject could still have their breathing impeded by continued pressure (PPFOF ¶31). **Mattioli himself admitted he stayed on top of Acevedo even after Acevedo stopped moving** (PPFOF ¶15). Whether Acevedo posed an ongoing threat or whether force continued long after he was under control is a disputed fact that goes to the heart of reasonableness.

C. Dispute over whether Mattioli recognized and disregarded signs of medical distress

Another central factual dispute is whether Mattioli recognized, or should have recognized, that Joel Acevedo was in medical distress and nonetheless disregarded those warning signs. The 911 recording captured Acevedo's audible gasping and struggle on the call while Mattioli held him pinned to the ground (PPFOF ¶69). Officer Roach testified that when he observed Mattioli's arms around Mr. Acevedo's neck, he cautioned, "I want to make sure that your arms aren't around his neck," to accurately document the conduct. Roach recalled that Mattioli responded with "Oh" and moved back, at which point Roach observed no response from Mr. Acevedo (PPFOF ¶36). Despite these clear indications, Mattioli admitted that when asked by officers whether Acevedo was breathing, he replied, **"I don't know. Handcuff him,"** showing both a lack of assessment and a conscious decision to prioritize restraint over rendering aid (PPFOF ¶16). Plaintiff's expert concluded that Officer Mattioli violated MPD SOP §460.40 and LESB training by failing to render prompt medical aid. (PPFOF ¶61).

Defendant, for his part, maintains that he perceived no signs of medical emergency and *assumed* Acevedo was fine. (PPFOF ¶16). That claim is irreconcilable with the 911 audio, the

6

observations of responding officers, and Mattioli's own contradictory statements about whether he restricted Acevedo's ability to breathe. This dispute goes beyond medical causation; it raises the critical question of whether Mattioli continued using force in the face of obvious medical distress. The record presents competing accounts, and only a jury can decide whether Mattioli acted reasonably or recklessly disregarded Acevedo's life-threatening condition.

D. Dispute over causation of death

The Milwaukee County Medical Examiner's Autopsy Protocol lists Acevedo's cause of death as "anoxic encephalopathy due to traumatic asphyxia" (PPFOF ¶50). Plaintiff's expert concluded that Mattioli's application of a chokehold, prone restraint, and failure to reposition Acevedo were substantial factors in causing death (PPFOF ¶¶59-60). Defense experts, including Dr. Valentine, Dr. Pearle, and Dr. Jentzen, have attempted to attribute the death to alcohol, cocaine, or asthma (Def. Ex. F, Expert Testimony, Nov. 9, 2023), but such conflicting expert opinions only underscore the existence of a triable issue.

Plaintiff's evidence ties death to positional and traumatic asphyxia caused by Mattioli's restraint, while Defendant's experts propose alternative explanations involving alcohol, drugs, or preexisting conditions. The stark divergence between the official medical examiner's autopsy findings, Plaintiff's expert conclusions, and the defense experts' opinions underscores that the cause of death cannot be resolved as a matter of law. It is a disputed factual question that must be decided by the jury after weighing the credibility of the competing medical evidence.

E. No credible dispute that Mattioli acted under color of law.

While Mattioli wishes to characterize his actions as those of a private citizen only, the record definitively establishes otherwise. Mattioli testified that he evaluated Acevedo's conduct in terms of felony "crimes," including robbery and theft, which he believed were occurring at the

time (PPFOF ¶4). He admitted he was "in a way" performing an arrest (PPFOF ¶¶7–8), told the dispatcher he was an "off-duty police officer" (PPFOF ¶6), directed responding officers to "cuff" Acevedo (PPFOF ¶37), and acknowledged that the restraint technique he used was one he learned and had employed as a police officer in the presence of supervisors (PPFOF ¶¶12–14). He was even wearing a T-shirt with an MPD badge insignia at the time, which he admitted could cause Acevedo to perceive him as acting in his police capacity (PPFOF ¶20). When Officer Robert Roach arrived and asked, **"Who is the officer?"** Mattioli responded, **"I am!"**. (PPFOF ¶77).

This case is precisely the type of excessive force dispute that the Seventh Circuit has warned should rarely be resolved on summary judgment. The parties offer sharply conflicting accounts of the type of restraint used, the duration and severity of that force, whether Joel Acevedo was resisting or already subdued, whether Mattioli ignored obvious signs of medical distress, and whether his restraint caused Acevedo's death. These are not peripheral disagreements; they strike at the core of the constitutional claims.

Because resolving these disputes would require the Court to make credibility determinations, weigh competing evidence, and draw inferences against the non-movant, summary judgment is improper. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Mattioli used objectively unreasonable force, and caused Joel Acevedo's death. Defendant's motion must therefore be denied.

## II. Mattioli Acted Under Color of Law

Deciding whether a police officer acted under color of state law should turn largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties. (*Pickrel v. City of Springfield, Ill.*, 45 F.3d 1115, 1118 (7th Cir. 1995)). Action is taken under color of state law when it involves

a misuse of power, " 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. (*Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001)).

Whether or not a police officer is off-duty does not resolve the question of whether he or she acted under color of state law. (*Gibson v. City of Chicago*, 910 F.2d 1510, 1517 (7th Cir. 1990)). No bright line distinguishes a police officer's personal pursuits from actions taken under color of state law. (*Coles v. City of Chicago*, 361 F. Supp. 2d 740, 748 (N.D. Ill. 2005)).

