**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

| | |
|---|---|
| JOSE ACEVEDO, individually, and as a Special Administrator of the ESTATE OF JOEL ACEVEDO, <br><br>      Plaintiff, <br><br> v. <br><br> MICHAEL MATTIOLI, et al. <br><br>      Defendants. | **CASE NO. 23-cv-00489** |

**PLAINTIFF'S RESPONSE TO
DEFENDANT MATTIOLI'S PROPOSED FINDINGS OF FACT
AND PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF FACT**

COMES NOW the Plaintiff, Jose Acevedo, Individually, and as a Special Administrator of the Estate of Joel Acevedo, by and through the undersigned counsel, submit the following Response to Defendant Mattioli's Proposed Findings of Fact And Plaintiff's Additional Proposed Findings of Fact.

### PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACTS

1. At the time of his death, Joel Acevedo (Acevedo) was an adult resident of the State of Wisconsin. (ECF 23 ¶ 4)

   Response: **Undisputed.**

2. Plaintiff, Jose Acevedo, is the father of Joel Acevedo and serves as the Special Administrator for the Estate of Joel Acevedo. (ECF 23 ¶ 5)

   Response: **Undisputed.**

3.  Defendant Michael Mattioli (Mattioli) is an adult resident of the State of Wisconsin and was employed with the City of Milwaukee Police Department from 2006 until he resigned in September of 2020. (Baynard Decl. Exh. A – Deposition of Michael Mattioli (hereinafter Mattioli Dep.) 6-7, 27, 63, 138-139, 147; Declaration of Michael Mattioli (hereinafter Mattioli Decl.) at ¶ 1)

    Response: **Undisputed.**

4.  Defendant City of Milwaukee is a Wisconsin municipal corporation whose principal offices are located in Milwaukee, Wisconsin. (ECF 23 ¶ 9)

    Response: **Undisputed.**

5.  This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction over the Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343. (ECF 23 ¶¶ 1-2)

    Response: **Undisputed.**

6.  The Eastern District of Wisconsin is the proper federal venue for this action under 28 U.S.C. § 1391(b) because it is where all acts alleged in the Amended Complaint occurred. (ECF 23 ¶ 3)

    Response: **Undisputed.**

7.  Mattioli met Acevedo at the Northwestern Mutual Building in 2019 while Mattioli was working as a uniformed Milwaukee police officer and while Acevedo was working as a security guard. (Mattioli Dep. at 65-66, 142)

    Response: **Undisputed.**

8.  On the evening of April 18, 2020, Mattioli hosted a bonfire at his home with three friends—Christopher Peters, Andrew Janowski, and Joel Acevedo. (Mattioli Dep. at 64; Baynard

Decl. Exh. C, Excerpts of the Trial Transcript in State of Wisconsin v. Michael A. Mattioli of Andrew Janowski's testimony (hereinafter Janowski Trial Trans.) at 93)

Response: **Undisputed.**

9. The night was uneventful, and the group sat around a bonfire drinking until it got too cold and they moved the gathering inside to the kitchen table. (Mattioli Dep. at 64, 69-70, 154; Baynard Decl. Exh. D – Excerpts of the Trial Transcript in State of Wisconsin v. Michael A. Mattioli of Christopher Peters' testimony (hereinafter Peters Trial Trans.) at 13-16; see also Janowski Trial Trans. at 76:1-9)

Response: **Undisputed.**

10. Mattioli, Peters, Janowski, and Acevedo all four friends consumed alcohol. (Mattioli Dep. at 64)

Response: **Undisputed.**

11. Acevedo and Peters had also used cocaine, but Mattioli was unaware of the drug use as the two did so in secret. (Mattioli Dep. at 64, 69-70, 164-165; Peters Trial Trans. at 12-13; 33: 15-19; see also Janowski Trial Trans. at 74:22-24)

Response: **Undisputed.**

12. At some point in the night, Acevedo asked Peters if he wanted to go in on the purchase of cocaine. (Peters Trial Trans. at 62:14-64:11)

Response: **Undisputed.**

13. Because the group was drinking, Peters, Janowski, and Acevedo all stayed the night at Mattioli's house. (Mattioli Dep. at 71-72, 146)

Response: **Undisputed.**

14. Mattioli went to sleep in his room on the second floor, Janowski went to sleep on the couch in the living room on the main level, and Peters went to sleep in the basement. (Mattioli Dep. at 71; Janowski Trial Trans. at 77; Peters Trial Trans. at 17)

Response: **Undisputed.**

15. In the early morning hours of April 19, 2020, Mattioli awakened in his dark bedroom to Acevedo rummaging through his pants pockets. (Mattioli Dep. at 72)

Response: **Undisputed.**

16. Mattioli believed that Acevedo was trying to rob him. (Mattioli Dep. at 72-73)

Response: **Undisputed.**

17. Mattioli observed Acevedo standing over him, yelling and moving fast. Based on Acevedo's behavior, Mattioli believed that he had not slept. (Mattioli Dep. at 73-73)

Response: **Undisputed.**

18. Acevedo had turned into a completely different person, became super hostile and irate, which was confusing and concerning to Mattioli because a couple of hours earlier, they were all friends having a good time. (Mattioli Dep. at 75; Janowski Trial Trans. at 73:22-24)

Response: **Undisputed.**

19. Based on Acevedo's erratic behavior, Mattioli wanted him out of his house and repeatedly told Acevedo to leave his house as he followed him down the stairs into the living room. (Mattioli Dep. at 75-76; Janowski Trial Trans. at 80:22-24, 100; Peters Trial Trans. at 19)

Response: **Undisputed.**

20. Acevedo turned towards Mattioli in an aggressive manner and squared up like he was going to fight. (Mattioli Dep. at 76-77)

Response: **Undisputed.**

21. Mattioli perceived Acevedo to be a physical threat. (Mattioli Dep. at 78)

Response: **Disputed. Although Mattioli testified that he perceived Joel Acevedo to be a physical threat, the broader record contradicts that characterization. Peters told Officer Roach that Mr. Acevedo was "subdued" by the time police arrived, meaning he was no longer actively fighting (Roach Dep., 25:13–26:5; Exhibit D). Mattioli himself admitted that he remained on top of Acevedo even after Acevedo stopped moving (Mattioli Dep., 100:2–24; Exhibit A). The 911 call captured Mr. Acevedo audibly gasping and struggling (FPC Charges, June 15, 2020, p. 4; Exhibit B). These facts undermine Mattioli's implication that Acevedo was and/or remained a threat when Mattioli used deadly force against him.**

22. Acevedo was a large person, bigger and stockier than Mattioli, and stood at about 6'3" and 270 pounds. (Mattioli Dep. at 76-77; Peters Trial Trans. at 49:22-50:6)

Response: **Undisputed.**

23. The commotion caused Janowski and Peters to wake up. (Mattioli Dep. at 78-79; Peters Trial Trans. at 17:15-18:14; Janowski Trial Trans. at 77:22-78:22)

Response: **Undisputed.**

24. Acevedo refused to leave Mattioli's house. (Mattioli Dep. at 78, Peters Trial Trans. at 19:4-20:17, 42-43, Janowski Trial Trans. at 101:1-2)

Response: **Disputed. The contemporaneous record shows Mr. Acevedo was attempting to leave, not refusing. Witness accounts reflected in the record indicate Mr. Acevedo had nearly left the house and was brought back inside before being pinned (FPC Charges, June 15, 2020, p. 3; Exhibit B). Mattioli admits that on the 911**

**call, Acevedo can be heard stating, "I want to go home." (Mattioli Dep. 89:5-10).**
**When officers arrived, Peters told Officer Roach that Mr. Acevedo was "subdued,"**
**and body-worn-camera evidence shows him face-down with Mattioli straddling his**
**neck—circumstances inconsistent with a refusal to leave (Roach Dep., 25:13–26:5;**
**FPC Charges, June 15, 2020, p. 5; Exhibits B and D).**

