# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JOSE ACEVEDO, individually, and as Special
Administrator of the Estate of JOEL ACEVEDO,

                Plaintiff(s),

v.                                         Case No. 23C0489

MICHAEL A. MATTIOLI,
and CITY OF MILWAUKEE,

                Defendants.

## DEFENDANT CITY OF MILWAUKEE'S
## REPLY TO PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF FACT

NOW COMES Defendant City of Milwaukee, through its counsel, City Attorney Evan Goyke, represented by Assistant City Attorney Clint B. Muche, pursuant to Fed. R. Civ. P. 56 and Civil L. R. 56, in response to Plaintiff's additional proposed findings of fact (ECF No. 72):

1.   Mattioli physically restrained Joel Acevedo by straddling him on the floor and pressing his upper body down against Acevedo's back, neck, and head area. (Mattioli Dep., 95:21–97:10; Exhibit A).

**RESPONSE**: Object that this paragraph is, in part, a duplication of the City's Proposed Finding of Fact ("CPFOF") (ECF No. 60), ¶¶ 43, 46-47, 53. *See* Civil L. R. 56(b)(2)(B)(ii) ("***Additional*** facts") (emphasis added). Notwithstanding, the City does not dispute that Mattioli restrained Acevedo with his bodyweight by straddling Acevedo, who was on his stomach on the floor, but disputes that the cited materials support the remaining factual propositions in this paragraph (e.g., Mattioli was "pressing his upper body against Acevedo's … neck and head area"). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement … of any additional facts … including references to … supporting materials[.]").

2. Mattioli admitted that his right arm was positioned across Acevedo's "neck and chin area" while using his body weight to push downward and prevent Acevedo from rising. (Mattioli Dep., 95:21–97:10; Exhibit A).

RESPONSE: No dispute.

3. Mattioli admitted that after Joel Acevedo fell to the ground, he got on top of him and used his bodyweight to keep him down, expressly stating that his "goal" was to prevent Acevedo from getting back up and continuing to throw punches. (Mattioli Dep., 80:22–81:2; Exhibit A).

RESPONSE: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 42-44, 46-47, 53-55. *See* Civil L. R. 56(b)(2)(B)(ii) ("***Additional*** facts") (emphasis added). Notwithstanding, the City does not dispute the factual propositions in this paragraph.

4. While restraining Acevedo, Mattioli acknowledged that he was evaluating Acevedo's conduct in terms of "crimes," testifying that he believed Acevedo had committed robbery with use of force, theft from person, and property damage, all felony-level offenses, and that this belief was "going through [his] head at the time." (Mattioli Dep., 81:9–23; Exhibit A).

RESPONSE: The City does not dispute that Mattioli posited that Acevedo's conduct supported a finding that he had committed several crimes that morning, but disputes that this single exchange supports a finding or inference that Mattioli "was evaluating" Acevedo's conduct in terms of crimes at the time in light of the record as a whole. In context, Mattioli testified that "[a]fter Joel fell onto the ground, I got on top of him and used my bodyweight to keep him on the ground because I knew that as soon as he got back up, he was going to continue throwing punches. It was my goal to not let that happen." *See* Mattioli Dep. (ECF No. 63-2 and 73-1), 80:16-81:2. *See also* Def. City of Milwaukee's Resp. to Pl.'s Proposed Findings of Fact (ECF No. 74), ¶ 6. Counsel then asks whether Mattioli agrees that Acevedo had not committed any felonies to that point, but Mattioli disagrees and provides the cited explanation. *Id.*, 81:3-23. Mattioli's answer concludes, "[t]here's different crimes that you could say he committed and [that] I think he committed." *See* Mattioli Dep. (ECF No. 63-2 and 73-1), 81:22-23. Notably, Mattioli uses the present tense: he *thinks* Acevedo committed crimes. Furthermore, to accept that Mattioli was

2

focused on Acevedo's crimes requires one to ignore all of his other testimony. *See* Def. City of Milwaukee's Resp. to Pl.'s Proposed Findings of Fact (ECF No. 74), ¶¶ 5-8. *See also* City of Milwaukee's Br. in Oppo. to Pl.'s Mot. for Partial Summ. J. (ECF No. 75), at 8-11.

5.  After Acevedo fell, Mattioli got on top of him to prevent him from rising and "keep[ing] punching people." He admitted he used his body weight to restrain Acevedo on the ground. (Mattioli Dep., 86:9–15; Exhibit A).

**RESPONSE**: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 42-44, 46-47, 53-55. *See* Civil L. R. 56(b)(2)(B)(ii) ("***Additional*** facts") (emphasis added). Notwithstanding, the City does not dispute the factual propositions in this paragraph.

6.  Mattioli called 911, during which he identified himself by telling the dispatcher, "I'm an off-duty police officer and I need help at my house." (Mattioli Dep., 86:17–87:3; Exhibit A).

**RESPONSE**: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 48-49. *See* Civil L. R. 56(b)(2)(B)(ii) ("***Additional*** facts") (emphasis added). Notwithstanding, the City does not dispute the factual propositions in this paragraph.

7.  Mattioli acknowledged that during his criminal trial testimony, he admitted he was "in a way" performing an arrest, explaining that he "detained [Acevedo] until the police got there" because he wanted Acevedo arrested. (Mattioli Dep., 87:4–88:15; Exhibit A).

**RESPONSE**: The City does not dispute that Mattioli testified that he arrested Acevedo "in a way" but disputes that a reasonable person would accept that Mattioli intended to or actually did personally effectuate Acevedo's arrest based upon that testimony in light of the record as a whole. *See* Def. City of Milwaukee's Resp. to Pl.'s Proposed Findings of Fact (ECF No. 74), ¶¶ 4-8. *See also* City of Milwaukee's Br. in Oppo. to Pl.'s Mot. for Partial Summ. J. (ECF No. 75), at 8-11.

