# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

| | |
|---|---|
| JOSE ACEVEDO, individually, and as a Special Administrator of the ESTATE OF JOEL ACEVEDO, | |
| Plaintiff, | **CASE NO. 23-cv-00489** |
| v. | |
| MICHAEL MATTIOLI and CITY OF MILWAUKEE, WISCONSIN, | |
| Defendants. | |

## PLAINTIFF'S RESPONSE TO DEFENDANT CITY'S ADDITIONAL PROPOSED FINDINGS OF FACT (Doc. 74)

COMES NOW the Plaintiff, Jose Acevedo, Individually, and as a Special Administrator of the Estate of Joel Acevedo, by and through his undersigned counsel, to submit the following Response to Defendant City's Additional Proposed Findings of Fact (Doc. 74, pp. 14-24):

1. At the time of his death, Joel Acevedo (Acevedo) was an adult resident of the State of Wisconsin. (ECF No. 23 ¶ 4).

   Response: **Undisputed.**

2. Plaintiff Jose Acevedo (Plaintiff) is Joel Acevedo's father and special administrator of the Estate of Joel Acevedo. (ECF 23     5).

Response: **Undisputed.**

3. Defendant Michael Mattioli (Mattioli) is an adult resident of the State of Wisconsin and was employed with the City of Milwaukee Police Department ("MPD") on April 19, 2020. (Muche Decl., 3, Ex. 1, Mattioli's Response to Request for Admission ("RFA") No. 1).

Response: **Undisputed.**

4. Mattioli had been employed by the MPD for more than a decade at the time of the incident. (Mattioli Dep. 27:21-23).

Response: **Undisputed.**

5. Mattioli participated in annual in-service trainings during his time as a Milwaukee police officer. (Mattioli Dep., 28:13-29:11; 33:8-34:10).

Response: **Undisputed.**

6. Following the incident, Mattioli was placed on administrative leave and later resigned. (Mattioli Dep., 23:24-24:8).

Response: **Undisputed.**

7. Mattioli was not scheduled for duty as a Milwaukee police officer on Saturday, April 18, or Sunday, April 19, 2020. (RFA Nos. 29-31).

Response: **Undisputed.**

8. Mattioli is 6'3" and weighed around 230 pounds in April 2020. (Mattioli Dep., 27:10-17).

   Response: **Undisputed.**

9. Acevedo was about as tall as Mattioli, but outweighed him by twenty-five pounds or more. (Mattioli Test., 39:16-20; Mattioli Dep., 77:12-25).

   Response: **Undisputed.**

10. Defendant City of Milwaukee is a Wisconsin municipal corporation whose principal offices are located in Milwaukee, Wisconsin. (ECF No. 23    9; ECF No. 28, 9).

    Response: **Undisputed.**

11. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction over the Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343. (ECF No. 23 ¶¶ 1-2).

    Response: **Undisputed.**

12. The Eastern District of Wisconsin is the proper federal venue for this action under 28 U.S.C. § 1391(b) because it is where all acts alleged in the Amended Complaint occurred. (ECF No. 23    3).

    Response: **Undisputed.**

13. City of Milwaukee records do not reflect that notice of circumstances of claim or an itemized statement of damages was served upon the City prior to filing suit as required under Wis. Stat. § 893.80(1d)(a) and (b). (Owczarski Decl., 6).

    Response: **Undisputed.**

14. On Saturday, April 18, 2020, Michael Mattioli invited three friends to come over to his house in Milwaukee to sit by the fire and have some alcoholic beverages. (Muche Decl, 4, Ex. 2 (hereinafter "Mattioli Dep."), 64:3-8, 64:9-15).

    Response: **Undisputed.**

15. Mattioli's guests included Christopher Peters ("Peters"), a childhood friend, Andrew Janowski ("Janowski"), who Mattioli met through Peters, and Joel Acevedo ("Acevedo"), who Mattioli knew through work and had recently introduced to Peters and Janowski. (Mattioli Dep., 64:9-65:7; Muche Decl., 5, Ex. 3, (hereinafter, "Peters Test."), 7:9-17, 8:6-25, 9:24-10:18, 30:15-31:15; Muche Decl., 6, Ex. 4 (hereinafter, "Janowski Test."), 67:23-25, 70:25-72:3, 91:4-92:5, 92:25-93:3; Muche Decl., 12, Ex. 10 (hereinafter, "Mattioli Test."), 27:5-28:10, 28:13-16, 29:18-21, 30:14-31:2).

