UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOSE ACEVEDO as Special Administrator
of the Estate of Joel Acevedo,

        Plaintiff,

  v.

Case No. 23-cv-0489-bhl

MICHAEL A MATTIOLI,
and the CITY OF MILWAUKEE,[1]

        Defendants.

---

### AMENDED ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
---

      This case arises out of the death of Joel Acevedo following a drunken altercation at the home of off-duty Milwaukee Police Officer Michael Mattioli. On the night in question, Acevedo was among a group of friends that Mattioli invited over for drinks and a bonfire. After the men drank heavily and fell asleep in different rooms of the house, Mattioli awoke to find Acevedo in his bedroom rummaging through his pants. Mattioli accused Acevedo of theft and told him to leave, leading to a physical struggle that ended with Mattioli on top of Acevedo and, aided by another friend, holding him down. Acevedo continued to resist even as Mattioli called 911. By the time responding officers arrived, Acevedo did not appear to be breathing and, despite efforts to resuscitate him, he was declared legally brain dead several days later. The administrator of Acevedo's estate (the Estate) now seeks to hold Mattioli and the City of Milwaukee (the City) liable for Acevedo's death under a number of state law tort theories and for federal constitutional violations.

      The parties have filed competing motions for summary judgment. Based on the undisputed facts, the Estate's federal constitutional claims fail as a matter of law. The record confirms that Mattioli was acting as a private citizen in connection with the incident, and not "under color of

---

[1] Defendants Robert Roach and Alfonso Morales were dismissed by stipulation on July 24, 2025. (ECF Nos. 5 & 50.)

law," precluding any alleged constitutional violation. The Court will therefore dismiss the Estate's federal claims and relinquish jurisdiction over its remaining state law claims.

## FACTUAL BACKGROUND[2]

At the time of the events in question, Acevedo was an adult resident of the State of Wisconsin. (ECF No. 91 at 1 ¶1.) He was an acquaintance of Mattioli, an adult resident of the State of Wisconsin and, at the relevant time, a member of the Milwaukee Police Department. (ECF No. 72 at 2 ¶3; ECF No. 85 ¶¶3–4.) The City is a municipal corporation with its principal office located in Milwaukee, Wisconsin. (ECF No. 91 at 2 ¶4.)

On April 18, 2020, Mattioli hosted a bonfire at his home that was attended by Acevedo and two other friends, Christopher Peters and Andrew Janowski. (*Id.* at 3 ¶8.) At the time of the party, Mattioli was *not* on duty. (ECF No. 72 at 2 ¶7; ECF No. 91 at 26 ¶56.) The four men spent the night drinking alcohol around a bonfire until it got too cold, at which point they went inside. (ECF No. 91 at 3 ¶¶8–9.) Because they had been drinking, the guests stayed the night in various rooms around Mattioli's home. (*Id.* at 4 ¶13.) Mattioli slept in his bedroom on the second floor. (*Id.* at 4 ¶14.) Janowski went to sleep on a couch in the living room on the main level of the house. (*Id.*) Peters went to sleep in the basement of the house. (*Id.*) It is unclear where Acevedo was or if he ever went to sleep.

In the early morning hours of April 19, 2020, Mattioli awoke to see Acevedo rummaging through his pants pockets. (*Id.* at 4 ¶15.) Mattioli concedes that both he and Acevedo were still intoxicated. (ECF No. 72 at 10 ¶51; ECF No. 91 at 28 ¶61.) When Mattioli asked Acevedo why he was stealing from him, Acevedo became loud, defensive, and angry. (ECF No. 72 at 6 ¶31.) He denied he was stealing anything and then began taking things out of his own pockets and throwing them on Mattioli's bed. (*Id.*) Mattioli got out of bed and told Acevedo to leave. (ECF No. 72 at 6 ¶33.) Acevedo left the room and began walking downstairs while Mattioli followed, continuing to insist that Acevedo leave. (*Id.* at 6 ¶¶33–34; ECF No. 91 at 5 ¶19.)