Here, the record contains ample evidence definitively establishing that Mattioli acted under color of law. **The City's own oversight body confirmed Mattioli's actions were treated as an official arrest**. On June 15, 2020, the Fire and Police Commission (FPC) issued a five-page charging document against Officer Mattioli alleging violations of MPD rules and procedures, including Rule 3 (Integrity), expressly citing his use of law-enforcement training to restrain Mr. Acevedo and his own description that he was effecting an arrest that resulted in great bodily harm (PPFOF ¶¶61-70).

Mattioli invoked his status as a police officer and framed his conduct as an arrest. He expressly identified himself as an off-duty police officer when calling 911 for assistance, telling the dispatcher, "I'm an off-duty police officer and I need help at my house" (PPFOF ¶6). At the time, he wore a memorial T-shirt bearing an MPD badge insignia, and admitted it was possible that Joel would perceive him as a police officer based on that shirt (PPFOF ¶20). Mattioli further admitted that at the time of the restraint, he evaluated Mr. Acevedo's conduct as felony-level crimes including robbery, theft from person, and property damage, and that those charges were "going through [his] head at the time" (PPFOF ¶4). At his criminal trial and in sworn testimony, Mattioli conceded he was "in a way" performing an arrest because he detained Joel Acevedo until

the police got there and wanted him arrested (PPFOF ¶¶7–8). He further acknowledged that as a police officer he had the legal privilege to use reasonable force to effectuate an arrest, and that he did so in restraining Acevedo (PPFOF ¶¶10–11). These demonstrate that Mattioli himself understood and portrayed his conduct as law enforcement action, not as private self-defense. "[A police officer's] being off-duty does not preclude him from acting under color of state law." *Pickrel v. City of Springfield, Ill*., 45 F.3d 1115, 1118 (7th Cir. 1995).

Under MPD policy, arrest is defined as taking or detaining a person into custody so their liberty is under the arrester's control, requiring intent to take into custody and the person's understanding they are in custody; no formal declaration of arrest is required. (PPFOF ¶51). Mattioli testified that when he performs arrests as a police officer, he does so on behalf of the police department, specifically the Milwaukee Police Department (MPD). (PPFOF ¶19). Mattioli also used police restraint techniques acquired through his employment. Mattioli admitted that the tactic he employed—straddling a prone suspect and pinning him with body weight, including across the neck and upper torso—was a method he learned through his police experience and had used previously as an officer (PPFOF ¶¶12–13). He confirmed he had employed this same restraint on duty in the presence of other officers, and was never told it was dangerous or constituted excessive force (PPFOF ¶14). By employing restraint techniques, he had learned and practiced as part of his police training, Mattioli was not acting as a private individual improvising force in a personal dispute; he was acting as a police officer invoking and applying law-enforcement methods.

Additionally, Mattioli directed responding officers to effectuate an arrest. When uniformed officers arrived, Mattioli was still physically restraining Mr. Acevedo on the floor (PPFOF ¶22). **He took Acevedo's arms behind his back "as if … to put handcuffs on him" and told the**

responding officers: **"Cuff this guy"** **(PPFOF ¶37)**. Directing official police action is quintessential conduct under color of law. **Even off-duty officers act under color of law where they call other police officers to assist an arrest**. *Pickrel*, 45 F.3d at 1118.

Responding officers deferred to Mattioli's assertion of police authority rather than treating him as a private actor. Upon entry, Officer Roach asked, "Who is the officer?" and to which Mattioli replied, "I am," while he continued restraining Mr. Acevedo (PPFOF ¶71). Officer Roach then ordered Mattioli to "get up" **and addressed him as "Officer," explaining he did so to get Mattioli's attention in his official capacity** because Mattioli did not appear responsive. (PPFOF ¶72). Officer Roach did not immediately displace Mattioli; instead, he issued repeated commands and ultimately had to physically pull Mattioli off Mr. Acevedo's back after multiple officers were on scene. (PPFOF ¶68). This sequence, asking who the officer was, accepting Mattioli's identification as the officer while he continued using force, addressing him as "Officer," and delaying physical intervention until repeated commands failed, is contemporaneous deference to Mattioli's claimed police authority, reinforcing the only reasonable conclusion that Mattioli was acting under color of law at the time.

Defendant cites *Plaats v. Barthelemy*, 641 F. App'x 624 (7th Cir. 2016), for the proposition that § 1983 does not cover private disputes. But *Plaats* involved a purely private altercation in which the officer never invoked his authority.[2] Likewise, *Wilson v. Price*, 624 F.3d 389 (7th Cir. 2010), and *Latuszkin v. City of Chicago*, 250 F.3d 502 (7th Cir. 2001), provide no support for Defendant's argument because both involved conduct wholly unrelated to any assertion of police authority. In *Wilson*, the defendant was a Chicago alderman who savagely beat a private citizen