25. Peters was scared and described Acevedo as enraged and aggressive. (Peters Trial Trans. at 21-25, 60:2-4)

   Response: **Undisputed.**

26. Acevedo lunged at Mattioli and forcefully struck him in the chest and caused him to step back. (Mattioli Dep. at 78-79, 155; Peters Trial Trans. at 20:18-21:8)

   Response: **Undisputed.**

27. Acevedo then punched Peters in the face so hard that Mattioli heard a crack and saw Peters go backward. (Mattioli Dep. at 79-80, 155; Peters Trial Trans. at 21:23-22:11, 50-51; Janowski Trial Trans. at 102-102)

   Response: **Undisputed.**

28. Acevedo punched Peters in the nose and then again in his right eye. (Peters Trial Trans at 21:23-22:4, 28:19-29:6, 50-51)

   Response: **Undisputed.**

29. Acevedo's assaults on Mattioli and Peters were unprovoked. (Mattioli Dep. at 79- 80, 164; Peters Trial Trans. at 47:5-25, 52; Janowski Trial Trans. at 103:3-11)

   Response: **Undisputed.**

30. Acevedo punched Peters with so much force that he lost his balance and knocked over a glass lamp as he fell to the ground. (Mattioli Dep. at 80)

Response: **Undisputed.**

31. The confrontation occurred in a very small area of Mattioli's living room and moved into the adjoining small kitchen. (Peters Trial Trans. at 62:1-13; Mattioli Dep. at 155)

Response: **Undisputed.**

32. Mattioli got on top of Acevedo and used his body weight to try and keep him on the ground because he knew that as soon as Acevedo got up, he was going to continue to throw punches, and Mattioli wanted to prevent that. (Mattioli Dep. at 80-81, 86)

Response: **Undisputed.**

33. By this point in the confrontation, Mattioli had witnessed Acevedo commit several misdemeanor and felony crimes, including physical assault, robbery with the use of force, theft from a person, and property damage. (Mattioli Dep. at 81:3-83:6)

Response: **Undisputed.**

34. Janowski became involved in the physical fight on the kitchen floor. (Jankowski Trial Trans. at 83)

Response: **Undisputed.**

35. Mattioli, Acevedo, and Jankowski wrestled around a little on the ground in the kitchen as Acevedo was standing up and Mattioli was trying to keep him on the ground. (Mattioli Dep. at 86; Peters Trial Trans. at 23:2-6, 53; Janowski Trial Trans. at 83)

Response: **Disputed. Although Defendant characterizes the encounter as merely "wrestl[ing] around a little … as Acevedo was standing up," the contemporaneous evidence shows Mr. Acevedo was forced prone and kept there under compressive restraint. Mattioli admitted his right arm was across Mr. Acevedo's neck and chin area while using body-weight to keep him down (Mattioli Dep., 92:17–93:3; Exhibit**

**A), and he remained on top even after Mr. Acevedo stopped moving (Mattioli Dep., 100:2–24; Exhibit A). Mattioli admitted to investigators that he squeezed and pressed on Joel Acevedo's neck when he told investigators, "I didn't press hard enough" and "I wasn't squeezing tight enough where he couldn't breathe." (Mattioli Dep., 98:22-24; 111:22-24). Officer Roach observed Mattioli with his stomach on Mr. Acevedo's back and arms around his neck, initially describing the hold as a "rear-naked chokehold" (Roach Dep., 57:16-58:13; 64:22–65:9; Exhibit A). The Fire & Police Commission, relying on body-worn camera, likewise found Mr. Acevedo face-down with Mattioli straddling his neck while Janowski restrained his legs (FPC Charges, June 15, 2020, p. 5; Exhibit B). Peters told Roach that Mr. Acevedo was "subdued" on officers' arrival (Roach Dep., 25:13–26:5; Exhibit D), and the 911 recording captured Mr. Acevedo's audible gasping and struggle on the call (FPC Charges, June 15, 2020, p. 4; Exhibit B).**

36.  At approximately 7:29 a.m., Mattioli called 911, identified himself as an officer, and requested assistance at his home at 4502 W. Cleveland Avenue in Milwaukee. (ECF 23 ¶ 11; Mattioli Dep. at 86)

     Response: **Undisputed.**

37. Mattioli called 911 because he needed help and wanted the Milwaukee Police Department to arrest Acevedo. (Mattioli Dep. at 87)

     Response: **Disputed. The contemporaneous record shows Mattioli was himself effectuating an arrest, not merely waiting for MPD to do so. On the 911 call Mattioli identified himself as a police officer and framed the encounter as an arrest (Mattioli Dep., 86:17–87:3; Exhibit A), having already evaluated Joel Acevedo's conduct as**

felony crimes and deciding to detain him (Mattioli Dep., 81:9–23; 87:4–88:15; 89:25–90:5; Exhibit A). Mattioli admits that other police officers responded to his "request for backup." (Mattioli Answer (Doc. 26) at ¶ 14). Mattioli admits that he did not lie to criminal investigators or when he testified at his criminal trial, when he admitted that he used force against Joel Acevedo during the performance of an arrest. (Mattioli Dep., Exhibit A, at pp. 87:4 to 87:9; 89:25 to 90:21). When officers entered, Mattioli was still physically restraining Mr. Acevedo, took his arms behind his back "as if … to put handcuffs on him," and directed, "Cuff this guy" (Roach Dep., 64:6–21; Exhibit D). Officer Roach immediately asked, "Who is the officer?" and Mattioli replied, "I am," while continuing the restraint (Taylor Expert Report, ¶8, p. 4; Exhibit F). MPD policy defines arrest as taking a person into custody so their liberty is under the arrester's control—no formal declaration is required (SOP 220.10(A)). Mattioli also acknowledged using restraint techniques he learned and employed as a MPD police officer (Mattioli Dep., 92:17–93:3; Exhibit A). These facts demonstrate Mattioli was invoking and exercising police authority to arrest Mr. Acevedo under color of law, not simply requesting that MPD do so.

38. Acevedo kept fighting and knocked the phone out of Mattioli's hand. Peters picked up the phone and told the dispatcher that Acevedo was attacking them and to please come as soon as possible. (Peters Trial Trans. at 24:18-25:5-12, 58:11-25)

Response: **Disputed. Although Peters told the dispatcher that Mr. Acevedo was "attacking" and to come quickly, the contemporaneous evidence shows a different picture. The 911 call captures Mr. Acevedo audibly gasping and struggling (FPC Charges, June 15, 2020, p. 4; Exhibit B). By the time officers arrived, Peters told**

**Officer Roach that Mr. Acevedo was "subdued," and body-worn camera shows Mr. Acevedo face-down with Mattioli straddling his neck while Janowski restrained his legs (Roach Dep., 25:13–26:5; FPC Charges, June 15, 2020, p. 5; Exhibits B and D). Mattioli remained on top even after Mr. Acevedo stopped moving and, when asked if Mr. Acevedo was breathing, answered, "I don't know. Handcuff him," further evidencing control—not an ongoing fight (Mattioli Dep., 103:5–10; Exhibit A). Witness accounts also reflect that Mr. Acevedo had nearly left the house and was brought back inside before he was pinned (FPC Charges, June 15, 2020, p. 3; Exhibit B).**

39. Acevedo's behavior and continued resistance posed a danger to Mattioli and others in the house. (Mattioli Dep. at 78, 82-83, 101-102)