8.  Mattioli admitted that when questioned by the prosecutor, he acknowledged he was "in a way" performing an arrest and specifically did not deny making an arrest. (Mattioli Dep., 89:25–90:5; Exhibit A).

**RESPONSE**: The City does not dispute that Mattioli did not "specifically … deny making an arrest" in response to the prosecutor's question, but disputes that a reasonable person would

3

believe that brief exchange predominates over the entire record as a whole—including Mattioli's explicit statement to plaintiff's counsel that "it really wasn't like that[.]" *See* Mattioli Dep. (ECF No. 63-2 and 73-1), 121:22-122:1-5. *See also* Def. City of Milwaukee's Resp. to Pl.'s Proposed Findings of Fact (ECF No. 74), ¶¶ 4-8; City of Milwaukee's Br. in Oppo. to Pl.'s Mot. for Partial Summ. J. (ECF No. 75), at 8-11.

9. Mattioli further admitted that after the incident he explained to law enforcement that he was arresting Acevedo for his conduct, and he confirmed under oath that he was not lying when he made that statement. (Mattioli Dep., 90:6–13; Exhibit A).

**RESPONSE**: The City does not dispute that Mattioli has been truthful throughout this entire process, *see* Mattioli Dep. (ECF Nos. 63-2 and 73-1), 90:21, including when he told plaintiff's counsel, "it really wasn't like that … like I said before, I just detained him until the police could get there." *Id.*, 121:22-122:5. *See also* Def. City of Milwaukee's Resp. to Pl.'s Proposed Findings of Fact (ECF No. 74), ¶¶ 4-8; City of Milwaukee's Br. in Oppo. to Pl.'s Mot. for Partial Summ. J. (ECF No. 75), at 8-11.

10. Mattioli acknowledged that, as a police officer, he has the legal privilege to use objectively reasonable force to effectuate an arrest. (Mattioli Dep., 90:22–91:1; Exhibit A).

**RESPONSE**: The City does not dispute that Mattioli stated, "[t]hat sounds right," in response to the following question from plaintiff's counsel: "[n]ow, as a police officer, am I correct you are allowed to – you have a privilege under the law to use force that is objectively reasonable to affect arrest, correct?" Mattioli Dep. (ECF Nos. 63-2 and 73-1), 90:22–91:1. The City disputes any suggestion or inference arising from this exchange that Mattioli testified he intended to perform an arrest.

11. Mattioli admitted that he used force against Joel Acevedo in effecting an arrest. (Mattioli Dep., 91:2–4; Exhibit A).

**RESPONSE**: The City disputes that Mattioli ever accepted or adopted plaintiff's counsel's framing of his conduct as an arrest in the course of his deposition. *See* Def. City of Milwaukee's Resp. to Pl.'s Proposed Findings of Fact (ECF No. 74), ¶¶ 4-8; City of Milwaukee's Br. in Oppo. to Pl.'s Mot. for Partial Summ. J. (ECF No. 75), at 8-11.

12. Mattioli admitted that the restraint technique he used on Joel Acevedo, holding him on the ground with his bodyweight, was a method he learned from his police experience. (Mattioli Dep., 92:17–93:3; Exhibit A).

**RESPONSE**: The City does not dispute that Mattioli testified he learned to use his bodyweight to keep someone on the ground "[b]asically from experience on the police force[,]" but disputes any suggestion or inference arising from the cited testimony that this was a "technique" taught to Mattioli by the Milwaukee Police Department. *See* Mattioli Dep. (ECF Nos. 63-2 and 73-1), 92:17–94:10. Furthermore, (at most) this testimony establishes only that Mattioli had used his bodyweight to pin fleeing suspects down before <u>but not</u> that he did so in the manner Plaintiff asserts that he did here or that MPD taught him to do so. *Id.*

13. Mattioli admitted that restraining a person on their stomach by using his bodyweight was a tactic he had employed before as a police officer. (Mattioli Dep., 93:4–10; Exhibit A).

**RESPONSE**: No dispute.

14. Mattioli confirmed that he had used this restraint technique while on duty in front of other police officers, and no officer ever told him the tactic was dangerous or constituted excessive force. (Mattioli Dep., 93:11–20; Exhibit A).

**RESPONSE**: No dispute.

15. Mattioli admitted that after Joel Acevedo stopped moving, he continued restraining him by staying on top with his knees and elbows on the ground until police arrived. (Mattioli Dep., 100:2–24; Exhibit A).

**RESPONSE**: No dispute.

16. When asked whether Joel Acevedo was breathing before Mattioli got up, Mattioli admitted he responded, "I don't know. Handcuff him," explaining that he assumed Acevedo was fine. Mattioli Dep., 103:5–10; Exhibit A).

5

**RESPONSE**: The City does not dispute that Mattioli stated, "I don't know—handcuff him," or that he testified, "I said [that] because I didn't think he wasn't breathing, I thought he was fine[,]" *see* Mattioli Dep. (ECF Nos. 63-2 and 73-1), 103:5-10, but disputes that the cited materials or the record as a whole supports the conclusion that "[Mattioli] assumed Acevedo was fine."

17. When confronted with his prior statement that he "wasn't squeezing tight enough where [Acevedo] couldn't breathe," Mattioli admitted that was a "poor choice of words" and conceded he was "very worked up" and "yelling at the officers" at the time. (Mattioli Dep., 111:14–21; Exhibit A).

**RESPONSE**: No dispute.

18. Mattioli admitted that the arrest of Joel Acevedo could have been for a state crime or a local ordinance violation. (Mattioli Dep., 124:10–16; Exhibit A).