    Response: **Undisputed.**

16. Mattioli and Acevedo were already in the backyard when Janowski arrived; Peters arrived last and joined the others by the fire pit. (Peters Test., 9:20-23, 10:4-8, 11:4-17, 34:12-16; Janowski Test., 72:7-22, 73:2-3, 93:4-7).

    Response: **Undisputed.**

17. The four men stayed outside drinking and talking until around midnight, then moved inside to Mattioli's kitchen table. (Peters Test., 11:4-13, 12:25-13:2, 14:5-15:6; Janowski Test., 73:4-21, 74:5-12, 74:25-75:16, 94:17-19; Mattioli Test., 32:10-13; Mattioli Dep.,

    70:16- 24).

    Response: **Undisputed.**

18. They continued drinking after they went inside, and Mattioli talked with another friend over FaceTime. (Peters Test., 15:18-22, 16:5-12, 36:14-37:9; Janowski Test., 75:15-20, 94:20-95:6; Mattioli Test., 32:14-15)

    Response: **Undisputed.**

19. Mattioli, Peters, Janowski, and Acevedo all consumed alcohol and spent the night at Mattioli's house. (Mattioli Test., 31:7-23, 32:5-7; Janowski Test., 72:7-22, 76:10-23; Peters Test., 11:14-17, 16:17-22, 34:12-16; Mattioli Dep., 71:15-72:4).

    Response: **Undisputed.**

20. Peters secretly used cocaine, unbeknownst to Mattioli and Janowski, during the night. (Peters Test., 12:6-24, 13:7-9; Janowski Test., 73:4-21, 74:5-12, 74:22-24).

    Response: **Undisputed.**

21. Peters saw Acevedo went to his car alone more than once. (Peters Test., 35:16-36:13).

    Response: **Undisputed.**

22. Acevedo sent Peters a text message about buying cocaine together—but Peters did not respond. (Peters Test., 13:10-14:1, 62:14-63:9).

    Response: **Undisputed.**

23. At some point, Janowski went to sleep on the couch in the living room, Peters went to the basement, and Mattioli went to his bedroom on the second floor. (Janowski Test., 76:25- 77:10; Peters Test., 17:1-7; Mattioli Test., 33:19-21, 40:3-11; Mattioli Dep., 71:5-14). Response: **Undisputed.**

24. Mattioli laid down in his clothes and went to sleep on his bed. (Mattioli Test., 33:22-34:7).

    Response: **Undisputed.**

25. Mattioli was wearing the same clothes he had worn the night before, i.e. jeans and a t-shirt, the next morning. (Mattioli Dep., 68:10-13).

    Response: **Undisputed.**

26. The shirt bore the name of a Milwaukee police officer who had been killed in the line of duty and included MPD logos and designs. (Mattioli Dep., 68:14-25).

Response: **Undisputed.**

27. The shirt was not department-issued – it was "just a shirt." (Mattioli Dep., 145:14-146:2).

Response: **Undisputed.**

28. In the morning Mattioli and Acevedo began to argue. Their verbal argument escalated into a physical confrontation involving Mattioli, Peters, Janowski, and Acevedo. (Peters Test., 21:23-22:8, 24:1-7, 24:23-24, 50:12-51:24, 55:4-6; Janowski Test., 81:4-82:7, 82:18- 83:11, 85:5-10, 101:1-25; Mattioli Test., 43:18-44:2, 54:16-19; Mattioli Dep., 95:21- 97:10).

Response: **Undisputed.**

29. Mattioli woke up because he felt someone's hand inside his right front pants pocket. (Mattioli Test., 34:10-15; Mattioli Dep., 72:9-73:25).

Response: **Undisputed.**

30. When he opened his eyes he saw Acevedo in his bedroom. (Mattioli Test., 34:16-22; Mattioli Dep., 72:9-73:25).

Response: **Undisputed.**

31. Mattioli asked "what are you doing," and asked why Acevedo was stealing from him. Acevedo became loud, defensive, and angry; he denied that he had stolen from Mattioli, and began taking things out of his pockets and throwing them onto Mattioli's bed. (Mattioli Test., 34:15-36:11; Mattioli Dep., 72:9-73:25).