The noise and skirmishing woke both Janowski and Peters. (ECF No. 72 at 7 ¶¶35–36.) Janowski stood up from the couch but did not immediately intervene. (*Id.* at 7 ¶35.) Peters came upstairs from the basement. (*Id.* at 7 ¶36.) All witnesses confirm that Mattioli and Acevedo were

---

[2] This background is derived primarily from the parties' Proposed Findings of Facts. (ECF Nos. 72, 74, 84, 85, 90, & 91.) Additional details are derived from responding officers' body camera footage, (ECF No. 61-5), which provide objective confirmation of the circumstances, *see Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 985 (7th Cir. 2021).

screaming at each other, with Mattioli accusing Acevedo of stealing and telling him to leave, and Acevedo refusing to go. (*Id.* at 7 ¶37.)

Mattioli ultimately threatened to call the police if Acevedo did not leave. (*Id.* at 7 ¶38.) Acevedo responded by shoving Mattioli in the chest, causing him to take a step backward. (*Id.* at 7 ¶40; ECF No. 91 at 5 ¶26.) Peters also began yelling, and Acevedo responded by punching him in the face, causing him to fall back into the adjoining kitchen. (ECF No. 72 at 8 ¶41; ECF No. 91 at 8 ¶¶27–28.) Acevedo also lost his balance and fell to the ground. (ECF No. 72 at 8 ¶¶41–42; ECF No. 91 at 8 ¶30.) When Acevedo tried to get up, Mattioli got on top of him and used his body weight to keep Acevedo down. (ECF No. 72 at 8 ¶43; ECF No. 91 at 8–9 ¶32.) With everyone now in the kitchen, Janowski joined the fight. (ECF No. 72 at 8 ¶45; ECF No. 91 at 9–10 ¶¶34–35.)

Eventually, Acevedo lay face-down on his stomach with Mattioli on top of him, straddling Acevedo's back with his knees on the ground. (ECF No. 72 at 8–9 ¶46; ECF No. 91 at 14 ¶40.) In holding Acevedo down, Mattioli was positioned with his upper body on top of Acevedo's upper body and his right arm under Acevedo's chin or neck. (ECF No. 91 at 15 ¶42.) The parties dispute whether Mattioli was choking him. (*Id.* at 50 ¶38, 32–34 ¶¶69–71.) Janowski lay across Acevedo's legs to further restrain him. (*Id.* at 15 ¶41.) Despite these efforts, Acevedo continued to try to push off the ground, but each time, Mattioli pushed him back down. (*Id.* at 15 ¶43.)

At 7:29 a.m., Mattioli called 911, telling the dispatcher, "I need help." (*Id.* at 11 ¶36; ECF No. 90 at 7 ¶36; ECF No. 72 at 10 ¶49; ECF No. 61-4 at 00:15–00:25.) He also accurately identified himself as an off-duty police officer. (ECF No. 91 at 11 ¶36; ECF No. 90 at 7 ¶36; ECF No. 72 at 10 ¶49; ECF No. 61-4 at 00:15–00:25.) During the call, Acevedo knocked the phone out of Mattioli's hand, and Peters picked up the phone to inform dispatchers that Acevedo was attacking them and urged dispatchers to send someone quickly. (ECF No. 91 at 12 ¶38.) Acevedo can be heard on the 911 call saying "Let me go. I want to go home." (ECF No. 72 at 10 ¶50; ECF No. 91 at 24 ¶53.) According to Peters and Mattioli, Acevedo continued to resist throughout the 911 call, and both believed he posed a danger to the individuals in the house. (ECF No. 91 at 12–13 ¶¶38–39.) When the call ended, Peters went outside to wait for officers to arrive. (ECF No. 72 at 13 ¶63.)