---

[2] Vander Plaats furnished no evidence that Barthelemy acted as a police officer, rather than a private citizen, during the attack. …Barthelemy attacked him as a civilian to punish him for his relationship with Shorter rather than to pursue a law-enforcement objective. The attackers attempted no arrest, wore no uniforms, and never identified themselves as police officers. *Plaats v. Barthelemy*, 641 F. App'x 624, 627 (7th Cir. 2016)

during a dispute at an auto repair shop. The Seventh Circuit held that his conduct was not under color of law because it bore no relationship to his legislative duties and he never invoked or used any governmental authority in the assault. Similarly, in *Latuszkin*, an off-duty, intoxicated Chicago police officer struck and killed a pedestrian while driving his personal car after leaving a party. The Seventh Circuit held he was acting as a private citizen because he was engaged in no police activity, displayed no indicia of authority, and did not purport to exercise official power at the time. Here, by contrast, Mattioli affirmatively declared his status as an officer, assessed Acevedo's conduct as crimes, and directed responding officers to effectuate an arrest (PPFOF ¶¶4, 6–8, 37). These contemporaneous assertions of authority make this case fundamentally different from *Plaats, Wilson*, or *Latuszkin*. On these facts, there is only one reasonable conclusion, i.e., that Mattioli was cloaked himself with the authority of the law and acted under color of law.

In sum, the record contains no reasonable dispute of fact that Mattioli's conduct went far beyond a private altercation. He invoked his status as a police officer, described his actions as an arrest, employed law-enforcement restraint techniques, and directed uniformed officers to complete the arrest he had initiated. The responding officers' recognition of him as "the officer" and their deference to his asserted authority underscore that this was not a personal quarrel but an assertion of state power. Whether he was officially on duty or not, Mattioli acted under color of law when he used deadly force to effect Joel Acevedo's arrest.

## III.    Mattioli's Use of Force is Objectively Unreasonable Under the Fourth Amendment

Defendant contends that his restraint of Joel Acevedo was objectively reasonable as a matter of law. This argument cannot withstand scrutiny. The record contains extensive disputes as to the severity and duration of the restraint, whether Acevedo was resisting or subdued, whether

Mattioli ignored clear signs of medical distress, and whether the force directly caused Acevedo's death.

An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. (*Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 428, 137 S. Ct. 1539, 1547, 198 L. Ed. 2d 52 (2017)) A court determines whether an officer has used excessive force in effectuating an arrest based on a standard of 'objective reasonableness'. (*Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016)). A police officer's use of force is unconstitutional if, 'judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest. (*Id.*) The court's "inquiry is fact specific and balances the intrusion on the individual against the governmental interests at stake." (*Id.*) The analysis is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers. (*Taylor v. City of Milford*, 10 F.4th 800, 806–07 (7th Cir. 2021)).

Defendant Mattioli frames his conduct as a minimal, non-violent attempt to hold Acevedo until police arrived. The record establishes otherwise. Here, Mattioli used a dangerous prone restraint with body weight and neck pressure. Mattioli admitted he straddled Mr. Acevedo on the ground and pressed his upper body weight across Mr. Acevedo's back, neck, and head area to keep him from rising (PPFOF ¶1). He acknowledged his right arm was positioned across Mr. Acevedo's "neck and chin area" during the restraint (PPFOF ¶2). Officer Roach corroborated that Mattioli's stomach was on Mr. Acevedo's back, his body weight was on the upper torso, and his arms were around Mr. Acevedo's neck (PPFOF ¶¶35–36). Mattioli admitted to investigators that he squeezed and pressed on Joel Acevedo's neck. (PPFOF ¶17). The Milwaukee County Medical Examiner

later determined the cause of death was "Anoxic Encephalopathy due to Traumatic Asphyxia" (PPFOF ¶50).

Consistent with national standards, Plaintiff's expert explains that the IACP's 2017 Consensus Policy defines a "choke hold" as restricting breathing to incapacitate, deems such maneuvers extremely dangerous, and allows them only when deadly force is authorized. (PPFOF ¶53). The expert further opines that Mattioli placed Mr. Acevedo in a chokehold, an unauthorized use of force, when Mr. Acevedo was unarmed and then became unconscious (PPFOF ¶55). This force was also inconsistent with MPD's own SOP 460 requirement to apply only necessary force and to cease once compliance is gained (PPFOF ¶60).

Defendant asserts that Acevedo continued to fight throughout the restraint. The evidence contradicts that narrative. Even after Mr. Acevedo stopped moving, Mattioli admitted that he continued to restrain him until officers arrived, keeping his knees and elbows pressed into Mr. Acevedo's body (PPFOF ¶15). When asked if Mr. Acevedo was breathing, Mattioli replied, "I don't know. Handcuff him" (PPFOF ¶16). This continued application of force against a motionless and unresponsive individual is objectively unreasonable. The Plaintiff's expert record also aligns with long-recognized risks, the IACP's 1993 review of in-custody restraint deaths warns that forcing struggling or intoxicated persons face-down—especially with body-weight—can restrict the "bellows" action of the diaphragm, mask early signs of distress, and precipitate fatal positional asphyxia; officers are urged to relieve pressure after control and to promptly reposition and monitor breathing and skin color (PPFOF ¶56).

In assessing a claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them. (*Lombardo v. City of St. Louis, Missouri*, 594 U.S. 464, 466, 141 S. Ct. 2239, 2241, 210 L. Ed. 2d 609 (2021)).

Those circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff 's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. (*Id.*)

Officer Roach testified that a person who is "subdued" could have their ability to breathe impeded. (PPFOF ¶31). Yet Mattioli used his full body weight and neck control instead of resorting to minimal measures, such as verbal commands, which Roach acknowledged is often the least forceful option (PPFOF ¶32).