    Response: **Disputed. Although Mattioli testified that Mr. Acevedo's behavior posed a danger, the contemporaneous record shows that any threat had abated. Peters told Officer Roach that Mr. Acevedo was "subdued" when police arrived (Roach Dep., 25:13–26:5; 25:13–26:5; Exhibit D), and Roach acknowledged that a subdued person's breathing can be impeded by continued pressure (Roach Dep., 36:16–18; Exhibit D). Mattioli admitted he remained on top of Mr. Acevedo even after Mr. Acevedo stopped moving (Mattioli Dep., 100:2–24; Exhibit A) and, when asked if Mr. Acevedo was breathing, answered, "I don't know. Handcuff him," demonstrating no assessment of a continuing danger (Mattioli Dep., 103:5–10; Exhibit A). The 911 recording captures Mr. Acevedo audibly gasping and struggle on the call (FPC Charges, June 15, 2020, p. 4; Exhibit B), while body-worn-camera evidence reflected in the FPC charging document shows him face-down with Mattioli straddling his neck**

**in a rear-naked-choke posture and Janowski restraining his legs—circumstances consistent with control, not ongoing danger (FPC Charges, June 15, 2020, p. 5; Exhibit B).**

40. After wrestling for several minutes, Mattioli and Acevedo were on the ground in a position with Acevedo was on his stomach and Mattioli was on top of him with his knees anchored on the ground, essentially straddling Acevedo. (Mattioli Dep. at 95-96)

Response: **Disputed. Mattioli disputes himself wherein at paragraph 35 herein, he states, "wrestled around a little" as opposed to "several minutes." Mattioli's description of his restraint technique does not accurately describe the technique. Mattioli admitted his right arm was across Mr. Acevedo's neck and chin area while using body-weight to keep him down (Mattioli Dep., 92:17–93:3; Exhibit A), and he remained on top even after Mr. Acevedo stopped moving (Mattioli Dep., 100:2–24; Exhibit A). Mattioli admitted to investigators that he squeezed and pressed on Joel Acevedo's neck when he told investigators, "I didn't press hard enough" and "I wasn't squeezing tight enough where he couldn't breathe." (Mattioli Dep., 98:22-24; 111:22-24). Officer Roach observed Mattioli with his stomach on Mr. Acevedo's back and arms around his neck, initially describing the hold as a "rear-naked chokehold" (Roach Dep., 57:16-58:13; 64:22–65:9; Exhibit A). The Fire & Police Commission, relying on body-worn camera, likewise found Mr. Acevedo face-down with Mattioli straddling his neck while Janowski restrained his legs (FPC Charges, June 15, 2020, p. 5; Exhibit B). Peters told Roach that Mr. Acevedo was "subdued" on officers' arrival (Roach Dep., 25:13–26:5; Exhibit D), and the 911 recording captured Mr.**

**Acevedo's audible gasping and struggle on the call (FPC Charges, June 15, 2020, p. 4; Exhibit B).**

41. Janowski laid across Acevedo's legs because of Acevedo's size and because he did not want Acevedo to cause any further harm to anyone. (Mattioli Dep. at 92; Jankowski Trial Trans. at 83, 106; Peters Trial Trans. at 24:23-25:)

    Response: **Undisputed.**

42. Mattioli's upper body was lying on top of Acevedo's upper body, and Mattioli's right arm was under Acevedo's chin/neck area. (Mattioli Dep. at 95-97, 99)

    Response: **Undisputed.**

43. Acevedo was trying to push off the ground, and Mattioli was trying to push him back down. (Mattioli Dep. at 97; Peters Trial Trans. at 56:19-57:6; Janowski Trial Trans. at 85- 86)

    Response: **Undisputed.**

44. Mattioli and Janowski were trying to get Acevedo under control, and Acevedo was angry and flailing and yelling. (Peters Trial Trans. at 55:7-18; Janowski Trial Trans. at 86:4-8)

    Response: **Disputed. It is disputed that Mattioli and Janowski were trying to get Acevedo "under control" in the context of behavior. Rather, the record is clear that Mattioli was trying to arrest Acevedo who was trying to leave. Mattioli admits that on the 911 call, Acevedo can be heard stating, "I want to go home." (Mattioli Dep. 89:5-10). Mattioli admits that he did not let Acevedo go home. (Mattioli Dep. 89:11-14).**

45. Mattioli did not put his entire body weight on Acevedo because he had weight on his elbow and arm, and his knees were on the ground. (Mattioli Dep. 107, 110-111)

Response: **Disputed. Although Mattioli testified that he did not place his entire body weight on Mr. Acevedo because his knees were on the ground and weight was on his elbow/arm, the broader record demonstrates compressive, torso-and-neck pressure. Mattioli admitted his right arm was positioned across Mr. Acevedo's neck and chin area while using body weight to keep him down (Mattioli Dep., 95:21–97:10; Exhibit A). Officer Roach observed Mattioli with his stomach on Mr. Acevedo's back, arms around the neck, and described the hold as a "rear-naked chokehold," using his complete body weight (Roach Dep., 57:16-58:13; 64:22–65:9; 66:10–16; Exhibit D). The Milwaukee Fire & Police Commission, relying on body-worn camera, likewise found Mr. Acevedo face-down with Mattioli straddling his neck in a rear-naked-choke posture while Janowski restrained his legs (FPC Charges, June 15, 2020, p. 5; Exhibit B), and the 911 recording captured Mr. Acevedo's audible gasping and struggle on the call (FPC Charges, June 15, 2020, p. 4; Exhibit B).**

46. At some point, Acevedo stopped struggling and started to calm down. Mattioli was exhausted, and it appeared to him that Acevedo was exhausted too. (Mattioli Dep. at 99, 104:24- 105:9, 162)

Response: **Disputed. Although Mattioli claims that Mr. Acevedo "stopped struggling" and both men were merely "exhausted," the contemporaneous record disputes this claim. Mattioli knew that Acevedo stopped moving as a result of the compressive restraint that he used on Acevedo (as opposed to because of exhaustion). Mattioli admitted he remained on top of Mr. Acevedo even after Mr. Acevedo stopped moving (Mattioli Dep., 100:2–24; Exhibit A) and, when asked if Mr. Acevedo was breathing, replied, "I don't know. Handcuff him," evidencing no assessment of his condition**

**(Mattioli Dep., 103:5–10; Exhibit A). The 911 audio captures Mr. Acevedo audibly gasping and struggling (FPC Charges, June 15, 2020, p. 4; Exhibit B). Officer Roach cautioned Mattioli about his arms around the neck; when Mattioli moved back, Roach observed no response from Mr. Acevedo (Roach Dep., 59:8-60:18; Exhibit D). Peters told Roach that Mr. Acevedo was "subdued" upon officers' arrival, and Roach acknowledged a subdued person's breathing can be impeded by continued pressure (Roach Dep., 25:13–26:5; 36:16–18; Exhibit D). Body-worn-camera evidence summarized by the FPC shows Mr. Acevedo face-down with Mattioli straddling his neck while Janowski restrained his legs (FPC Charges, June 15, 2020, p. 5; Exhibit B). These facts contradict the implication of benign de-escalation due to mutual exhaustion.**

47. Once Acevedo stopped struggling, Mattioli checked and saw Acevedo was breathing and thought everything was okay. Mattioli felt relief because he believed that Acevedo had stopped fighting and knew that police would be there any minute to help him. (Mattioli Dep. at 106-107)

    Response: **Disputed. The claim that Mattioli "checked," confirmed Mr. Acevedo was breathing, and thought "everything was okay" is contradicted by the record. The 911 recording captures Mr. Acevedo audibly gasping and struggling (FPC Charges, June 15, 2020, p. 4; Exhibit B). Officer Roach observed Mattioli still in the restraint position described by Mattioli – with his stomach on Mr. Acevedo's back, arms around the neck – and described the hold as a "rear-naked chokehold," using his complete body weight (Roach Dep., 57:16-58:13; 64:22–65:9; 66:10–16; Exhibit D). When asked if Mr. Acevedo was breathing, Mattioli replied, "I don't know. Handcuff**

him." (Mattioli Dep., 103:5–10; Exhibit A). After Officer Roach cautioned Mattioli about his arms around Mr. Acevedo's neck, Mattioli moved back and Roach observed no response from Mr. Acevedo (Roach Dep., 59:8-60:18; Exhibit D). Mattioli also admitted he remained on top of Mr. Acevedo even after Mr. Acevedo stopped moving (Mattioli Dep., 100:2–24; Exhibit A), and had to be commanded multiple times— ultimately being physically pulled off—by responding officers ((FPC Charges, June 15, 2020, p. 4; Exhibit B). These facts are inconsistent with any reasonable conclusion that "everything was okay."