**RESPONSE**: The City does not dispute that Mattioli testified he believed that Acevedo could have been arrested for state crimes or local ordinance violations, but disputes any suggestion or inference arising from this exchange that Mattioli testified he intended to perform an arrest. *See* Mattioli Dep. (ECF Nos. 63-2 and 73-1), 124:10–16.

19. Mattioli further testified that when performing arrests as a police officer, he does so "on behalf of the police department," and specifically identified the Milwaukee Police Department as the department he represents. (Mattioli Dep., 124:17–125:5, Exhibit A).

**RESPONSE**: The City does not dispute that Mattioli testified that **when performing** arrests as a police officer he did so on behalf of his department (i.e., MPD), but disputes any suggestion or inference arising from this exchange that Mattioli ever testified that he intended to perform an arrest at the time. *See* Mattioli Dep. (ECF Nos. 63-2 and 73-1), 124:17–125:5.

20. Mattioli admitted that he identified himself as a police officer during the 911 call. (Mattioli's RFA Response No. 4; Exhibit C).

**RESPONSE**: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 42-44, 46-47, 53-55. *See* Civil L. R. 56(b)(2)(B)(ii) ("**Additional** facts") (emphasis added).

Notwithstanding, the City does not dispute that Mattioli identified himself as "an off duty police officer," but disputes that an suggestion or inference plausibly arises from this statement that Mattioli invoked police authority during the incident.

21. Mattioli admitted that when the responding police officers, including Officer Robert Roach, arrived at his home, he was physically restraining Joel Acevedo inside the residence. (Mattioli's RFA Resp. No. 10; Exhibit C).

**RESPONSE**: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 48–49. *See* Civil L. R. 56(b)(2)(B)(ii) ("*Additional* facts") (emphasis added). Notwithstanding, the City does not dispute that <u>Mattioli and Janowski</u> were restraining Acevedo in Mattioli's kitchen when Officer Roach and his partner arrived.

22. The Fire and Police Commission's (FPC) assumption of the investigation into Officer Michael Mattioli's conduct was the first time the Commission had ever stepped in to take over an internal investigation from the Milwaukee Police Department. Aldrete further stated that the takeover of the Mattioli investigation was a "very unique" action by the FPC. (Aldrete Dep., 24:22–25:13; Exhibit H).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]").

23. At the time of the Mattioli incident, the Chief of Police was Alfonso Morales. She further explained that it was her understanding that it was unprecedented for the Fire and Police Commission to take over an internal affairs investigation from a police chief, and confirmed that the FPC's intervention occurred because "something had to go awry or there had to be some concern" that warranted stepping in. (Aldrete Dep., 26:4–18; Exhibit H).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]").

24. The Fire and Police Commission took over the Mattioli investigation from Chief Alfonso Morales in 2020 due to extraordinary circumstances, including the MillerCoors mass shooting, the killing of George Floyd, COVID-19, civil unrest, the upcoming DNC, and national demands for police accountability. She explained there was intense public and political pressure, and the commissioners felt they had to act to ensure oversight and prevent further casualties. (Aldrete Dep., 27:7–28:11; Exhibit H).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]").

25. The Fire and Police Commission informed Chief Morales it wanted to ensure due diligence in the Mattioli investigation so that, if wrongdoing was found, appropriate discipline would be imposed. Aldrete confirmed that there was a concern as to whether the Chief would fulfill his duties in conducting due diligence and issuing appropriate discipline. (Aldrete Dep., 36:1–10; Exhibit H).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]").

26. During the investigation into Officer Mattioli, Aldrete reviewed his personnel file and observed prior internal affairs investigations and past discipline. Aldrete confirmed that one such discipline involved Mattioli's reckless firing of a firearm while off duty in an incident involving a neighbor. (Aldrete Dep., 40:6–41:3; Exhibit H).

**RESPONSE**: Object as irrelevant to the determination of the issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]").

27. The conclusion of the Fire and Police Commission's investigation into Officer Michael Mattioli was that he should be removed from the department and fired. (Aldrete Dep., 45:11–16; Exhibit H).

8

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Because FPC Core Values apply to officer conduct whether on- or off-duty, the FPC charges are not relevant to the issues presented at summary judgment. *See* Lewis Dep. (ECF No. 73-7), 9:2-11, 77:5-78:5, Ex. 9 ("MPD Code of Conduct"), at 2 ("Department members shall ***at all times*** conduct themselves … in accordance with the provisions of this Code.") (emphasis added), 108:13-109:23, 127:11-25, 132:12-133:6, 136:18-142:1, 145:5-22, 146:25-148:4. Notwithstanding, if further answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

28. A physical altercation involving an officer is ordinarily classified as a Priority One call, the most urgent police response, which may involve the threat of loss of life. (Roach Dep., 24:8–22; Exhibit D).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]").

29. Upon arrival at Mattioli's residence, Officer Robert Roach first encountered a male in a blue shirt with a cut under his eye, whom he accepted as Chris Peters, and, after asking initial questions to ascertain the situation (including where everyone was), Peters informed Roach that "Joel was subdued" inside the residence. (Roach Dep., 25:13–26:5; Exhibit D).

**RESPONSE**: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 65-67. *See* Civil L. R. 56(b)(2)(B)(ii) ("***Additional*** facts") (emphasis added). Notwithstanding, the City does not dispute the factual propositions asserted in this paragraph, including without

9

limitation that Peters informed Roach that Mattioli and Janowski had Acevedo "subdued" inside when officers arrived.

30. A subject who is "subdued" is no longer fighting, but the term "subdued" indicates that force is being used in the form of restraint. (Roach Dep., 25:13–26:5; Exhibit D).