   Response: **Undisputed.**

32. Investigators found a rolled up dollar bill on Mattioli's bed that tested positive for cocaine. DNA testing implicated Acevedo but excluded the others. (Muche Decl., 9, Ex. 7 (hereinafter, "Dalland Test."), 59:2-19, 60:20-63:3).

   Response: **Undisputed.**

33. When Mattioli stood up and told him to leave, Acevedo began walking down the stairs and Mattioli followed behind. (Mattioli Test., 36:12-23; Mattioli Dep., 74:23-75:12, 75:24- 76:12).

   Response: **Undisputed.**

34. Mattioli told Acevedo to leave repeatedly after they reached the first floor, but Acevedo refused. (Mattioli Test., 37:2-4, 37:22-38:3; Mattioli Dep., 76:13-21).

   Response: **Undisputed.**

35. The argument woke Janowski on the couch, who stood up but did not immediately intervene. (Janowski Test., 77:22-78:23, 79:19-25; 98:3-24; Mattioli Test., 38:12-25; Mattioli Dep., 76:22 77:11).

    Response: **Undisputed.**

36. The argument also woke Peters, who came upstairs and saw Mattioli, Acevedo, and Janowski in Mattioli's living room. (Peters Test., 17:17-18:25, 39:16-21; Mattioli Test., 39:1-9).

    Response: **Undisputed.**

37. Mattioli and Acevedo were screaming at each other; Mattioli was accusing Acevedo of stealing from him and telling him to leave, and Acevedo was refusing to go. (Peters Test., 19:4-10, 42:21-43:10; Janowski Test., 78:18-79:9).

    Response: **Undisputed.**

38. Mattioli forcefully told Acevedo to leave telling him "If you don't, I'm going to call the police." (Janowski Test., 100:11-25).

    Response: **Undisputed.**

39. Mattioli pointed at Acevedo, telling Peters, "He was stealing from me." (Mattioli Test., 42:5-10; Mattioli Dep., 78:8-24).

    Response: **Undisputed.**

40. Acevedo shoved Mattioli in the chest. (Peters Test., 20:18-21:19, 47:5-20, 49:6-11; Janowski Test., 80:13-21; Mattioli Test., 39:1-15; Mattioli Dep., 78:25-79:17).

Response: **Undisputed.**

41. Peters yelled at Acevedo to "get the fuck out of the house," then Acevedo struck Peters in the face causing him to fall backwards into the kitchen. (Peters Test., 21:23-22:8, 50:12- 51:24; Janowski Test., 81:4-82:7, 101:1-25; Mattioli Dep., 79:18-20).

Response: **Undisputed.**

42. Acevedo lost his balance in the process and fell to the ground. (Mattioli Test., 42:22-43:7; Mattioli Dep., 79:18-80:15).

Response: **Undisputed.**

43. As Acevedo tried to stand back up, Mattioli got on top of him. (Mattioli Test., 43:18-44:2; Peters Test., 22:12-14, 23:2-10, 53:1-54:11; Janowski Test., 82:8-17; Mattioli Dep., 80:21-81:2).

Response: **Undisputed.**

44. Mattioli got on top of Acevedo because he "didn't want him to get up and keep punching people." (Mattioli Dep., 86:3-11).

Response: **Undisputed.**

45. Everyone ended up in the kitchen; Mattioli and Janowski, who had wrestled Acevedo to the floor, were trying to keep him down while Acevedo tried to get up. (Peters Test., 22:12- 14, 23:2-16, 24:8-22, 53:1-54:11, 55:7-9; 56:19- 57:6; Janowski Test., 85:11-22, 105:3- 106:1; Mattioli Test., 44:21-45:2, 46:2-11; Mattioli Dep., 86:8-18).

Response: **Undisputed.**

46. Mattioli was on Acevedo's back straddling his upper torso, and Janowski was laying across Acevedo's legs. (Peters Test., 24:1-7, 24:23-24, 55:4-6; Janowski Test., 82:18-83:11, 85:5-10; Mattioli Test., 43:18-44:2, 54:16-19; Mattioli Dep., 95:21-97:10).