Around 7:38 a.m., Milwaukee Police Officers Robert Roach and Mark Sheremeta arrived. (ECF No. 91 at 21 ¶49; ECF No. 72 at 13 ¶64.) Peters met Roach at the sidewalk and reported

that Acevedo had been subdued and was inside the house. (ECF No. 61-5 at 2:38–3:02.) He then escorted the officers to Mattioli's side door, which led into the kitchen. (*Id.* at 3:02–3:34.) During the walk to the house, Peters informed Roach that Mattioli was a police officer. (*Id.*) Upon entering, Roach saw Mattioli holding Acevedo down, and Mattioli told him to handcuff Acevedo. (*Id.* at 3:34–3:44.) Roach asked which of them was the police officer. (*Id.* at 3:44–3:47.) Mattioli responded that he was the officer, after which Roach asked if Acevedo was breathing, and Mattioli said, "I don't know." (*Id.* at 3:47–3:51.) Roach then moved closer, indicating he was "making sure [Mattioli] did not have his arm around [Acevedo's] neck," and Mattioli said "oh, yeah." (*Id.* at 3:51–3:57.) By that time, Acevedo was not moving. (*Id.*; ECF No. 91 at 17 ¶46; ECF No. 80-1 at 100:2–9, 104:24–105:9.)

Mattioli moved to sit on Acevedo's back and hold his hands behind him. (ECF No. 61-5 at 3:55–4:02.) Roach tapped Acevedo's arm and said "hello," and when Acevedo did not respond, Roach told Mattioli to get up several times, finally saying "Officer, get up." (*Id.* at 3:58–4:05.) Mattioli and Janowski got off Acevedo and stepped back, Roach checked Acevedo for a pulse but did not find one, and the officers then rolled Acevedo onto his back to start cardio-pulmonary resuscitation (CPR). (ECF No. 91 at 22 ¶51; ECF No. 72 at 14 ¶70; ECF No. 61-5 at 4:05–4:58, 6:20–7:48.) CPR continued until the emergency medical technicians (EMTs) arrived. (ECF No. 72 at 14 ¶71.) At 8:01 a.m., the EMTs detected a pulse; Acevedo was then transported to a hospital, but he never regained consciousness. (*Id.* at 15 ¶¶72–73.) On April 25, 2020, a week after the incident, Acevedo was pronounced brain dead. (*Id.* at 15 ¶76.)

## LEGAL STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could influence the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). A dispute over a material fact is "genuine"

only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Upon such a showing, the burden shifts to the opposing party to "make a showing sufficient to establish the existence of an element essential to that party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). This burden is not onerous, but the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

If the parties assert different characterizations of the facts, the Court must view the record in the light most favorable to the non-moving party. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

## ANALYSIS

In Counts I and III of the Amended Complaint, the Estate asserts Fourth Amendment excessive force claims against Mattioli and the City of Milwaukee under 42 U.S.C. §1983 and *Monell v. Department of Social Services*, 346 U.S. 658 (1978). (ECF No. 23 ¶¶65–83, 94–99.) Both claims require proof that Mattioli acted "under color of law" when he used force to restrain Acevedo during their altercation in Mattioli's home. *See Schertz v. Waupaca Cnty.*, 875 F.2d 578, 581 (7th Cir. 1989). Because the undisputed facts confirm that Mattioli was acting in his private capacity and not under color of state law when he used force against Acevedo, the Estate's federal claims fail as a matter of law.

An individual acts "under color of state law" for purposes of Section 1983 when he or she engages in misconduct while exercising power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988). The record confirms that, at the time of the incident, Mattioli was both employed as a Milwaukee police officer, (ECF No. 72 at 2 ¶3; ECF No. 85 ¶¶3–4), and off duty, (ECF No. 72 at 2 ¶7). Neither fact is dispositive. The Seventh Circuit has confirmed that a defendant's "mere status as a policeman" does not necessarily render his actions under color of law. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1516 (7th Cir. 1990). Similarly, a defendant need not have been "actively assigned" or on duty to perform an official action under color of law. *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995); *see also Gibson*, 910 F.2d at 1516 n.10. Whether a defendant was acting under color of law instead depends on the nature and context of the specific acts undertaken. *Pickrel*, 45 F.3d at 1118. The defendant must undertake those actions pursuant to "the cloth of state authority." *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989). In other words, he or she must invoke or affirmatively exercise state authority to facilitate or enable the alleged unconstitutional misconduct. *See DiDonato v. Panatera*, 24 F.4th 1156, 1161–62 (7th Cir. 2022). If the state employee does not invoke state authority to facilitate or enable misconduct, there can be no constitutional claim under Section 1983. *See id*.