The law is clearly established that police officers cannot use "significant" force on suspects who are only passively resisting arrest. (*Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014)). Force that is reasonable while a suspect poses a threat may no longer be reasonable as the threat decreases. (*Id.*) And, as the expert explains, Officer Michael Mattioli's application of a choke hold and failure to move Mr. Acevedo from a prone position once under control and provide medical aid fell below the standard of care for a properly trained officer and were substantial factors in Joel Acevedo's death. (PPFOF ¶60).

The FPC eventually charged Mattioli based in part on Mattioli's admitted **"effecting an arrest"** that caused great bodily harm, corroborated by BWC footage and witness statements that Mr. Acevedo has nearly left the house but was brought back in and pinned (PPFOF ¶¶63-67). Additionally, despite clear signs that Mr. Acevedo was in distress, Mattioli took no meaningful steps to provide aid. He admitted that after Mr. Acevedo stopped moving, he remained on top of him until officers arrived and, when asked if Mr. Acevedo was breathing, replied, "I don't know. Handcuff him," explaining that he assumed Mr. Acevedo was "fine" (PPFOF ¶¶15–16). By failing

to assess Mr. Acevedo's condition, failing to reposition him, and failing to initiate or request medical assistance, Mattioli disregarded obvious medical needs.

The FPC further charged Mattioli after finding that during the 911 call, in which Mattioli identified himself as an off-duty officer, an audible gasping/struggle sound can be heard, along with a bystander assuring "*we got him Michael, don't worry*" and Mattioli's continued restraint despite obvious control. (PPFOF ¶69). This is also followed by the fact that Mattioli had to be commanded several times to disengage and was physically pulled off Mr. Acevedo's back by PO Roach, even after multiple police officers had responded to the call. (PPFOF ¶68).

Here, the FPC found that although the 911 call was placed from Mattioli's phone, he did not request medical assistance, instead seeking police backup for what he characterized as an arrest, while the audio captured ongoing distress. (PPFOF ¶69). The BWC also shows Mr. Acevedo face-down with Mattioli straddling his neck in a rear-naked-choke posture and a clear change in condition requiring aid which Mattioli did not provide or request. (PPFOF ¶70). This is further evidence of objective unreasonableness and deliberate disregard for medical needs.

The Seventh Circuit directs courts to weigh four factors in assessing whether an officer's response to medical needs was reasonable: "(1) whether the officer had notice of the medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) police interests that might inhibit providing treatment." (*Snukis v. Taylor*, 145 F.4th 734, 742 (7th Cir. 2025)).

Viewed under the *Snukis* framework, every factor weighs against Mattioli. First, he had clear notice of Acevedo's medical need, while pinned under Mattioli's weight, Acevedo went limp and unresponsive—an obvious emergency. Second, the seriousness of the condition was undeniable, the Medical Examiner later confirmed traumatic asphyxia, a life-threatening event.

Third, the required response was minimal, MPD policy required only that Mattioli render or request aid, yet he did neither, instead assuming Acevedo was "fine." Finally, once Acevedo was unresponsive, he posed no threat to officer safety or public order, eliminating any justification for delay. Plaintiff's expert concludes that Mattioli's use of a neck restraint, failure to reposition Acevedo, and failure to provide medical aid fell below accepted standards and were substantial factors in his death. (PPFOF ¶60). The reasonableness inquiry "takes into account the sufficiency of the steps the officers did take. (*Id*.) Here, Mattioli took no steps at all. Rather than ensuring Mr. Acevedo's safety, he dismissed observable signs of distress and left him prone, pinned, and untreated until other police officers arrived.

Defendant leans heavily on *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), to argue that his restraint of Joel Acevedo was constitutionally reasonable. But that reliance is misplaced. Phillips arose from markedly different circumstances, and its holding cannot be stretched to immunize the type of prolonged, deadly restraint at issue here. In *Phillips*, the Seventh Circuit upheld summary judgment where officers restrained Mr. Phillips who continued **"violently resisting" by thrashing and kicking, posing an immediate risk**. The officers applied limited, temporary measures until medical personnel arrived.[3]

The circumstances here are critically different. Unlike *Phillips*, the record shows that Joel Acevedo had been subdued by the time officers arrived. Peters told Officer Roach that Acevedo

---

[3] Almost immediately after Mr. Phillips was on the ground, Officer Duarte arrived as backup; he confirms that Mr. Phillips was still moving at that point. Officer Duarte then called an ambulance and took up a position at Mr. Phillips' feet to protect those around Mr. Phillips from his kicking. Officer Busch arrived immediately thereafter and solved the kicking danger by placing restraints on Mr. Phillips' legs. The restraints placed on Mr. Phillips' legs were similar to handcuffs and allowed the legs to move apart to some degree; the leg restraints were not connected to his handcuffs so as to place Mr. Phillips in a hog-tied position. It was reasonable to restrain Mr. Phillips' legs given the peril posed by his continued kicking. The testimony as to the timing of these events varies somewhat, but the difference is immaterial. It is undisputed that just a few minutes passed between Mr. Phillips' wrists being cuffed and his legs being restrained, and at any rate, Mr. Phillips was still moving at the time the leg restraints were applied. *Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997)

was "subdued," meaning that he was no longer actively fighting though still under restraint (PPFOF ¶¶29–30). Roach acknowledged that a subdued subject's ability to breathe could still be impaired by pressure on the back and neck (PPFOF ¶31). **Mattioli himself admitted that he remained on top of Acevedo even after Acevedo stopped moving** (PPFOF ¶15). Compounding these facts, the 911 audio captured Acevedo audible gasping and struggling on the call. (PPFOF ¶69). Just as important, the officers in *Phillips* restrained Mr. Phillips and actively monitored his condition on the floor.[4] By contrast, the restraint here was prolonged, involved direct pressure across Acevedo's neck and torso (PPFOF ¶¶1–2, 35–39), and continued long after any possible justification had passed. Unlike in *Phillips*, Mattioli ignored audible signs of distress and failed to monitor Acevedo's condition, leading to his death.