48. Mattioli stayed on top of Acevedo with his knees and elbows on the ground, and Janowski stayed on the back of Acevedo's legs until the police arrived. (Mattioli Dep. at 88, 89, 94, 100, 121; Janowski Trial Trans. at 86:21-87)

Response: **Disputed. Although Mattioli and Janowski claim his "knees and elbows were on the ground" while Janowski held the legs, the broader record shows compressive torso-and-neck restraint. Mattioli admitted his right arm was positioned across Mr. Acevedo's neck and chin area while using body weight to keep him down (Mattioli Dep., 95:21–97:10; Exhibit A). Officer Roach observed Mattioli with his stomach on Mr. Acevedo's back, arms around the neck, and described the hold as a "rear-naked chokehold," indicating substantial weight on the upper torso (Roach Dep., 57:16-58:13; 64:22–65:9; 66:10–16; Exhibit D). The Milwaukee Fire & Police Commission, relying on body-worn camera, likewise found Mr. Acevedo face-down with Mattioli straddling his neck in a rear-naked-choke posture while Janowski restrained his legs (FPC Charges, June 15, 2020, p. 5; Exhibit B). These facts**

**contradict any suggestion that Mattioli avoided placing significant body-weight on Mr. Acevedo's upper torso and neck.**

49. At approximately 7:38 a.m., Milwaukee Police Officer Defendant Roach and his partner arrived and made contact with Peters in the front yard of Mattioli's residence. (ECF 23 ¶ 14; Baynard Decl. Exh. B – Deposition of Robert Roach (hereinafter Roach Dep.) at 25; Peters Trial Trans. at 26-27)

Response: **Undisputed.**

50. Mattioli still thought Acevedo was a threat and told the MPD officers multiple times to handcuff Acevedo. (Mattioli Dep. at 101; Baynard Decl. Exh. E – Excerpts of the Trial Transcript in State of Wisconsin v. Michael A. Mattioli of Robert Roach's testimony (hereinafter Roach Trial Trans.) at 19:19-22)

Response: **Disputed. While Mattioli told responding officers to "Cuff this guy" and took Mr. Acevedo's arms behind his back "as if … to put handcuffs on him" (Roach Dep., 64:6–21; Exhibit D), the record does not support his assertion that he "still thought Acevedo was a threat." Peters told Officer Roach that Mr. Acevedo was "subdued" when police arrived (Roach Dep., 25:13–26:5; 25:13–26:5; Exhibit D). Mattioli admitted he remained on top even after Mr. Acevedo stopped moving, and when asked if Mr. Acevedo was breathing he responded, "I don't know. Handcuff him." (Mattioli Dep., 100:2–24; 103:5–10; Exhibit A). Roach cautioned Mattioli about his arms around the neck, and upon Mattioli moving back, Roach observed no response (Roach Dep., 59:8-60:18; Exhibit D). Body-worn-camera evidence summarized by the FPC shows Mr. Acevedo face-down with Mattioli straddling his neck while Janowski restrained his legs, and officers ultimately had to physically pull**

**Mattioli off (FPC Charges, June 15, 2020, p. 4-5; Exhibit B). These facts undermine any claim of a perceived continuing threat and instead show Mattioli asserting police authority and directing an arrest under color of law.**

51. Mattioli and Janowski got off Acevedo and took a step back. At that time, Officer Roach checked Acevedo for a pulse and started CPR. (Roach Dep. at 83-84)

    Response: **Undisputed.**

52. Mattioli was in disbelief and did not know that Acevedo had stopped breathing and did not observe Acevedo in any respiratory distress during the altercation. If he had, he would have changed the situation. (Mattioli Dep. at 98:9-12, 101-102, 104, 107)

    Response: **Disputed. Although Mattioli claims he did not observe respiratory distress and would have "changed the situation" had he known, the record shows otherwise. The 911 call captured Mr. Acevedo audibly gasping and pleading to be let go and to go home during the restraint (FPC Charges, June 15, 2020, p. 4; Exhibit B). When asked whether Mr. Acevedo was breathing, Mattioli responded, "I don't know. Handcuff him," evidencing no assessment of breathing (Mattioli Dep., 103:5–10; Exhibit A). After Officer Roach cautioned Mattioli about his arms around Mr. Acevedo's neck, Mattioli moved back and Roach observed no response from Mr. Acevedo (Roach Dep., 59:8-60:18). Mattioli admitted he remained on top even after Mr. Acevedo stopped moving (Mattioli Dep., 100:2–24; Exhibit A), and had to be commanded multiple times and ultimately pulled off by responding officers (FPC Charges, June 15, 2020, p. 4; Exhibit B). The Medical Examiner determined the cause of death was anoxic encephalopathy due to traumatic asphyxia, consistent with respiratory compromise during restraint (Autopsy Protocol, p. 1; Exhibit E).**

53. Mattioli did not recall any statements Acevedo made while they were wrestling on the ground and did not recall Acevedo saying anything like "let me go home." (Mattioli Dep. at 159; Janowski Trial Trans. at 86:15-16)

Response: **Disputed. Although Mattioli and Janowski claim they do not recall any statements by Mr. Acevedo, the contemporaneous 911 recording captures audible gasping/struggle and clear signs of distress during the restraint (FPC Charges, June 15, 2020, p. 4; Exhibit B). Moreover, Mattioli admits that on the 911 call, Acevedo can be heard stating, "I want to go home." (Mattioli Dep. 89:5-10).**

54. Mattioli did not observe Acevedo to be suffering from any medical emergency during their altercation. (Mattioli Dep. at 91)

Response: **Disputed. Although Mattioli claims he observed no medical emergency, the contemporaneous evidence shows otherwise. The 911 recording captures audible gasping and struggling and clear signs of distress during the restraint (FPC Charges, June 15, 2020, p. 4; Exhibit B). When asked whether Mr. Acevedo was breathing, Mattioli replied, "I don't know. Handcuff him," reflecting no assessment of breathing (Mattioli Dep., 103:5–10; Exhibit A). After Officer Roach cautioned Mattioli about his arms around Mr. Acevedo's neck, Mattioli moved back and Roach observed no response from Mr. Acevedo (Roach Dep., 59:8-60:18; Exhibit D). Mattioli admitted he remained on top even after Mr. Acevedo stopped moving (Mattioli Dep., 100:2–24; Exhibit A). These facts contradict the assertion that there were no indications of a medical emergency.**

55. As a police officer making an arrest, Mattioli has held people on the ground until he could get them into handcuffs in front of other MPD officers and supervisors. No one has ever

told Mattioli that it was dangerous or excessive force to use his body weight to hold someone on the ground. No one has ever died. (Mattioli Dep. at 93-94, 154, 161)

Response: **Undisputed.**

56. On April 18 and 19, 2020, Mattioli was employed as a Milwaukee Police Department Officer and in good standing but was off duty at all times during his interaction with Acevedo. (Mattioli Dep. at 63)