**RESPONSE**: Object that the cited materials do not support the factual proposition asserted. *See* Civil L. R. 56(b)(2)(B)(ii) ("[A]ny additional facts that require the denial of summary judgment, including references to … supporting materials[.]").

31. A person who is "subdued" could have their ability to breathe impeded. (Roach Dep., 36:16–18; Exhibit D).

**RESPONSE**: The City does not dispute that Mr. Roach testified, "[i]s it possible? Yes, that's possible[,]" when asked: "[y]ou would agree that being subdued could include the ability to breathe being impeded?"

32. Upon opening the door to Mattioli's residence, Officer Robert Roach immediately observed Michael Mattioli on top of Joel Acevedo, exerting force by holding him down. Roach acknowledged that at that moment he did not issue a command for the two individuals to separate, despite agreeing that in a physical altercation one of the most minimal uses of force available to an officer is to give a verbal command. (Roach Dep., 43:11–44:9; Exhibit D).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). *See also* ECF No. 50 (dismissing claims against Defendant Roach for failure to intervene).

33. Use of force must be proportionate to the type of force or restraint an individual is posing. (Roach Dep., 53:17–21; Exhibit D).

**RESPONSE**: Object as a legal conclusion, rather than a statement of fact. *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional ***facts*** that require the denial of summary judgment[.]") (emphasis added). Notwithstanding, the City does not dispute that the above

10

statement of law accurately describes the constitutional standard applicable to uses of force under color of state law.

34. Officer Roach received use-of-force training with the Milwaukee Police Department and the training informed him that the use of neck restraints can constitute deadly force because it can lead to death. (Roach Dep., 56:5–19; Exhibit D).

> **RESPONSE**: No dispute.

35. Officer Roach walked up to where Mattioli and Joel Acevedo were positioned and observed Mattioli on his knees straddling Acevedo, with his body over Acevedo specifically, Mattioli's stomach on Acevedo's back. (Roach Dep., 57:16-58:13; Exhibit D).

> **RESPONSE**: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 43, 46-47, 53. *See* Civil L. R. 56(b)(2)(B)(ii) ("***Additional*** facts") (emphasis added). Notwithstanding, the City does not dispute that Mattioli was physically atop Acevedo, straddling him, with his stomach on Acevedo's back.

36. Officer Robert Roach testified that use of force around the neck is improper; upon witnessing Mr. Mattioli's arms around Mr. Acevedo's neck, Roach stated, "I want to make sure that your arms aren't around his neck," explaining he asked to clarify and accurately describe the conduct for a superior or report. Roach recalled that Mattioli responded with "Oh" and then moved back, after which Roach observed no response from Mr. Acevedo. (Roach Dep., 59:8-60:18; Exhibit D).

> **RESPONSE**: The City does not dispute that Roach testified that use of force around or to the neck was inconsistent with MPD's use of force policy at the time, *see* CPFOF (ECF No. 60), ¶ 81, but objects to the remaining factual propositions in this paragraph as irrelevant to the legal issues presented by the parties' cross-motions (i.e., whether Mattioli acted under color of state law and whether he acted in his scope of employment).

37. Michael Mattioli took Joel Acevedo's arms behind his back "as if … to put handcuffs on him," and though Mattioli did not have cuffs he told the responding officers, "Cuff this guy," which Roach understood to mean effectuate an arrest or, at minimum, detain Acevedo in handcuffs. (Roach Dep., 64:6–21; Exhibit D).

11

**RESPONSE**: The City does not dispute that Mattioli believed Acevedo should be arrested and told Roach to handcuff him but objects that Roach's subjective interpretation of events is irrelevant to the legal issues presented by the parties' cross-motions (i.e., whether Mattioli acted under color of state law and whether he acted in his scope of employment).

38. A rear-naked chokehold is when one arm is placed around the front of someone's neck, the other arm is held onto to create a fulcrum, and pressure is applied. During the questioning by investigators following the April 19, 2020 incident involving Officer Mattioli and Joel Acevedo, Officer Roach stated that he believed that is what he had observed. (Roach Dep., 64:22–65:9; Exhibit D).

**RESPONSE**: No dispute.

39. Mattioli's right arm was positioned underneath Joel and around Joel's neck, and that Mattioli appeared to have his full body weight on Joel's upper body. (Roach Dep., 66:10–16; Exhibit D).

**RESPONSE**: No dispute.

40. In 2020, the policymakers for the City of Milwaukee as it relates to the Milwaukee Police Department were the Board of Fire and Police Commissioners (FPC), and the policymakers for the City as a whole were the Common Council and the Mayor. (Lewis Dep., 9:2–15; Exhibit G).

**RESPONSE**: No dispute.

41. Policies function as rules that must be followed by officers, and there are penalties if the rules are not followed; policies are necessary to hold officers accountable when their violations affect citizens. (Lewis Dep., 26:1-11; Exhibit G).

**RESPONSE**: No dispute.

42. MPD SOP 220.30, the off-duty arrest and aid policy, provides that members are discouraged from taking police action when they have consumed alcohol or any substance that could impair rational action or conduct. (Lewis Dep., 43:2–21; Exhibit G).

**RESPONSE**: No dispute.

43. The City admits that MPD SOP 220.30 permits an officer who has consumed alcohol to take police action on behalf of MPD. (Lewis Dep., 46:12–22; Exhibit G).