Response: **Undisputed.**

47. Mattioli testified, "all I basically did was use my body-weight to keep him on the ground." (Mattioli Dep., 92:16-22).

Response: **Disputed. Although Mattioli testified that "all [he] basically did was use [his] body-weight to keep him on the ground" (Mattioli Dep., 92:16–22), the broader record demonstrates that his restraint went beyond mere body-weight pressure. Mattioli admitted that his right arm was positioned across Mr. Acevedo's neck and chin area while applying body-weight to keep him down (Mattioli Dep., 95:21–97:10; Exhibit A). Mattioli admitted to investigators that he squeezed and pressed on Joel**

11

**Acevedo's neck when he told investigators, "I didn't press hard enough" and "I wasn't squeezing tight enough where he couldn't breathe." (Mattioli Dep., 98:22-24; 111:22-24).–Officer Roach further testified that Mattioli's right arm was underneath and around Joel Acevedo's neck and that he appeared to have his full bodyweight on Joel's upper body (Roach Dep., 66:10–16; Exhibit D). The Milwaukee Fire and Police Commission, relying on body-worn camera evidence, found that Mr. Acevedo was face-down with Mattioli straddling his neck in what was described as a rear-naked chokehold, while Janowski restrained his legs (FPC Charges, June 15, 2020, p. 5; Exhibit B).**

48. Mattioli retrieved his cell phone from his pants pocket and called 911 at 7:28 a.m. (Carsky Decl., ¶¶ 9, Ex. 3 (hereinafter, "CAD Sheet") and 10, Ex. 4 (hereinafter, "911 Call"); Mattioli Dep., 86:8-18; Janowski Test., 85:5-8; Mattioli Test., 47:2-6; Muche Decl., 7, Ex. 5 (hereinafter, "Blomme Test."), 116:5-117:8;).

Response: **Undisputed.**

49. Mattioli told the operator, "I'm an off duty officer, and I need help at my house." (911 call; Mattioli Test., at 48:8-10; Mattioli Dep., 86:19-87:3).

Response: **Undisputed.**

50. Mattioli did not hear Acevedo say "Let me go. I want to go home," during the 911 call. (Mattioli Test., 76:20-24; Mattioli Dep., 88:16-89:10, 159:11-24).

Response: **Disputed. The 911 recording establishes that Mr. Acevedo was conscious and speaking when the call began and that audible gasping/snorting and the sounds of a struggle could be heard; a voice— believed to be Janowski—says, "*we got him Michael, don't worry.*" Despite this, Mattioli continued restraining Acevedo and did not deescalate. (Mattioli Dep., 100:10-101:10). Accordingly, whether Mattioli claims he did not hear the precise words "Let me go. I want to go home" does not negate the objective evidence of audible distress and his failure to deescalate. (Exhibit B).**

51. Mattioli was intoxicated and angry during the incident. (Mattioli Test., 72:3-8; Mattioli Dep., 147:1-17).

Response: **Disputed. Mattioli testified that he was intoxicated before he went to bed and "somewhat" intoxicated when he woke up in the morning, but there is no evidence establishing his level of intoxication during the incident. (Mattioli Dep., 147:1-17). To the contrary, Mattioli testified that he had not consumed alcohol to a point where he was impaired to where his judgment was clouded. (Mattioli Dep., 61:7 to 62:13).**

52. Mattioli believed Acevedo was trying to steal from him, had refused to leave, and had attacked him and his friend. (Mattioli Dep., 81:3-23).

    Response: **Undisputed.**

53. Mattioli stayed on top of Acevedo until the police arrived. (Mattioli Dep., 99:13-100:24).

    Response: **Undisputed.**

54. Mattioli explained, "[Acevedo] was – he was throwing punches at people, and I wanted to keep him on the ground so he couldn't do that anymore until the police could show up and arrest him." (Mattioli Dep., 164:2-8).

    Response: **Undisputed.**

55. He stated, "I just wanted to hold him there until the police could get there." (Mattioli Dep., 165:22-166:5; see also Mattioli Dep., 121:22-122:5).

    Response: **Undisputed.**

56. Mattioli never told Acevedo he was under arrest or ordered him to "stop resisting." (Mattioli Dep. 155:11-24).

    Response: **Undisputed.**

57. Mattioli did not direct Janowski to lay across Acevedo's legs; Janowski did so to prevent Acevedo from harming anyone else. (Janowski Test., 106:2-15; Mattioli Test., 54:16-55:1).