Analyzing whether a state employee defendant acted under color of law is thus inherently fact-bound, but the Seventh Circuit has laid out several clear lines underpinning the analysis. In *First Midwest Bank, Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978 (7th Cir. 2021), the Seventh Circuit addressed similar claims against an off-duty police officer who engaged in violent conduct against a friend while at home after a night of drinking. In *LaPorta*, the defendant-officer got into a drunken altercation in his own home with his friend after a dispute involving the officer hitting his dog. *Id.* at 983. When the plaintiff yelled for him to stop and announced he was leaving, the officer shot him in the head. *Id.* Following a jury verdict in the plaintiff's favor, the Seventh Circuit vacated the judgment and remanded the case with instructions to enter judgment in favor of the defendants. *Id*. The Court of Appeals held that, based on the facts, the police officer was not acting under color of law when he shot the plaintiff. *Id.* at 987. The Court explained that because the defendant officer's actions were "wholly unconnected to his duties" as an officer and were "those of a private citizen in the course of a purely private social interaction," the defendant was entitled to judgment as a matter of law. *Id*.

In *DiDonato*, the Seventh Circuit affirmed the dismissal of constitutional claims against an off-duty paramedic, who was accused of sexually assaulting a young woman who had a medical emergency at his home. 24 F.4th at 1158. The plaintiff alleged that she had slipped, fallen, and injured her head in the bathtub of the paramedic's home. *Id.* at 1158. The defendant paramedic rinsed the blood from her head, wrapped it in a towel, and then proceeded to sexually assault her. *Id.* The Court of Appeals affirmed the district court's dismissal of the plaintiff's Fourteenth Amendment Due Process claims, concluding that the plaintiff's allegations were insufficient to support a finding that the defendant acted under color of law. *Id.* at 1161. The Court explained that the defendant's state employment as a paramedic and the "overlap" between his job responsibilities and the misconduct alleged did not support a finding that he acted under color of law. *Id.* It noted that the allegations might expose him to state law negligence liability, but the complaint did not plausibly allege that defendant's actions or inactions were a misuse of any power his city employer had bestowed upon him. *Id.* Nor did the allegations suggest that his wrongdoing was made possible because he was "clothed" with authority by virtue of state law. *Id.* The Court further explained that allegations the paramedic was "on call" at the time did not matter because the alleged misconduct was not "facilitated" by any misuse of state power and did not involve the "invocation" of any state authority. *Id.* at 1162.

In contrast to *LaPorta* and *DiDonato*, the Seventh Circuit reversed a district court's dismissal of claims against an off-duty police officer on "color of law" grounds in *Pickrel*. *See* 45 F.3d at 1118. The plaintiff in *Pickrel* alleged that she was wrongfully arrested by an off-duty police officer who worked as a part-time private security guard at a McDonald's restaurant. *Id.* at 1117. According to the complaint, the defendant approached the plaintiff and her father and threatened to arrest them if they did not leave. *Id.* When they refused his instructions, he directed the plaintiff to stand up and announced that she was "under arrest." *Id.* When she did not immediately comply, he then used force to pull her from her booth, stand her up, throw her to the ground, and put her in handcuffs until on-duty police officers took her and her father into custody. *Id.* The Seventh Circuit rejected the district court's conclusion that dismissal was appropriate simply because the officer was off-duty. *Id.* at 1118. The Court of Appeals explained that a jury could find that the defendant acted under color of law given that he was wearing his police uniform (complete with badge and gun), had parked his squad car just outside (advertising his presence as a police officer), and had actually told her he was "arresting" her for resisting a peace officer. *Id.*

at 1118–19. These allegations were sufficient for the plaintiff to proceed with her constitutional claims past the pleading stage. *Id.* at 1119.