In sum, the evidence easily permits a jury to find that Mattioli used excessive force. Defendant's assertion that his actions were "reasonable as a matter of law" cannot be reconciled with the record. His prone restraint with body weight and neck pressure directly led to Mr. Acevedo's death, and courts have long recognized that such tactics carry a grave risk of positional asphyxia. (*Abdullahi*, 423 F.3d at 773). Determining whether this force was objectively reasonable under the circumstances is a fact-intensive inquiry reserved for the jury, not one that can be decided on summary judgment.

## IV. Qualified Immunity Does Not Shield Mattioli

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[4] The evidence remains uncontroverted that the officers monitored Mr. Phillips while he was on the floor. Even the ambulance attendants, on whose testimony the plaintiffs rely, testified that the officers were standing within about a foot of Mr. Phillips when they arrived. The fact also remains that there is no testimony that the officers ignored Mr. Phillips while he was in a prone position or that they walked away from him while he was on the floor. *Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997)

constitutional rights of which a reasonable person would have known. (*Abdullahi v. City of Madison*, 423 F.3d 763, 774–75 (7th Cir. 2005)). Thus, in order to survive summary judgment on grounds of qualified immunity, a plaintiff must (1) allege violation of a valid legal right and (2) demonstrate that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (*Id*.) Here, Plaintiffs' evidence creates triable issues on both prongs.

A. A reasonable jury could find that Mattioli violated the Fourth Amendment

The Fourth Amendment prohibits the use of excessive force to seize a person in order to make an arrest. (*Gupta v. Melloh*, 19 F.4th 990, 995–96 (7th Cir. 2021)). A police officer's use of force is unconstitutional if, 'judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.' (*Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016)). For a particular application of force to be classified as 'deadly,' it must at least carry with it a substantial risk of causing death or serious bodily harm. (*Id*.)

The record contains ample evidence from which a jury could conclude that Mattioli used deadly and excessive force. He straddled Joel Acevedo on the ground, pressed his bodyweight onto Acevedo's back and neck, and positioned his arm across Acevedo's neck and chin (PPFOF ¶¶1–2, 15). Officer Roach corroborated these observations, testifying that he saw Mattioli's stomach pressed against Acevedo's back, arms around his neck, and described the hold as a **"rear-naked chokehold"** (PPFOF ¶¶35–39). The 911 call captured Acevedo audibly gasping and pleading, "let me go home" (PPFOF ¶69). Yet Mattioli admitted that when asked whether Acevedo was breathing, he replied, "I don't know. Handcuff him" (PPFOF ¶16).

These facts support a finding that Mattioli used deadly force, neck compression and prone restraint with bodyweight, long after Acevedo was subdued (PPFOF ¶¶29–31, 36). At minimum,

whether Mattioli's use of force was objectively reasonable is a jury question. *Abdullahi*, 423 F.3d at 773.

B. <u>The right violated was clearly established</u>

By April 2020, it was clearly established that the use of neck restraints or maintaining a prone, bodyweight restraint on a person who is subdued and no longer resisting violates the Fourth Amendment. The Seventh Circuit held that summary judgment was inappropriate where factual disputes existed about the amount of force used and the extent of resistance, emphasizing that "when material facts are in dispute, then the case must go to a jury" because continued force after resistance ends can be objectively unreasonable.(*Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010)). The court further explained that force must be proportional to the threat posed, and as the threat decreases, so must the level of force; it is the "totality of the circumstances, not the first forcible act, that determines objective reasonableness." (*Id.*)

An officer who may have deliberately broken the ankle of a no-longer-resisting suspect was not entitled to qualified immunity even though the suspect had previously been actively resisting arrest. (*Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014)). An officer who intentionally broke a suspect's arm during handcuffing, after the suspect submitted to an order to lie on the ground was not entitled to qualified immunity even though the suspect had threatened officer's safety, and had resisted arrest by running away. (*Id.*) This gave clear notice that an officer may not keep a subdued individual pinned face-down with bodyweight or neck compression, especially in the face of audible distress.

The facts here fit squarely within that clearly established framework. The 911 recording captured Joel Acevedo audibly gasping and struggling while Mattioli straddled him on the ground (PPFOF ¶69). Officer Roach testified that he observed Mattioli's arms around Acevedo's neck in

what he described as a "rear-naked chokehold" (PPFOF ¶38). Peters told Roach that Acevedo was "subdued" by the time police arrived (PPFOF ¶29). Yet Mattioli admitted he stayed on top of Acevedo even after Acevedo stopped moving (PPFOF ¶15) and, when asked if Acevedo was breathing, replied, "I don't know. Handcuff him" (PPFOF ¶16).