Response: **Disputed as stated. It is undisputed that on April 18 and 19, 2020, Mattioli was employed as a Milwaukee Police Department Officer in good standing and was off duty when the incident began with Acevedo. However, it cannot be credibly disputed that Mattioli acted under color of law and in the scope of his employment when he used deadly force against Acevedo during the performance of an arrest.**

57. Acevedo's medical history demonstrates a compromised respiratory system, chronically asthmatic lungs, exacerbated by an immunoglobulin deficiency, severe pulmonary insufficiency, and obesity. (Baynard Decl. Exh. F – Excerpts of the Trial Transcript in State of Wisconsin v. Michael A. Mattioli, including Dr. Jeffrey Jentzen's testimony (hereinafter Jentzen's Trial Trans.) at 59, 86, 92)

Response: **Undisputed. However, the official cause of death was "anoxic encephalopathy due to traumatic asphyxia," consistent with compressive restraint—not underlying disease (Autopsy Protocol, p. 1; Exhibit E).**

58. Acevedo smoked cigarettes. (Peters Trial Trans at 33)

Response: **Undisputed.**

59. At the time of the incident, Mattioli was unaware of Acevedo's health history with his lungs and asthma. (Mattioli Dep. at 97, 162)

Response: **Undisputed.**

60. Acevedo had a post-mortem urine sample collected on April 19, 2020, at approximately 11:32 am, which tested positive for cocaine and ethanol. (Baynard Decl. Exh. F – Excerpts of the Trial Transcript in State of Wisconsin v. Michael A. Mattioli, including Dr. Jimmie Valentine's testimony (hereinafter Valentine's Trial Trans.) at 4, 9, 12:24-13:18)

Response: **Undisputed.**

61. Acevedo's BAC at 11:32 am (approximately 3 hours after the incident) was estimated at .2. (Valentine Trial Trans at 13)

Response: **Undisputed.**

62. As a result of Acevedo's death, Mattioli was charged with first-degree reckless homicide. The matter proceeded to trial in November of 2023 and resulted in a not guilty verdict in favor of Mattioli. 1 (Mattioli Dep. at 134)

Response: **Undisputed.**

63. The Estate failed to serve a written Notice of Circumstances upon Mattioli and his employer within 120 days of the event. (ECF 32 at 33 ¶¶3-4; Mattioli Decl. ¶ 2)

Response: **Undisputed.**

64. Mattioli did not intend to hurt or kill Acevedo. (Mattioli Dep. at 85, 166)

Response: **Disputed. Mattioli's after-the-fact statement about his intent is contradicted by the objective record. The 911 recording captures audible gasping and struggling and clear signs of distress during the restraint (FPC Charges, June 15, 2020, p. 4; Exhibit B). He straddled Mr. Acevedo and applied body-weight with his right arm across the neck and chin area (Mattioli Dep., 95:21–97;95:21–97:10; Exhibit A); Officer Roach observed Mattioli's stomach on Acevedo's back with arms**

**around the neck and initially described a "rear-naked chokehold" (Roach Dep., 57:16-58:13; 64:22–65:9; Exhibit D), and body-worn-camera evidence summarized by the FPC shows Mr. Acevedo face-down with Mattioli straddling his neck while Janowski restrained the legs (FPC Charges, June 15, 2020, p. 5; Exhibit B). Mattioli remained on top even after Mr. Acevedo stopped moving, and when asked if Mr. Acevedo was breathing he replied, "I don't know. Handcuff him." (Mattioli Dep., 103:5–10; Exhibit A). The Medical Examiner found death was anoxic encephalopathy due to traumatic asphyxia, consistent with compressive restraint (Autopsy Protocol, p. 1; Exhibit E). These contemporaneous facts undercut his claimed lack of intent and, at minimum, create a triable issue as to the reasonableness of his force and causation.**

65. Mattioli did punch, push, kick, or strike Acevedo. (Mattioli Dep. at 79, 163; Peters Trial Trans. at 54:12-20; Janowski Trial Trans. at 102:1-5)

Response: **Undisputed.**

66. Mattioli had access to his firearm but did not use it against Acevedo during the altercation. (Mattioli Dep. at 83, 163)

Response: **Undisputed.**

67. Mattioli acted in self-defense, and his only intent was to restrain Acevedo until help came to prevent further injury to himself and others. (Mattioli Dep. at 166)

Response: **Disputed. Although Mattioli claims he acted only in self-defense to prevent injury until help arrived, the contemporaneous evidence shows his force exceeded any self-defense purportedly needed and was used during the performance of an arrest. Mattioli admits that he did not lie to criminal investigators or when he testified at his**

criminal trial, when he admitted that he used force against Joel Acevedo during the performance of an arrest. (Mattioli Dep., Exhibit A, at pp. 87:4 to 87:9; 89:25 to 90:21). Peters told Officer Roach that Mr. Acevedo was "subdued" when police arrived (Roach Dep., 25:13–26:5; Exhibit D). Mattioli admitted he remained on top even after Mr. Acevedo stopped moving and, when asked if Mr. Acevedo was breathing, replied, "I don't know. Handcuff him." (Mattioli Dep., 103:5–10; Exhibit A). 911 recording captures audible gasping and struggle and pleas to be released (FPC Charges, June 15, 2020, p. 4; Exhibit B). Officer Roach observed Mattioli's arms around Mr. Acevedo's neck and initially described a "rear-naked chokehold," and body-worn-camera evidence summarized by the FPC shows Mr. Acevedo face-down with Mattioli straddling his neck while Janowski restrained his legs (Roach Dep., 57:16-58:13; 64:22–65:9; Exhibit D). Officers had to command Mattioli multiple times and ultimately pull him off (FPC Charges, June 15, 2020, p. 4; Exhibit B). MPD policy requires only necessary force and prompt medical aid after force when needed (MPD SOP 460.15; 460.40; Exhibit J). Officer Michael Mattioli's application of a choke hold and failure to move Mr. Acevedo from a prone position once under control, and provide medical aid fell below the standard of care for a properly trained officer and were substantial factors in Joel Acevedo's death. (Taylor Expert Report, ¶ 43, p. 9; Exhibit F)

68. Acevedo was the aggressor in the confrontation. (Janowski Trial Trans. at 108:17- 24)

Response: **Disputed. Although Janowski characterized Mr. Acevedo as the aggressor, the contemporaneous record shows Mr. Acevedo was attempting to leave and was restrained. The 911 call captures audible gasping and struggle of Mr. Acevedo (FPC**

**Charges, June 15, 2020, p. 4; Exhibit B). Mattioli admits that on the 911 call, Acevedo can be heard stating, "I want to go home." (Mattioli Dep. 89:5-10). Witness accounts reflect that Mr. Acevedo had nearly left the house and was brought back inside before being pinned (FPC Charges, June 15, 2020, p. 3; Exhibit B). When officers arrived, Peters told Officer Roach that Mr. Acevedo was "subdued," meaning no longer actively fighting (Roach Dep., 25:13–26:5; Exhibit D). Body-worn-camera evidence summarized by the FPC shows Mr. Acevedo face-down with Mattioli straddling his neck while Janowski restrained his legs—circumstances consistent with control of a subdued person, not an aggressor (FPC Charges, June 15, 2020, p. 5; Exhibit B).**

69. Roach entered the home and observed Mattioli "stacked" on top of Acevedo in what he described as a "rear naked choke hold." However, Roach conceded in his deposition and criminal trial testimony that "there was not a way for me to tell if there was actually pressure on the neck." (Roach Trial Trans. at 9:8-24, 13:4-16, 25:19-22)

     Response: **Undisputed.**

70. Mattioli did not place Acevedo in a rear-naked choke hold. (Mattioli Dep. at 115, 164)

     Response: **Disputed. Although Mattioli denies using a rear-naked choke, the contemporaneous record shows a neck restraint consistent with that description. Mattioli admitted his right arm was positioned across Mr. Acevedo's neck and chin area while applying body-weight to keep him down (Mattioli Dep., 95:21–97:10; Exhibit A). Mattioli admitted to investigators that he squeezed and pressed on Joel Acevedo's neck when he told investigators, "I didn't press hard enough" and "I wasn't squeezing tight enough where he couldn't breathe." (Mattioli Dep., 98:22-24; 111:22-24). Officer Roach observed Mattioli's arms around Mr. Acevedo's neck with**

his stomach on Mr. Acevedo's back and initially described the restraint as a "rear-naked chokehold" (Roach Dep., 64:22–65:9; Exhibit D). After Roach cautioned Mattioli about his arms being around the neck, Mattioli moved back and Roach observed no response from Mr. Acevedo (Roach Dep., 59:8-60:18; Exhibit D). The Milwaukee Fire & Police Commission, relying on body-worn camera, likewise found Mr. Acevedo face-down with Mattioli straddling his neck in a rear-naked-choke posture while Janowski restrained his legs (FPC Charges, June 15, 2020, p. 5; Exhibit B).