**RESPONSE**: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 90.

*See* Civil L. R. 56(b)(2)(B)(ii) ("*Additional* facts") (emphasis added). Notwithstanding, the City

does not dispute that SOP 220.30 "discourages" rather than expressly prohibits members from taking police action when they have consumed alcohol, *see* ECF No. 73-9 ("SOP 220"), but disputes that this means that City policy "permits" an officer to place him or herself on duty and act in an official capacity while under the influence of alcohol. *See* SOP 220 (ECF No. 61-2), at 6 ("The member's actions must be objectively reasonable. All aspects of the situation, including the member's abilities, training, experience, availability of equipment, communications, as well as a tactical risk assessment, shall be taken into consideration prior to deciding to act. The opportunity and/or means to have on-duty officers safely respond prior to acting must be weighed. When practicable, the member should contact the law enforcement jurisdiction in lieu of, or prior to, intervening."); Lewis Dep. (ECF No. 73-7), 41:3-46:22 (explaining intervening after consuming alcohol may be objectively unreasonable under the circumstances and that SOP 220.30(B)(2) must be read in conjunction with 220.30(B)(1)).

44. The City admits that MPD SOP 220.30 is vague in that it does not provide a formula for determining impairment as it pertains to the policy. (Lewis Dep., 47:22–48:11; Exhibit G).

**RESPONSE**: The City disputes that the cited materials or the record as a whole support a finding that the policy is vague, but does not dispute that SOP 220.30(B)(2) does not specify a quantity or volume of alcohol consumed that constitutes impairment. *See* SOP 220 (ECF No. 61-2), at 6.

45. The City admits that MPD SOP 220.30 is vague because as drafted, an officer may not know whether they are complying with the policy. (Lewis Dep., 51:8–22; Exhibit G).

**RESPONSE**: The City disputes that the record as a whole supports a finding that the City "admits" that the policy is vague; the City's witness explained that the standard is objective. *See* Lewis Dep., 51:8-54:2.

46. MPD SOP 220 imposes additional limitations on off-duty arrests: members must comply with state and federal law; a member cannot be personally involved in the incident underlying the

13

arrest (unless the member is a victim of a crime), and a member may not take police action while working off-duty where the arrest furthers the interests of a private employer. (Lewis Dep., 113:20–114:8; Exhibit G).

**RESPONSE**: No dispute.

47. Pursuant to MPD SOP 220, an officer making an arrest must identify with a badge or ID card—merely saying "I'm a cop" is insufficient—so the person has reasonable assurance the officer has put themself (*sic*) on duty and is lawfully detaining them; attempting an arrest without an ID card would violate the policy. (Lewis Dep., 121:5–122:4; Exhibit G).

**RESPONSE**: The City does not dispute that the plain text of SOP 220.30(B)(6) provides that an unarmed, off-duty officer attempting to perform an arrest "shall possess a department issued identification card," or that the witness explained that the underlying policy rationale as summarized *supra*.

48. The City admits that when the investigation concluded, there was a preponderance of evidence that Mattioli violated state law against chokeholds. (Lewis Dep., 140:15–20).

**RESPONSE**: The City does not dispute that MPD initiated an internal investigation into whether Mattioli's conduct violated department policies or standards while he remained a department employee; that department core values must be upheld whether the member is on or off duty; that committing a crime is a violation of department core values; that Mattioli did not cooperate with the internal investigation and ultimately resigned; and that the internal investigation was closed with a finding of "sustained" as to the allegation that Mattioli violated state law when he placed Acevedo in a chokehold causing asphyxiation and death based upon the issuance of criminal charges against him. *See* Lewis Dep., 132:12-134:25, 135:19-137:24, 140:12-20, 143:15–144:17. The City objects that neither the cited materials, nor the record as a whole support an inference or suggestion that the City independently found that Mattioli committed a criminal offense.

49. The City admits that its investigation concluded that there was a preponderance of evidence that Mattioli committed first-degree reckless homicide by placing Joel Acevedo in a chokehold

causing asphyxiation and death, and that Mattioli's acquittal in the criminal case is not relevant to his employment status. (Lewis Dep., 140:15–20; 143:7–144:17; Exhibit G).

RESPONSE: The City does not dispute that MPD found that Mattioli had violated state law based on the initiation of criminal proceedings against him, and that his subsequent acquittal did not impact his employment status because he had already resigned by then. *See* Lewis Dep., 132:12-134:25, 135:19-137:24, 140:12-20, 143:15–144:17. The City objects that neither the cited materials, nor the record as a whole support an inference or suggestion that the City independently found that Mattioli committed a criminal offense.

50. The Milwaukee County Medical Examiner's Autopsy Protocol for Joel A. Acevedo lists the Cause of Death as "Anoxic Encephalopathy due to Traumatic Asphyxia." (Autopsy Protocol, p. 1; Exhibit E).

RESPONSE: No dispute.

51. MPD SOP 220.10(A) defines "Arrest" as taking or detaining a person into custody so their liberty is under the arrester's control, requiring intent to take into custody and the person's understanding they are in custody; no formal declaration of arrest is required. (SOP 220.10(A); Exhibit I).

RESPONSE: No dispute.

52. MPD SOP 220.30(A) provides that an off-duty member may arrest or provide aid/assistance anywhere in Wisconsin if: (1) responding to an emergency that poses a significant threat to life or bodily harm, or (2) taking action the member would be authorized to take while on duty in Milwaukee County under the same circumstances. (MPD SOP 220.30(A); Exhibit I).

RESPONSE: The City does not dispute that this paragraph summarizes one sub-part of Section 220.30, but denies that that recitation is accurate or complete unless read in conjunction with the following section which explicitly provides limitations upon the authority outlined in the first part. *See* CPFOF (ECF No. 60), ¶ 89; ECF No. 73-9 ("SOP 220"), at 5-6.