    Response: **Undisputed.**

58. Although plaintiff's counsel tried repeatedly to get Mattioli to adopt his framing that Mattioli "arrested" Acevedo, Mattioli replied, "I mean, I didn't see it that way. In the heat of the moment, which was chaotic, I didn't – I wasn't thinking, 'okay, I am arresting this man on behalf of the [City] of Milwaukee.'" (Mattioli Dep., 121:15-122:5).

Response: **Disputed. Mattioli admits that he did not lie to criminal investigators or when he testified at his criminal trial, when he admitted that he used force against Joel Acevedo during the performance of an arrest. (Mattioli Dep., Exhibit A, at pp. 87:4 to 87:9; 89:25 to 90:21). On scene, Mattioli placed Acevedo's arms behind his back "as if … to put handcuffs on him," telling officers, "Cuff this guy" (Roach Dep., 64:6–21; Exhibit D). He also identified himself as a police officer during the 911 call (Mattioli Dep., 86:17–87:3; Mattioli's RFA Resp. No. 4; Exhibits A and C). Mattioli admits that other police officers responded to his "request for backup." (Mattioli Answer (Doc. 26) at 14). When the first arriving officer asked, "Who is the police officer?" Mattioli responded, "I am." (Taylor Expert Report, ¶8, p. 4; Exhibit F). In any event, MPD SOP 220.10(A) defines arrest by custodial control and intent and expressly states no formal declaration of arrest is required; thus, Mattioli's subjective after-the-fact framing is effectively rebutted by his**

own admissions, his conduct verified by Officer Roach, and conduct consistent with an arrest. (SOP 220.10(A); Exhibit I)..

59. Mattioli only said he was attempting to arrest Acevedo after the fact. (Mattioli Dep., 87:4-88:15).

Response: **Disputed. The record contains contemporaneous statements and conduct showing Mattioli was effecting an arrest, not merely an after-the-fact characterization. During the 911 call he identified himself as a police officer (Mattioli Dep., 86:17–87:3; Mattioli's RFA Resp. No. 4; Exhibits A and C); upon entry, when asked "Who is the police officer?" he replied "I am." (Taylor Expert Report, ¶8, p. 4;Exhibit F). While restraining Mr. Acevedo, Mattioli took Acevedo's arms behind his back "as if … to put handcuffs on him," and directed officers, "Cuff this guy." (Roach Dep., 64:6–21; Exhibit D). He also told a DA investigator he had arrested Acevedo (Taylor Expert Report, ¶14, p. 5; Exhibit F), and admits that he did not lie to criminal investigators or when he testified at his criminal trial, when he admitted that he used force against Joel Acevedo during the performance of an arrest. (Mattioli Dep., Exhibit A, at pp. 87:4 to 87:9; 89:25 to 90:21). In any event, MPD SOP 220.10(A) defines arrest by custodial control and intent and states no formal declaration is required; Mattioli's on-scene statements and actions satisfy**

**that standard. (SOP 220.10(A); Exhibit I).**

60. During the 911 call, Acevedo knocked Mattioli's phone from his hand and Peters picked it up. (Peters Test., 25:4-24; 57:25-58:10).

    Response: **Undisputed.**

61. Acevedo fought to break free from Mattioli and Janowski's grasp during the remainder of the call. (Mattioli Test., 49:1-20, 50:22-24; 911 Call; Tlomak Test., 11:7-12:4, 56:9-18, 12:5-12).

    Response: **Undisputed.**

62. Peters told the dispatcher "This man is attacking us." He meant Mattioli, Janowski, and himself by "us." (911 call; Peters Test., 58:11-22; Mattioli Test., 50:25-51:5).