Based on these principles and precedents, the Estate's constitutional claims against Mattioli fail because the undisputed facts establish that he was not acting under color of law when he fought with and subdued Acevedo while off duty in his own home on the night and early morning of April 18 and April 19, 2020. Like the defendant in *LaPorta*, Mattioli's actions were "wholly unconnected to his duties" as an officer and were "those of a private citizen in the course of a purely private social interaction." 988 F.3d at 987. While the fight in *LaPorta* related to a dispute over the drunken mistreatment of a pet, and the disagreement here began with a drunken quarrel over a potential theft, in both cases, the defendants were off-duty officers acting as any private citizen might within his or her own home. Although Mattioli's conduct in physically subduing and restraining Acevedo might "overlap" with his duties as a police officer, *DiDonato* makes clear this is insufficient to show that Mattioli was acting under color of law. 24 F.4th at 1161 ("[T]he mere overlap between [] routine job responsibilities and the conduct [] complained of does not mean that [the official] acted under color of state law[.]"). Likewise, nothing in Mattioli's request that the responding officer handcuff Acevedo supports a finding that he was invoking state authority. At most, he was asking for help in turning over a previously violent person to the police. There is no evidence that Mattioli undertook any of his efforts "clothed" with any authority he had as a City of Milwaukee police officer. Nor has the Estate come forward with facts indicating that Mattioli invoked his authority as a police officer in combatting or holding Acevedo down until on-duty police officers arrived to take him into custody.

In response, the Estate points out that Mattioli was wearing a t-shirt with the Milwaukee Police Department logo during the altercation. (ECF No. 72 at 5 ¶¶24–26.) But the shirt was not department-issued. It was a memorial t-shirt recognizing a Milwaukee police officer who had been killed in the line of duty. (*Id.* at 5 ¶¶26–27.) Mattioli's wearing of such a t-shirt to bed in his own home cannot reasonably be understood to suggest that he was clothing himself with police authority when he was responded to Acevedo rummaging through his pants pockets. No record facts suggest that Mattioli used, or that anyone in the house would have understood, the shirt to be a demonstration that Mattioli was acting under color of law. This is a far cry from the full police uniform, including badge, gun and nearby squad car, that the Seventh Circuit held was enough, when presented in connection with the off-duty officer's announcement of an "arrest," to allow the

plaintiff in *Pickrell* to survive a motion to dismiss. The Estate has had the chance to develop the record in discovery and has presented no evidence that Mattioli's wearing of this t-shirt would have reasonably given anyone the impression he was acting as a police officer in his altercation with Acevedo.

The Estate also points to the fact that Mattioli (truthfully) relayed that he was an off-duty police officer on the 911 call and confirmed this fact to the arresting officers when they arrived. According to the Estate, these facts show that Mattioli affirmatively invoked his authority because "[r]esponding officers deferred to Mattioli's assertion of police authority rather than treating him as a private actor." (ECF No. 71 at 6–7.) The record does not support this strained characterization. Nothing in the 911 call or in the body cam footage of Mattioli's interactions with on-duty officers indicates any attempt by him to "invoke" or assert any police authority. Rather, the evidence shows that, while Mattioli informed the dispatcher that he was a police officer, Peters told responding officers that Mattioli was a police officer, and, when asked, Mattioli confirmed that fact. (ECF No. 61-5 at 3:02–3:45.) Whether responding officers treated Mattioli differently upon that knowledge does not necessarily mean that Mattioli invoked his own police authority. The Estate also insists that Mattioli's identification as an off-duty officer is material because "[a] private citizen never identifies themselves as a police officer." (ECF No. 86 at 4.) But police officers "are also private citizens," *see Lindke v. Freed*, 601 U.S. 187, 196 (2024), and, as already explained, a defendant's status as a police officer is insufficient to establish that a person acted under color of law, *Gibson*, 910 F.3d at 1516. That Mattioli found his status as an off-duty police officer to be relevant background information when talking to the 911 dispatcher does not necessarily mean he invoked his police authority.