Professional standards and training further reinforced the constitutional limits. MPD training and SOPs warned of the dangers of neck restraints (PPFOF ¶34). The International Association of Chiefs of Police classified chokeholds as deadly force, permissible only to prevent death or great bodily harm (PPFOF ¶53). National law enforcement guidance had long recognized the risk of death from prolonged prone restraint under bodyweight pressure (PPFOF ¶56). Officer Robert Roach even testified that he knew that the use of force that he observed was not proper. (PPFOF ¶36). Thus, by April 2020, it is unmistakably clear that an officer cannot lawfully pin a subdued, unarmed, audibly gasping person face-down with pressure on the back and neck. Any reasonable officer in Mattioli's position would have understood that such conduct violated the Fourth Amendment.

Defendant's reliance on *Hunter v. Bryant*, 502 U.S. 224, 226, 112 S. Ct. 534, 535, 116 L. Ed. 2d 589 (1991), is misplaced. Hunter involved whether federal agents reasonably believed they had probable cause to arrest an individual for threatening the President. The case turned on mistaken probable cause in a fast-moving investigative context, not on the use of physical force against a subdued, unarmed individual. Here, unlike in *Hunter*, the dispute is not about competing legal conclusions over probable cause—it is about what actually occurred during Mattioli's restraint of Joel Acevedo, including whether Mattioli applied a chokehold, whether Acevedo was still resisting, and whether Mattioli ignored obvious signs of medical distress. Those disputes must be resolved by a jury.

Equally unavailing is Defendant's suggestion that Mattioli lacked notice because he was unaware of Acevedo's "health ailments" or cocaine use. The medical evidence does not support Defendant's narrative. The Milwaukee County Medical Examiner concluded that Acevedo died from "anoxic encephalopathy due to traumatic asphyxia" (PPFOF ¶50). Plaintiff's expert likewise found that Mattioli's use of a chokehold, prone restraint, and failure to reposition Acevedo were substantial factors causing death (PPFOF ¶¶58-60).

Most critically, whether Acevedo had underlying conditions is irrelevant to the qualified immunity analysis. Officers are judged by the objective reasonableness of their actions, not by hindsight knowledge of a suspect's medical vulnerabilities. Mattioli's decision to continue compressing Acevedo's neck and torso despite audible distress cannot be excused by reference to speculative medical conditions.

In sum, Plaintiffs have shown that Mattioli used deadly force on a subdued, gasping individual and ignored clear signs of medical distress, leading to Acevedo's death. Training and professional standards had long warned of the dangers of neck restraints and positional asphyxia, making the risks unmistakable. Defendant's reliance on mistaken judgment or health conditions cannot excuse a prolonged restraint of an unarmed, compliant person. And, Mattioli's own backup officer testified that he knew the force was not proper. On these facts, qualified immunity does not apply, and Mattioli's motion must be denied.

## V. Plaintiff's State-Law Claims Survive Summary Judgment

### A. Supplemental jurisdiction remains and even if federal claims were dismissed, the § 1367(c) factors favor keeping the state claims.

Defendant's threshold argument, asking the Court to "decline supplemental jurisdiction", presupposes dismissal of all federal claims. It fails for the simple reason that Plaintiff's § 1983

claims present multiple, triable disputes. A district court also has supplemental jurisdiction over any claim that is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." (*Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008)). Federal courts may exercise supplemental jurisdiction over a state claim if the state and federal claims "derive from a common nucleus of operative fact. (*Id.*)

When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction pursuant to § 1367(c)(3). But while a district court may relinquish its supplemental jurisdiction if one of the conditions of § 1367(c) is satisfied, it is not required to do so. (*Id.*) Supplemental jurisdiction is a doctrine of discretion, and its "justification lies in considerations of judicial economy, convenience and fairness to litigants. (*Id.*)

Even if the Court were to dismiss the federal claims (it should not), factors favor retaining the state claims. Here, discovery has been conducted; the record is developed (including depositions, medical and policy evidence); and the state-law theories arise from the same nucleus of operative fact as the federal claims. Retention avoids duplicative litigation and promotes economy and fairness.

B. The notice-of-claim argument under Wis. Stat. § 893.80(1d) fails

Under § 893.80(1d)(a), the notice of injury provision, a claimant must serve written notice of the circumstances of her claim upon the relevant governmental entity or employee within 120 days of the event giving rise to that claim. Wis. Stat. § 893.80(1d)(a). Alternatively, the claimant can satisfy the provision if she proves the defendant had actual notice of her claims and was not prejudiced by the lack of formal, written notice. (T*he Estate Of Laliah Swayzer, Et Al., Plaintiffs, V. Milwaukee County, et al.*,No. 16-CV-1703-BHL, 2022 WL 656884 (E.D. Wis. Mar. 4, 2022)).

That is the case here. The City, through the Fire & Police Commission (FPC) and MPD, had immediate, sustained actual notice. The FPC assumed the investigation, for the first time ever, took over from MPD, reviewed Mattioli's personnel file and discipline, and concluded he should be fired (PPFOF ¶¶23–27, 25). MPD classified the matter as a Priority One officer-involved incident with threat to life (PPFOF ¶28), collected eyewitness, 911, BWC evidence, and evaluated charges and policy violations (PPFOF ¶¶61-70). This is textbook actual notice; the City cannot show prejudice. Courts applying § 893.80(1d)(a) routinely excuse noncompliance where, as here, the governmental entity has actual notice and cannot show prejudice. The FPC's unprecedented takeover (PPFOF ¶23), personnel and prior-discipline review (PPFOF ¶24), recommendation for termination (PPFOF ¶25), and charging analysis (PPFOF ¶¶61-70) demonstrate comprehensive, early notice of the claim's circumstances. Defendant identifies no prejudice in investigating, preserving, or defending the claim—indeed, the City's investigation is the backbone of the defense narrative. Under § 893.80(1d)(a), that ends the inquiry.