71. Mattioli did not choke or apply pressure to Acevedo's neck, nor did he strangle or suffocate Acevedo. (Mattioli Dep. at 99,107-108, 110-111, 154:10-12)

Response: **Disputed. Although Mattioli denies choking or applying pressure to Mr. Acevedo's neck, the record shows otherwise. The 911 recording capturing audible gasping and struggle further contradicts the assertion that no neck pressure or suffocation occurred (FPC Charges, June 15, 2020, p. 4; Exhibit B). Mattioli admitted his right arm was positioned across Mr. Acevedo's neck and chin area while using body-weight to keep him down (Mattioli Dep., 95:21–97:10; Exhibit A). Mattioli admitted to investigators that he squeezed and pressed on Joel Acevedo's neck when he told investigators, "I didn't press hard enough" and "I wasn't squeezing tight enough where he couldn't breathe." (Mattioli Dep., 98:22-24; 111:22-24). Officer Roach observed Mattioli with his stomach on Mr. Acevedo's back and arms around the neck, initially describing the restraint as a "rear-naked chokehold" (Roach Dep., 57:16-58:13; 64:22–65:9; Exhibit D); after Roach cautioned him about his arms being around the neck, Mattioli moved back and Roach observed no response from Mr.**

**Acevedo (Roach Dep., 59:8-60:18; Exhibit D). The Fire & Police Commission, relying on body-worn camera, likewise found Mr. Acevedo face-down with Mattioli straddling his neck in a rear-naked-choke posture while Janowski restrained the legs (FPC Charges, June 15, 2020, p. 5; Exhibit B). The Medical Examiner determined the cause of death was anoxic encephalopathy due to traumatic asphyxia (Autopsy Protocol, p. 1; Exhibit E), and Plaintiff's expert opined that Mattioli placed Mr. Acevedo in a chokehold and that the neck/prone, body-weight restraint was a substantial factor in his death (Taylor Expert Report, ¶ 43, p. 9; Exhibit F).**

72. Mattioli did not have access to handcuffs at the time of the incident. (Mattioli Dep. at 87)

Response: **Undisputed.**

## **PLAINTIFF'S PROPOSED FINDINGS OF FACT (PPFOF)**

1. Mattioli physically restrained Joel Acevedo by straddling him on the floor and pressing his upper body down against Acevedo's back, neck, and head area. (Mattioli Dep., 95:21–97:10; Exhibit A).

2. Mattioli admitted that his right arm was positioned across Acevedo's "neck and chin area" while using his body weight to push downward and prevent Acevedo from rising. (Mattioli Dep., 95:21–97:10; Exhibit A).

3. Mattioli admitted that after Joel Acevedo fell to the ground, he got on top of him and used his bodyweight to keep him down, expressly stating that his "goal" was to prevent Acevedo from getting back up and continuing to throw punches. (Mattioli Dep., 80:22–81:2; Exhibit A).

4. While restraining Acevedo, Mattioli acknowledged that he was evaluating Acevedo's conduct in terms of "crimes," testifying that he believed Acevedo had committed robbery with use of force, theft from person, and property damage, all felony-level offenses, and that this belief was "going through [his] head at the time." (Mattioli Dep., 81:9–23; Exhibit A).

5. After Acevedo fell, Mattioli got on top of him to prevent him from rising and "keep[ing] punching people." He admitted he used his body weight to restrain Acevedo on the ground. (Mattioli Dep., 86:9–15; Exhibit A).

6. Mattioli called 911, during which he identified himself by telling the dispatcher, "I'm an off-duty police officer and I need help at my house." (Mattioli Dep., 86:17–87:3; Exhibit A).

7. Mattioli acknowledged that during his criminal trial testimony, he admitted he was "in a way" performing an arrest, explaining that he "detained [Acevedo] until the police got there" because he wanted Acevedo arrested. (Mattioli Dep., 87:4–88:15; Exhibit A).

8. Mattioli admitted that when questioned by the prosecutor, he acknowledged he was "in a way" performing an arrest and specifically did not deny making an arrest. (Mattioli Dep., 89:25–90:5; Exhibit A).

9. Mattioli admitted that when questioned by the prosecutor, he acknowledged he was "in a way" performing an arrest and specifically did not deny making an arrest. (Mattioli Dep., 89:25–90:5; Exhibit A).

10. Mattioli acknowledged that, as a police officer, he has the legal privilege to use objectively reasonable force to effectuate an arrest. (Mattioli Dep., 90:22–91:1; Exhibit A).

11. Mattioli admitted that he used force against Joel Acevedo in effecting an arrest. (Mattioli Dep., 91:2–4; Exhibit A).

12. Mattioli admitted that the restraint technique he used on Joel Acevedo, holding him on the ground with his bodyweight, was a method he learned from his police experience. (Mattioli Dep., 92:17–93:3; Exhibit A).

13. Mattioli admitted that restraining a person on their stomach by using his bodyweight was a tactic he had employed before as a police officer. (Mattioli Dep., 93:4–10; Exhibit A).

14. Mattioli confirmed that he had used this restraint technique while on duty in front of other police officers, and no officer ever told him the tactic was dangerous or constituted excessive force. (Mattioli Dep., 93:11–20; Exhibit A).

15. Mattioli admitted that after Joel Acevedo stopped moving, he continued restraining him by staying on top with his knees and elbows on the ground until police arrived. (Mattioli Dep., 100:2–24; Exhibit A).

16. When asked whether Joel Acevedo was breathing before Mattioli got up, Mattioli admitted he responded, "I don't know. Handcuff him," explaining that he assumed Acevedo was fine. (Mattioli Dep., 103:5–10; Exhibit A).

17. Mattioli admitted to investigators that he squeezed and pressed on Joel Acevedo's neck when he told investigators, "I didn't press hard enough" and "I wasn't squeezing tight enough where he couldn't breathe." (Mattioli Dep., 98:22-24; 111:22-24; Exhibit A).

18. Mattioli admitted that the arrest of Joel Acevedo could have been for a state crime or a local ordinance violation. (Mattioli Dep., 124:10–16; Exhibit A).

19. Mattioli further testified that when performing arrests as a police officer, he does so "on behalf of the police department," and specifically identified the Milwaukee Police Department as the department he represents. (Mattioli Dep., 124:17–125:5; Exhibit A).

20. During the struggle with Joel Acevedo, Mattioli was wearing jeans and a memorial "Officer Matthew Rittner" T-shirt displaying an MPD badge insignia over the left chest and a tactical enforcement design on the back; he had no shoes and was wearing socks. Mattioli agreed it was possible that, seeing the T-shirt, Joel would perceive he was a police officer. (Mattioli Dep., 68:10–69:6; Exhibit A).