53. The International Association of Chiefs of Police (IACP) 2017 Consensus Policy and Discussion Paper on the Use of Force states "a choke hold is defined as a physical maneuver that restricts an individual's ability to breathe for the purposes of incapacitation." In the most common choke hold, referred to as an arm-bar hold, an officer places his or her forearm across the front of the individual's neck and then applies pressure for the purpose of cutting off air flow. These are

15

extremely dangerous maneuvers that can easily result in serious bodily injury or death. Therefore, the Consensus Policy allows their use only when deadly force is authorized. (Taylor Expert Report, 32, p. 7; Exhibit F)

RESPONSE: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]").

54. MPD SOP 460 does not warn against using force in the head/neck region, does not preclude the use of chokeholds/neck restraints, does not warn against unsafe body positions (i.e., face down, being compressed, etc.), does not preclude the use of non-sanctioned techniques, and does not discuss de-escalation. (Taylor Expert Report, 15, p. 5; Exhibit F)

RESPONSE: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]").

55. Officer Mattioli believed that Mr. Acevedo was attempting to steal something from his pants pocket. An affray erupted between Officer Mattioli, Chris, Andrew, and Mr. Acevedo. Officer Mattioli wrestled with Mr. Acevedo and placed him in a chokehold, which constituted an unauthorized use of force. Mr. Acevedo was unarmed and became unconscious. (Taylor Expert Report, 33, p. 8; Exhibit F)

RESPONSE: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 28-31, 39, 45-46, 52-55, 57, 62, 73, 76. *See* Civil L. R. 56(b)(2)(B)(ii) ("***Additional*** facts") (emphasis added). The City additionally objects that Taylor's opinions about "use of force" presume that Mattioli acted under color of state law and therefore are not relevant to the legal issues presented by the parties' cross-motions (i.e., whether Mattioli acted under color of state law and whether he acted in his scope of employment). *See* Taylor Report (ECF No. 80-6).

56. The IACP (1993) review of 94 restraint-related, in-custody deaths underscores that forcibly holding struggling, intoxicated, or medically-compromised arrestees face-down—especially when hog-tied or pinned by officers' body-weight—can restrict the "bellows" action of the diaphragm,

mask early signs of distress, and precipitate fatal positional asphyxia; the report therefore urges officers to avoid transporting prisoners in the prone position, to relieve downward pressure immediately after handcuffing, and to reposition individuals to a seated or lateral posture while closely monitoring breathing and skin color. (Taylor Expert Report, 36, p. 8; Exhibit F).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]").

57. MPD's Use of Force policy did not warn against using force in the head/neck region, did not preclude the use of chokeholds/neck restraints, did not warn against unsafe body positions (i.e., face down, being compressed, etc.), did not preclude the use of non-sanctioned techniques, and did not discuss de-escalation. As such, MPD's policy permitted Mattioli's conduct and did not warn Mattioli that the force he was using was inconsistent with current professional practices. The City should have used nationally accepted policies such as those recommended by the 2017 IACP Consensus Policy. (Taylor Expert Report, 40, p. 8; Exhibit F).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, the City disputes that SOP 460, *see* ECF No. 61-1, at 1-2, does not incorporate by reference the Wisconsin Defense and Arrest Tactics ("DAAT") Disturbance Resolution Model which discusses de-escalation.

58. The force used was sanctioned by the City because Mattioli testified that he had used the same restraint techniques on previous occasions in the presence of police supervisors who did not advise him that he should not do so. Therefore, he believed he was acting in accordance with policy and training. (Taylor Expert Report, 41, p. 8; Exhibit F).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). The City further objects that whether the City "sanctioned"

17

Mattioli's technique and/or had notice of a widespread custom or practice necessitating a policy response is a legal conclusion, rather than a statement of fact. *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional ***facts*** that require the denial of summary judgment[.]") (emphasis added). If response is required, the City disputes that the cited materials or the record as a whole establish either that the City had notice of a widespread custom or practice, or exhibited reckless disregard under the circumstances.

59. Officer Mattioli's actions that were not precluded by policy and sanctioned by supervisors directly caused Joel Acevedo's fatal anoxic brain injury.  (Taylor Expert Report, 42, p. 8; Exhibit F).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment).  *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). The City further objects that even if relevant, this opinion is not admissible because it is outside the scope of this witness's expertise (e.g. Taylor is a police practices expert, not a medical expert). *See* Taylor Report (ECF No. 80-6), at 1-2.

60. Officer Michael Mattioli's application of a choke hold and failure to move Mr. Acevedo from a prone position once under control, and provide medical aid fell below the standard of care for a properly trained officer and were substantial factors in Joel Acevedo's death. (Taylor Expert Report, 43, p. 9; Exhibit F).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). The City further objects that the operative complaint does not provide any notice of claims relative to failure to provide medical care. *See* ECF No. 23.

61. During the struggle with Joel Acevedo, Mattioli was wearing jeans and a memorial "Officer Matthew Rittner" T-shirt displaying an MPD badge insignia over the left chest and a tactical enforcement design on the back; he had no shoes and was wearing socks. Mattioli agreed

it was possible that, seeing the T-shirt, Joel would perceive he was a police officer. (Mattioli Dep., 68:10–69:6; Exhibit A).

**RESPONSE**: Object that this paragraph is a duplication of CPFOF (ECF No. 60), ¶¶ 24-27. *See* Civil L. R. 56(b)(2)(B)(ii) ("***Additional*** facts") (emphasis added). Notwithstanding, the City does not dispute the factual propositions in this paragraph related to what Mattioli was wearing. The City objects that Mattioli's opinion about what Acevedo would or might perceive is irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment), *see* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"), and further disputes that the cited materials or the record as a whole plausibly support an inference or suggestion that Mattioli invoked official authority by wearing the same clothing during the incident that he wore the night prior. *See* CPFOF (ECF No. 60), ¶¶ 24-27. Plaintiff's suggested inference is further undercut by testimony that MPD sells T-shirts to the public, including officers' family and friends. *See* Lewis Dep. (ECF No. 73-7), 129:4-14.