    Response: **Undisputed.**

63. After the 911 call ended at 7:32 a.m., Peters went outside to wait for officers to arrive. (Peters Test., 25:25-26:7, 58:11-22; Mattioli Test., 50:25-51:5; Blomme Test., 117:9-10). Response: **Undisputed.**

64. Officer Robert Roach ("Roach") and Officer Mark Sheremeta ("Sheremeta") were dispatched to Mattioli's house at 7:34 a.m. in response to the 911 call. (CAD Sheet, Carsky Decl., ¶ 11, Ex. 5 (hereinafter, "Roach BWC"), 2:30-40). Response: **Undisputed.**

65. When they arrived Roach and Sheremeta saw Peters outside with visible injuries to his face. (Roach BWC, 2:40-3:04).

Response: **Undisputed.**

66. Peters met Roach and Sheremeta by the sidewalk and brought them to Mattioli's kitchen door. (Peters Test., 60:17-19).

Response: **Undisputed.**

67. Peters told them that Joel was "subdued" inside, and led officers up the driveway to a side door. (Roach BWC, 3:05-3:30).

Response: **Undisputed.**

68. Roach entered Mattioli's kitchen and saw Mattioli and Janowski on top of Acevedo. (Roach BWC, 3:30-4:10).

Response: **Undisputed.**

69. After the parties were separated, Roach checked Acevedo's pulse and requested an emergency medical response. (Roach BWC, 4:10-4:24).

Response: **Undisputed.**

70. Acevedo was rolled onto his back, then Officer Sheremeta started cardio-pulmonary resuscitation ("CPR"). (Roach BWC, 4:25-4:55).

Response: **Undisputed.**

71. Officers continued CPR until EMTs arrived. (Muche Decl., ¶8, Ex. 6 (hereinafter, "Deford Test."), 28:10-31:12).

Response: **Undisputed.**

72. EMTs detected that Acevedo had a pulse at 8:01 a.m. He was loaded and transported to St. Luke's Hospital shortly thereafter. (Deford Test., 31:4-12; Muche Decl., ¶11, Ex. 9 (hereinafter, "Tlomak Test.,"), 17:10-20).

Response: **Undisputed.**

73. Acevedo never regained consciousness after he was admitted to the hospital. (Tlomak Test., 19:22-18:5).

Response: **Undisputed.**

Additional Relevant Facts

74. Investigators from the Milwaukee County District Attorney's Office responded to Mattioli's house and conducted a criminal investigation into the incident. (Blomme Test., 112:8-23).

Response: **Undisputed.**

75. Mattioli, Janowski, and Peters each separately made recorded statements on-scene, immediately after the incident. (Carsky Decl., 12, Ex. 6 (hereinafter, "Bouzek BWC"); Carsky Decl., 13, Ex. 7 (hereinafter, "Romero-Perez BWC"); Carsky Decl., 14, Ex. 8 (hereinafter, "Dathe BWC")).

Response: **Undisputed.**

76. Acevedo was pronounced brain dead on April 25, 2020. (Tlomak Test., 9:2-3).

    Response: **Undisputed.**

77. Mattioli was charged with 1st Degree Reckless Homicide in State of Wisconsin v.

    Michael A. Mattioli, Milwaukee County Circuit Court Case No. 2020CF1991. See

    https://wcca.wicourts.gov/caseDetail.html?caseNo=2020CF001991&countyNo=40&indx=0&mode=details.

    Response: **Undisputed.**

78. The criminal trial was conducted between November 6 and November 10, 2023, and resulted in a verdict of "not guilty" verdict. *Id*.

    Response: **Undisputed.**

Milwaukee Police Department Policies and Procedures

79. Mattioli was aware of the Department's use of force and arrest policies. (Mattioli Dep., 34:11-35:22; 38:2-40:7).

    Response: **Undisputed.**

80. Mattioli understood Standard Operating Procedures ("SOP") to be the Department's expectation about how things should be done, and attended trainings about how to implement policies in the field. (Mattioli Dep., 48:8-

15).