The Estate also maintains that, during the 911 call, Mattioli requested "back up," suggesting that he was taking the lead on an official police arrest. (ECF No. 74 ¶3.) But this "fact" is not supported by the evidence. It is true that in answering the complaint, Mattioli admitted, "upon information and belief," that other officers responded to what *the Estate* characterized as "Mattioli's request for back up." (ECF Nos. 23 ¶14 & 26 ¶14.) But these are not the words that Mattioli actually used. (ECF No. 73-1 at 86:24–87:3 (confirming during Mattioli's deposition that, during the 911 call, Mattioli said "I need help"); ECF No. 61-4 at 00:15–00:25 (recording of the 911 call).) Nothing in the language Mattioli used would support a finding that he was clothing his actions in police authority or otherwise acting under color of law in connection with making

the 911 call, something that any private citizen engaged in a physical altercation with a house guest who refused to leave might do.

Finally, the Estate points to Mattioli's deposition testimony in which he admitted that while fighting with and detaining Acevedo, he went over in his mind the multiple crimes, including physical assault, robbery with the use of force, theft from a person, and property damage, he believed Acevedo had committed. (ECF No. 91 at 9 ¶33.) Mattioli's *internal* thoughts are not evidence that he clothed his actions with or invoked any state authority. As *DiDonato* makes clear, it is a defendant's affirmative statements and actions expressing the use of state power that are central to the color of law analysis. *See* 24 F.4th at 1162.[3]

In the end, none of the facts cited by the Estate, whether viewed individually or together, are sufficient for a reasonable jury to find that Mattioli acted under color of law in fighting with and restraining Acevedo. Accordingly, the Estate's federal claims against Mattioli and the City fail as a matter of law. Given the dismissal of the federal law claims, the Court will relinquish jurisdiction over the Estate's remaining state law claims. *See Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008). The Court also notes that the Estate may have undercut its ability to pursue its state law claims by failing to follow state law notice requirements. (*See* ECF No. 72 ¶13; ECF No. 52 at 15–16; ECF No. 64 at 25); *see also* Wis. Stat. §893.80; *Estate of Swayzer v. Milwaukee Cnty.*, No. 16-cv-1703-bhl, 2022 WL 656884, at *21–*22 (E.D. Wis. Mar. 4, 2022). The Court will not delve into this technical state law issue, however, and will instead leave it for the state courts to address, if necessary.

---

[3] The Estate also points in passing to a *draft* Fire and Police Commission (FPC) charging document alleging a violation of FPC Department Rule 3 (Integrity), Section 3.03, which directs police officers to exercise the powers of arrest only when lawful, necessary, and proportionate. (ECF No. 71 at 4–5.) Contrary to the Estate's characterization, this document does not reflect "official" charges against Mattioli; it is a draft. (*Id.* at 5; ECF No. 84 ¶¶67–68 (citing ECF No. 73-2 (charges from June 15, 2020)); *see also* ECF No. 80-8 at 105:1–106:5 (explaining that the document issued on June 15, 2020 was a draft charging document); 109:17–110:23 (explaining that the FPC charges from July 10, 2020 were the official charges).) The record confirms the FPC did not ultimately charge Mattioli with making an arrest as a police officer or otherwise suggest he acted under color of law. (*See* ECF No. 84 ¶63; *see also* ECF No. 87-3 at 1.) And, in any event, an after-the-fact draft of potential charges does not alter the undisputed facts of the incident or retroactively imbue Mattioli's actions with police authority.

## CONCLUSION[4]

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendant Mattioli's Motion for Summary Judgment, ECF No. 51, is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment, ECF No. 55, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant City of Milwaukee's Motion for Summary Judgment, ECF No. 59, is **GRANTED**.

**IT IS FURTHER ORDERED** that the two Motions in Limine, ECF Nos. 66 & 94, are **DENIED as moot**.

**IT IS FURTHER ORDERED** that Defendant City of Milwaukee's Expedited Motion for Leave to File a Reply Brief, ECF No. 88, is **GRANTED**.

Dated at Milwaukee, Wisconsin on March 16, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

---

[4] The Court must dispose of three remaining motions: the City's unopposed motion for leave to file a late reply, (ECF No. 88), and two pending motions in limine, (ECF Nos. 66 & 94). The motion for leave to file a reply will be granted, while the motions in limine will be denied as moot.