C. <u>Discretionary-act immunity does not bar the claims</u>

Wis. Stat. § 893.80(4) bars suits against governmental entities for intentional torts committed by their officers or employees when acting in legislative, quasi-legislative, judicial, or quasi-judicial functions. (*Petkus v. Richland Cnty.*, Wis., 767 F.3d 647, 653 (7th Cir. 2014)).[5] The court has recognized four exceptions to governmental immunity under the statute. The court noted that immunity does not apply to the performance of: (1) ministerial duties; (2) duties to address a "known danger;" (3) actions involving medical discretion (the Scarpaci rule); and (4) actions that

---

[5] The statute can't immunize the [defendant] from liability for violating federal law. But neither can it immunize [defendant] against state-law claims. (*Petkus v. Richland Cnty.*, Wis., 767 F.3d 647, 653 (7th Cir. 2014)).

are "malicious, willful, and intentional." (*Willow Creek Ranch, L.L.C. v. Town of Shelby*, 2000 WI 56, ¶ 26, 235 Wis. 2d 409, 425, 611 N.W.2d 693, 700)

The known-and-compelling-danger and ministerial-duty doctrines remove this conduct from immunity. Immunity yields when a public employee confronts a known and compelling danger that creates a "certain and imperative" duty to act. (*Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 25, 253 Wis. 2d 323, 337, 646 N.W.2d 314, 321) MPD training recognizes neck restraints can constitute deadly force (PPFOF ¶34). Roach immediately focused on Mattioli's arms around Mr. Acevedo's neck; when Mattioli moved back, Roach observed no response from Mr. Acevedo (PPFOF ¶36). Peters had already told Roach that Mr. Acevedo was "subdued" (PPFOF ¶¶29–30), and Roach acknowledged a subdued subject's breathing can be impeded (PPFOF ¶31). MPD SOP 460.40 then imposes a ministerial duty: after force is used, members "shall render or request medical aid … as soon as reasonably possible" (PPFOF ¶53). A reasonable jury could find that once distress and unresponsiveness were evident, Mattioli had a non-discretionary duty to cease compressive force and promptly seek medical aid—and that he failed to do so (PPFOF ¶¶15–16, 36, 53, 69).

Defendant's self-defense gloss does not warrant judgment as a matter of law. Wisconsin does not privilege force "intended or likely to cause death or great bodily harm" absent an imminent threat. Wis. Stat. § 939.48(1). Even crediting an initial need to restrain, a jury could find that any imminent threat had passed once Mr. Acevedo was subdued and then unresponsive, rendering continued neck/prone compression neither necessary nor reasonable (PPFOF ¶¶29–31, 36).

In sum, immunity doesn't apply here. Once Mr. Acevedo was reported subdued and then appeared unresponsive, Mattioli had a non-discretionary duty to stop using compressive force and

promptly seek medical aid. A reasonable jury could find he failed to do both. Self-defense cannot justify continued neck/prone pressure after any imminent threat has passed. Because these are fact questions for a jury, discretionary-act immunity cannot be resolved on summary judgment.

D. Defendant's "no intent" argument does not defeat the state tort claims; privilege and intent present jury questions on this record

The Wisconsin Supreme Court has held that force used by police officers is privileged only if it is reasonably necessary; excessive force constitutes assault and battery. (*Schulze v. Kleeber*, 10 Wis. 2d 540, 103 N.W.2d 560 (1960)). [6] Here, the record establishes intentional contact and supports a finding that any privilege was exceeded. Mattioli straddled Mr. Acevedo on the floor, pressed his upper body across Mr. Acevedo's back/neck/head area, and admitted his right arm was across the "neck and chin area" while using bodyweight to keep him down (PPFOF ¶¶1–3). He further admitted he maintained that restraint until police arrived (PPFOF ¶15). Officer Roach corroborated that he encountered Mattioli on top of Mr. Acevedo, with his stomach on Acevedo's back and arms around the neck, initially describing the hold as a rear-naked chokehold (PPFOF ¶¶35–39). On these facts, a reasonable jury could conclude that, even if the encounter began with privileged force, Mattioli used more force than reasonably necessary, thereby committing a battery.

Defendant's self-defense or defense-of-others argument likewise cannot support summary judgment. Privilege turns on reasonableness, and whether the force used was necessary is a fact question. "One who has police authority to maintain the peace has a privilege to use force, and the question then becomes simply whether the force was excessive for the accomplishment of the

---

[6] A police officer ordered by mayor to remove a spectator from a council meeting was privileged to use whatever force was reasonably necessary to effect removal, but if the officer used more force than reasonably necessary it constituted an assault and battery. (*Schulze v. Kleeber*, 10 Wis. 2d 540, 103 N.W.2d 560 (1960)).

purpose. The reasonableness of the force depends upon the facts of each case, and is a question to be resolved by the jury." (*Johnson v. Ray*, 99 Wis. 2d 777, 782, 299 N.W.2d 849, 852 (1981)).