21. Mattioli admitted that he identified himself as a police officer during the 911 call. (Mattioli's RFA Response No. 4; Exhibit C).

22. Mattioli admitted that when the responding police officers, including Officer Robert Roach, arrived at his home, he was physically restraining Joel Acevedo inside the residence. (Mattioli's RFA Resp. No. 10; Exhibit C).

23. The Fire and Police Commission's (FPC) assumption of the investigation into Officer Michael Mattioli's conduct was the first time the Commission had ever stepped in to take over an internal investigation from the Milwaukee Police Department. Aldrete further stated that the takeover of the Mattioli investigation was a "very unique" action by the FPC. (Aldrete Dep., 24:22–25:13; Exhibit H).

24. During the investigation into Officer Mattioli, Aldrete reviewed his personnel file and observed prior internal affairs investigations and past discipline. Aldrete confirmed that one such discipline involved Mattioli's reckless firing of a firearm while off duty in an incident involving a neighbor. (Aldrete Dep., 40:6–41:3; Exhibit H).

25. The conclusion of the Fire and Police Commission's investigation into Officer Michael Mattioli was that he should be removed from the department and fired. (Aldrete Dep., 45:11–16; Exhibit H).

26. In order to violate an SOP policy such as Rule No. 3, there must be a perceived violation of departmental policy by a member of the fire or police department acting on duty. (Aldrete Dep., 128:13–25; Exhibit H).

27. Before charges could be issued by the Fire and Police Commission, a fact investigation had to be performed, and at its conclusion the commissioners reviewed the evidence and determined which charges they felt comfortable issuing. (Aldrete Dep., 129:8–22; Exhibit H).

28. A physical altercation involving an officer is ordinarily classified as a Priority One call, the most urgent police response, which may involve the threat of loss of life. (Roach Dep., 24:8–22; Exhibit D).

29. Upon arrival at Mattioli's residence, Officer Robert Roach first encountered a male in a blue shirt with a cut under his eye, whom he accepted as Chris Peters, and, after asking initial questions to ascertain the situation (including where everyone was), Peters informed Roach that "Joel was subdued" inside the residence. (Roach Dep., 25:13–26:5; Exhibit D).

30. A subject who is "subdued" is no longer fighting, but the term "subdued" indicates that force is being used in the form of restraint. (Roach Dep., 25:13–26:5; Exhibit D).

31. A person who is "subdued" could have their ability to breathe impeded. (Roach Dep., 36:16–18; Exhibit D).

32. Upon opening the door to Mattioli's residence, Officer Robert Roach immediately observed Michael Mattioli on top of Joel Acevedo, exerting force by holding him down.

Roach acknowledged that at that moment he did not issue a command for the two individuals to separate, despite agreeing that in a physical altercation one of the most minimal uses of force available to an officer is to give a verbal command. (Roach Dep., 43:11–44:9; Exhibit D).

33. Use of force must be proportionate to the type of force or restraint an individual is posing. (Roach Dep., 53:17–21; Exhibit D).

34. Officer Roach received use-of-force training with the Milwaukee Police Department and the training included understanding the dangers of neck restraints; and that the use of neck restraints can constitute deadly force because it can lead to death. (Roach Dep., 56:5–19; Exhibit D).

35. Officer Roach walked up to where Mattioli and Joel Acevedo were positioned and observed Mattioli on his knees straddling Acevedo, with his body over Acevedo specifically, Mattioli's stomach on Acevedo's back. (Roach Dep., 57:16-58:13; Exhibit D).

36. Officer Robert Roach testified that use of force around the neck is improper; upon witnessing Mr. Mattioli's arms around Mr. Acevedo's neck, Roach stated, "I want to make sure that your arms aren't around his neck," explaining he asked to clarify and accurately describe the conduct for a superior or report. Roach recalled that Mattioli responded with "Oh" and then moved back, after which Roach observed no response from Mr. Acevedo. (Roach Dep., 59:8-60:18; Exhibit D).

37. Michael Mattioli took Joel Acevedo's arms behind his back "as if … to put handcuffs on him," and though Mattioli did not have cuffs he told the responding officers, "Cuff this guy," which Roach understood to mean effectuate an arrest or, at minimum, detain Acevedo in handcuffs. (Roach Dep., 64:6–21; Exhibit D).

38. A rear-naked chokehold is when one arm is placed around the front of someone's neck, the other arm is held onto to create a fulcrum, and pressure is applied. During the questioning by investigators following the April 19, 2020 incident involving Officer Mattioli and Joel Acevedo, Officer Roach stated that he believed that is what he had observed. (Roach Dep., 64:22–65:9; Exhibit D).

39. Mattioli's right arm was positioned underneath Joel and around Joel's neck, and that Mattioli appeared to have his full bodyweight on Joel's upper body. (Roach Dep., 66:10–16; Exhibit D).

40. Before engaging with anyone, Officer Robert Roach asked, "Who is the officer?" (Roach Dep., 46:8–11; Exhibit D).

41. On scene, Officer Robert Roach instructed Michael Mattioli to "get up" and addressed him as "Officer," explaining he was referring to Mattioli in his official capacity to get his attention because Mattioli did not appear responsive, consistent with Roach's experience that calling out an officer's rank draws their attention. (Roach Dep., 61:25–62:17; Exhibit D).

42. MPD SOP 220.30, the off-duty arrest and aid policy, provides that members are discouraged from taking police action when they have consumed alcohol or any substance that could impair rational action or conduct. (Lewis Dep., 43:2–21; Exhibit G).

43. The City admits that MPD SOP 220.30 permits an officer who has consumed alcohol to take police action on behalf of MPD. (Lewis Dep., 46:12–22).

44. MPD policy provides no formula for determining impairment in off-duty arrests. (Lewis Dep., 47:22–48:11; Exhibit G).

45. The City admits that MPD SOP 220.30 is vague in that it does not provide a formula for determining impairment as it pertains to the policy and so an officer may not know whether they are complying with the policy. (Lewis Dep., 47:22–48:11; 51:8–22).

46. MPD SOP 220 imposes additional limitations on off-duty arrests: members must comply with state and federal law; a member cannot be personally involved in the incident underlying the arrest (unless the member is a victim of a crime), and a member may not take police action while working off-duty where the arrest furthers the interests of a private employer. (Lewis Dep., 113:20–114:8).

47. Under MPD policy, an officer making an arrest must identify with a badge or ID card—merely saying "I'm a cop" is insufficient—so the person has reasonable assurance the officer has put themself on duty and is lawfully detaining them; attempting an arrest without an ID card would violate the policy. (Lewis Dep., 121:5–122:4; Exhibit G).

48. When the investigation concluded, there was a preponderance of evidence that Mattioli violated state law against chokeholds. (Lewis Dep., 140:15–20; Exhibit G).

49. The City admits that its investigation concluded that there was a preponderance of evidence that Mattioli committed first-degree reckless homicide by placing Joel Acevedo in a chokehold causing asphyxiation and death, and that Mattioli's acquittal in the criminal case is not relevant to his employment status. (Lewis Dep., 140:15–20; 143:7–144:17; Exhibit G).

50. The Milwaukee County Medical Examiner's Autopsy Protocol for Joel A. Acevedo lists the Cause of Death as "Anoxic Encephalopathy due to Traumatic Asphyxia." (Autopsy Protocol, p. 1; Exhibit E).

51. MPD SOP 220.10(A) defines "Arrest" as taking or detaining a person into custody so their liberty is under the arrester's control, requiring intent to take into custody and the person's understanding they are in custody; no formal declaration of arrest is required. (SOP 220.10(A); Exhibit I).

52. MPD SOP 220.30(A) provides that an off-duty member may arrest or provide aid/assistance anywhere in Wisconsin if: (1) responding to an emergency that poses a significant threat to life or bodily harm, or (2) taking action the member would be authorized to take while on duty in Milwaukee County under the same circumstances. (MPD SOP 220.30(A); Exhibit I).