62. During cross-examination at his criminal trial Mattioli acknowledged he was "in a way" making an arrest, and that he wanted Joel Acevedo arrested for crimes he believed had been committed. (Mattioli Dep., 87:4–88:12; Exhibit A).

**RESPONSE**: The City does not dispute that Mattioli so testified, but disputes that the record as a whole plausibly supports an inference or suggestion that Mattioli's testimony establishes that he either formed a subjective intent to exercise official authority <u>or</u> outwardly manifested such intention during the incident. *See* Mattioli Dep. (ECF No. 63-2 and 73-1), 87:4-21, 88:1-15, 89:20-90:5, 121:16-122:22.

63. Per the Fire and Police Commission, in order to violate an SOP policy such as Rule No. 3, there must be a perceived violation of departmental policy by a member of the fire or police department acting on duty. (Aldrete Dep., 128:13–25; Exhibit H).

19

**RESPONSE**: The City disputes that the record as a whole plausibly supports the conclusion that the FPC's former executive director has a present ability to speak for the FPC. *See* Aldrete Dep. (ECF No. 80-8), 7:2-24, 8:4-20, 48:13-54:3 (denying a present recollection), 55:2-20 (same), 56:14-57:18, 87:16-89:4, 90:9-22, 113:7-10, 122:11-25. The City further disputes that the record as a whole supports the conclusion that FPC Core Values only apply while members are on duty, or that the FPC investigation into this incident was limited to conduct while on duty. *Id.*, 96:13-99:6, 102:8-104:1; *see also* Lewis Dep. (ECF No. 73-7), 9:2-11, 77:5-78:5, Ex. 9 ("MPD Code of Conduct"), at 2 ("Department members shall ***at all times*** conduct themselves … in accordance with the provisions of this Code.") (emphasis added), 108:13-109:23, 127:11-25, 132:12-133:6, 136:18-142:1, 145:5-22, 146:25-148:4. Furthermore, Plaintiff has misidentified the document identifying charges for consideration by the Commissioners as the charging document issued against Mattioli. *See* Muche Declaration, ¶¶ 3-7, Ex. 2 and 3. *See also* Aldrete Dep. (ECF No. 77-1 and 80-8), 95:12-25, 102:8-104:1, 105:1-109:16, 109:17-111:9. The witness further testified that the FPC process entailed a fact investigation, a draft charging document with recommended charges for the Board to approve in whole or in part, and a formal charging document reflecting the Board's decision. *Id.*, 7:2-9:9, 10:25-11:12, 12:7-13:16, 14:6-15:16, 23:24-25:7, 27:2-28:11, 29:17-30:4, 32:13-21, 41:19-21, 44:17-46:12, 48:13-49:14, 50:15-25, 54:14-23, 89:20-90:15, 104:20-107:9, 109:17-111:9, 113:2-114:3, 122:11-25, 129:8-22. Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

64. Before charges could be issued by the Fire and Police Commission, a fact investigation had to be performed, and at its conclusion the commissioners reviewed the evidence and determined which charges they felt comfortable issuing. (Aldrete Dep., 129:8–22; Exhibit F).

**RESPONSE**: The City does not dispute that following an FPC investigation potential charges are recommended to the Commission or that the Commission votes to formally issue those charges which it approves, but disputes that Plaintiff has accurately identified the formal charging document issued July 10, 2025, in the matter of citizen complaint against Michael Mattioli. *See* City's Response to Additional Proposed Findings of Fact, ¶ 63, *supra*. The City objects that the investigators recommendations about potential charges are irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

65. On June 15, 2020, the Milwaukee Fire & Police Commission (FPC) issued a five-page charging document against Officer Michael Mattioli alleging violations of MPD rules and procedures. (FPC Charges, June 15, 2020, p. 1; Exhibit B).

**RESPONSE**: The City disputes that this document reflects the charges issued against Mattioli by the FPC; the testimony received was that these potential charges were referred to the Committee for consideration. *See* City's Response to Additional Proposed Findings of Fact, ¶ 63, *supra*. The City objects that the investigators recommendations about potential charges are irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R.

21

56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

66. The FPC charged Mattioli with violating Rule 3 (Integrity) §3.00, citing that he used his law-enforcement training to restrain Mr. Acevedo in a manner disproportionate to the alleged danger. (FPC Charges, June 15, 2020, p. 1; Exhibit B).

**RESPONSE**: The City disputes that this document reflects the charges issued against Mattioli by the FPC; the testimony received was that these potential charges were referred to the Committee for consideration. *See* City's Response to Additional Proposed Findings of Fact, ¶ 63, *supra*. *See also* Muche Decl., ¶¶ 3-9, Ex. 1, 2 and 3. The City objects that the investigators recommendations about potential charges are irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

67. Under Rule 3 (Integrity) §3.03, the FPC cited Mattioli's own description that he was effecting an arrest of Mr. Acevedo, which resulted in great bodily harm. (FPC Charges, June 15, 2020, p. 2; Exhibit B).

**RESPONSE**: The City disputes that this document reflects the charges issued against Mattioli by the FPC; the testimony received was that these potential charges were referred to the

22

Committee for consideration. *See* City's Response to Additional Proposed Findings of Fact, ¶ 63, *supra*. *See also* Muche Decl., ¶¶ 3-9, Ex. 1, 2 and 3. The City objects that the investigators recommendations about potential charges are irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

68. The FPC cited Mattioli's statements in which he admitted he was effecting an arrest that resulted in great bodily harm. Body-worn camera footage captured witness Andrew Janowski stating that Mr. Acevedo had "nearly left the house and he was brought back in and they laid on his legs so he would not get away." (FPC Charges, June 15, 2020, p. 3; Exhibit B).