Response: **Disputed in part; disputed as incomplete and misleading. While Mattioli acknowledged that SOPs reflect the Department's expectations and that he attended trainings (Mattioli Dep., 48:8–15; Exhibit A), the record shows material deficiencies in MPD policy/training and in Mattioli's implementation: he was required to sign for receipt of SOPs but was not required to read them, was not given time during shift to do so, and no one explained them to him or asked if he had questions (Taylor Expert Report, ¶¶ 18–20, pp. 5; Exhibit F); he was never told he could not use non-sanctioned techniques (Taylor Expert Report, ¶21, p. 5; Exhibit F); MPD had no neck-restraint/chokehold policy and SOP 460 lacked warnings about head/neck force, prone compression, non-sanctioned techniques, and de-escalation (Taylor Expert Report, ¶¶ 16–17, p. 5; Exhibit F); and SOP 220's off-duty provisions are "vague," leaving "discouraged" action to the officer's discretion (Taylor Expert Report, ¶15, p. 5; Lewis Dep., 51:8–22; Exhibits F and G). Consistent with those gaps, Mattioli testified he learned the body-weight prone restraint on the job and used it many times in front of supervisors without correction (Mattioli Dep., 92:17–93:3; 93:11–20; Exhibit A). He also failed to request medical aid during the 7:28 a.m. 911 call despite audible**

**distress, contrary to SOP 460.40 (FPC Charges, June 15, 2020, p. 5; SOP 460.40; Exhibits B and J).**

81. Mattioli was never taught to use neck restraints in the course of his duties by the Milwaukee Police Department, and never saw or was aware of other Milwaukee police officers using neck restraints. (Mattioli Dep., 17:13-18:15; 20:13-23; 55:19-56:20).

    Response: **Disputed. Mattioli testified that he learned the restraint that he used on Joel Acevedo (body-weight with arm across the neck) on the job and used it many times in front of supervisors without correction; it was sanctioned by supervisors, and not precluded by policy. (Mattioli Dep., 92:17–93:3; 93:11–20; Exhibit A).**

82. Mattioli opined that it was not "realistic" to read every page of every policy, but he always tried to "do the right thing." (Mattioli Dep., 54:9-21).

    Response: **Disputed. Whether Mattioli believed it was not "realistic" to read every policy and that he tried to "do the right thing" is not the issue. The record establishes material policy/training deficiencies both in text and implementation. Mattioli was required to sign for SOPs but was not required to read them, was not given time during shift to do so, and no one explained them or checked understanding (Taylor Expert Report, ¶¶ 18–20, pp. 5–6; Exhibit F); he was never told he could not use non-**

sanctioned techniques (Taylor Expert Report, ¶21, p. 6; Exhibit F); MPD had no neck-restraint policy, and SOP 460 did not warn against using force in the head/neck region, did not preclude the use of chokeholds/neck restraints, did not warn against unsafe body positions (i.e., face down, being compressed, etc.), did not preclude the use of non-sanctioned techniques, and did not discuss de-escalation. (Taylor Expert Report, 40 p.8; Exhibit F). MPD's Off-Duty policy was vague and did not preclude Mattioli from acting in his capacity as a police officer when he did so, leaving it to his discretion whether to attempt to arrest a person while off-duty after having consumed alcohol. (Taylor Expert Report, 37 p. 8; Exhibit F). Consistent with those deficiencies, Mattioli learned and repeatedly used the restraint technique on duty in front of supervisors without correction (Mattioli Dep., 92:17–93:3; 93:11–20; Exhibit A). Thus, his subjective "do the right thing" assertion neither excuses unreasonable force nor failure to render aid under the governing policies.

83. Mattioli learned what a "rear-naked chokehold" was after this incident, but denied that is what he did during the incident. (Mattioli Dep., 19:13-20:12; 96:9-97:14; 98:22-99:17; 107:19-108:24; 109:24-111:4; 115:2-24).

Response: **Disputed. Regardless of when Mattioli says he learned the term "rear-naked chokehold," the objective evidence shows he used a**

neck restraint. Officer Roach testified he saw Mattioli's right arm underneath and around Mr. Acevedo's neck and that Mattioli appeared to have his full bodyweight on Mr. Acevedo's upper body; Roach also stated he believed he observed a rear-naked chokehold. (Roach Dep., 64:22–65:9; 66:10–16; Exhibit D) The FPC charging memorandum, based on body-worn camera, likewise describes Mr. Acevedo face-down with Mattioli straddling his neck in what was described as a rear-naked chokehold, while Janowski restrained the legs. (FPC Charges, June 15, 2020, p. 5.; Exhibit B) Plaintiff's expert concludes Mattioli placed Mr. Acevedo in a chokehold. . (Taylor Expert Report, ¶¶ 33–34, p. 8.; Exhibit F) Expert further notes Roach told Mattioli, "I'm making sure you don't have your arm around his neck," to which Mattioli responded, "Oh yeah," then withdrew his arm—after which Mr. Acevedo's head rolled to the side and he appeared lifeless. (Taylor Expert Report, ¶10, p. 5.; Roach Dep., 59:8-60:18; Exhibits D and F) Mattioli admitted that his right arm was positioned across Acevedo's "neck and chin area" while using his body weight to push downward and prevent Acevedo from rising. (Mattioli Dep., 95:21–97:10; Exhibit A) Mattioli admitted that he cannot state with certainty that the neck restraint technique that he used did not restrict bloodflow to Joel Acevedo's brain.