The IIED claim also does not fail for lack of "intent to cause distress." Wisconsin recognizes that IIED's intent element is satisfied if the defendant either acted for the purpose of causing emotional distress. (*Rabideau v. City of Racine*, 2001 WI 57, ¶ 34, 243 Wis. 2d 486, 502, 627 N.W.2d 795, 803)[7] A jury could find substantial certainty here, the 911 audio captured audible gasping and struggle while Mattioli kept Mr. Acevedo pinned (PPFOF ¶69); when asked if Mr. Acevedo was breathing, Mattioli responded, "I don't know. Handcuff him." (PPFOF ¶16); and Roach's caution about neck contact was followed by unresponsiveness (PPFOF ¶36). Plaintiff's expert opined that Officer Michael Mattioli's application of a choke hold and failure to move Mr. Acevedo from a prone position once under control and provide medical aid fell below the standard of care for a properly trained officer and were substantial factors in Joel Acevedo's death. (PPFOF ¶¶59-60). From those facts, a jury could conclude the conduct was extreme and outrageous and undertaken with knowledge to a substantial certainty it would cause severe distress, at minimum, creating a triable issue on IIED.

In sum, Defendant's "no-intent" theory fails under Wisconsin law and the record. Plaintiffs need only show intentional contact beyond privilege to prove battery, and the evidence supports this. Reasonableness of force and self-defense are jury questions. IIED intent may be inferred from the 911 call, the neck restraint, observed unresponsiveness, and failure to render aid. Summary judgment must be denied.

---

[7] One who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from it. (*Rabideau v. City of Racine*, 2001 WI 57, ¶ 34, 243 Wis. 2d 486, 502, 627 N.W.2d 795, 803)

**VI. Plaintiffs' Wrongful-Death Claim Under Wis. Stat. §§ 895.03 & 895.04 Should Not Be Dismissed or Limited**

Defendant's bid to dismiss or curtail the wrongful-death claim misconstrues Wisconsin law. Wisconsin's statute expressly authorizes the personal representative (or special administrator) to bring the wrongful-death action, regardless of whether every potential beneficiary is a named party. (See Wis. Stat. § 895.04(1)). Distribution of any recovery is then made according to the statutory hierarchy in § 895.04(2) (See *Force v. Am. Family Mut. Ins. Co.*, 2014 WI 82, ¶¶8–12, 356 Wis. 2d 582, 850 N.W.2d 866) (explaining that § 895.04's scheme determines who shares in the recovery and in what order, without extinguishing the claim itself). The ability to recover under Wisconsin's wrongful death statute is similar to intestate succession, namely, a claimant has standing only if no other beneficiary higher in the hierarchy has standing. (*Anderson v. Westfield Ins. Co.*, 300 F. Supp. 2d 726, 729 (W.D. Wis. 2002)). This does not transform the beneficiary hierarchy into a standing defect that defeats suit by the personal representative.

Defendant also misstates the damages cap. Wisconsin law sets the loss-of-society cap at $350,000 for an adult decedent (and $500,000 for a minor), and expressly permits such damages to the "parents of the deceased." Wis. Stat. § 895.04(4). Nothing in *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005), alters Wisconsin's wrongful-death remedies; *Russ* bars independent federal (§ 1983) familial-association claims for loss of society absent state action directed at the parent-child relationship and does not restrict recovery available under Wisconsin's wrongful-death statute.

Because Wisconsin law authorizes the special administrator to pursue wrongful death, because disputes over who shares in any recovery are governed by § 895.04(2) (not by dismissal), and because the statutory damages regime remains fully available notwithstanding *Russ*, Defendant's request to dismiss or limit the wrongful-death claim should be denied.

## CONCLUSION

Viewing the record in the light most favorable to Plaintiff, genuine disputes of material fact exist as to whether Mattioli's use of force was objectively unreasonable, and whether his conduct caused Joel Acevedo's death, as well as on Plaintiffs' state-law claims, including wrongful death under Wis. Stat. §§ 895.03–.04. Those issues are for a jury, not for resolution on summary judgment. Accordingly, Defendant Michael Mattioli's Motion for Summary Judgment should be denied in its entirety and this case should proceed to trial.

Dated this 10th day of September 2025.

Respectfully submitted,

By: /s/ B'Ivory LaMarr
**B'IVORY LAMARR, ESQUIRE**
Wisconsin Bar No. 1122469
blamarr@lamarrfirm.com
THE LAMARR FIRM
5718 Westheimer Road, Suite 1000
Houston, TX 77057
800.679.4600, Ext. 700

By: /s/ Devon m. Jacob
**DEVON M. JACOB, ESQUIRE**
Pennsylvania Bar No. 89182
djacob@jacoblitigation.com
JACOB LITIGATION, INC.
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733

**KIRK M. CLAUNCH, ESQUIRE**
Texas Bar No. 1039975
claunchlaw3@earthlink.net
THE CLAUNCH LAW FIRM
301 W. Central Avenue, Forth Worth, TX 76164
817.335.4003

**BENJAMIN L. CRUMP, ESQUIRE**
Washington, D.C. Bar No. 1552623
court@bencrump.com
PRECIOUS CHAVEZ, ESQUIRE
precious@bencrump.com
**BEN CRUMP LAW, PLLC**
122 S. Calhoun Street, Tallahassee, FL 32301
800.959.1444

*Counsel for Plaintiff*