53. The International Association of Chiefs of Police (IACP) 2017 Consensus Policy and Discussion Paper on the Use of Force states "a choke hold is defined as a physical maneuver that restricts an individual's ability to breathe for the purposes of incapacitation." In the most common choke hold, referred to as an arm-bar hold, an officer places his or her forearm across the front of the individual's neck and then applies pressure for the purpose of cutting off air flow. These are extremely dangerous maneuvers that can easily result in serious bodily injury or death. Therefore, the Consensus Policy allows their use only when deadly force is authorized. (Taylor Expert Report, ¶ 32, p. 7; Exhibit F)

54. MPD SOP 460 does not warn against using force in the head/neck region, does not preclude the use of chokeholds/neck restraints, does not warn against unsafe body positions (i.e., face down, being compressed, etc.), does not preclude the use of non-sanctioned techniques, and does not discuss de-escalation. (Taylor Expert Report, ¶ 15, p. 5; MPD SOP 460; Exhibit F and J)

55. Officer Mattioli believed that Mr. Acevedo was attempting to steal something from his pants pocket. An affray erupted between Officer Mattioli, Chris, Andrew, and Mr. Acevedo. Officer Mattioli wrestled with Mr. Acevedo and placed him in a chokehold, which constituted an unauthorized use of force. Mr. Acevedo was unarmed and became unconscious. (Taylor Expert Report, ¶ 33, p. 8; Exhibit F)

56. The IACP (1993) review of 94 restraint-related, in-custody deaths underscores that forcibly holding struggling, intoxicated, or medically-compromised arrestees face-down—especially when hog-tied or pinned by officers' body-weight—can restrict the "bellows" action of the diaphragm, mask early signs of distress, and precipitate fatal positional asphyxia; the report therefore urges officers to avoid transporting prisoners in the prone position, to relieve downward pressure immediately after handcuffing, and to reposition individuals to a seated or lateral posture while closely monitoring breathing and skin color. (Taylor Expert Report, ¶ 36, p. 8; Exhibit F).

57. MPD's Use of Force policy did not warn against using force in the head/neck region, did not preclude the use of chokeholds/neck restraints, did not warn against unsafe body positions (i.e., face down, being compressed, etc.), did not preclude the use of non-sanctioned techniques, and did not discuss de-escalation. As such, MPD's policy permitted Mattioli's conduct and did not warn Mattioli that the force he was using was inconsistent with current professional practices. The City should have used nationally accepted policies such as those recommended by the 2017 IACP Consensus Policy. (Taylor Expert Report, ¶ 40, p. 8; Exhibit F).

58. The force used was sanctioned by the City because Mattioli testified that he had used the same restraint techniques on previous occasions in the presence of police supervisors who

did not advise him that he should not do so. Therefore, he believed he was acting in accordance with policy and training. (Taylor Expert Report, ¶ 41, p. 8; Exhibit F).

59. Officer Mattioli's actions that were not precluded by policy and sanctioned by supervisors directly caused Joel Acevedo's fatal anoxic brain injury. (Taylor Expert Report, ¶ 42, p. 8; Exhibit F).

60. Officer Michael Mattioli's application of a choke hold and failure to move Mr. Acevedo from a prone position once under control and provide medical aid fell below the standard of care for a properly trained officer and were substantial factors in Joel Acevedo's death. (Taylor Expert Report, ¶ 43, p. 9; Exhibit F).

61. Per the Fire and Police Commission, in order to violate an SOP policy such as Rule No. 3, there must be a perceived violation of departmental policy by a member of the fire or police department acting on duty. (Aldrete Dep., 128:13–25).

62. Before charges could be issued by the Fire and Police Commission, a fact investigation had to be performed, and at its conclusion, the commissioners reviewed the evidence and determined which charges they felt comfortable issuing. (Aldrete Dep., 129:8–22).

63. On June 15, 2020, the Milwaukee Fire & Police Commission (FPC) issued a five-page charging document against Officer Michael Mattioli alleging violations of MPD rules and procedures. (FPC Charges, June 15, 2020, p. 1).

64. The FPC charged Mattioli with violating Rule 3 (Integrity) §3.00, citing that he used his law-enforcement training to restrain Mr. Acevedo in a manner disproportionate to the alleged danger. (FPC Charges, June 15, 2020, p. 1).

65. Under Rule 3 (Integrity) §3.03, the FPC cited Mattioli's own description that he was effecting an arrest of Mr. Acevedo, which resulted in great bodily harm. (FPC Charges, June 15, 2020, p. 2).

66. The FPC cited Mattioli's statements in which he admitted he was effecting an arrest that resulted in great bodily harm. Body-worn camera footage captured witness Andrew Janowski stating that Mr. Acevedo had "nearly left the house and he was brought back in and they laid on his legs so he would not get away." (FPC Charges, June 15, 2020, p. 3).

67. The FPC found that Mattioli continued to restrain Mr. Acevedo despite clear signs of control and audible distress. (FPC Charges, June 15, 2020, p. 4).

68. Officer Roach reported that Mattioli had to be commanded several times to disengage and was physically pulled off Mr. Acevedo's back, even after multiple officers had arrived. (FPC Charges, June 15, 2020, p. 4).

69. The FPC found that Mattioli's did not request medical assistance, instead requesting police backup for what he characterized as an arrest. The 911 recording establishes that Mr. Acevedo was conscious and speaking when the call began and that audible gasping/snorting and the sounds of a struggle could be heard; a voice—believed to be Janowski—says, "we got him Michael, don't worry." (MPD SOP 460.40; FPC Charges, June 15, 2020, p. 5).

70. Body-worn camera from Officers Roach and Sheremeta shows Mr. Acevedo face-down with Mattioli straddling his neck (described as a rear-naked chokehold) while Janowski restrained his legs. There was an obvious change in Mr. Acevedo's condition requiring immediate first aid and a medical request, and Mattioli did neither. (FPC Charges, June 15, 2020, p. 5).

71. Before engaging with anyone, Officer Roach asked, "Who is the police officer?" and Mattioli stated, "I am." (Taylor Expert Report, ¶8, p. 4; Roach Dep., 46:8–11).

72. On scene, Officer Robert Roach instructed Michael Mattioli to "get up" and addressed him as "Officer," explaining he was referring to Mattioli in his official capacity to get his attention because Mattioli did not appear responsive, consistent with Roach's experience that calling out an officer's rank draws their attention. (Roach Dep., 61:25–62:17).


Dated this 10th day of September 2025.

Respectfully submitted,

By: /s/ B'Ivory LaMarr
**B'IVORY LAMARR, ESQUIRE**
Wisconsin Bar No. 1122469
blamarr@lamarrfirm.com
THE LAMARR FIRM
5718 Westheimer Road, Suite 1000
Houston, TX 77057
800.679.4600, Ext. 700

By: /s/ Devon m. Jacob
**DEVON M. JACOB, ESQUIRE**
Pennsylvania Bar No. 89182
djacob@jacoblitigation.com
JACOB LITIGATION, INC.
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733

**KIRK M. CLAUNCH, ESQUIRE**
Texas Bar No. 1039975
claunchlaw3@earthlink.net
THE CLAUNCH LAW FIRM
301 W. Central Avenue, Forth Worth, TX 76164
817.335.4003

**BENJAMIN L. CRUMP, ESQUIRE**
Washington, D.C. Bar No. 1552623
court@bencrump.com
PRECIOUS CHAVEZ, ESQUIRE
precious@bencrump.com
**BEN CRUMP LAW, PLLC**
122 S. Calhoun Street, Tallahassee, FL 32301
800.959.1444

*Counsel for Plaintiff*