**RESPONSE**: The City disputes that this document reflects the charges issued against Mattioli by the FPC; the testimony received was that these potential charges were referred to the Committee for consideration. *See* City's Response to Additional Proposed Findings of Fact, ¶ 63, *supra*. *See also* Muche Decl., ¶¶ 3-9, Ex. 1, 2 and 3. The City objects that the investigators recommendations about potential charges are irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members

shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

69. The FPC found that Mattioli continued to restrain Mr. Acevedo despite clear signs of control and audible distress. (FPC Charges, June 15, 2020, p. 4; Exhibit B).

**RESPONSE**: The City disputes that this document reflects the charges issued against Mattioli by the FPC; the testimony received was that these potential charges were referred to the Committee for consideration. *See* City's Response to Additional Proposed Findings of Fact, ¶ 63, *supra*. *See also* Muche Decl., ¶¶ 3-9, Ex. 1, 2 and 3. The City objects that the investigators recommendations about potential charges are irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of ... any additional facts that require the denial of summary judgment[.]"). Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

70. Officer Roach reported that Mattioli had to be commanded several times to disengage and was physically pulled off Mr. Acevedo's back, even after multiple officers had arrived. (FPC Charges, June 15, 2020, p. 4; Exhibit B).

**RESPONSE**: The City disputes that this document reflects the charges issued against Mattioli by the FPC; the testimony received was that these potential charges were referred to the Committee for consideration. *See* City's Response to Additional Proposed Findings of Fact, ¶ 63, *supra*. *See also* Muche Decl., ¶¶ 3-9, Ex. 1, 2 and 3. The City objects that the investigators recommendations about potential charges are irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within

24

his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

71. The FPC found that Mattioli's did not request medical assistance, instead requesting police backup for what he characterized as an arrest. The 911 recording establishes that Mr. Acevedo was conscious and speaking when the call began and that audible gasping/snorting and the sounds of a struggle could be heard; a voice—believed to be Janowski—says, "we got him Michael, don't worry." (MPD SOP 460.40; FPC Charges, June 15, 2020, p. 5; Exhibit B and J).

**RESPONSE**: The City disputes that this document reflects the charges issued against Mattioli by the FPC; the testimony received was that these potential charges were referred to the Committee for consideration. *See* City's Response to Additional Proposed Findings of Fact, ¶ 63, *supra*. *See also* Muche Decl., ¶¶ 3-9, Ex. 1, 2 and 3. The City objects that the investigators recommendations about potential charges are irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws, whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

72. Body-worn camera from Officers Roach and Sheremeta shows Mr. Acevedo face-down with Mattioli straddling his neck (described as a rear-naked chokehold) while Janowski restrained his legs. There was an obvious change in Mr. Acevedo's condition requiring immediate first aid and a medical request, and Mattioli did neither. (FPC Charges, June 15, 2020, p. 5; Exhibit B).

**RESPONSE**: The City disputes that this document reflects the charges issued against Mattioli by the FPC; the testimony received was that these potential charges were referred to the Committee for consideration. *See* City's Response to Additional Proposed Findings of Fact, ¶ 63, *supra*. *See also* Muche Decl., ¶¶ 3-9, Ex. 1, 2 and 3. The City objects that the investigators recommendations about potential charges are irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, if answer is required, the City does not dispute that the FPC formally charged that Mattioli violated Core Value 3.00—Integrity and Referencing Guiding Principle 3.05, which provides in part: "Department members shall obey local ordinances and state and federal laws whether on or off-duty." *See* Muche Decl., ¶¶ 3-9, Ex. 3.

73. Before engaging with anyone, Officer Robert Roach asked, "Who is the officer?" (Roach Dep., 46:8–11; Exhibit D).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, the City does not dispute that Peters told Roach that one of the involved parties was an off-duty officer, that Roach asked "who is the police officer?," or that Mattioli responded "I am." <u>However</u>, the City disputes that this exchange reasonably supports an inference or suggestion that Mattioli invoked police authority during the incident because department policy requires off-duty officers to immediately identify themselves when on-duty officers respond. *See* ECF No. 73-9, SOP § 220.30(C)(2).

74. Officer Roach asked, "Who is the police officer?" and Mattioli stated, "I am." (Taylor Expert Report, ¶8, p. 4; Exhibit F).

**RESPONSE**: Object as duplication of Plaintiff's additional proposed finding ¶ 73. If further response is required, the City incorporates by reference their response to that paragraph.

75. On scene, Officer Robert Roach instructed Michael Mattioli to "get up" and addressed him as "Officer," explaining he was referring to Mattioli in his official capacity to get his attention because Mattioli did not appear responsive, consistent with Roach's experience that calling out an officer's rank draws their attention. (Roach Dep., 61:25–62:17; Exhibit D).

**RESPONSE**: Object as irrelevant to the determination of the legal issues raised by the parties' cross-motions (i.e., whether Mattioli acted under color of law and/or within his scope of employment). *See* Civil L. R. 56(b)(2)(B)(ii) ("[A] statement of … any additional facts that require the denial of summary judgment[.]"). Notwithstanding, the City does not dispute the factual propositions in this paragraph.

Dated and signed at Milwaukee, Wisconsin 16th day of September, 2025.

EVAN C. GOYKE
City Attorney

s/ Clint B. Muche
CLINT B. MUCHE
Assistant City Attorney
State Bar No. 1131629
*Attorneys for Defendants*
*Robert Roach, Alfonso Morales and*
*City of Milwaukee*

P.O. ADDRESS:
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
(414) 286-2601
Email: cmuche@milwaukee.gov

1032-2023-681/xxxxxx

27