**(Mattioli Dep., 108:25 – 109:9; Exhibit A) Finally, the IACP 2017 Consensus Policy defines chokeholds as maneuvers that restrict breathing and permits them only when deadly force is authorized—a standard not met here. (Taylor Expert Report, ¶32, p. 8; Exhibit F) Thus, the record contradicts Defendant's assertion and supports that Mattioli employed a neck restraint consistent with a chokehold.**

84. MPD Standard Operating Procedure 460 – Use of Force ("SOP 460") was effective June 21, 2019. (Carsky Decl.,  7, Ex. 1 (hereinafter, "SOP 460")).

Response: **Undisputed.**

85. Section 460.05 states: "[i]t is the policy of the department to accomplish the department's mission with cooperation of the public and with minimal reliance upon the use of physical force. Members shall only use the force necessary to perform their duties in accordance with department policy." (SOP 460).

Response: **Undisputed.**

86. Section 460.15 states: "[t]he use of force by a police member must be objectively reasonable. Police members shall use only the force necessary to effectively maintain control of a situation and protect the safety of police members and the public." (*Id.*).

Response: **Undisputed.**

87. MPD Standard Operating Procedure 220 – Arrest Authority ("SOP 220") was also in effect on April 19, 2020. (Carsky Decl., 8, Ex. 2 (hereinafter, "SOP 220")).

Response: **Disputed. The MPD Standard Operating Procedure 220 – Arrest Authority ("SOP 220") was effective on April 24, 2017. (Exhibit I).**

88. Section 220.05 states: "[i]t is the policy of the Milwaukee Police Department that all arrests made by members both on or off duty shall be conducted professionally and in accordance with established legal principles." (SOP 220).

Response: **Undisputed.**

89. Section 220.30(B) imposes limitations upon MPD officers' authority to make off-duty arrests. (SOP 220).

Response: **Undisputed.**

90. Section 220.30(B)(2) states: "[m]embers are discouraged from taking police action when the member has consumed alcohol or any other substance which could impair rational action or conduct." (SOP 220).

Response: **Undisputed.**

91. Section 220.30(B)(3) states: "[t]he member shall not be personally involved in the incident underlying the arrest." (SOP 220).

Response: **Undisputed. Section 220.10 of the policy, however, excludes from the definition of "personally involved" "situations where the off-duty member is a victim of a crime." (SOP 220).**

Dated this 16th day of September 2025.

Respectfully submitted,

By: /s/ B'Ivory LaMarr
**B'IVORY LAMARR, ESQUIRE**
Wisconsin Bar No. 1122469
blamarr@lamarrfirm.com
THE LAMARR FIRM
5718 Westheimer Road, Suite 1000
Houston, TX 77057
800.679.4600, Ext. 700

By: /s/ Devon M. Jacob
**DEVON M. JACOB, ESQUIRE**
Pennsylvania Bar No. 89182
djacob@jacoblitigation.com
JACOB LITIGATION, INC.
P.O. Box 837
Mechanicsburg, Pa. 17055-0837
717.796.7733

**KIRK M. CLAUNCH, ESQUIRE**
Texas Bar No. 1039975
claunchlaw3@earthlink.net
THE CLAUNCH LAW FIRM
301 W. Central Avenue
Forth Worth, TX 76164
817.335.4003

**BENJAMIN L. CRUMP, ESQUIRE**
Washington, D.C. Bar No. 1552623
court@bencrump.com
**PRECIOUS CHAVEZ, ESQUIRE**
precious@bencrump.com
**BEN CRUMP LAW, PLLC**
122 S. Calhoun Street
Tallahassee, FL 32301
800.959.1444

*Counsel for Plaintiff*